IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

DEANDRE BETHEL,                          )
                                         )
                    Petitioner,          )
                                         )
v.                                       )        Case No. CF-2012-660
                                         )
STATE OF OKLAHOMA                        )
                                         )
                    Respondent.          )
                                         )

## APPLICATION FOR POST-CONVICTION RELIEF
## BRIEF-N-CHIEF

Mr. Bethel is proceeding pro se, under *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1087 (2007); *Andrews v. Heaton*, 483 F.3d 1070, 1116 (10th Cir. 2007); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 562 (1972) (Taking into account that a pro se pleading is to be held to a less stringent standard than one formally submitted by an attorney); and claims *Hughes v. Rowe*, 449 U.S. 4, 9, 101 S.Ct. 173 (1980) (The Court must review liberally and interpret pro se arguments to raise the strongest arguments that they suggest.). Mr. Bethel prays the Court's forbearance in reviewing the Habeas Petition.

## BACKGROUND

February 4, 2012, Bryon Ivory, Ernest Roberts and Bradley Jarrett pulled into the parking lot of Club Pink at approximately 1:40 a.m. As the men sat in the vehicle, another car pulled into the parking lot, parking behind the victims with their lights on. One individual approached the vehicle, while Mr. Roberts was exiting Mr. Ivory's vehicle. The person asked Mr. Roberts did he know him. Mr. Roberts said, "No." The assailant pulled a gun and stuck it in Mr. Roberts' ribs. Mr. Roberts took out his wallet and cell phone, offered the wallet and cell phone to the assailant as an escape mechanism, turned and ran. Roberts' jumped over a four-foot wall with a five-foot drop-off on the other side. Mr. Jarrett also exited the vehicle and ran, but before running saw two individuals

standing beside the car parked behind them. Mr. Jarrett ran so hard that he ran out of his Nikes. There was shooting and a short time later Mr. Ivory was discovered dead from gun shot wounds.

Several Tulsa Firefighters witnessed two cars leaving the parking lot in a hurry. They described one of the vehicles as a white Chevy Cobalt. Several hours later Mr. Bethel was discovered sleep at an intersection street light in a white Chevy Cobalt and a gun in the passenger seat. Mr. Bethel was arrested for Public Intoxication and Possession of a Firearm and bonded out of jail. Police later tested the weapon and discovered that it was one of the weapons used in the shooting of Mr. Ivory. During and after both arrests Mr. Bethel consistently proffered to police officers that he had bought the gun that morning from someone named Rio. Mr. Bethel was charged and convicted by a jury of Felony Murder with the underlying felony of First Degree Robbery with a Firearm. Mr. Bethel was sentenced to life with the possibility of parole. From this sentence Mr. Bethel request post-conviction relief.

During his time of incarceration, Mr. Bethel did his own investigation as to what happened at Club Pink that night. He discovered that the incident was not a robbery, but retaliation of an ongoing feud between Bryon Ivory and Laharry Myers. Mr. Bethel, also, discovered that there were witnesses present that could testify that he was not present during the altercation and didn't participate. (See Affidavits).

**PROPOSITION I.  ACTUAL INNOCENCE**

Petitioner presents reliable newly discovered evidence supporting the allegation of constitutional error of ineffective assistance of trial counsel for failing to research, interview and call DeAndre Williams and Elza Riley as witnesses to testify at trial. Mr. Williams and Mr. Riley would testify at trial that they were present at the scene and Mr. Bethel was not present and did not participate in an armed robbery and that there was no robbery, but that the crime was retaliation for a previous altercation between the two men. *See attached affidavits.*

The "fundamental miscarriage of justice" exception to the procedural bar doctrine applies "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." ***Murray v. Carrier***, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); see also ***Herrera v. Collins,*** 506 U.S. 390, 400-404, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993); ***Sawyer v. Whitley***, 505 U.S. 333, 339-41, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992); ***Schlup v. Delo***, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). To meet this test, a criminal

defendant must make a colorable showing of factual innocence. *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000) (citing Herrera, 506 U.S. at 404). "The miscarriage of justice exception, . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1933, 185 L. Ed. 2d 1019 (2013) (quoting Schlup, 513 U.S. at 329) (internal quotation marks omitted). Under Schlup, a showing of innocence sufficient to allow consideration of procedurally barred claims must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error . . . ." *Schlup*, 513 U.S. at 316. The petitioner must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Id.* at 324.

A. NEWLY DISCOVERED EVIDENCE OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, § 20 OF OKLAHOMA'S CONSTITUTION FOR FAILING TO DISCOVER EVIDENCE AND FAILING TO FILE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO INTERVIEW, INVESTIGATE AND CALL DEANDRE WILLIAMS AND ELZA RILEY TO TESTIFY AT TRIAL

Appellate counsel failed to discover evidence of eyewitness testimony of Elza Riley. Further appellate counsel's failure to make the proper argument in the direct appeal brief was below professional norms and prejudiced the appeal. Had the waived information been included in the brief, then it would have demonstrated that Mr. Bethel was actually innocent of the crimes in which he was convicted. Whereby, Appellate counsel was ineffective.

1. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT THE TESTIMONY OF CRITICAL, AVAILABLE DEFENSE WITNESSES AT TRIAL, VIOLATING MR. BETHEL'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 30 OF THE OKLAHOMA CONSTITUTION

Despite the fact that this claim was a critical issue in the case, defense counsel failed to secure the attendance of these witnesses who could provide corroboration to Mr. Bethel's statements that he bought the gun after the fact. Mr. Bethel repeatedly told police he had bought the .40 caliber pistol shortly before he was arrested.

Appellate counsel was ineffective for failure to file ineffective assistance of trial counsel for failure to investigate, interview and call DeAndre Williams and Elza Riley as witnesses at trial. Both eyewitnesses would testify that they were present at the crime scene, that there was no robbery, but the crime was a retaliation for a previous altercation between two men and that Mr. Bethel was not present at the time. Trial counsel's failure to investigate, interview, and call Mr. Williams and Mr. Riley as witnesses for the defense was ineffective assistance of counsel. Appellate counsel's failure to discover and submit the claim on direct appeal demonstrates appellate counsel's ineffectiveness prejudiced Petitioner's appeal. Both counsels' unprofessional errors effected both the outcome of the trial and the appeal.

Neither trial counsel nor appellate counsel discovered the information discovered by Mr. Bethel. Mr. Bethel discovered the information through his own investigations and both attorneys had the opportunity to discover the evidence and did not. The evidence and the eyewitnesses were available if counsels had properly investigated, interviewed the witnesses. However, due to ineffective assistance of both counsels, counsels failed to discover the evidence. Petitioner claims due to ineffective assistance of counsels the evidence was not presented at trial or on appeal and that the court should determine the effectiveness of trial counsel and appellate counsel when considering whether the evidence is material and whether the evidence creates a reasonable probability that, had it been introduced at trial or on appeal that it would have changed the outcomes.

## STANDARD OF REVIEW

Post-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See *Smith v. Robbins*, 528 U.S. 259, 289, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000) ("[Petitioner] must satisfy both prongs of the Strickland test in order to prevail on his claim of ineffective assistance of appellate counsel."); *Coddington*, 2011 OK CR 21, P 3, 259 P.3d at 835; *Davis v. State*, 2005 OK CR 21, P 7, 123 P.3d 243, 246. Under *Strickland*, a petitioner must show both (1) deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding (in this case the appeal) would have been different. *Strickland*, 466 U.S. at 687-89, 104 S.Ct. at 2064-66. And we recognize that "[a] court considering a claim of ineffective assistance of

4

counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065).

In reviewing a claim of ineffective assistance of appellate counsel under *Strickland*, a court must look to the merits of the issue(s) that appellate counsel failed to raise. See *Malicoat v. Mullin*, 426 F.3d 1241, 1249 (10th Cir. 2005) ("[I]n certain circumstances, appellate counsel's omission of an issue may constitute ineffective assistance under *Strickland*. In analyzing such claims, the court must consider the merits of the omitted issue." (citing *Robbins*, 528 U.S. at 288, 120 S.Ct. at 765-66*)); Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) ("The very focus of a Strickland inquiry regarding performance of appellate counsel is upon the merits of omitted issues, and no test that ignores the merits of the omitted claim in conducting its ineffective assistance of appellate counsel analysis comports with federal law."). In the context of ineffective assistance of appellate counsel claims, only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient (due to failing to raise the omitted issue(s)) and also whether the failure to raise the omitted issue(s) on appeal prejudiced the defendant, *i.e.*, whether there is a reasonable probability that raising the omitted issue(s) would have resulted in a different outcome in the defendant's direct appeal (e.g., a reversal, new trial, new sentencing proceeding, or sentence modification). In the context of ineffective assistance of appellate counsel claims, only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient (due to failing to raise the omitted issue(s)) and also whether the failure to raise the omitted issue(s) on appeal prejudiced the defendant, i.e., whether there is a reasonable probability that raising the omitted issue(s) would have resulted in a different outcome in the defendant's direct appeal (e.g., a reversal, new trial, new sentencing proceeding, or sentence modification). *Id. Logan v. State*, 293 P.3d 969, 974 (Okl. Cr. 2013).

Petitioner will prove that the oversight of appellate counsel prejudiced the appeal, by demonstration that trial counsel was ineffective for failing to uphold the constitutional level of representation as determined by the *Sixth Amendment* of the United States Constitution. Petitioner also demonstrates that Mr. Bethel was prejudiced and but for counsels' unprofessional errors there would have been a different outcome in the trial. See below.

# ARGUMENT AND AUTHORITIES

The murder of Byron Ivory was retaliation for a previous altercation between the two (2) men. The suspects in the white car knew Mr. Ivory and called Mr. Ivory to Club Pink to retaliate for a previous altercation. See Exhibits **1 & 2**, Affidavit from Elza Rily and DeAndre Williams, who were present at Club Pink to witness the fight between the two (2) men. Mr. Williams later plead guilty to Accessory After the Fact in the instant matter. This altercation was not a robbery and was never intended to be a robbery. The underlying felony of First Degree Robbery With a Firearm did not occur, evidenced by that amount of guns involved in the crime.

*First,* there was an altercation between (2) rival groups of black males inside the club that caused a ruckus. Several members of one of the groups were escorted from the club (Tr. 335-39).

*Second,* there was video of *three* (3) suspects leaving in a white car (Tr. 797), but evidence of four (4) guns being fired (Tr. 715). The suspect shooter, later identified by Mr. Williams and Mr. Riley as Laharry Myers a/k/a L.J., was the person holding the gun on the robbery victim. The hypothesis that Mr. Ivory possessed the fourth weapon and this was an altercation between two (2) rivals was never presented or considered by the jury. The jury was unaware that the two (2) men knew each other and that there was an ongoing feud.

It is conceivable that one of the four guns belonged to the victim. There is also evidence that this was not a robbery. The testimony of the robbery victim was that his property was not demanded, but that when he felt a gun on his torso that he volunteered his property without provocation and for the purpose of escape (Tr. 370, 384). The evidence further indicates that Mr. Ivory, the only victim that did not run was not robbed. Factually, part of the robbery victim's property that was volunteered was found under Mr. Ivory (Tr. 801). The robbery victim threw the property, turned, and ran, jumping a four-foot wall with a five-foot drop. The victim ran out of his Nikes, in the nightclub parking lot with people milling around. The missing cell phone could have been lost and/or recovered by anyone. The death of Mr. Ivory was not the result of a robbery, but in retaliation of an ongoing feud between the two men. The conviction of First Degree Robbery with a Firearm as a prerequisite for the Felony Murder conviction of Mr. Bethel did not occur.

## 1.   BELOW PROFESSIONAL NORMS

A criminal defense lawyer has a duty to conduct reasonable investigations into his client's case, which extends to the law as well as the facts. See *Strickland*, 466 U.S. at 690-91. As that duty pertains to investigation of the law, counsel is obligated to research relevant law to make an informed decision whether certain avenues will prove fruitful." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482, 176 L. Ed. 2d 284 (2010) (describing the ABA's standards as "valuable measures of the prevailing professional norms of effective representation"). The extent to which counsel will be obligated to investigate in order to perform at a constitutionally adequate level of competency will vary case by case: as the Supreme Court observed in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. But "[a] decision not to investigate cannot be deemed reasonable if it is uninformed." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002). Petitioner request the trial court to determine whether trial counsel's failure to utilize this evidence could be considered a sound trial strategy and that the trial court should find Petitioner's counsel's "failure to discover" was not sound trial strategy and conclude that counsel's notion not to investigate and call eyewitnesses is founded upon ineffective assistance of counsel. See *Glossip v. State*, 2001 OK CR 21, P20, 29 P.3d 597, 601.

Petitioner claims, due to ineffective assistance of counsels, the evidence was not presented at trial or on appeal and that the court should determine the effectiveness of trial counsel and appellate counsel when considering whether the evidence is material and whether the evidence creates a reasonable probability that had the evidence been introduced at trial or on appeal, it would have changed the outcomes.

### a.   FAILURE TO INVESTIGATE, INTERVIEW AND CALL WITNESSES

Trial counsel was ineffective for failing to call DeAndre Williams and Elza Riley as witnesses. Due to newly discovered evidence of affidavits from Mr. Williams and Mr. Riley, where they state that they would had testified at trial that Mr. Bethel was not present at the night club at the time of altercation.

Both witnesses had specific facts that could only be obtained if they witnessed the events of the crime. The witnesses' testimonies were crucial to the determination of guilt or innocence of Mr. Bethel. However, neither of the eyewitnesses were interviewed, investigated, or called as a witness by trial counsel or their information used in the direct appeal.

The extent to which counsel will be obligated to investigate in order to perform at a constitutionally adequate level of competency will vary case by case. In the instant matter, counsel did not call any witnesses on behalf of Petitioner. The only witness that showed at trial and testified for the defense was Mr. Bethel. Defense counsel had a duty to investigate all strategies of defense and to call all relevant witnesses to testify on behalf of the defense of Petitioner. Defense counsel did not interview, investigate, or call Mr. Williams or Mr. Riley as witnesses. This establishes the first prong of *Strickland*. The testimony of Mr. Williams coupled with the testimony of Mr. Riley are both surpassingly missing from the trial and appeal and is evidence of ineffective assistance of counsels.

It cannot be said that trial counsel made a strategic decision not to call these witnesses or that he was unaware of these witnesses, because Mr. Williams was a co-defendant of Mr. Bethel's and the cases were severed. It cannot be said that appellate counsel was unaware of Mr. Williams.

Had Mr. Williams testified that he saw Mr. Myers commit the crime and did not see Mr. Bethel would have effected the jury's verdict. The same is true involving the testimony of Mr. Riley. What the jury should have heard was two (2) eyewitnesses (Williams and Riley) testify that Petitioner was not at the scene of the crime. Verses circumstantial evidence of Mr. Bethel ending up with one of the weapons used in a crime the following morning. The jury should of heard testimony from these eyewitnesses that this was not a robbery, but there was an ongoing feud between the two men and they both had guns and further testimony that Mr. Bethel was not present. The additional testimony from Mr. Williams and Mr. Riley was crucial to the determination of the jury's verdict.

The failure of trial counsel and appellate counsel to interview, investigate, and call to testify Mr. Williams and Mr. Riley is ineffective assistance of counsel. A criminal defense lawyer has a duty to conduct reasonable investigations into his client's case, which extends to the law as well as the facts. See *Strickland*, 466 U.S. at 690-91. As that duty pertains to investigation of the law, counsel is obligated to research relevant law to make an informed decision whether

certain avenues will prove fruitful." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). But "[a] decision not to investigate cannot be deemed reasonable if it is uninformed." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002). Trial counsel and appellate counsel was uninformed and failed to reasonably investigate and call crucial eyewitnesses to testify to Mr. Bethel's innocence. Both counsel's performance by precedent is below professional norms, which satisfies the first prong of *Strickland*.

## 2. PREJUDICE

The jury's failure to hear contrary testimony to unreliable circumstantial evidence prejudiced Mr. Bethel. Had the jury heard from Mr. Williams (an accessory after the fact) and Mr. Riley an eyewitness to contradict the circumstantial evidence, it would have caused the jury to determine the truth and that Mr. Bethel was not present during the time of the crime, whereby determining his actual innocence. Mr. Williams has nothing to gain or lose by testifying that Petitioner was not present. Mr. Riley has nothing to gain by volunteering his testimony either. On the other hand, the absence of these eyewitnesses caused Mr. Bethel prejudice. This is demonstrated by Williams' and Riley's affidavits, swearing that Mr. Bethel was not present at the crime.

It was imperative that the jury heard the testimony of Mr. Williams and Mr. Riley. The absence of the testimony prejudiced Petitioner, because the jury was not allowed to judge between the testimony of the eyewitnesses and the circumstantial evidence. Only Mr. Williams and Riley could truly say what happened and who was there that night and that trial counsel nor appellate counsel interviewed, investigated or called either of the witnesses. This is crucial testimony that was necessary for the determination of guilt or innocence. This determination is the essence and only factor of Mr. Bethel's conviction.

Whereby, the absence of the testimony of Mr. Williams testifying that he did not witness Mr. Bethel at the crime scene and the absence of the testimony of Mr. Riley that he also failed to witness Mr. Bethel at the crime scene prejudiced the Mr. Bethel and affected the outcome of the trial.

Both counsels did not complete and analyze the evidence likely to be introduced at trial or on appeal. If counsels had made a complete investigation, they would of interviewed Mr. Williams and Mr. Riley and known that they were willing to testify at trial that Petitioner was not

present at the crime scene. The extent to which counsel will be obligated to investigate in order to perform at a constitutionally adequate level of competency will vary case by case: as the Supreme Court observed in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. But "[a] decision not to investigate cannot be deemed reasonable if it is uninformed." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002). Counsels' failures to investigate, interview, or call Williams and Riley as witnesses can not be considered reasonable. There is no evidence that counsels had reasons not to investigate the aforementioned witnesses. Here, the only evidence against Mr. Bethel is that he possessed a weapon used the night of the crime. The calling of eyewitnesses Williams and Riley in contradiction to the circumstantial evidence was reasonable and would had changed the outcome of the verdict.

Therefore, counsels were unreasonable for not interviewing, investigating, and calling Williams and Riley to testify on behalf of the defense or using the information in the appeal. The testimony of the absent eyewitness would had affected the verdict, effected the appeal and demonstrated that Mr. Bethel is actually innocent. Therefore Mr. Bethel is prejudiced.

Petitioner has demonstrated that he is actually innocent of Robbery with a Firearm and Felony Murder because he was not present at the crime scene as sworn to by the eyewitnesses. The affidavit from Mr. Williams demonstrates that Mr. Bethel was not present at the scene of the crime. The affidavit of Riley also demonstrates that Mr. Bethel was not present at the crime scene. The jury was uninformed of Mr. Williams' and Mr. Riley's testimonies. Both their testimonies' were crucial to the defense of Mr. Bethel. Trial and appellate counsels' failure interview and call Mr. Williams or Mr. Riley as witnesses were unprofessional errors. Mr. Bethel has satisfied both prongs of in regards to ineffective assistance of trial and appellate counsel. The missing eyewitness satisfies the first prong of *Strickland*. The second prong of *Strickland* is satisfied by had the eyewitnesses been called it would have changed the outcome of both trial and the appeal. Wherefore, Petitioner has satisfied both prongs of *Strickland* in regards to ineffective assistance of appellate counsel.

Petitioner further claims his actual innocence because this case is a case in which new evidence shows it is more likely than not that no reasonable juror would have convicted Mr. Bethel after the aforementioned evidence was presented before a jury.

Wherefore, Petitioner request that the sentence be vacated and the case remanded back with instructions to dismiss.

Petitioner also requests that Mr. Williams and Mr. Riley be called as witnesses at an evidentiary hearing to determine the efficiency of trial and appellate counsels' effectiveness.

**B.** APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE TRIAL COUNSEL WAS INEFFECTIVE FOR NOT SUBJECTING THE PROSECUTION'S CASE OF ROBBERY WITH A FIREARM TO ADVERSARIAL TESTING AND CONCEDED THE ROBBERY CHARGE BY CONFESSING GUILT WITHOUT PERMISSION OF APPELLANT

## ARGUMENT AND AUTHORITIES

Appellate counsel was ineffective for failing to file trial counsel was ineffective for not subjecting the prosecution's case of First Degree Robbery with a Firearm to adversarial testing and conceded the robbery charge by confessing guilt without permission of appellant.

Defense counsel was ineffective for not subjecting the prosecution's case of First Degree Robbery with a Firearm the underlying felony to Felony Murder to adversarial testing. Mr. Bethel conceded guilt to Public Intoxication and Possession of a Firearm. However, trial counsel also conceded guilt to the First Degree Robbery With a Firearm charge during trial without consent from Mr. Bethel.

Defense Counsel on several occasions conceded that this was an intentional robbery – instead of challenging with adversarial testing the prosecution's case of robbery with a firearm. Had counsel challenged that the suspects had no intentions of taking away property (which is a required element of robbery) then the Petitioner could not have been convicted of the underlying felony of First Degree Robbery With a Firearm. Contrary to defense counsel's professional duty, his performance fell below the objective standard of reasonableness required by the *Sixth Amendment*. Instead of challenging the First Degree Robbery With Firearm charge, counsel stated that it was an intentional robbery, even though the assailant's had no intention of taking away property.

Petitioner will prove that the oversight of appellate counsel prejudiced the appeal, by demonstration that trial counsel was ineffective for failing to uphold the constitutional level of

representation as determined by the *Sixth Amendment* of the United States Constitution. See below:

## 1. BELOW PROFESSIONAL NORMS

The murder of Byron Ivory was retaliation for a previous altercation between the two (2) men. The driver of the white car (identified as Rio) knew Mr. Ivory and called Mr. Ivory to Club Pink so that LaHarry Myers could retaliate from the previous altercation. See Affidavits **1 & 2,** Affidavit from Elza Rily and DeAndre Williams, who were present at Club Pink and witnessed the incident between the two (2) men. Mr. Williams later plead guilty in the Murder as an accessory after the fact in the instant matter. The altercation was not a robbery and was never intended to be a robbery. The underlying felony of First Degree Robbery With a Firearm did not occur, evidenced by that amount of guns involved in the crime scene and the lack of taking of property.

*First,* there was an altercation between (2) rival groups of black males inside the Club Pink that caused a ruckus (Tr. 335-39).

*Second,* there was only one suspect thought to have a gun in the parking lot witnessed by the victims (Tr. 367-68). There was video of *three* (3) suspects leaving in a white car (Tr. 797), but evidence of four (4) guns being fired (Tr. 715). The suspect shooter, identified as LaHarry Myers a/k/a L.J. by Mr. Williams and Mr. Riley as the person holding the gun on the robbery victim was in an ongoing feud with the deceased victim. The hypothesis that Mr. Ivory possessed the fourth weapon and this was in a shootout between two (2) rivals was never presented or considered by the jury. The jury was unaware that the two (2) men knew each other and that there was an ongoing feud between the two.

It is conceivable that one of the four guns belonged to the victim. There is also evidence that this was not a robbery, through the testimony of the robbery victim that his property (cell phone and wallet) were not demanded, but that when he felt a gun on his torso that he volunteered his property without provocation to institute an escape (Tr. 370, 384). Further evidence indicates that Mr. Ivory, the only victim that did not run was not robbed. Factually, the robbery victim volunteered his property as an escape mechanism -- part of the property [his wallet] was found under Mr. Ivory (Tr. 801). The robbery victim threw the property and turned

and ran, jumping a four-foot wall with a five-foot drop, in a nightclub parking lot with people milling around. The cell phone could have been lost and/or recovered by anyone. The death of Mr. Ivory was not the result of a robbery, but retaliation of an ongoing feud between the two men.

Defense counsel was ineffective for not subjecting the prosecution's case of First Degree Robbery with a Firearm to adversarial testing and conceding that there was a robbery. Defense counsel conceded the Public Intoxication, Possession of a Firearm and on several occasions conceded that this was an intentional First Degree Robbery with a Firearm without the consent of Mr. Bethel. Had counsel challenged that the suspects had no intention of taking away property, then the appellant could not be convicted of the underlying felony of Robbery With a Firearm. Contrary to his professional duty, defense counsel's performance fell below the objective standard of reasonableness required by the *Sixth Amendment*. Defense counsel gave motive and demonstrated before the jury the vulnerableness of the victims. If there was a robbery, which is hard to determine and would be hard for a jury to determine if the charge was challenged, because the only alleged property taken is an absent cell phone, from a person that jumped a four-foot wall with a five-foot drop-off and ran out his shoes in a crowded nightclub parking lot. No one knows what actually happened to the cell phone.

*Third,* the volunteering of his property by the robbery victim does not indicate that the other suspects had prior knowledge that anything would be taken or knowledge that anything was taken. Prior knowledge and the intention to take away property are elements of First Degree Robbery. Due to the spontaneity of the victim volunteering his property [which might of saved his life, because it distracted the man with the gun long enough for him to run] it could not be proven beyond a reasonable doubt that the other suspects had knowledge or consented to taking of property. See *Rosemond v. United States,* 134 S.Ct. 1240, 188L.Ed.2d 248 (2014), the Supreme Court held, in order to aid and abet, a defendant must have advance knowledge that a crime will be committed. One of the "basics" of aiding and abetting robbery [in addition to taking away is the requisite act of intent] when he intends to facilitate that offense's commission." See also *Williams v. Trammell*, 782 F.3d 1184 (10th Cir. 2015), citing *Rosemond*, "Some mutual state beyond "mere assent" or "acquiescence" is also required. *Id. Wingfeild v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997). Whereby, if there was a robbery, which it could not be proven that there was without defense counsel's concession. There may have been a

spontaneous robbery, which did not elevate the other suspects of premeditation consensus that a robbery would be committed. The only person that offered any evidence of premeditated robbery or confessed culpability to the robbery was trial defense counsel.

Factually, defense counsel acknowledged the robbery, gave motive, opportunity and scenarios, whereby, robbery could be accomplished. Defense counsel admitted on two (2) occasions that the gun Bethel possessed was the murder weapon (Tr. 1020). Defense counsel further gave motive, "And so from about 1:30 to 2:00 a.m. in the morning, you have what is called a target-rich environment, if you're a crook. You have lots of people, many of whom are inebriated, getting out of the bar at the same time, going to their cars, and they often have money and stuff and they have their keys. So predators tend to wander by at such times (Tr. 1021) ..."Robbery crews are working the area at this time... (Tr. 1022). Defense counsel concedes that there was a robbery and that it was intentional, which he was the only person to offer any evidence or confess culpability to robbery. Defense counsel's concession may not have been directly confessing the robbery, but overtly confessed that the victims were seasoned for a robbery and that robbery crews were working the area. The evidence introduced through affidavits supports the evidence that this was not a robbery. This demonstrates ineffective assistance of trial counsel. Mr. Bethel had not intended to confess to guilt of robbery and counsel's confession was without Petitioner's consent.

## 2. PREJUDICE

The Oklahoma rules of Professional Conduct govern attorney conduct in this state. These rules do not lay the groundwork for claims of ineffectiveness, but they are pertinent to any discussion of attorney conduct when the rules touch on subjects raised in a claim of ineffectiveness. The rules set forth the necessity of open consultation between attorneys and clients; furthermore, some decisions are left to the client after such consultation. "In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." Rule 1.2, Rules of Professional Conduct, 5 O.S.1991, Ch.1, App. 3-A. "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.4(b), Rules of Professional Conduct, 5 O.S.1991, Ch.1, App. 3-A. Likewise, the decision to concede guilt must be the client's ultimate decision.

The prosecution was required to prove robbery. Whereby, defense counsel's declaration of robbery proved the prosecution's case determining guilt to the robbery. Defense counsel gave motive and situations whereby the robbery could be accomplished. Had counsel not conceded that the victims were primed and ready to be robbed and that there was a robbery, whether directly or overtly, then the state was required to prove the robbery. The concession allowed the jury to agree with counsel that a robbery had occurred and convicted Mr. Bethel of First Degree Robbery with a Firearm. This prejudiced Mr. Bethel. See *Jackson v. State*, 2001 OK CR 37, ¶ 25, 41 P.3d 395, 400 ("[a] complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence.") Defense counsel's declaration of robbery prejudiced Mr. Bethel. Had counsel not made the declaration that a robbery was committed then there is a reasonable probability that the outcome of the trial would have been different.

Under *Strickland*, Mr. Bethel proves both (1) deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable by conceding the robbery, and (2) resulting prejudice by Mr. Bethel being convicted of the robbery by counsel's concession. Wherefore there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-89, 104 S.Ct. at 2064-66.

Wherefore, Mr. Bethel was prejudice by counsel's concession to robbery. Therefore, ineffective assistance of trial counsel has been established and the court should remand Mr. Bethel's case, because his *Sixth Amendment* right to effective assistance was violated.

## CONCLUSION

Actual innocence is demonstrated above by the newly discovered evidence that both trial counsel and appellate counsel were ineffective for failing to discover critical reliable evidence of eyewitness testimony that would have determined that Mr. Bethel was not at the crime scene. Further, **Exhibit B.** in Petitioner's direct appeal, an affidavit from Wanda Janell Smith was submitted proving that Mr. Bethel was also not at the crime scene and he later left Ms. Smith to go purchase the weapon that was involved in the crime. In light of the evidence discovered after trial, had trial counsel presented the testimony of Ms. Smith, Mr. Williams, and Mr. Riley demonstrating that he was not at the crime scene verses the circumstantial evidence, there is a

strong probability that the jury's decision would have been different. As a matter of fact, if the prosecution would have properly interviewed the aforementioned witnesses, there is a strong possibility that the state would not have pursued prosecuting Mr. Bethel at all. Further, had trial counsel investigated, interview, and called the witness the outcome of the trail would have been different. In addition, had appellate counsel discovered the evidence and introduce it in Mr. Bethel's appeal would have produced a different outcome of the appeal. Mr. Bethel is specifically innocent of the underlying felony of First Degree Robbery with a Firearm. The witnesses' affidavits prove that the crime was not a robbery, but the retaliation of a long ongoing feud between two (2) rivals. Because there was no robbery, then Mr. Bethel cannot be convicted of the underlying felony, which results in innocence of the Felony Murder.

Wherefore, for the aforementioned reasons the absent witnesses prejudiced Mr. Bethel and he is actually innocent of the conviction. Therefore, he requests an evidentiary hearing, where the critical absent witness evidence can be used to determine counsels' ineffectiveness and after reaching such a conclusion the court must determine that Mr. Bethel is actually innocent. Whereby, the conviction should be vacated and remanded with instructions to dismiss.

RESPECTFULLY SUBMITTED

DeAndre Bethel
#690424
LCF-Lawton
8607 SE Flowermound Rd.
Lawton, OK

## CERTIFICATE OF VERIFICATION

I state under penalty of perjury under the laws of Oklahoma that the foregoing is true and correct.

9-26-16 Lawton, OK
**(Date and Place)**

**(Signature)**

Exhibit B

Case No. F-2014-336

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

### DEANDRE BETHEL

Appellant,

vs.

### THE STATE OF OKLAHOMA

Appellee.

Appeal from the
District Court of Tulsa County

## BRIEF OF APPELLANT

Jamie D. Pybas
Division Chief
Oklahoma Bar Assoc. No. 13000
Homicide Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

### ATTORNEY FOR APPELLANT

December 22, 2014

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE CASE .................................................... 1

STATEMENT OF THE FACTS .................................................. 2

PROPOSITION I

THE STATE'S EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE ALL THE ELEMENTS OF ROBBERY WITH A FIREARM AND THEREFORE ALSO INSUFFICIENT TO SUPPORT MR. BETHEL'S CONVICTION FOR FIRST DEGREE FELONY MURDER BASED ON THAT UNDERLYING FELONY. ACCORDINGLY, MR. BETHEL'S CONVICTIONS AND SENTENCES ON COUNTS I AND II SHOULD BE VACATED AS THEY ARE IN VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ................................. 11

PROPOSITION II

MR. BETHEL'S CONVICTION AND SENTENCE FOR COUNT II, ROBBERY WITH A FIREARM, MUST BE VACATED BECAUSE THE SAME CHARGE SERVED AS THE UNDERLYING FELONY FOR HIS CONVICTION OF FELONY MURDER, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, § 21 OF THE OKLAHOMA CONSTITUTION ................................................ 17

PROPOSITION III

THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER OFFENSES OF SECOND DEGREE DEPRAVED MIND MURDER, SECOND DEGREE FELONY MURDER, AND ACCESSORY AFTER THE FACT, IN VIOLATION OF MR. BETHEL'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ................................. 19

A.    Second Degree Depraved Mind Murder ........................... 20

B.    Second Degree Murder with Robbery by Force and Fear as the Underlying Felony ............................................... 22

C.    Accessory ........................................................ 24

i

**PROPOSITION IV**

      THE TRIAL COURT ERRED IN FAILING TO COMPLY WITH THE LAW GOVERNING CONTACT WITH JURORS DURING DELIBERATIONS AND BY FAILING TO ADVISE DEADLOCKED JURORS NOT TO SURRENDER THEIR HONEST CONVICTIONS CONCERNING THE WEIGHT OF THE EVIDENCE IN ORDER TO REACH A VERDICT, IN VIOLATION OF OKLA. STAT. TIT. 22, § 894 AND MR. BETHEL'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7, 19 AND 20 OF THE OKLAHOMA CONSTITUTION ............................... 26

**PROPOSITION V**

      MR. BETHEL'S TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR BY THE ADMISSION OF IMPROPER LAW ENFORCEMENT OPINION TESTIMONY THAT INVADED THE PROVINCE OF THE JURY IN VIOLATION OF HIS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ......... 32

**PROPOSITION VI**

      THE ADMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE CONTAINED IN STATE'S EXHIBIT 28, A TAPED RECORDING OF A PHONE CALL BETWEEN MR. BETHEL AND HIS MOTHER, RESULTED IN A VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ...................................................... 38

**PROPOSITION VII**

      IMPROPER VICTIM IMPACT TESTIMONY AND EVIDENCE WAS ADMITTED AT TRIAL, DEPRIVING MR. BETHEL OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7, 9 AND 20 OF THE OKLAHOMA CONSTITUTION ....... 40

    A.     The Admission of a Pre-mortem Photograph of the Victim ......... 40

    B.     Improper Victim Impact Evidence During Formal Sentencing ......................................................... 41

**PROPOSITION VIII**

      COUNTS III AND IV WERE IMPROPERLY JOINED AT MR. BETHEL'S TRIAL IN VIOLATION OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ...................................... 42

ii

**PROPOSITION IX**

    THE ADMISSION OF EVIDENCE OBTAINED AS A RESULT OF AN ILLEGAL SEARCH AND SEIZURE VIOLATED MR. BETHEL'S RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, SECTION 30 OF THE OKLAHOMA CONSTITUTION ........................................................ 44

**PROPOSITION X**

    MR. BETHEL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION ........ 46

    A.    Failure to Adequately Protect the Record with Appropriate Objections ........................................................ 46

    B.    Failure to Request Instructions on Appropriate Lesser Related Offenses ........................................................ 48

    C.    Failure To Present Critical, Available Defense Witnesses ............ 49

    D.    Conclusion ........................................................ 50

**CONCLUSION** ........................................................ 50

**CERTIFICATE OF SERVICE** ........................................................ 51

## TABLE OF AUTHORITIES

### CASES

<u>Allen v. United States</u>,
    164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) ........................... 29

<u>Andrew v. State</u>,
    2007 OK CR 23, 164 P.3d 176 ........................................ 39

<u>Avants v. State</u>,
    1983 OK CR 35, 660 P.2d 1051 ....................................... 16

<u>Aycox v. State</u>,
    1985 OK CR 83, 702 P.2d 1057 (Okl.Cr. 1985) ........................ 46

<u>Barnett v. State</u>,
    2011 OK CR 28, 263 P.3d 959 ........................................ 23

<u>Breshers v. State</u>,
    1977 OK CR 331, 572 P.2d 561 ....................................... 21

_Brogie v. State,_
    1985 OK CR 2, 695 P.2d 538 ................................................. 30

_Brown v. State,_
    1975 OK CR 191, 541 P.2d 242 ............................................... 39

_Buchanan v. State,_
    1974 OK CR 111, 523 P.2d 1134 .............................................. 39

_Capps v. State,_
    1984 OK CR 8, 674 P.2d 554 ................................................. 41

_Childress v. State,_
    2000 OK CR 10, 1 P.3d 1006 ................................................. 20

_Cody v. State,_
    1961 OK CR 43, 361 P.2d 307 ............................................... 40

_Coffia v. State,_
    2008 OK CR 24, 191 P.3d 594 ............................................... 18

_Commonwealth v. Kitchen,_
    730 A.2d 513 (Pa. 1999) ................................................... 32

_Curtis v. State,_
    1988 OK CR 220, 762 P.2d 981 .............................................. 37

_Dennis v. State,_
    1977 OK CR 83, 561 P.2d 88 ................................................ 21

_Drew v. State,_
    1989 OK CR 1, 771 P.2d 224 ................................................ 29

_Driver v. State,_
    1981 OK CR 117, 634 P.2d 760 .............................................. 48

_Dungan v. State,_
    1982 OK CR 152, 651 P.2d 1064 ............................................. 39

_Dunkle v. State,_
    2006 OK CR 29, 139 P.3d 228 ............................................... 46

_Dyke v. State,_
    1986 OK CR 44, 716 P.2d 693 ............................................... 43

_Fairchild v. State,_
    1999 OK CR 49, 998 P.2d 611 ............................................... 16

_Frazier v. State,_
    1981 OK CR 13, 624 P.2d 84 ................................................ 15

Galloway v. State,
   1985 OK CR 42, 698 P.2d 940 .............................................. 49

Gianfrancisco v. State,
   570 So. 2d 337 (Fla. App. 1990) .......................................... 32

Givens v. State,
   1985 OK CR 104, 705 P.2d 1139 ............................................ 28

Glass v. State,
   1985 OK CR 65, 701 P.2d 765 .............................................. 43

Higgins v. State,
   1972 OK CR 16, 493 P.2d 1121 ............................................. 29

Glossip v. State,
   2001 OK CR 21, 29 P.3d 597 ............................................ 24, 49

Grant v. State,
   2009 OK CR 11, 205 P.3d 1 ................................................ 40

Harris v. Oklahoma,
   433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) ..................... 19

Hicks v. Oklahoma,
   447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) .................... 23

Hogan v. State,
   2006 OK CR 19, 139 P.3d 907 .............................................. 37

Hooks v. State,
   2001 OK CR 1, 19 P.3d 294 ................................................ 29

Humphries v. State,
   18 So.3d 305 (Miss.Ct. App. 2009) ....................................... 22

In re Winship,
   397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ..................... 12

Jackson v. Virginia,
   443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ................... 12, 17

James v. State,
   2007 OK CR 1, 152 P.3d 255 ............................................... 37

Jefferson v. State,
   1984 OK CR 27, 675 P.2d 443 ............................................. 19

Jenkins v. United States,
   380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) .................... 30

v

Jennings v. State,
    1987 OK CR 219, 744 P.2d 212 ............................................. 49

Jewell v. Territory,
    1896 OK 16, 43 P. 1075 ................................................... 21

Keeble v. United States,
    412 U.S. 206, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) ...................... 25

Kluver v. Weatherford Hospital Authority,
    859 P.2d 1081 (Okla. 1993) ............................................... 18

Maben v. Lee,
    1953 OK CR 139, 260 P.2d 1064 .......................................... 32

Massie v. State,
    1976 OK CR 174, 553 P.2d 186 ........................................... 21

McCarty v. State,
    1988 OK CR 271, 765 P.2d 1215 .......................................... 36

McHam v. State,
    2005 OK CR 28, 126 P.3d 662 ............................................. 25

Miles v. State,
    1979 OK CR 116, 602 P.2d 227 ........................................... 30

Miller v. State,
    2001 OK CR 17, 29 P.3d 1077 ............................................ 47

Mitchell v. State,
    2005 OK CR 15, 120 P.3d 1196 ........................................... 16

Mitchell v. State,
    2011 OK CR 26, 270 P.3d 160 ......................................... 27, 31

Moulton v. State,
    1948 OK CR 130, 201 P.2d 268 ........................................... 16

Myers v. State,
    2000 OK CR 25, 17 P.3d 1021 ............................................ 37

Neitzel v. State,
    655 P.2d 325 (Alaska App. 1982) ......................................... 22

Palmer v. State,
    1994 OK CR 16, 871 P.2d 429 ............................................ 21

Patterson v. State,
    2002 OK CR 18, 45 P.3d 925 ............................................. 50

Perry v. State,
    1993 OK CR 5, 853 P.2d 198 ................................................. 19

Pickens v. State,
    1979 OK CR 99, 600 P.2d 356 ............................................. 29

Pickens v. State,
    2001 OK CR 3, 19 P.3d 866, 878-79 ................................. 16

Rea v. State,
    3 Okl.Cr. 281, 105 P. 386 (1909) ..................................... 25

Rogers v. United States,
    422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) ............................. 27

Romano v. State,
    1995 OK CR 74, 909 P.2d 92 ................................................ 36

Rounds v. State,
    1984 OK CR 49, 679 P.2d 283 ............................................. 15

Ryder v. State,
    2004 OK CR 2, 83 P.3d 856 ................................................ 36

Sartin v. State,
    1981 OK CR 157, 637 P.2d 897 ......................................... 29

Seabolt v. State,
    2006 OK CR 50, 152 P.3d 235 ......................................... 45

Shields v. United States,
    273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927) ............................. 27

Simpson v. State,
    1994 OK CR 40, 876 P.2d 690 .................................. 24, **passim**

Smith v. State,
    1996 OK CR 50, 932 P.2d 521 ................................................. 37

Smith v. State,
    2007 OK CR 16, 157 P.3d 1155 ......................................... 27, 42

Stanley v. State,
    1988 OK CR 151, 762 P.2d 946 ............................................. 20

Stiles v. State,
    1992 OK CR 23, 829 P.2d 984 ................................................ 19

Strickland v. Washington,
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ........................ 46

Sutton v. State,
    1988 OK CR 158, 759 P.2d 235 ............................................... 29

Tarter v. State,
    1961 OK CR 18, 359 P.2d 596 ............................................... 20

Thomas v. State,
    1987 OK CR 113, 741 P.2d 482 ............................................... 29

Tomlin v. State,
    1994 OK CR 14, 869 P.2d 334 ............................................... 45

United States v. Brown,
    776 F.2d 397 (2nd Cir. 1985) ............................................... 32

United States v. Espinosa,
    827 F.2d 604 (9th Cir. 1987) ............................................... 32

United States v. United States Gypsum Co.,
    438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ......................... 30

Walton v. State,
    1987 OK CR 227, 744 P.2d 977 ............................................... 20

Warner v. State,
    2006 OK CR 40, 144 P.3d 838 ............................................... 29

Whalen v. United States,
    445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) ....................... 19

Wiley v. State,
    183 S.W.3d 317 (Tenn. 2006) ............................................... 48

Wilhoit v. State,
    1991 OK CR 50, 816 P.2d 545 ............................................... 49

Williams v. State,
    1973 OK CR 354, 513 P.2d 335 ............................................... 20

Williams v. State,
    2001 OK CR 9, 22 P.3d 702 ............................................... 25

Williams v. Taylor,
    529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ...................... 46

Willingham v. State,
    1997 OK CR 62, 947 P.2d 1074 ............................................... 21

Wong Sun v. United States,
    371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) .......................... 45

Woods v. State,
   602 So. 2d 1210 (Ala. Crim. App. 1992) ..................................... 22

# STATUTORY AUTHORITY

Okla. Stat. tit. 12, § 2403 (2011) ................................................. 39, 40

Okla. Stat. tit. 21, § 11 (2011) ..................................................... 17

Okla. Stat. tit. 21, § 142A-8 (2011) ............................................... 42

Okla. Stat. tit. 21, § 172 (2011) ................................................... 12

Okla. Stat. tit. 21, § 173 (2011) ................................................... 24

Okla. Stat. tit. 21, § 175 (5) (2011) ............................................... 24

Okla. Stat. tit. 21, § 645 (2011) ................................................... 23

Okla. Stat. tit. 21, § 646(A)(1) (2011) ............................................ 23

Okla. Stat. tit. 21, § 701.7 (2011) .................................................. 1

Okla. Stat. tit., 21 § 701.8 (2011) ................................................. 22

Okla. Stat. tit. 21, § 701.8 (1) (2011) ............................................. 20

Okla. Stat. tit. 21, § 701.9 (B) ..................................................... 22, 23

Okla. Stat. tit. 21, § 791 (2011) ................................................... 22, 23

Okla. Stat. tit. 21, § 801 (2011) ................................................... 1, 13

Okla. Stat. tit. 21, § 1289.13 (2011) ............................................... 1

Okla. Stat. tit. 22, § 196(1)(2011) ................................................. 45

Okla. Stat. tit. 22, § 202(1) (2011) ................................................ 45

Okla. Stat. tit. 22, § 436 .......................................................... 43

Okla. Stat. tit. 22, § 837 (2011) ................................................... 20

Okla. Stat. tit. 22, § 894 (2011) ................................................... 26, 27

Okla. Stat. tit. 22, § 896 (2011) ................................................... 29, 31

Okla. Stat. tit. 22, § 916 (2011) ................................................... 20

Okla. Stat. tit. 22, § 1066 (2011) ................................................ 42

Okla. Stat. tit. 37, § 8 (2011) .......................................................... 1

Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (Supp. 2014) ...................................... 49

## CONSTITUTIONAL AUTHORITY

## United States Constitutional Authority

U.S. Const., amend. IV .................................................... 44, 45

U.S. Const., amend. V .................................................. 11, 17, 19

U.S. Const., amend. VI ................................................ 26, 31, 46

U.S. Const., amend. XIV ............................................ 11, **passim**

## Oklahoma Constitutional Authority

Okla. Const. Art. II, § 7 ............................................. 11, **passim**

Okla. Const. Art. II, § 9 ..................................................... 40

Okla. Const. Art. II, § 19 ............................................... 26, 31

Okla. Const. Art. II, § 20 ........................................... 11, **passim**

Okla. Const. Art. II, § 21 ..................................................... 17

Okla. Const. Art. II, § 30 ............................................... 44, 45

## OTHER AUTHORITIES

## Oklahoma Uniform Jury Instructions - Criminal

Instruction No. 2-5, OUJI-CR (2d) ........................................ 12
Instruction No. 4-64, OUJI-CR (2d) ...................................... 13
Instruction No. 4-91, OUJI-CR (2d) ................................... 20, 21
Instruction No. 4-144, OUJI-CR (2d) ..................................... 13
Instruction No. 6-45, OUJI-CR (2d) ...................................... 16
Instruction No. 10-11, OUJI-CR (2d) ..................................... 29

x

## BRIEF OF APPELLANT

This brief is submitted on behalf of Deandre Bethel, the defendant in Tulsa County District Court, who will be referred to by name or as Appellant. Appellee will be referred to as the State or as the prosecution. Numbers in parentheses refer to page citations in the original record (O.R.), preliminary hearing (PH.Tr.), motion hearing (M.Tr.), jury trial (Tr. ) and sentencing proceeding. (S.Tr.)

## STATEMENT OF THE CASE

Appellant, Deandre Bethel was charged by Amended Information in Tulsa County Case Number CF-2012-0660, with Count 1, First Degree Felony Murder during the commission of an Robbery with a Firearm, in violation of Okla. Stat. tit. 21, § 701.7 (2011); Count 2, Robbery with a Firearm, in violation of Okla. Stat. tit. 21, § 801 (2011); Count 3, Transporting a Loaded Firearm in a Motor Vehicle, in violation of Okla. Stat. tit. 21, § 1289.13 (2011); and, Count 4, Public Intoxication, in violation of Okla. Stat. tit. 37, § 8 (2011). (O.R. 40-45, 65-72)

Mr. Bethel's jury trial was held before the Honorable James M. Caputo, District Judge, on February 4-8, 2014. Assistant District Attorneys Kali Strain and John Salmon prosecuted the case, and Steven Vincent represented Mr. Bethel. The jury found Mr. Bethel guilty on all counts and assessed punishment at life imprisonment with the possibility of parole in the Oklahoma Department of Corrections on Count 1; five (5) years imprisonment in the Oklahoma Department of Corrections on Count 2; five (5) months imprisonment in the Tulsa County jail and a $250.00 fine on Count 3, and thirty (30) days imprisonment in the Tulsa County jail and a $100.00 fine on Count 4. (O.R. 312-15) When the jury's judgment was formally imposed on March 14, 2014, the court ordered the sentences on Counts 1 and 2 to be served consecutive to each other and Counts 3 and 4 to run concurrent to each other and concurrently to Counts 1 and 2. (S.Tr. 20-21) It is from this judgment and sentence that Mr. Bethel appeals.

## STATEMENT OF THE FACTS

This case concerns the death of Byron Ivory, Jr., 24, on February 4, 2012. Mr. Ivory was shot multiple times shortly before 2:00 a.m., in the parking lot outside Club Pink, at 1800 South Boston Avenue, in Tulsa, Oklahoma. Emergency personnel were unable to revive Mr. Ivory and he was pronounced dead at St. John Hospital about 4 ½ hours later. (Tr. 610, 632, 752)

Earlier that evening, Mr. Ivory was hanging out with two friends, Ernest Roberts and Bradley Jarrett. (Tr. 360, 414) The men met at Mr. Roberts's apartment complex around 10:30 or 11:00 p.m. There they had a few drinks and decided to go to the Gray Snail bar on Cherry Street in Tulsa. (Tr. 361-62, 414-15) Mr. Ivory drove the group in his 2009 Chevrolet Impala. (Tr. 362, 416) At the Gray Snail, the men drank rum and beer and listened to music for several hours. (Tr. 416) Around 1:30 a.m., they decided to go to see if any of their friends were at Club Pink. They arrived shortly before the club was about to close. (Tr. 363-64, 417, 439) They drove around the parking lot looking for a parking place. The parking lot was full of cars. (Tr. 401) Mr. Ivory was driving, Mr. Roberts was in the front passenger seat, and Mr. Jarrett was in the back seat. (Tr. 364, 418) The group found a parking place next to a railing with a five-foot drop on the other side. They sat there for two or three minutes. As they were about to get out of the car, a short, thin, African American male, wearing a black or navy blue hoodie, approached the passenger side of Mr. Ivory's vehicle. (Tr. 366-67, 378, 380-81, 419, 423-24, 443) Mr. Roberts estimated the man was approximately 5'6" or 5'8". (Tr. 380) Mr. Jarrett thought he was approximately 5'5". (Tr. 441) Mr. Roberts noticed the man had a "chin strap" which he explained was sideburns connected to a beard, with no mustache. (Tr. 366, 381) According to Mr. Jarrett, the man was staggering like he was drunk. (Tr. 419)

Mr. Roberts's car door was open and his right foot was out of the car. The man asked Mr. Roberts, "Do I know you?" (Tr. 366, 392, 420) Mr. Roberts replied,

"I don't know." (Tr. 367, 420) Mr. Ivory said "hurry up, ya'll, let's get out of here." (Tr. 468) The man put a gun to Mr. Roberts's right side. Mr. Roberts was scared and thought he was being robbed. He got out of the car, raised his hands, and asked the man if he would like his cell phone and wallet. The man answered, "Yes." (Tr. 368, 370, 392) Mr. Roberts handed him these items. Mr. Roberts clarified that the man never made any demands or any comments, Mr. Roberts just assumed he was being robbed. (Tr. 384)

Mr. Jarrett saw a car parked directly behind Mr. Ivory's Impala. It was a silver or white four-door sedan. (Tr. 424, 471) The vehicle's headlights were shining directly into his eyes. (Tr. 424) He noticed a person standing outside that vehicle, on the driver's side. (Tr. 421, 445-47) The man was tall and African American. (Tr. 423, 448) Mr. Jarrett could not see whether the man had a firearm. (Tr. 443)

While the gunman's attention was diverted, Mr. Jarrett jumped out of the back seat and ran. (Tr. 371-72, 384, 425) He heard multiple gunshots. (Tr. 425) Once Mr. Roberts handed over his possessions, he jumped over the rail and also fled. Mr. Roberts was unsure whether Mr. Ivory was standing outside the car on the driver's side or if he was still in the car when the incident occurred. (Tr. 368, 371) As Mr. Roberts was running away, he thought he heard Mr. Ivory struggling with someone. He heard what he described as "rustling" sounds. (Tr. 373, 383)

Mr. Roberts ran to Club Pink, which was about 20 yards away. After he took two or three steps, he heard between five and ten gunshots. (Tr. 373, 387) Mr. Roberts told one of the security guards at Club Pink that he had been robbed. (Tr. 390) He reunited with Mr. Jarrett at Club Pink. Mr. Jarrett was not wearing any shoes. He said his black Nike tennis shoes had fallen off while he was running away. (Tr. 395, 425, 453; State's Exs. 58-60) The two men were shocked and scared and wanted to get out of the area. They saw a friend at the club and asked for a ride to Mr. Roberts's apartment. (Tr. 375-76, 429, 459) From there, the two decided to go

3

to Mr. Roberts's parents' house in Bartlesville, arriving around 3:00 a.m. They tried calling Mr. Ivory several times on the way but could never reach him. (Tr. 376-77, 378, 402, 428, 456) Around 8:30 or 9:00 a.m. that morning, they received a call from a Tulsa Police Detective informing them that Mr. Ivory had died. The two men returned to Tulsa to talk to detectives about the homicide. (Tr. 432, 461)

Justin David White, and Clayton Lee Ayers, firemen with the City of Tulsa, were at Station Five, their duty station, located at 18th and Boston on February 4, 2012. Between 1:30 a.m. and 2:00 a.m., the two men heard shots fired in the parking lot west of the fire station, near Spirit Bank. (Tr. 479, 501) Mr. White estimated he heard between nine and twelve gunshots. (Tr. 479, 495) Mr. Ayers thought there were six or seven shots. (Tr. 504) The two men said they ducked behind their fire truck when they heard the shots. (Tr. 479, 505)

Mr. White testified he saw a white, four-door, Chevrolet Cobalt leaving the area where the shots were fired at a high rate of speed. (Tr. 481, 488) He identified States's Exhibit 3 as similar to the vehicle he saw that evening. (Tr. 485) He noticed the rear driver's side door of the vehicle was open and an individual was getting into the moving vehicle as it was driving off. Mr. White could not tell the race or gender of this person. (Tr. 488-89, 515) He testified there were no distinguishing marks on the car, such as decals or dents. (Tr. 486)

The white car came out of the parking lot directly to the west of the station, turned south on Boston, and then went west when it reached 21st street. (Tr. 486, 491, 507) Both men saw another darker colored vehicle rapidly leaving the area in the same direction as the first vehicle, but were not sure whether that vehicle was associated with the incident. (Tr. 490, 498, 508) At the time of the gunshots, there were approximately 30 or 40 people leaving the bars in the area. (Tr. 496, 517)

Mr. White reported the gunshots to the Tulsa Police Department and went to the parking lot with Mr. Ayers. (Tr. 482-83, 506-07) They saw two people

4

standing near a large, black, male lying facedown between two vehicles at the north end of the parking lot. (Tr. 483, 509, 519) Mr. Ayers raised the man's shirt and observed three or four gunshots wounds. The victim was still breathing but was gasping for air. (Tr. 484, 509-10) Mr. White started assisting him until EMSA arrived a short time later and took over his medical care. (Tr. 484, 511)

Deandre Bethel was developed as a suspect in the shooting when he was stopped by police later that morning, around 6:00 a.m., in a white Chevrolet Cobalt which matched the description of a vehicle seen leaving the crime scene. At that time, Mr. Bethel was arrested for transporting a loaded firearm and public intoxication. The .40 caliber Smith and Wesson semiautomatic handgun taken during this arrest was later linked forensically to the crime. Tulsa Police Officer Amley Floyd testified about this arrest of Mr. Bethel. Officer Floyd was working the graveyard shift on February 4, 2012. He received a call from EMSA around 5:20 a.m., reporting that an ambulance had stopped at the intersection of Apache and Lewis and noticed an individual, who appeared to be passed out, behind the wheel of a vehicle with a gun in the passenger seat next to him. (Tr. 542, 558, 582-85) Officer Floyd went to the intersection and saw a white, Chevy Cobalt with a paper tag. The driver did not move and the car remained parked at the intersection even though the light went through several cycles. (Tr. 543) Officer Floyd thought the driver was intoxicated or asleep at the wheel. (Tr. 544) He could tell the car was running and there was only one person in the car. Because he had been informed there was a firearm in the car, he waited for backup to arrive. (Tr. 545) Officers Ian Adair and Charles Ramsey arrived and assisted with the stop. (Tr. 586-87)

Officer Floyd activated his lights and sirens and gave the driver of the vehicle commands over the loud speaker to place his hands up and put the vehicle in park. (Tr. 545-46) Officer Floyd said the driver lifted his head up and the vehicle proceeded through the intersection after the light turned green. (Tr. 546) The

5

vehicle began moving slowly, around five or ten miles per hour northbound. It traveled approximately 800 to 1000 feet and then stopped. (Tr. 547, 587) As the officers approached the vehicle, they could see the driver leaning over the passenger seat and reaching for the floorboard. Officer Floyd ordered the driver out of the vehicle. (Tr. 548-49, 588)

Officer Floyd and Officer Adair both identified Deandre Bethel as the driver. (Tr. 548, 588) Mr. Bethel got out of the car very slowly. Officer Floyd instructed Mr. Bethel to turn around and he made several full turns. Mr. Bethel was unsteady on his feet and staggering. As he was turning around, he kept falling over. (Tr. 551, 589) Officer Floyd placed handcuffs on Mr. Bethel. Both he and Officer Adair noticed a strong odor of alcohol coming from Mr. Bethel's person. He was slurring his speech and his eyes were bloodshot. (Tr. 551, 589) Officer Floyd gave Mr. Bethel a sobriety test, during which he observed signs of intoxication. He said Mr. Bethel was falling over during this test. Officer Floyd was concerned for his safety. (Tr. 553) Officer Floyd informed Mr. Bethel of his *Miranda* rights. Mr. Bethel asked what his charges were and Officer Floyd told him public intoxication and possession of a firearm. Mr. Bethel asked where the firearm was and Officer Floyd told him it was inside the vehicle. (Tr. 553-54) Mr. Bethel told Officer Floyd he bought the firearm because he was advised by a police officer that someone was trying to kill him and he needed a gun for protection. (Tr. 554, 601) Mr. Bethel said he thought he been at a bar until around midnight but did not remember leaving the bar or how he ended up at the traffic light at Apache and Lewis. (Tr. 554)

Officer Floyd placed Mr. Bethel under arrest and booked him for public intoxication. His breathalyzer test registered a .04, below the legal limit for DUI. (Tr. 555) Officer Floyd testified there was no doubt in his mind that Mr. Bethel was "highly under the influence of something." (Tr. 556, 562) His condition got worse even after he took the sobriety test. He was harder to wake up, and Officer Floyd

had to continue to lean him up against the wall. He said Mr. Bethel repeatedly asked him why was he there. (Tr. 556, 567)

Officer Stanley conducted an inventory search of the vehicle after Mr. Bethel was arrested, in accordance with police department policy. (Tr. 590, 603) A handgun magazine was located on the driver's side floorboard containing live rounds. Underneath the driver's seat, Officer Stanley found an unloaded silver and black, Smith and Wesson, .40 caliber handgun. (Tr. 559-60, 590-91, 596; State's Exhibits 7, 8) Mr. Bethel's vehicle was taken into police custody and towed to the Gilcrease Division impound lot. (Tr. 568, 592) Officer Floyd and Officer Stanley both said they did not know anything about the shooting of Byron Ivory, Jr. at that point.[1] (Tr. 568, 605)

Tulsa Police Detective Kyle Martin Ohrynowicz recorded a video of the crime scene which was admitted at trial as State's Exhibit 64. (Tr. 611) Detective Ohrynowicz narrated the video for the jury and pointed out the location of the evidence in the case, including the location of bullet fragments and cartridge casings at the scene. Most of the evidence was located between a black SUV and the victim's silver Impala. (Tr. 614-54) Detective Ohrynowicz admitted he could not determine when this evidence was left at the scene. (Tr. 654)

Terrance Higgs, a Firearm and Toolmarks Examiner with the Oklahoma State Bureau of Investigation, testified he examined State's Exhibit 8, the .40 caliber Smith and Wesson, semiautomatic pistol taken from Mr. Bethel's car, after it was submitted by the Tulsa Police Department. The pistol held 11 cartridges, ten in the magazine and one in the chamber. (Tr. 689-690) Agent Higgs determined the pistol was in working order. (Tr. 691) He compared casings, bullets and bullet fragments

---

[1] Officer Floyd revealed at trial that he had been good friends with Byron Ivory, Jr. and had gone to high school with him for four years. (Tr. 568-69)

7

collected from the scene to ones fired from the pistol. (Tr. 692) He concluded that State's Exhibits 12, 19 and 66, two shell casings and one bullet fragment, had all been fired from State's Exhibit 8. (Tr. 692-96, 886) Agent Higgs testified there were at least four separate firearms involved in the shooting: a .357/.38 special, a .45 Hi-Point, a .40 Glock or Sigma and the .40 caliber Smith and Wesson. (Tr. 715-16) His report was admitted at trial as State's Exhibit 71. (Tr. 713)

Medical Examiner Joshua Lanter testified that he conducted an autopsy of Byron Ivory, Jr., on February 12, 2012. (Tr. 751) Dr. Lanter's autopsy report and diagram were admitted at trial as State's Exhibit 73. (Tr. 754, 765) He identified ten separate gunshot wounds to Mr. Ivory's body, mostly in the torso area. (Tr. 755-61) Dr. Lanter opined that the wound to Mr. Ivory's back and lung, and the wound to his chest which involved the aorta and large bowel, could have been lethal alone. Collectively, these wounds would almost certainly have been lethal. (Tr. 762) Dr. Lanter also thought that the blood loss Mr. Ivory sustained from the remaining bullet wounds could ultimately have been lethal as well. He removed a projectile from Mr. Ivory's knee region and provided it to the police. (Tr. 763-764, 767; State's Ex. 68) Toxicology tests revealed an ethanol alcohol concentration of .06 in the victim's blood and .07 percent in the fluid of his eye. (Tr. 773) Dr. Lanter concluded that the cause Mr. Ivory's death was multiple gunshot wounds and the manner of his death was homicide. (Tr. 765)

Tulsa Police Detective Jason White testified he obtained and reviewed State's Exhibit 72, video surveillance from the Spirit Bank parking lot. He claimed he could see a four-door sedan pull up behind the victim's car approximately two-and-a-half minutes after the victim pulled into the parking space. (Tr. 791-92) He testified the video showed occupants of this vehicle approaching the victim's car, followed by a muzzle flash and then multiple individuals reentering the vehicle and two vehicles leaving the scene at a high rate of speed. (Tr. 797) One vehicle went

southbound on Boston and another went westbound on 21st street. (Tr. 798)
Detective White noted that the parking lot was full of cars at this time, but not
people, as it was 1:40 a.m. and the bars had not yet closed. (Tr. 798)

Detective White said he interviewed Tulsa Fireman Jason White, who told
him he got a good look at one of the suspect vehicles. He described it as a white,
four-door Chevy Cobalt. (Tr. 802) Detective White claimed he received information
that Deandre Bethel had been involved in a disturbance at Club Pink that evening.
He also learned that Mr. Bethel had been stopped and arrested in the area of
Apache and Lewis in a white Chevy Cobalt. At the time of this arrest, Mr. Bethel
was in possession of a firearm consistent in caliber with one used in the shooting.
(Tr. 804) Detective White retrieved this firearm from the property room in order to
submit it for comparison with the known evidentiary items from the scene of the
shooting. (Tr. 803, 804)  He subsequently discovered that several of the casings
and a bullet fragment collected from the parking lot matched the firearm taken
from Mr. Bethel's vehicle during this earlier arrest. (Tr. 804-09)

On the basis of this evidence, Mr. Bethel was arrested by the warrant squad
around 11:00 a.m. on December 8, 2012, and charged with the murder of Byron Ivory,
Jr. (Tr. 739-42, 812) He was brought to the detective division for an interview, which
was admitted at trial as State's Exhibit 74. (Tr. 818).  After being advised of his
*Miranda* rights, Mr. Bethel agreed to talk to the detectives. (Tr. 814-16; State's
Exhibit 75) According to Detective White, Mr. Bethel told him he did not remember
anything from 8:00 p.m. until the time he was stopped by police around 5:00 a.m.
He could not remember what he was wearing that evening.  (Tr. 822-23, 885) Mr.
Bethel told Detective White that he bought the gun from a guy with dreads that he
thought was named Rio, but Detective White claimed he was unable to corroborate

this information. (Tr. 835, 865; State's Ex. 74).[2] During the interview, Mr. Bethel's clothing was collected. His gray Carolina hoodie was admitted at trial as State's Exhibit 26, but it was never linked to the crime. (Tr. 836)

Detective White admitted he did not locate any fingerprints or DNA evidence linking Mr. Bethel to the homicide. (Tr. 892-901) He admitted police did not process the firearm to determine if any fingerprints could be linked to the person who sold the weapon to Mr. Bethel. (Tr. 901) Detective White said Mr. Roberts's wallet was recovered under the victim's body but his cell phone was never recovered. Two cell phones were located in Mr. Bethel's vehicle after his arrest but neither was Mr. Roberts's cell phone. (Tr. 923) Although Mr. Bethel's house was searched, no evidence associated with the homicide was recovered. (Tr. 926)

Deandre Bethel testified on his own behalf. He told the jury that he did not kill or rob Byron Ivory, Jr., and that he had never seen Mr. Ivory before in his life. (Tr. 979) He said he could not remember whether he was at Club Pink on the evening/morning hours of February 3-4, 2012. (Tr. 980, 987) At the time of the incident he drove a 2009 Chevy Cobalt. He purchased the vehicle on January 9, 2012, and it still had a temporary tag on February 4, 2012. (Tr. 980) He did not believe his vehicle was at or near Club Pink that night but admitted he had memory problems because he was under the influence of alcohol and had taken a Xanax bar. He said Xanax "takes you out of it" and alcohol intensifies this effect. (Tr. 981)

Mr. Bethel testified he was wearing a light-colored, button-up, collared shirt, blue-gray jeans and gray Nike shoes when he was arrested that morning. (Tr. 982) He did not remember changing his clothes at any time that evening. (Tr. 982)

Mr. Bethel said he told police he had bought this silver and black firearm

---

[2] Detective White testified that there was a robbery reported at the Mercury Lounge across the street a few minutes before the shooting. (Tr. 914) Interestingly, one of the individuals involved in the robbery was reported to have "a beanie with some dreads hanging out." (Tr. 919)

find beyond a reasonable doubt that Mr. Bethel committed the robbery that occurred outside the Club Pink that night, or that Mr. Bethel knowingly and with criminal intent aided and abetted Deandre Williams or anyone else in committing that crime. Therefore, his convictions for the robbery and the murder predicated on that offense rest on insufficient evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, Counts 1 and 2 must be vacated.

## PROPOSITION II

**MR. BETHEL'S CONVICTION AND SENTENCE FOR COUNT II, ROBBERY WITH A FIREARM, MUST BE VACATED BECAUSE THE SAME CHARGE SERVED AS THE UNDERLYING FELONY FOR HIS CONVICTION OF FELONY MURDER, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, § 21 OF THE OKLAHOMA CONSTITUTION.**

As argued in Proposition I, the conviction for First Degree Felony Murder cannot be upheld because the evidence is legally insufficient to prove Mr. Bethel guilty of the predicate felony, and thus also insufficient to prove the murder. If this Court rejects this argument and upholds the conviction for First Degree Felony Murder on Count 1, then the Double Jeopardy Clauses of the federal and state constitutions require that the predicate felony, Robbery with a Firearm, be vacated. U.S. Const. amend. V; Okla. Const. art. 2, § 21; *see also* Okla. Stat. tit. 21, § 11 (2011).

The State charged Mr. Bethel in Count 1 of the Amended Information with First Degree Felony Murder as follows:

> DEANDRE BETHEL and DEANDRE ARMON WILLIAMS, on or about 2/4/2012, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of FELONY MURDER-FIRST DEGREE, a Felony, by unlawfully, feloniously, and willfully while acting in concert each with the other and with other unknown individuals and during the commission of an attempted robbery with a firearm of Byron James Ivory Jr., Ernest Jordan Roberts and Bradley Jarrett w/a firearm, without authority of law, effect the death of Byron James Ivory Jr. by shooting him then and there and thereby inflicting certain mortal wounds in the body of said Byron James Ivory Jr. from which mortal wounds the same Byron James Ivory Jr. did

languish and die on the 4th day of February 2012,

(O.R. 129) Mr. Bethel was convicted at trial of First Degree Felony Murder as alleged in Count 1. (O.R. 312; Tr. 1063-64) The underlying felony of Robbery with a Firearm alleged in Count I was the identical robbery that was independently charged in Count II of the Amended Information:

> DEANDRE BETHEL and DEANDRE ARMON WILLIAMS, on or about 2/4/2012, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of ROBBERY WITH A FIREARM, a Felony, by unlawfully, feloniously, and wrongfully, while acting in concert each with the other and with other unknown individuals, rob one Byron James Ivory Jr., Ernest Jordan Roberts, and Bradley Jarrett by wrongfully taking and carrying away certain personal, to-wit: money and cell phones, belonging to Byron James Ivory Jr., Ernest Jordan Roberts, and Bradley Jarrett and in the possession of said Byron James Ivory Jr., Ernest Jordan Roberts, and Bradley Jarrett, and in their immediate presence, without their consent and against their will, said robbery being accomplished by said defendants with the use of a certain firearm, to·wit: handguns, and which they used to menace and threaten the said Byron James Ivory Jr., Ernest Jordan Roberts, and Bradley Jarrett with harm if they resisted, and by said assault, threats and menace, did then and there put the said Byron James Ivory Jr., Ernest Jordan Roberts, and Bradley Jarrett in fear of immediate and unlawful injury to their person and overcame all their resistance, and while so intimidating them, did then and there wrongfully take and obtain from them the personal property and money aforesaid,

(O.R. 129) In addition to being found guilty and receiving a sentence of life with the possibility of parole for the felony murder in the course of a robbery with a firearm, Mr. Bethel was convicted separately of this same robbery as to these same victims and sentenced to five (5) years imprisonment. (O.R. 313; Tr. 1063-64)

Whether Mr. Bethel's convictions for both First Degree Felony Murder and Robbery with a Firearm violate the prohibition against double punishment is a question of law which this Court reviews *de novo*. *Coffia v. State*, 2008 OK CR 24, 191 P.3d 594, 596. "Issues of law are reviewable by a *de novo* standard and an appellate court claims for itself plenary independent and non-deferential authority to reexamine a trial court's legal rulings." *Kluver v. Weatherford Hosp. Auth.*, 859 P.2d 1081, 1084 (Okla. 1993) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)).

Clearly, the predicate felony of Robbery with a Firearm as to these three victims merged into the proof required for Mr. Bethel's conviction of First Degree Felony Murder. The Double Jeopardy Clause prohibits convictions for felony murder and the underlying felony. *See Harris v. Oklahoma*, 433 U.S. 682, 382-83, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Whalen v. United States*, 445 U.S. 684, 693-94, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). Where proof of the felony is a necessary element of the felony murder, the offense is the same, and the defendant cannot be punished for both. *Id.* at 694. The appropriate remedy is to vacate the conviction for the underlying felony. *See Perry v. State*, 1993 OK CR 5, 853 P.2d 198, 200-01 (vacating conviction for robbery where defendant was convicted of robbery and felony murder on the basis of that robbery because convictions for both violated double jeopardy); *Jefferson v. State*, 1984 OK CR 27, 675 P.2d 443, 447 (same); *Stiles v. State*, 1992 OK CR 23, 829 P.2d 984, 995 (same). Counts 1 and 2 both alleged the same actions against the same victims. Because Count 2 was the predicate felony for the conviction on Count 1, this Court must order the conviction for Robbery with a Firearm dismissed as it is wholly subsumed by the Felony Murder conviction.

## PROPOSITION III

**THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER OFFENSES OF SECOND DEGREE DEPRAVED MIND MURDER, SECOND DEGREE FELONY MURDER, AND ACCESSORY AFTER THE FACT, IN VIOLATION OF MR. BETHEL'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

Mr. Bethel was convicted of First Degree Felony Murder and sentenced to life imprisonment with the possibility of parole. (O.R. 312, 376-77; Tr. 1063) The jury was given no options other than guilt or innocence for First Degree Murder because the trial court did not provide the jury with instructions on any lesser offenses. Although Mr. Bethel argued in Proposition I that the evidence was insufficient as a matter of law to sustain the conviction, he alternatively submits that in the event

19

this Court finds the evidence sufficient, the evidence also was sufficient to warrant lesser related offense instructions.

Oklahoma statutes authorize instructions on lesser offenses when appropriate. Okla. Stat. tit. 22, §§ 837, 916 (2011). When one is charged with First Degree Murder, all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be given if they are supported by the evidence. *Childress v. State*, 2000 OK CR 10, 1 P.3d 1006, 1101-02. Moreover, where there is any evidence tending to reduce the crime charged from murder to a lesser degree of homicide, the trial court should give the defendant the benefit of the doubt and instruct the jury on the lesser offense. *Tarter v. State*, 1961 OK CR 18, 359 P.2d 596, 597.

Prior to closing arguments, the trial court asked defense counsel if he had any proposed instructions. Counsel offered no proposed lesser offense instructions. (Tr. 1000-01) Despite this lapse in representation, which is the subject of a claim of ineffective assistance of counsel in Proposition X, under Oklahoma law the trial court had an absolute duty to instruct the jury on any lesser included offense supported by the evidence, whether requested or not. *See Stanley v. State*, 1988 OK CR 151, 762 P.2d 946, 949; *Walton v. State*, 1987 OK CR 227, 744 P.2d 977, 978; *Williams v. State*, 1973 OK CR 354, 513 P.2d 335, 339; *Tarter v. State*, 1961 OK CR 18, 359 P.2d 596, 597, 600-601. The following lesser offenses were supported by the evidence and the jury should have received instructions on each of these offenses.

A.   **Second Degree Depraved Mind Murder.**

The evidence as presented to the jury supported the lesser offense of Second Degree Depraved Mind Murder under Okla. Stat. tit. 21, § 701.8 (1) (2011). There are two elements to this crime: first, that the conduct was "imminently dangerous to another person," and second, that the conduct "evinced a depraved mind in extreme indifference to human life." OUJI-CR (2d) 4-91. A person evinces a

20

"depraved mind" when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another. "Imminently dangerous conduct" means conduct that creates what a reasonable person would realize as an immediate and extremely high degree of risk to another person. Instruction No. 4-91, OUJI-CR (2d); *Palmer v. State*, 1994 OK CR 16, 871 P.2d 429, 432-33, *overruled on other grounds by Willingham v. State*, 1997 OK CR 62, 947 P.2d 1074.

Oklahoma law has long required that for conduct to evince a depraved mind, it must be done with a conscious disregard of the obvious danger to others. *See Jewell v. Territory*, 1896 OK 16, 43 P. 1075, 1082. The act or conduct must be "calculated" to put life in jeopardy and "perpetrated with the full consciousness of the probable consequences." *Massie v. State*, 1976 OK CR 174, 553 P.2d 186, 191; *see also Palmer v. State*, 871 P.2d at 432-33. The examples of conduct evincing a depraved mind – firing a gun into a crowd of people, poisoning a public water well, derailing a speeding train, blowing up a building that the person knows to be occupied – all have one common fact that distinguishes them from lesser degrees of homicide. *Jewell v. Territory*, 43 P. at 1078. That fact, as this Court stated in *Dennis v. State*, 1977 OK CR 83, 561 P.2d 88, 95, is that "death to someone is so probable that the law will infer an intent."

An instruction on this offense would have allowed the jury to find that although Mr. Bethel may not have intended to kill Mr. Ivory, his decision to participate in a robbery when armed participants were involved and weapons were discharged in an area full of people was an act imminently dangerous to Mr. Ivory and other people in the vicinity, and evinced a depraved mind regardless of human life. *See Palmer v. State*, 871 P.2d at 431-433; *Breshers v. State*, 1977 OK CR 331, 572 P.2d 561, 563-565, 568. Shooting into a crowd of people is a classic example of depraved indifference to human life, the defining element of this form of Second

21

Degree Murder. *See, e.g., Woods v. State,* 602 So.2d 1210, 1212-13 (Ala. Crim. App. 1992); *Neitzel v. State,* 655 P.2d 325, 327 (Alaska App. 1982); *Humphries v. State,* 18 So.3d 305, 309 (Miss. Ct. App. 2009).

Mr. Bethel was entitled to have Second Degree Depraved Mind Murder considered by his jury, and was deprived of this entitlement. A rational jury could have inferred from the evidence presented that Mr. Bethel acted not with an intent to kill but with a depraved mind, evidenced by imminently dangerous conduct. If the jury had been instructed on Second Degree Murder, Mr. Bethel would have faced different elements of proof, as well as different punishment ranges. The punishment range for Second Degree Murder is ten (10) years to life imprisonment. Okla. Stat. tit. 21, § 701.9 (B) (2011). When the jury was not instructed upon Second Degree Murder, it was denied the ability to consider the evidence and the actions of Mr. Bethel as to this critical lesser offense. Accordingly, his conviction must be reversed for a new trial.

### B.  Second Degree Murder with Robbery by Force and Fear as the Underlying Felony.

Oklahoma's Second Degree Felony murder doctrine is set forth in Okla. Stat. tit. 21, § 701.8 (2011) which states "Homicide is murder in the second degree in the following cases:  2. When perpetrated by a person engaged in the commission of any felony other than the unlawful acts set out in Section 1, subsection B, of this act." Section 701.8(2) is felony murder when the underlying felony is any felony other than those enumerated in section 701.7(B). In the instant case, the evidence would have permitted the jury to find Mr. Bethel guilty of the underlying felony of First Degree Robbery, Okla. Stat. tit. 21, § 791, *et seq.* Section 791 defines robbery as the wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. Section 797(1) specifies that robbery will be of the first degree when, during

22

the course of the robbery, the defendant inflicts serious bodily injury upon the person. Oklahoma defines Robbery by Force or Fear as "a wrongful taking of personal property in the possession of another, from his person or his immediate presence, and against his will, accomplished by means of force or fear." Okla. Stat. tit. 21, § 791 (2011).

The State's theory was that Mr. Bethel was with a group of individuals who attempted to take money and/or property from Byron Ivory, Ernest Jordan and Bradley Jarrett by force or fear by ambushing them in the parking lot. If the jury chose to believe Mr. Bethel was a participant but did not shoot or brandish a gun that evening, it could have found him guilty of this form of robbery.

Another possible underlying felony for an instruction on Second Degree Felony Murder could have been premised on the felony of Assault with a Dangerous Weapon or Aggravated Assault and Battery pursuant to Okla. Stat. tit. 21, §§ 645 and 646(A)(1)(2011). If the jury chose to believe Mr. Bethel fired a weapon at the other occupants of the car, he could be found guilty of Second Degree Felony Murder using one of these felonies as the underlying crime.[7]

Second Degree Murder is punishable by a sentence of not less than ten years nor more than life. Okla. Stat. tit. 21, § 701.9 (B). Had the jury been instructed on lesser related offenses, and convicted Mr. Bethel on any of them, he would have faced a punishment potentially less than he faced on the First Degree Murder charge. Mr. Bethel submits that this was fundamental error and warrants plain error review. Neglecting to instruct the jury on the appropriate lesser related offenses constituted a serious violation of due process of law and deprived Mr. Bethel of rights essential to his defense. *Hicks v. Oklahoma*, 447 U.S. 343, 345-346, 100 S.Ct. 2227, 2229-30, 65 L.Ed.2d 175 (1980) (holding that an arbitrary denial of

---

[7] With the demise of the merger rule, there would be no impediment to the use of these crimes as the underlying felony. *See Barnett v. State*, 2011 OK CR 28, 263 P.3d 959.

23

rights provided by State law, in that case the right to have the jury decide punishment, is a violation of due process of law); *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 695.

C.    Accessory.

Clearly, Appellant's theory of defense was that he was not involved in the alleged robbery or the resulting homicide, but the evidence could supported the argument that he was at least an Accessory After the Fact. In order to be guilty of being an Accessory, the accused must "conceal or aid the offender with knowledge that he [the offender] has committed a felony, and with such intent that he may avoid or escape from arrest, trial, conviction, and, or punishment. . ." Okla. Stat. tit. 21, § 173 (2011). Under the facts of this case, a reasonable jury could have doubted whether Mr. Bethel was indeed "a willing participant in this robbery" and concluded that he had aided Mr. Williams or others, knowing they had just committed a felony and with an intent to help them avoid arrest and prosecution. Given Mr. Bethel's possession of a weapon associated with the homicide and a vehicle matching the description of one of the getaway cars after the crime had been committed, there is ample evidence supporting an instruction on this offense and the jury should have been so instructed.[8] Accessory After the Fact to First Degree Murder is a very serious crime carrying a range of punishment from five (5) to forty-five (45) years. Okla. Stat. tit. 21, § 175 (5) (2011). If the jury had been instructed on this offense, it could have found Mr. Bethel of a serious felony and sentenced him to imprisonment for his connection to the murder without having to impose a minimum life sentence. Instructions on Accessory would have provided a third alternative, but instead the jury was forced to chose between a conviction for Murder in the First Degree or out right acquittal for a homicide. Given only the

---

[8]    An instruction on the lesser related offense of Accessory can be appropriate in a murder case. *See Glossip v. State*, 2001 OK CR 21, 29 P.3d 597.

choice between finding him guilty of an offense the State did not prove or letting him go free despite his involvement, the jury opted for the former, although it clearly struggled with this decision as the jury deliberated well into the early morning hours. (Tr. 1056-63) The realization that juries will do this is why instructions on lesser offenses must be given. *See, e.g., Keeble v. United States*, 412 U.S. 206, 212-13, 93 S.Ct. 1993, 1998, 36 L.Ed.2d 844 (1973).

By failing to request instructions on Accessory as a lesser related offense, trial counsel waived for Appellant all but plain or fundamental error.[9] *Williams v. State*, 2001 OK CR 9, 22 P.3d 702, 713. Fundamental error is error that goes to the foundation of the case or takes from a defendant a right essential to his defense. *See Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 695 (citing, *inter alia*, *Rea v. State* 3 Okl.Cr. 281, 105 P. 386 (1909) (Syllabus 2(c))). Appellant submits that under the facts in this case, the failure to provide instructions on Accessory both went to the foundation of the case *and* took from Appellant a right essential to his defense. As this Court has recognized, "The people of this State are, in the most literal sense, a party to every criminal prosecution. The public has an undeniable interest in seeing that offenders are *appropriately* punished for their crimes." *McHam v. State*, 2005 OK CR 28, 126 P.3d 662, 669 (emphasis added). The jury could not determine the appropriate punishment for Mr. Bethel without correctly assessing the crime of which he was guilty. Because the instructions prevented the jury from making an accurate assessment of Appellant's guilt, his convictions must be reversed.

---

[9]    In Proposition X, Appellant claims that trial counsel was constitutionally ineffective for failing to request such an instruction.

## PROPOSITION IV

**THE TRIAL COURT ERRED IN FAILING TO COMPLY WITH THE LAW GOVERNING CONTACT WITH JURORS DURING DELIBERATIONS AND BY FAILING TO ADVISE DEADLOCKED JURORS NOT TO SURRENDER THEIR HONEST CONVICTIONS CONCERNING THE WEIGHT OF THE EVIDENCE IN ORDER TO REACH A VERDICT, IN VIOLATION OF OKLA. STAT. TIT. 22, § 894 AND MR. BETHEL'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7, 19 AND 20 OF THE OKLAHOMA CONSTITUTION.**

The trial court handled questions during jury deliberations in a manner contrary to the clear command of statute and directives by this Court. The law dictates that prejudice be presumed, and the facts of this case do not overcome that presumption. Accordingly, Mr. Bethel's convictions must be overturned.

After the jury retired to deliberate Mr. Bethel's fate at 6:04 p.m., they sent out four separate notes to the trial court. (Tr. 1056) At 7:20 p.m., the jury sent out its first note requesting a DVD player and a television. (Tr. 1062) Apparently, the trial court never saw this note as it was given directly to the bailiff, who provided the jury with a television and DVD player. (Tr. 1062) At 11:06 p.m., the jury sent a second note, which contained two questions: (1) "What should we do if we can not come to a unanimus (sic) decision?", and (2) "If we have unanimus (sic) decisions on some counts – how do we proceed?" (Tr. 1059; Court's Exhibit)[10] The trial court responded in writing at 11:30 p.m., telling the jury, "Please continue to deliberate on those counts which you have not yet reached a unanimous decision." (Tr. 1060; Court's Exhibit) At 12:14 a.m., the trial court received another note from the jury that said, "Can the court contact family members of the jury and let them know we are ok and still on duty?" (Tr. 1060; Court's Exhibit) The trial court again responded in writing, informing the jury that "You were all advised to alert your families that you would be in deliberations until complete." (Tr. 1060; Court's

---

[10] Although the trial court included these notes as part of the record on appeal, he did not designate a particular Court's Exhibit number for each note.

26

Exhibit) The trial court later told counsel that he did not notify the parties about this note because he did not believe it was anything "germane" to the facts of the case. (Tr. 1060-61) The jury sent a final note at 12:55 a.m., indicating it had "reached our verdicts." (Tr. 1061; Court's Exhibit)

The trial court erred in his handling of the jury's questions. First, he failed to bring the jury back into the courtroom on each of the notes. The Oklahoma Legislature has mandated how jury questions are to be handled procedurally. If jurors have a question on a point of law during deliberations, the trial court is required to inform counsel and to bring the jury back into the courtroom to give them further information. *Mitchell v. State*, 2011 OK CR 26, ¶ 130, 270 P.3d 160; *see also Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Shields v. United States*, 273 U.S. 583, 585, 588, 47 S.Ct. 478, 71 L.Ed. 787 (1927). Oklahoma law requires:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

Okla. Stat. tit. 22, § 894 (2011). Here, however, the trial court failed to follow Section 894's mandate. There is no evidence that the jury was brought back into open court for any of the questions. Further, as to the note at 12:14 a.m. in which jurors asked if they could contact their family members, the trial court admitted he did not inform or consult counsel about this jury question. (Tr. 1060-61)

Mr. Bethel had a right to assume that any communication with the jury would be made in open court and that he would have an opportunity to be heard. His rights to counsel and due process were violated by the trial court's communication with the jury outside of the courtroom and without the presence of Mr. Bethel or his attorney as to this particular question. *See Smith v. State*, 2007 OK CR 16, ¶¶ 50-52,

157 P.3d 1155 (finding district court erred in providing written answers to the jury's questions without first consulting with counsel and then bringing the jury into open court to answer the questions).

It is true that counsel was notified and asked to respond to the jury's note at 11:06 p.m., which contained two questions: (1) "What should we do if we can not come to a unanimus (sic) decision?", and (2) "If we have unanimus (sic) decisions on some counts – how do we proceed?" (Tr. 1059; Court's Exhibit)  Unfortunately, counsel acquiesced in the Court's response to continue deliberating. (Tr. 1060; Court's Exhibit) Trial counsel should have objected to the court's directive and his failure to adequately protect the record is addressed in a separate claim of ineffective assistance of counsel in Proposition X. Nonetheless, the trial court committed fundamental error by deviating from settled law on how to respond when a jury indicates it is at an impasse. The trial judge failed to follow any of the prescribed procedures. Rather than bringing the jury back into the courtroom, the judge sent written a response to the jury. Had the response been appropriate, the judge's failure to follow Section 894 probably would have been harmless. *See, e.g., Givens v. State*, 1985 OK CR 104, 705 P.2d 1139, 1140-41. However, his response to this question was not only inappropriate, it was coercive.

The complete and correct answer to the jury's question about unanimity was two-fold: a not guilty verdict must be unanimous, and if jurors could not reach a unanimous verdict, a mistrial would be declared. Rather than telling the jury this, however, the judge responded, "Please continue to deliberate on those counts which you have not yet reached a unanimous decision." (Tr. 1060)  The judge's response was coercive, especially to jurors who were in the minority, because it indicated there was no way for the trial to conclude other than by unanimous verdicts.

This Court has held that when jurors indicate they are at an impasse in

28

deliberations, the trial judge can call the jury back into the courtroom and ask if jurors think further deliberations would be helpful. If jurors indicate they might be able to reach a verdict with further deliberations, the court can ask them to continue deliberating. *See Higgins v. State*, 1972 OK CR 16, ¶ 23, 493 P.2d 1121; *Sutton v. State*, 1988 OK CR 158, ¶¶ 12-13, 759 P.2d 235, 237. If the jurors advise that further deliberations would not be fruitful, the judge can declare a mistrial. Okla. Stat. tit. 22, § 896 (2011).

Alternatively, the Court can simply give the jury the carefully-crafted *Allen* instruction[11] approved by this Court. *See* Instruction No. 10-11, OUJI-CR (2d), which derives from the "model of fairness" instruction approved in *Pickens v. State*, 1979 OK CR 99, ¶¶ 10-11, 600 P.2d 356, 358-59; *accord Thomas v. State*, 1987 OK CR 113, ¶ 21, 741 P.2d 482, 488. Indispensable to such an instruction is making clear that the request for the jury to continue deliberating and to try reaching a verdict "does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision." Instruction No. 10-11, OUJI-CR (2d ed.).

Jurors must be admonished that "[n]o juror should ever agree to a verdict that is contrary to the law in the court's instructions, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue." *Id.*; *Hooks v. State*, 2001 OK CR 1, ¶ 26, 19 P.3d 294 (noting well-settled law indicates that exhorting jurors not to abandon their honestly held beliefs is necessary whenever a deadlocked jury is returned to deliberations), *abrogated on other grounds by Warner v. State*, 2006 OK CR 40, 144 P.3d 838; *see also Sartin v. State*, 1981 OK CR 157, ¶ 7, 637 P.2d 897, 898; *Drew v. State*, 1989 OK CR 1, ¶ 19, 771 P.2d 224, 229;

---

[11]  An *Allen* instruction derives its name from jury instructions approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

*accord Brogie v. State*, 1985 OK CR 2, ¶ 30, 695 P.2d 538, 545 (holding that asking the jury to arrive at a verdict is not coercive if jurors are cautioned not to surrender honest convictions just to reach a verdict). An *Allen* instruction will not be upheld if it does not tell jurors they have a right to hold to their honest convictions. *Miles v. State*, 1979 OK CR 116, ¶¶ 5-6, 602 P.2d 227.

This Court's insistence that special care be taken to prevent coercion of a verdict is consistent with Supreme Court precedent requiring the same of courts over which it has supervisory powers. As is the case with state judges in Oklahoma, a federal judge cannot tell the jury it must reach a unanimous decision or emphasize the importance of reaching a unanimous verdict without also emphasizing that no juror should surrender his honest conviction or concur in a verdict he believes is untrue solely because of the opinions of other jurors or because of the importance of arriving at a decision. *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)(*per curiam*); *United States v. United States Gypsum Co.*, 438 U.S. 422, 459-62, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

In *Jenkins*, after the jury deliberated for two hours, it sent out a note to the trial judge advising that it had been unable to agree upon a verdict. The judge brought the jury into the courtroom and told them, "You have got to reach a decision in this case." *Jenkins*, 380 U.S. at 446. The Supreme Court held that the judge's statement had a coercive effect on the jury and thus reversed the conviction for a new trial. *Id.*

In our case, directing the jury that what they should do in the event of being hung is to "please continue to deliberate" was the functional equivalent of telling the jury it had to reach a verdict. As this Court requires, the judge should have either (1) asked jurors if further deliberations would be helpful and directed them continue deliberations only if jurors agreed doing so would be fruitful, or (2) given an *Allen* charge, explaining the importance of reaching unanimous verdicts if

30

possible and encouraging jurors to listen to each other's views but admonishing them not to surrender honestly held opinions just to reach a unanimous verdict. Simply ordering the jury to continue deliberating indicated the only way for the trial to conclude was with unanimous verdicts. This, of course, is contrary to Okla. Stat. tit. 22, § 896 (2011), which allows a mistrial to be declared where the jury is unable to reach a verdict.

As to the question about whether the court would contact their families, the court failed to give the jurors any indication of how late into the night they would be required to deliberate and failed to alleviate their concerns about contacting family members. (Tr. 1059-61). When the judge refused the request to contact their family members it was clear to the jurors that reaching a unanimous decision was the only way they could go home. Unsurprisingly, at 12:55 a.m., the jurors reached a verdict. (Tr. 1061) It is a reasonable inference that jurors felt coerced and made compromises just to go home. It is hard to believe that this verdict, rendered approximately 40 minutes after jurors were told they could not contact their family members, was the result of legitimate deliberations rather than pressure on the minority jurors to end the deadlock.

Where, as here, the judge communicates with the jury after deliberations have begun, prejudice is presumed. *Mitchell v. State*, 2011 OK CR 26, ¶ 130. A violation of Section 894 can be harmless, but only if the Court is convinced, on the face of the record, that there was no prejudice to the defendant. *See id.; Smith*, 2007 OK CR 16, ¶ 52. In this case, the nature of the judge's communication with the jury does not permit that conclusion. Further, the court's response to the jury's question regarding unanimity deprived Mr. Bethel of his right to a fair trial and unanimous verdicts under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, § 19 of the Oklahoma Constitution. Therefore this Court must reverse and remand this case for a new trial.

## PROPOSITION V

**MR. BETHEL'S TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR BY THE ADMISSION OF IMPROPER LAW ENFORCEMENT OPINION TESTIMONY THAT INVADED THE PROVINCE OF THE JURY IN VIOLATION OF HIS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

Law enforcement officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy. A jury is inclined to give great weight to their opinions. *See Gianfrancisco v. State*, 570 So.2d 337, 338 (Fla. App. 1990). Thus, particularly when the testifying officer is the "case agent," special attention must be paid to the officer's "expert" opinion testimony to ensure that it falls within the permissible range of opinion testimony. *See, e.g., United States v. Espinosa*, 827 F.2d 604, 613 (9th Cir. 1987); *United States v. Brown*, 776 F.2d 397, 401 & n.6 (2nd Cir. 1985); *Commonwealth v. Kitchen*, 730 A.2d 513, 521-22 (Pa. 1999); *Maben v. Lee*, 1953 OK CR 139, 260 P.2d 1064, 1067.

Tulsa Police Detective Jason White was the "case agent" in this case and testified at length regarding his investigation of this crime. (Tr. 4) In the process, Detective White's testimony clearly overstepped permissible bounds on numerous occasions. Detective White's testimony was used by the prosecution to reiterate the same evidence presented by other witnesses, but with the imprimatur of Detective White's expertise, skill and persuasiveness as a professional witness. The prosecutor improperly used Detective White to vouch for the integrity of the investigation by reviewing and commenting on the evidence. The prosecutor also improperly used the direct examination of Detective White to marshal the facts and provide the jury with his own personal opinion about the credibility of the State's witnesses and his theory of the case. Much of Detective White's testimony was unnecessarily cumulative, speculative and more prejudicial than probative. As such, this testimony should have been excluded.

32

During direct examination, Detective White was allowed to rehash the details of his investigation for the jury even though this information had already been presented to the jury through other witnesses. Detective White testified he contacted Tulsa Police Detective Vic Regalado with information regarding the ballistics report on the gun taken from Mr. Bethel's vehicle. Over defense counsel's objection, Detective White rehashed these facts for the jury, including that the "gun was a match" to casings and a bullet fragment found at the scene. (Tr. 810-11) He then recounted what he told Terrance Higgs, OSBI firearm examiner, when he dropped off the firearm in question to be tested. (Tr. 811) Detective White also told the jury that he had received information Deandre Bethel was at Club Pink that night, even though there was no evidence of this in the record. (Tr. 810)

Detective White was then allowed to recount details of his interview with Mr. Bethel, even though this interview, State's Exhibit 74, was played in its entirety for the jury. Detective White highlighted the things he wanted the jury to focus on. (Tr. 817-25) He told the jury he did not believe the stories Mr. Bethel told him were consistent with each other and recounted these alleged inconsistencies for the jury. (Tr. 822-25) Defense counsel objected, arguing the actual interview was the best evidence. The trial court warned the prosecutor to move on, stating, "we don't need this officer to testify and tell us everything we're going to see and then we have to see it." (Tr. 823, 824) Despite this warning, the prosecutor asked Detective White to continue to rehash the interview with Mr. Bethel and he did so. (Tr. 824)

Detective White was asked to comment on what concerned him about Mr. Bethel's story in the video interview. He claimed Mr. Bethel was unable to provide him with details he could corroborate. He said the time frames Mr. Bethel provided raised "red flags" to him. (Tr. 824) Detective White was asked to identify other red flags raised during the interview. He recounted a portion of the interview where he had asked Mr. Bethel about the gun and how he obtained it. He gave the jury

details about how he did not find Mr. Bethel's explanation plausible. (Tr. 825)

Defense counsel renewed his objection, arguing Detective White was bolstering the

State's case by reiterating details in the video and giving his personal opinions on

Mr. Bethel's veracity when the interview itself was the best evidence. (Tr. 825) The

trial court overruled the objection. (Tr. 825) Detective White continued to recount

the questions he asked of Mr. Bethel and his opinion Mr. Bethel was being evasive

and deceptive in his answers. The trial court finally sustained the objection. (Tr.

825) The videotape was then played for the jury. (Tr. 826; State's Exhibit 74)[12]

Following the presentation of the video, Detective White resumed his

improper narrative of the State's case. (Tr. 827) The prosecutor asked Detective

White to relate information on several phone calls recorded while Mr. Bethel was

being held in the Tulsa County jail. (Tr. 841; State's Exhibit 76) Defense counsel

objected to Detective White's commentary, again arguing the tapes "speak for

themselves." (Tr. 842) Counsel complained that Detective White was "talking

about what was happening on the calls prior to the jury having an opportunity to

listen to them." (Tr. 843) Counsel's objections were overruled and Detective White

proceeded to give the jury his opinion on the meaning of some of the conversations

occurring during the phone calls. (Tr. 842, 843) He was again asked to identify his

concerns and any red flags he noted during the phone calls.

The taped phone calls were then played for the jury. At the conclusion of

each call, Detective White was asked give a synopsis of what he found important

and identify any "red flags" raised related to his investigation. (Tr. 850) As to the

first call, Detective White opined that the meaning of the term "burner" was a

street term for a gun, specifically one that may have been used to commit a crime.

---

[12]    Unfortunately there is no transcript of the videotape since both parties waived
the recording on the record. (Tr. 826)

(Tr. 843) As to the second phone call, Detective White was concerned that when Mr. Bethel's father asked him if he was at the club, "he told his dad that he was, despite telling me that he did not remember." (Tr. 850) Regarding the third phone call to Mr. Bethel's mother, Detective White was concerned that Mr. Bethel denied being at the club and having any involvement in the crime. He said this was significant to his investigation because Mr. Bethel "was not telling the truth." (Tr. 859) As to the fourth call, Detective White was concerned that Mr. Bethel was talking to an unknown individual and stated twice that the cops did not know anything. (Tr. 863)

The prosecutor used Detective White's testimony to essentially give a closing argument in the case. On redirect examination, the prosecutor asked Detective White to reiterate what he found significant to the case during his investigation. When he was asked to sum up what was significant about where the gun was found he said, "being stopped in a white Chevy Cobalt which is described by a firefighter who was right there watching it who knew cars." (Tr. 931) He opined it was significant that Mr. Bethel was stopped with this gun within a few hours of the shooting. (Tr. 932) Detective White was asked whether there was anything significant about the fact that Mr. Bethel was the only person in the car. He testified no one else was present to have put the gun in the car. (Tr. 932)

Detective White was asked to review the State's evidence and comment on whether it was consistent with the testimony he had heard from the various State's witnesses during the case. (Tr. 933) He explained that the SpiritBank video was consistent with what he had heard from the witnesses in the case. (Tr. 933) Detective White then gave his opinion on where he thought the victim was standing when he was shot. (Tr. 936) He also opined that he thought the casings were placed at the scene on February 4, 2012, and gave a synopsis of the evidence supporting this opinion. (Tr. 937) Detective White gave his opinion that the lack of bullets at the scene was likely attributable to the fact that the bullets had gone through Mr.

Ivory and lodged in the ground. (Tr. 939) He was testified that people could be wrong about the color of the vehicle because white was sometimes mistaken for silver. (Tr. 941) He was allowed to opine that he thought the SpiritBank video was consistent with Ernest Roberts's and Bradley Jarrett's testimony and the firefighters' testimony. (Tr. 942)

Throughout his testimony, Detective White was allowed to essentially give his opinion on every aspect of the case, invading the province of the jury and improperly bolstering the State's case. His testimony was full of personal opinions requiring no specialized knowledge and merely told the jury what result to reach. The jury was just as capable of reaching these conclusions since they were not based on any specialized knowledge. Opinion testimony from supposed "experts," particularly those in uniform, carry with them a particular danger of overly influencing a jury's verdict. *See McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215, 1218 (noting the danger of unfair prejudice invited by the aura of special reliability and trustworthiness surrounding scientific or expert testimony)(quoting *United States v. Green* 548 F.2d 1261, 1268 (6th Cir. 1977); *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973)). This improper testimony denied the jury its fact finding function. *Romano v. State*, 1995 OK CR 74, 909 P.2d 92, 109 ("While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells the jury what result to reach is inadmissible.").

Detective White's opinion that Mr. Bethel was not telling the truth was particularly harmful. (Tr. 825, 859) It is axiomatic that no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant as such testimony violates the defendant's constitutional right to due process and to an independent determination of the facts. Ultimately, it is the *exclusive* province of the jury to determine the credibility of witnesses. *See Ryder v. State*,

36

2004 OK CR 2, 83 P.3d 856, 868 (citing *Myers v. State*, 2000 OK CR 25, 17 P.3d 1021, 1032, *overruled in part on other grounds by James v. State*, 2007 OK CR 1, 152 P.3d 255, 257; *Smith v. State*, 1996 OK CR 50, 932 P.2d 521, 530; *Curtis v. State*, 1988 OK CR 220, 762 P.2d 981, 983.

Compounding the prejudice, after the State essentially presented a closing argument through Detective White's opinion testimony, the prosecutor then argued these same inferences again. During closing argument, the prosecutor emphasized Detective White's investigation and his findings in order to urge the jury to believe both Detective White and his synopsis of the witnesses and testimony. (Tr. 1010-13)

Appellant fully recognizes that trial counsel failed to object to some of this inadmissible testimony and has alleged in the alternative in Proposition X, that trial counsel rendered ineffective assistance of counsel. Because Appellant failed to object to some of Detective White's opinion testimony, he has waived review of all but plain or fundamental error. *Simpson v. State*, 1994 OK Cr 40, 876 P.2d 690, 693. In order to demonstrate "plain error," Appellant must show: "1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding." *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, 923. As argued above, admission of this testimony was clearly error and obviously affected Mr. Bethel's substantial rights. Because the jury's verdicts were likely influenced by Detective White's improper opinion testimony, Mr. Bethel's convictions must be reversed and remanded for a new trial.

## PROPOSITION VI

**THE ADMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE CONTAINED IN STATE'S EXHIBIT 28, A TAPED RECORDING OF A PHONE CALL BETWEEN MR. BETHEL AND HIS MOTHER, RESULTED IN A VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

During questioning of Detective Jason White, the State presented the recording of a phone call in which Mr. Bethel was speaking to his mother from the Tulsa County jail. (Tr. 859-63, 955; State's Exhibit 28) The State claimed the evidence was necessary to show that Mr. Bethel denied to his mother that he had been at Club Pink the evening of the shooting although he had earlier told his father he had been present at Club Pink that night. (Tr. 859) Even assuming this was a legitimate use of the intercepted phone call, the State failed to redact irrelevant and prejudicial portions of the conversation. It would have been a simple matter to redact the phone call to play only the section where Mr. Bethel denies being at the club.[13] Instead the jury heard Mr. Bethel's mother repeatedly chastise him for failing to call his attorney prior to speaking to police, and telling him to "keep your mouth shut and ask for your attorney." (Tr. 861) This evidence shed no light whatsoever on whether Mr. Bethel was guilty. The probative value of this evidence was minimal but the prejudice to Mr. Bethel was devastating, requiring his case be reversed and remanded for a new trial.

Appellant recognizes admissions by a party opponent that are not hearsay are admissible, but they are still subject to other rules of evidence and to

---

[13] This was the only portion of the phone call that was even arguably relevant:

DEANDRE BETHEL: I told them what I know. I mean, I didn't know -- I mean, they asked me where -- that's where I went from. They tried to tell me I was at this club and I told them I wasn't there. They tried to say they had me on video being at the club and all of that. I just bought that damn gun that night. I told them that. I told the police officer who pulled me over. I told him I had just bought that gun. (Tr. 860-61; State's Ex. 28)

38

constitutional safeguards. Under Okla. Stat. tit. 12, § 2403 (2011), relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value. This phone call should have been redacted to remove Mr. Bethel's discussions with his mother about exercising his Sixth Amendment right to counsel.[14] This evidence had no other real purpose other than to demonstrate to the jury that Mr. Bethel's mother thought he needed to "lawyer up" in order to infer that his mother thought he was guilty and had something to hide.

Because trial counsel did not object to this error, this Court's review is limited to plain error. *See* Proposition X. "Plain error is that error which is plain from the record, and which goes to the foundation of the case or takes from a defendant a right essential to his defense." *Andrew v. State*, 2007 OK CR 23, 164 P.3d 176, 188 ; *Dungan v. State*, 1982 OK CR 152, 651 P.2d 1064, 1065-66 ( elicitation by prosecutor of testimony from police officer about defendant's decision to remain silent during his custodial interrogation, was fundamental, or plain, error, despite lack of objection by defense counsel, because "of the lack of probative value of the evidence in question and due to its extreme prejudicial consequences). This error was plain and fundamental as there is a substantial likelihood the jury used this irrelevant evidence for an illegitimate purpose. Because Mr. Bethel's convictions relied on this highly prejudicial evidence in violation of the Fourteenth Amendment, they must be reversed and remanded for a new trial.

---

[14] Although this was technically not a comment on an actual invocation of the right to counsel, it is analogous to such a situation. This Court has long recognized the rule prohibiting a prosecutor from commenting on, or eliciting testimony about, a defendant's pretrial silence. *See Brown v. State*, 1975 OK CR 191, 541 P.2d 242, 244; *Buchanan v. State*, 1974 OK CR 111, 523 P.2d 1134, 1137.

## PROPOSITION VII

**IMPROPER VICTIM IMPACT TESTIMONY AND EVIDENCE WAS ADMITTED AT TRIAL, DEPRIVING MR. BETHEL OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7, 9 AND 20 OF THE OKLAHOMA CONSTITUTION.**

### A.    The Admission of a Pre-mortem Photograph of the Victim.

A photograph of the victim when he was alive was admitted into evidence. (State's Ex. 1; Tr. 4-7) Prior to the beginning of trial, defense counsel objected to this photograph, arguing it was a blatant effort to gain sympathy for the victim from the very start of the trial. (Tr. 5-7) The trial court reserved ruling at that point. (Tr. 6) While questioning the first State's witness, Sharon Livingston, the prosecutor sponsored the admission of State's Exhibit 1, a photograph of Byron Ivory, Jr., Ms. Livingston's first-born son. (Tr. 329) Ms. Livingston was emotionally distraught during this testimony, and the record reflects she was obviously crying as she was handed some Kleenex by the prosecutor. (Tr. 329) Unfortunately, although defense counsel objected to this photograph prior to trial, inexplicably, when the photograph was offered during the testimony of Ms. Livingston, counsel failed to renew the objection and the photograph was admitted without objection. (Tr. 329-330; State's Exhibit 1) Counsel's failure to adequately protect the record in this regard is discussed in Proposition X.

Appellant recognizes that this Court has previously upheld the admission of in life photographs under the 2002 amendment to Okla. Stat. tit. 12, § 2403, requiring that live victim photographs *shall* be admitted at trial, irrespective of their prejudicial effect. *See, e.g., Grant v. State*, 2009 OK CR 11, 205 P.3d 1, 22. However, amended Section 2403 erodes the fundamental right to a fair trial by diverting the jury from making a reasoned moral response to the evidence to making an impassioned one. *Cody v. State*, 1961 OK CR 43, 361 P.2d 307, 324.

Appellant respectfully asks this Court to reconsider these prior rulings allowing the admission of in life photographs. Here, the display of Mr. Ivory's in life photograph was a clear appeal to emotion and sympathy and has no place in Oklahoma courtrooms. *See, e.g., Capps v. State*, 1984 OK CR 8, 674 P.2d 554, 557.

**B.      Improper Victim Impact Evidence During Formal Sentencing.**

Some of the statements of the family members exceeded the permissible bounds of victim impact testimony. The victim's father, Byron Ivory, Sr., appeared at formal sentencing and asked on behalf of his son and his family that the trial court sentence Mr. Bethel to the maximum sentence possible, life without the possibility of parole. (S.Tr. 5)  He then launched into a lengthy recitation of "ten questions that I read and found that really describe just how I feel and I believe my son felt the same way." (S.Tr. 5) None of these questions and comments had any relevance to the impact this crime had upon Mr. Ivory or his family. (S.Tr. 5-10)

Mr. Ivory's sister, Tanisha Livingston, prepared a detailed victim impact statement but was too upset to read it herself, prompting the prosecutor read it for her. (S.Tr. 10) In graphic detail, her statement described the emotional moment in which she learned her brother had been killed from her mother who was "screaming and crying hysterically." (S.Tr. 10) She described in dramatic fashion having to sit through anatomy class and how working with a cadaver caused her to wonder what her brother "must have experienced in the moments from when he was being shot to when he died" and whether he was scared and felt alone. (S.Tr. 14) She spent several pages talking about her own child and how hard it was to keep up the pace of life when all she wanted to do was grieve for her brother. (S.Tr. 15-16) She also asked the court to "give Deandre Bethel the maximum sentence possible and without parole." (S.Tr. 17) She concluded that she "cannot understand a world with Deandre Bethel in it, free and without consequence for what he did." (S.Tr. 17)

Because Appellant did not object on the grounds alleged here, the error is

reviewed for plain error. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 692-93. To prevail, the defendant must show (1) an error occurred; (2) the error is plain or obvious; and (3) the error affected the substantial rights of the defendant. The first two requirements have already been demonstrated. An error is a deviation from a legal rule. *Simpson v. State*, 876 P.2d at 694. Allowing family members to testify to evidence which is outside the permissible bounds of relevant victim impact evidence deviated from the statute that governs and limits victim impact evidence. Okla. Stat. tit. 21, §§ 142A-8 (2011); *Lott v. State*, 98 P.3d at 346-47.

In ordering that there be no suspension of any portion of the life sentence, and that Counts 1 and 2 run consecutive to each other, it was apparent the trial court was influenced by the improper victim impact statements. (S.Tr. 20-21) Accordingly, Mr. Bethel would ask this Court to remand this case for another resentencing proceeding, one that comports with his Fourteenth Amendment due process rights. Okla. Stat. tit. 22, § 1066 (2011).

PROPOSITION VIII

**COUNTS III AND IV WERE IMPROPERLY JOINED AT MR. BETHEL'S TRIAL IN VIOLATION OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

Despite the fact that these offenses were completely separate and unrelated, the State joined Counts I and II, First Degree Felony Murder and Robbery with a Firearm, with Counts III and IV, Transporting a Loaded Firearm in a Motor Vehicle and Public Intoxication in a single case and these offenses were tried together at Mr. Bethel's trial. (O.R. 312-15, 316-18; Tr. 305-06) This Court reviews improper joinder claims for abuse of discretion. *Smith v. State*, 2007 OK CR 16, 157 P.3d 1155, 1164. Counsel properly preserved this error by objecting to the improper joinder both before and at trial. (O.R. 188-90; M.Tr. 8/27/13 57-60; Tr. 18-19)

"[J]"oinder of separately punishable offenses is permitted if the separate

offenses arise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." *Glass v. State*, 1985 OK CR 65, 701 P.2d 765, 768. *See also* Okla. Stat. tit. 22, § 436, *et seq.* In interpreting the phrase "series of acts or transactions," this Court explained "joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan." *Glass*, 701 P.2d at 768; *Smith v. State,* 157 P.3d at 1165; *Dyke v. State*, 1986 OK CR 44, 716 P.2d 693, 697.

Considering this rule of law with respect to the joinder of Counts III and IV with Counts I and II, these crimes were wholly separate and independent of each other. First, the two alleged offenses are clearly not of "the same type," as contemplated by the case law quoted above. First Degree Felony Murder in the commission of a Robbery with a Firearm is a crime against the person, punishable as a felony under Title 21, while the offenses of Transporting a Loaded Firearm and Public Intoxication are misdemeanors, and Public Intoxication is punishable under Title 37. Thus, this factor does not support joinder because the two offenses are not even similar to each other. *See Glass*, 701 P.2d at 768.

Second, although the offenses did occur within four to five hours of each other, they did not occur in the same location. The alleged robbery and homicide occurred at 200 E. 18th Street, while the alleged transportation of the loaded firearm and the public intoxication offenses occurred at 2400 North Lewis. (O.R. 66)

Third, the proof that relates to each offense does not overlap "so as to evidence a common scheme or plan" because the robbery and homicide of Byron Ivory and his companions could not have facilitated the public intoxication or transporting a loaded firearm charges.

Ultimately, the joinder of these two offenses in one Information, and in one trial, resulted in the presentation of evidence regarding unrelated and dissimilar

43

offenses that likely made the finding of guilt on Counts 1 and 2 easier because of the mere existence of the other counts. It is impossible for this Court to conclude beyond a reasonable doubt that the joinder of the two cases and improperly admitted evidence did not prejudicially impact Mr. Bethel. Thus, Mr. Bethel should be granted relief. At the very least, his sentences should be appropriately modified.

## PROPOSITION IX

**THE ADMISSION OF EVIDENCE OBTAINED AS A RESULT OF AN ILLEGAL SEARCH AND SEIZURE VIOLATED MR. BETHEL'S RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, SECTION 30 OF THE OKLAHOMA CONSTITUTION.**

Prior to trial, Appellant filed a motion to suppress the evidence garnered as a result of his arrest on the early morning hours of February 4, 2012, on the grounds that arresting officers did not have probable cause for making the initial traffic stop. (O.R. 193-96) Officers Amley Floyd and Ian Adair stopped Mr. Bethel's vehicle based on information from an unknown EMSA driver alleging that a man was slumped over the steering wheel at the intersection of 2400 East Apache with a gun in the passenger seat of his vehicle. (M.Tr. 8/27/13 24-25, 28) Appellant alleged these officers did not have the authority to make a warrantless misdemeanor arrest "based solely on information from a third party or on mere suspicion of a misdemeanor." (O.R. 194) A hearing was held on the motion and Officers Floyd and Adair admitted they had never personally talked to the EMSA driver and did not observe the firearm in the vehicle until after they handcuffed and took Mr. Bethel into custody. (M.Tr. 8/27/13 29-31, 43, 48) Nonetheless, the trial court ruled that irrespective of the unidentified EMSA caller, the officers had probable cause to arrest Mr. Bethel for the crime of public intoxication and denied the motion to suppress. (M.Tr. 8/27/13 56) The motion was renewed by defense counsel shortly prior to trial and again summarily denied. (Tr. 18-19)

When reviewing a trial court's ruling on a motion to suppress evidence based on an illegal search and seizure, this Court defers to the trial court's factual findings unless those findings are clearly erroneous. However, the ultimate conclusion drawn from those facts is a legal question this Court reviews *de novo* under the totality of the circumstances. *Seabolt v. State*, 2006 OK CR 50, 152 P.3d 235, 237. Here, the trial court's factual findings denying the motion to suppress were clearly erroneous.

There is no doubt the offenses for which Mr. Bethel was arrested were both misdemeanors. (O.R. 66) When Officers Floyd and Adair first approached Mr. Bethel's vehicle, they had not observed these misdemeanor offenses occur but were instead acting on the unknown EMSA driver's observations. (M.Tr. 8/27/13 24-25, 28) Since they did not witness these misdemeanor offenses, under Oklahoma law, Mr. Bethel's arrest was illegal. In Oklahoma, the law permitting warrantless arrests is more strictly circumscribed for misdemeanors than for felonies. This Court stated in *Tomlin v. State*, 1994 OK CR 14, 869 P.2d 334, 339, that by statute, neither a peace officer nor a private citizen may make a warrantless arrest for any offense other than a felony, unless the offense was committed or attempted in the arrester's presence. *See* Okla. Stat. tit. 22, § 196(1)(2011); Okla. Stat. tit. 22, § 202(1)(2011). As these officers did not have authority to make a warrantless misdemeanor arrest, the resulting traffic stop was illegal, and the fruits obtained from it, particularly State's Exhibits 7 and 8, the .40 caliber firearm and magazine clip linked to the shooting of Mr. Ivory, should have been suppressed as fruit of the poisonous tree obtained in violation of the Fourth Amendment to the United States Constitution and Article II, Section 30 of the Oklahoma Constitution. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Accordingly, Mr. Bethel's convictions should be reversed and remanded with instructions to dismiss.

45

## PROPOSITION X

**MR. BETHEL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

In *Strickland v. Washington*, 466 U.S. 668, 681, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court held a conviction cannot stand if defense counsel's performance falls below the objective standards of reasonableness required by the Sixth Amendment and this deficient performance creates a reasonable probability the defendant did not receive a fair trial with a reliable result. The reasonable probability standard does not require a showing of prejudice beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance of the evidence. Rather, it merely requires a showing sufficient to undermine confidence in the outcome. *Id.* at 694-95, 104 S.Ct. at 2068; *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring); *Fisher v. Gibson*, 282 F.3d at 1307. In this case, Mr. Bethel was prejudiced by his attorney's failure to make timely objections to adequately protect the record at trial, to request viable lesser offense instructions, and to present critical alibi testimony in support of his defense at trial.

### A.   Failure to Adequately Protect the Record with Appropriate Objections.

Defense counsel's failure to object to inadmissible evidence can constitute ineffective assistance of counsel. *Dunkle v. State*, 2006 OK CR 29, 139 P.3d 228, 245 n.88 (Okl.Cr. 2006); *Aycox v. State*, 1985 OK CR 83, 702 P.2d 1057, 1058 (Okl.Cr. 1985). In this case, as discussed in Proposition IV, counsel failed to adequately protect the appellate record and jeopardized Mr. Bethel's right to a fair trial by failing to object to the court's improper answer to the jury's question about what would happen if they could not reach a unanimous verdict. (Tr. 1059-60)

In Proposition V, Appellant alleged that Detective Jason White was allowed

to testify to improper opinion evidence and that his testimony was clearly error and affected Mr. Bethel's substantial rights, depriving him of a fair trial. Unfortunately, defense counsel failed to object to the bulk of these inadmissible opinions. Since a reasonable trial strategy is one that advances the client's interests, failing to object to prejudicial, inadmissible opinion testimony cannot be considered a sound trial strategy. *See, e.g., Miller v. State*, 2001 OK CR 17, 29 P.3d 1077, 1086 (failure to object to improper opinion testimony of victim impact witness).

In Proposition VI, Appellant argued that State's Exhibit 28, a recorded phone call, should have been redacted to remove Mr. Bethel's discussions with his mother about exercising his Sixth Amendment right to counsel. (Tr. 859-63, 955) Defense counsel had a duty to lodge proper objections and protect his client's rights. If this Court finds this claim is waived and that no "plain error" occurred, then counsel was ineffective for failing to raise these argument and jeopardizing Mr. Bethel's opportunity for a fair trial and meaningful appellate review. *Collis v. State*, 685 P.2d at 977 ("It is beyond the stretch of [this court's] wildest imagination to find a valid trial strategy" in the failure of defense counsel to interpose an appropriate objection.)

In Proposition VII, Appellant argued the prosecutor deprived Mr. Bethel of a fair trial and formal sentencing hearing by the introduction of improper and highly prejudicial victim impact evidence. Although counsel objected to the admission of a pre-mortem photograph of the victim prior to trial, for some inexplicable reason, counsel failed to renew this objection to State's Exhibit 1 at trial, thus inviting Appellee to respond that any errors regarding the admission of this evidence were waived. (Tr. 5-7, 329-30) Appellant can detect no rational trial strategy for counsel's failure to object to this prejudicial evidence, which created an emotional atmosphere that undoubtedly contributed to the jury's finding he was

47

guilty of First Degree Murder. Defense counsel's failure to protect Mr. Bethel's right to a fair trial was outside the wide range of professionally competent assistance and resulted in prejudice to his client.

### B. Failure to Request Instructions on Appropriate Lesser Related Offenses.

In Proposition III, Appellant argued that the trial court committed plain error by failing to instruct the jury on the lesser related offenses of Second Degree Depraved Mind Murder, Second Degree Felony Murder and Accessory. As discussed in that proposition of error, evidence adduced at trial would have supported a conviction of these forms of lesser related offenses. Mr. Bethel should have been afforded a jury that had some options for dealing with his apparent culpability other than convicting him of First Degree Murder, with its mandatory life sentence, either with or without the possibility of parole.

Although Appellant has argued the trial court has a fundamental duty to afford Mr. Bethel the benefit of all appropriate instructions, particularly lesser offenses supported by the evidence, whether requested or not, it is also true that trial counsel has a duty to vigorously advocate his client's interests, which includes requesting relevant jury instructions. *See, e.g., Driver v. State*, 1981 OK CR 117, 634 P.2d 760, 763. As such, failure to request instructions on included offenses supported by the evidence may constitute ineffective assistance. *See Wiley v. State*, 183 S.W.3d 317, 330-31 (Tenn. 2006) (finding trial counsel ineffective for failing to request instructions on second degree murder as a lesser included offense of first degree murder). Here, counsel neglected his duty to request the appropriate instructions on lesser offenses, and his failure to do so amounted to ineffective assistance of counsel. There is nothing in the record of this case that suggests any viable trial strategy in not requesting these instructions. Accordingly, Mr. Bethel has not received a fair trial, and his convictions should be reversed and

48

remanded.

###### C.     Failure To Present Critical, Available Defense Witnesses.

Appellant has filed an Application for Evidentiary Hearing on Sixth Amendment Claim concurrently with this brief in accordance with Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (Supp. 2014), in which he alleges that defense counsel was ineffective for failing to present the testimony of two available witnesses, one who could have testified that Mr. Bethel was with her at the time of the alleged robbery/homicide of Byron Ivory, Jr., and a second witness who could have testified that he was with Mr. Bethel when Mr. Bethel purchased the .40 caliber, semiautomatic handgun between 3:00 and 4:00 a.m. that morning. This evidence would have supported Mr. Bethel's alibi defense and corroborated his claim that he purchased the firearm long after the murder occurred. *See* Exhibits A-C, attached to *Application for Evidentiary Hearing on Sixth Amendment Claim*.

Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066. This Court has likewise found a violation of the Sixth Amendment right to counsel when defense counsel has failed to investigate or utilize important impeachment evidence, exculpatory evidence or a well-founded defense. *Glossip v. State*, 2001 OK CR 21, 29 P.3d 597, 601; *Wilhoit v. State*, 1991 OK CR 50, 816 P.2d 545, 546-47; *see also Jennings v. State*, 1987 OK CR 219, 744 P.2d 212, 214-15 (counsel ineffective for failing to present available evidence including witnesses, physical evidence, and expert testimony corroborating defendant's claim); *Galloway v. State*, 1985 OK CR 42, 698 P.2d 940, 941-942 (counsel ineffective for failure to present available evidence in support of defense).

Given defense counsel's strategy of attempting to prove his client's

innocence by establishing reasonable doubt, any evidence tending to place Mr. Bethel somewhere else besides Club Pink at the time Mr. Ivory was killed, and evidence that would have corroborated his explanation for how he came to be in possession of one of the alleged murder weapons would have been critical to this end. Thus, Appellant can see no legitimate strategy behind trial counsel's failure to interview and call these witnesses at trial. *See Patterson v. State*, 2002 OK CR 18, 45 P.3d 925, 929-30 (counsel ineffective for failure to present exculpatory testimony of available witness who claimed to have seen the victim alive after the alleged date of her murder).

This extra-record claim should be considered with the remainder of Mr. Bethel's claims in order to determine whether counsel's representation, as a whole, fell below minimal constitutional standards of effective representation.

### D.   Conclusion.

As the Supreme Court noted in its seminal case on the issue, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation" but "simply to ensure that criminal defendants receive a fair trial. *Strickland v. Washington*, 466 U.S. at 689. The facts of this case demonstrate that counsel's performance fell outside the wide range of professionally competent assistance and that there is a reasonable probability that the outcome of Mr. Bethel's trial would have been different, but for trial counsel's unprofessional errors or omissions. *Strickland*, 466 U.S. at 694.

### CONCLUSION

Based on the preceding errors, discussion of facts, arguments and citations of legal authority, the record before this Court and any errors that this Court may note *sua sponte*, Mr. Bethel respectfully asks the Court to reverse the Judgment and Sentences imposed against him or order any other relief as justice requires.

Respectfully submitted,

DEANDRE BETHEL

By: _____
JAMIE D. PYBAS
Oklahoma Bar No. 13000
Division Chief
Homicide Direct Appeals Division
Oklahoma Indigent Defense System
PO Box 926
Norman, Oklahoma 73070-0926
(405) 801-2666
Fax: (405) 801-2690

ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

This is to certify that on December 22, 2014, a true and correct copy of the foregoing *Brief of Appellant* was mailed, *via* United States Postal Service, postage pre-paid, to Appellant at the address set out below, and a copy was served upon the Attorney General by leaving a copy with the Clerk of this Court.

**Deandre A. Bethel,** #690424
Oklahoma State Penitentiary
P.O. Box 97
McAlester, Oklahoma 74502

_____
JAMIE D. PYBAS

Exhibit
C

Case No. F-2014-336

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

## DEANDRE BETHEL

Appellant,

vs.

## THE STATE OF OKLAHOMA

Appellee.

Appeal from the
District Court of Tulsa County

## APPLICATION FOR EVIDENTIARY HEARING
ON SIXTH AMENDMENT CLAIM

Jamie D. Pybas
Division Chief
Oklahoma Bar Assoc. No. 13000
Homicide Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666


ATTORNEY FOR APPELLANT

December 22, 2014

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

DEANDRE BETHEL,  )
          )
    Appellant,  )
          )
v.  )     Case No. F-2014-366
          )
THE STATE OF OKLAHOMA,  )
          )
    Appellee.  )

## APPLICATION FOR EVIDENTIARY HEARING
## ON SIXTH AMENDMENT CLAIM

Appellant, Deandre Bethel, by and through his appellate counsel, and in accordance with Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (Supp. 2014), respectfully applies to the Court for an evidentiary hearing on his Sixth Amendment claim of ineffective assistance of counsel at his jury trial in the District Court of Tulsa County. Rule 3.11 (B)(3)(b) provides in relevant part:

> When an allegation of the ineffective assistance of counsel is predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of the trial, and a proposition of error alleging ineffective assistance of trial counsel is raised in the brief-in-chief of Appellant, appellate counsel may submit an application for an evidentiary hearing, together with affidavits setting out those items alleged to constitute ineffective assistance of trial counsel.

As required by rule, Mr. Bethel raised a claim of ineffective assistance of counsel in Proposition X of the Brief of Appellant, filed contemporaneously with this Application. This Application sets forth the factual basis, which appears outside the record, supporting this Sixth Amendment claim, and requests that the Court grant an evidentiary hearing so that those factual matters can become part of the record. In support of this Application, Appellant submits the following documents, which are attached:

1

(A) Affidavit of Deandre Armon Williams

(B) Affidavit of Wanda Janell Smith

(C) Affidavit of Jolene Perham

## BRIEF IN SUPPORT OF APPLICATION

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT THE TESTIMONY OF CRITICAL, AVAILABLE DEFENSE WITNESSES AT TRIAL, VIOLATING MR. BETHEL'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 20 OF THE OKLAHOMA CONSTITUTION.**

In Proposition X of the Brief of Appellant, Mr. Bethel argued that defense counsel was ineffective for failing to present the testimony of available witnesses who could have established an alibi for Mr. Bethel and could have testified they were present when Mr. Bethel bought a gun from an individual during the early morning hours after the homicide in question. This evidence would have corroborated Mr. Bethel's statements to police and his trial testimony and undermined the State's claim that he used the firearm in question to rob and shoot Byron Ivory, Jr., on February 4, 2012.

Despite the fact that this claim was a critical issue in the case, defense counsel failed to secure the attendance of these witnesses who could provide corroboration to Mr. Bethel's statements that he bought the gun after the fact. Mr. Bethel repeatedly told police he had bought the .40 caliber pistol shortly before he was arrested during the early morning hours of February 4, 2012. During this arrest, he told Officer Amley Floyd that he bought the firearm because he was advised by a police officer that someone was trying to kill him and he needed a gun for protection. (Tr. 554, 601) After he was arrested a second time on February 8, 2012, he also told Detectives White and Felton that a police officer named "Sticks" told him he needed a gun for protection because someone was trying to kill him. (State's Exhibit 74) Mr. Bethel told the detectives that shortly before he was

2

stopped by police on the morning of February 4, 2012, he bought a Smith and Wesson handgun from a black male with "dreads," but he could not remember the man's name. He paid $175.00 for the gun. Mr. Bethel was was not sure what time he purchased the gun, but thought it was 2:00 a.m. or later. He told the detectives that "LJ," or LaHarry Myers, called him and told him about a gun for sale. He met LJ at Lucky Sam's convenience store, near 3500 North Lewis Avenue. He was in his own car and he thought LJ was driving a green Grand Am. (State's Ex. 74; 11:33) He followed LJ to a nearby neighborhood where LJ took him to purchase the firearm. (State's Ex. 74; 11:36)

Detective White testified at trial that he was unable to corroborate this information after he interviewed Mr. Bethel. (Tr. 835) Had counsel conducted a reasonable investigation, he could have called several witnesses to attest to Mr. Bethel's account of the gun purchase. Deandre Williams, who was charged with Mr. Bethel but pled guilty to Accessory After the Fact, could have provided crucial testimony in support of Mr. Bethel's defense had he been called as a witness. (O.R. 65-72) Mr. Williams states in his affidavit, attached to this Application as Exhibit A, that he saw Mr. Bethel around 4:00 a.m. on the morning of February 4, 2012. He called Mr. Bethel on the phone to see where he was. Mr. Bethel said he was in the vicinity of Mr. Williams's house near Lucky Sam's convenience store on North Lewis. *See* Exhibit A at 1. Mr. Williams told Mr. Bethel to meet him at Lucky Sam's. The two met there and saw LaHarry Myers, otherwise known as "L.J.," getting out of his white Crown Victoria in the parking lot. *See* Exhibit A at 1.

Mr. Bethel asked L.J. if he still had a gun for sale. L.J. said he still had some guns and they would need to go around the corner near the 007 Club to get the guns. *See* Exhibit A at 1. Mr. Bethel said a "cop" named "Sticks" told him he needed a gun for protection because the Hoovers were trying to get at him. According to Mr.

3

Williams, all three men drove in separate cars to the location. *See* Exhibit A at 1. Mr. Williams said he was driving my brother's maroon 2000 Chevy Tahoe. He thought it took less than a minute to get to the house. He did not know whose house it was. *See* Exhibit A at 1. Once there, he got out of his car and got into Mr. Bethel's white car. Mr. Williams said L.J. approached and said he was going inside the house to get the guns. *See* Exhibit A at 1.

According to Mr. Williams, a few minutes later, L.J. came out of the house with two guns, a .40 caliber and a 9 millimeter and showed them to Mr. Bethel. *See* Exhibit A at 1. Mr. Bethel asked L.J. if there was anything wrong with the guns and whether they were "hot." L.J. said the guns were fine. Mr. Williams stated that Mr. Bethel gave L.J. $150.00 in exchange for the .40 caliber gun. Mr. Williams got in his vehicle and left. *See* Exhibit A at 1. Mr. Williams said that Mr. Bethel's trial lawyer never contacted him about this information prior to trial, nor did anyone from his staff. Mr. Williams states that he was willing to testify and would have done so had he been asked to appear on Mr. Bethel's behalf. *See* Exhibit A at 1.

A second witness could not only have corroborated Mr. Bethel's statement about the gun, but she could have provided testimony that established Mr. Bethel was with her at the time Mr. Ivory was killed. Mr. Bethel told Detectives White and Felton during the interview that his own personal phone was off that night but that he believed he was using a girl named Janell's phone. He told police he was not sure of Janell's last name or her phone number. He could not remember exactly where she lived. (State's Ex. 74, 11:37; Tr. 835) He told the detectives that Janell was a "hook-up" and she had been staying with her friend Neka. (State's Ex. 74; 11:37) Detective White testified at trial that he attempted to locate this "girl named Janelle" but was unsuccessful. (Tr. 835)

In fact, as she states in her affidavit attached to this Application as Exhibit

4

B, Wanda Janell Smith could have testified that she was Deandre Bethel on the evening of February 3, 2014, and into the early morning hours of February 4, 2014. *See* Exhibit B at 1. She was dating Mr. Bethel at the time. Around 1:00 p.m., Mr. Bethel dropped her off at the home of her best friend, Neka. He came back over at about 9:00 p.m. Ms. Smith said she and Mr. Bethel hung out, playing dominoes and drinking. She saw Mr. Bethel take a couple of Xanax bars. Around 1:00 a.m., they left for her mother's house in Mr. Bethel's white Cobalt car. *See* Exhibit B at 1.

Mr. Smith said her mother lived at 539 E 49th Place in Tulsa. At that point, Mr. Bethel was "pretty messed up." *See* Exhibit B at 1. Ms. Smith's grandmother called her around 3:00 a.m. She was ill and needed help to be moved from her bed to the living room. Ms. Smith and Mr. Bethel went over to her grandmother's house around the corner to help move her. According to Ms. Smith, around 3:00 a.m., Mr. Bethel's friend, LJ (LaHarry Myers), called her cell phone. Ms. Smith said Mr. Bethel did not have a working phone at the time. *See* Exhibit B at 1. LJ asked if "Belly" was with Ms. Smith. Ms. Smith said "Belly" was Mr. Bethel's nickname. According to her affidavit, she gave Mr. Bethel her phone. He was talking to LJ, but Ms. Smith did not know what they were saying. *See* Exhibit B at 1.

After he finished talking, Mr. Bethel told Ms. Smith he was going to meet LJ to go buy a gun. Ms. Smith stated that she told Mr. Bethel, "Let me go with you." *See* Exhibit B at 1. He told her "no" and they got into an argument. Ms. Smith said Mr. Bethel did not want her to go with him because he thought LJ was going to rob him. After they argued some more, Ms. Smith said she got out of the car and Mr. Bethel drove off without her. Later that morning, she said she got a phone call that Mr. Bethel was in jail. *See* Exhibit B at 1.

Ms. Smith said she was never contacted by the police, the district attorney's office or any defense attorneys who represented Deandre Bethel before his trial in

5

February 2014. She said she was willing to testify and would have done so had she been asked to appear on Mr. Bethel's behalf. *See* Exhibit B at 1.

As Exhibit C to the Application establishes, trial counsel was notified of the existence of this witness prior to trial, yet failed to contact her or call her as a witness at trial on Mr. Bethel's behalf. Exhibit C is a letter from Mr. Bethel's mother, Glenda Gray, sent to defense counsel prior to trial. This letter was contained in the files provided to appellate counsel by Appellant's trial attorney. Ms. Gray writes that she is "sending vital information regarding my son Deandre Bethel's case." *See* Exhibit C at 1. She lists several witnesses she believes are important for Mr. Bethel's defense. One of these witnesses is Wanda Janell Smith, and Ms. Gray provides Ms. Smith's address and two separate phone numbers for her. *See* Exhibit C at 1. Clearly, defense counsel was notified of the existence of this witness prior to trial, yet failed to contact her and present her testimony at trial on Mr. Bethel's behalf.

Had trial counsel secured the attendance of these two witnesses, they could have provided an alibi for Mr. Bethel at the time of the shooting of Mr. Ivory and proven the existence of Janell, the "mystery" woman police and prosecutors were unable to locate. (Tr. 835, 1047-48) This evidence would have corroborated Mr. Bethel's repeated statements to police that he bought the gun from a black male with dreads several hours after the homicide of Byron Ivory had already occurred. As it was, the jury was provided with only the unsubstantiated testimony of Mr. Bethel claiming that he bought the gun after the fact. (Tr. 835, 865, State's Ex. 74) Without this corroboration, the prosecutor was able to argue to the jury that Mr. Bethel had fabricated all of this information:

> And, you know, the only reason he bought the gun is because the police told him to buy it and he just happened to do that on a night that a white Chevy Cobalt was seen outside of this parking lot where Byron Ivory, Junior

6

was murdered, and it's even more amazing because he gets from the scene and this gun dealer, Rio, has to call LaHarry Myers - the dead guy who can't come in and say whether or not this happened - and get ahold of him and say, hey, let me tell you, I know your friend is looking for a new burner. I've got this great .40 caliber Smith and Wesson model, it's a 40-06, has a 10 magazine bullet and a plus-one capacity, I'm look (sic) to sell this gun for $175, and LaHarry is able to get ahold of Byron Ivory (sic)? I mean, that's amazing. His cell phone had been turned off the night before, he told that to Jason White. But LaHarry somehow knows that he has some girl's phone, he doesn't even know the girl's name, Janele, something like that that he met -- met her walking down the street, doesn't know where she lives but he just happened to have her phone and LaHarry knew that he had her phone and was able to get a hold of Deandre Bethel who was so drunk that he blew a .04 and maybe taken a Xanax and fell asleep in an intersection, and he was able to met (sic) up with LaHarry outside this club and then meet up with the gun dealer, and get to being passed out in an intersection on north Lewis, all within, like, three hours from the murder. I mean, that's efficiency, ladies and gentlemen of jury, and you shouldn't believe it for a second.

(Tr. 1047-48)

The Sixth Amendment imposes on counsel certain basic duties, including "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Counsel also has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690, 104 S.Ct. at 2066.

Even before *Strickland,* this Court indicated that it was counsel's duty to investigate and use relevant evidence helpful to the defendant. In *Smith v. State*, 1982 OK CR 143, 650 P.2d 904, 906-907, counsel inexplicably failed to call available witnesses in support of the defendant's insanity defense. In response to this omission, this Court quoted the American Bar Association Standard for Criminal Justice, Defense Function 4-4.1, which states that, "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to *explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction*." (Emphasis added). 650 P.2d at 908. This Court held:

7

We recognize that the attorney for a defendant may, at times, have legitimate reasons for not calling certain witnesses to testify. The decision of which witness, if any, to call at trial is one of strategy best left to counsel, and generally will not be second-guessed on appeal. [Citations omitted] Before counsel may make such tactical decisions, however, it is imperative that he have knowledge of the substance of the evidence excluded. Thus, when, as in the present case, counsel knows of the existence of a person or persons who possess information relevant to the client's case and fails to exercise ordinary diligence to pursue that evidence, we cannot justify such lack of industry as a strategic error. [Citations omitted]

*Id.* This Court has found a violation of the Sixth Amendment right to counsel when counsel has failed to investigate or utilize important impeachment evidence, exculpatory evidence or a well-founded defense. *Glossip v. State*, 2001 OK CR 21, 29 P.3d 597, 601; *Wilhoit v. State*, 1991 OK CR 50, 816 P.2d 545, 546-47; *see also Jennings v. State*, 1987 OK CR 219, 744 P.2d 212, 214-15 (counsel ineffective for failing to present available evidence including witnesses, physical evidence, and expert testimony corroborating defendant's claim); *Galloway v. State*, 1985 OK CR 42, 698 P.2d 940, 941-942 (counsel ineffective for failure to present available evidence in support of defense). When counsel fails to investigate for purposes of an alibi defense, federal courts have found this failure constitutionally deficient. *See Brown v. Myers*, 137 F. 3d 1154, 1156-57 (9th Cir. 1998); *United States v. Gray*, 878 F. 2d 702, 711 (3d Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986); *Nealy v. Cabana*, 764 F.2d 1173, 1178-80 (5th Cir. 1985).

Given defense counsel's strategy of attempting to prove his client's innocence by establishing reasonable doubt, any evidence tending to corroborate the central claims of the defense in this case, i.e., that Mr. Bethel was not at Club Pink at the time of the robbery/shooting and that he was only in possession of the gun because he had purchased it shortly before he was stopped by police that morning, would have likely changed the outcome of this case. Witnesses who could state that Mr. Bethel was present with them when the homicide occurred or when

8

he bought the gun would have been critical to this end. Thus, Appellant can see no legitimate strategy behind the failure to interview and call these witnesses at trial. *See Patterson v. State*, 2002 OK CR 18, 45 P.3d 925, 929-30 (counsel ineffective for failure to present exculpatory testimony of available witness who claimed to have seen the victim alive after the alleged date of her murder).

The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2064. In order to prevail on a claim that he was denied his Sixth Amendment right to counsel, the defendant must make two showings: First, that counsel's performance was deficient, and second, that there is a reasonable probability that, but for the counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. 466 U.S. at 694, 104 S.Ct. at 2068; *see also Williams v. Taylor*, 529 U.S. 362, 392-94, 120 S.Ct. 1495, 1512-14, 146 L.Ed.2d 389 (2000). When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt.

The facts of this case demonstrate a reasonable probability that the outcome of Mr. Bethel's trial would have been different, but for trial counsel's failure to adequately investigate the case and present the testimony of these critical alibi witnesses. The State's case against Mr. Bethel was not so overwhelming as to foreclose the possibility that additional evidence in Mr. Bethel's favor would have created reasonable doubt in the mind of at least one juror. The jury obviously struggled with the verdict in this case as evidenced by their notes during deliberations. (Tr. 1059-61) Mr. Bethel submits that this Court cannot have

9

confidence in the outcome of his trial under the circumstances here, and his convictions must be reversed and remanded for a new trial.

## CONCLUSION

It is clear from the above extra-record claim of ineffectiveness of counsel, compounded by record claims asserted in Proposition X of his Brief, that Mr. Bethel was not afforded a meaningful test of the adversarial process in his trial, and that under *Strickland*, he has met his burden of establishing that counsel's performance was deficient and that he was prejudiced such that there is a reasonable probability that, but for these errors, Mr. Bethel would not have been convicted of the crimes charged. Mr. Bethel respectfully, pursuant to Rule 3.11(B)(3)(b) of the Rules of this Court, and in consideration of his above arguments and attached exhibits, requests an evidentiary hearing to make full proof of his extra-record claim.

Respectfully submitted,

DEANDRE BETHEL,

By: _____

JAMIE D. PYBAS
Oklahoma Bar No. 13000
Division Chief
Capital Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070-0926
(405) 801-2666

ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I certify that on the date of filing the above and foregoing instrument, a true and correct copy of the same was delivered to the Clerk of this Court with instructions to deliver said copy to the Office of the Attorney General of the State of Oklahoma.

_____
JAMIE D. PYBAS

Exhibit

D

No. F-2014-336

IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

DEANDRE BETHEL,

Appellant,

-vs-

THE STATE OF OKLAHOMA,

Appellee.

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

MAR 2 3 2015

MICHAEL S. RICHIE
CLERK

BRIEF OF APPELLEE
FROM TULSA COUNTY DISTRICT COURT
CASE NO. CF-2012-660

E. SCOTT PRUITT
ATTORNEY GENERAL OF OKLAHOMA

THEODORE M. PEEPER, OBA # 19909
ASSISTANT ATTORNEY GENERAL

313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)

ATTORNEYS FOR APPELLEE

MARCH 23, 2015

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF THE FACTS | 2 |

**PROPOSITION I**

SUFFICIENT EVIDENCE SUPPORTS DEFENDANT'S
CONVICTIONS FOR FELONY MURDER AND ROBBERY
WITH A FIREARM. .................................. 6

**PROPOSITION II**

BECAUSE DEFENDANT WAS CONVICTED OF THE
ROBBERY OF MR. ROBERTS AND WAS SEPARATELY
CONVICTED OF THE MURDER OF MR. IVORY, A
SEPARATE VICTIM, THERE WAS NO DOUBLE JEOPARDY
AND THE COUNTS DO NOT MERGE. ................... 13

**PROPOSITION III**

LESSER INCLUDED OFFENSE INSTRUCTIONS WERE NOT
WARRANTED WHERE DEFENDANT TOOK THE STAND
AND "TOTALLY DENOUNCED" ANY INVOLVEMENT IN
THE ROBBERY WHICH LED TO MR. IVORY'S DEATH ..... 16

**PROPOSITION IV**

BECAUSE THE RESPONSES RECEIVED BY THE JURY
ACCOMPLISHED THE SAME RESULT AS IF THE COURT
HAD BROUGHT THE JURY INTO THE COURTROOM AND
RESPONDED VERBALLY, DEFENDANT HAS SHOWN NO
ERROR FROM THE WAY JUROR QUESTIONS WERE
HANDLED. .......................................... 19

**PROPOSITION V**

        THE OPINION TESTIMONY OF DETECTIVE WHITE WAS
        PROPERLY ADMITTED, ESPECIALLY WHERE THE
        LIMITATIONS OF HIS OPINION TESTIMONY WERE
        THOROUGHLY EXPLORED ON CROSS-EXAMINATION. . . . . . . . . . 23

**PROPOSITION VI**

        THE RECORDING OF DEFENDANT'S CONVERSATION
        WITH HIS MOTHER WAS PROPERLY ADMITTED WHERE
        DEFENDANT OBVIOUSLY DID NOT INVOKE HIS RIGHT
        TO SILENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**PROPOSITION VII**

        THERE WAS NO PLAIN ERROR IN THE ADMISSION OF
        THE SINGLE, IN-LIFE PHOTOGRAPH OF THE VICTIM OR
        IN THE COURT'S CONSIDERATION OF THE VICTIM
        IMPACT STATEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**PROPOSITION VIII**

        THE JOINDER OF COUNTS 3 AND 4 IN THE SAME TRIAL
        WITH COUNTS 1 AND 2 WAS PROPER AND NOT AN
        ABUSE OF DISCRETION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**PROPOSITION IX**

        THE ADMISSION OF EVIDENCE SEIZED AS A RESULT OF
        THE TRAFFIC STOP AND ARREST OF DEFENDANT FOR
        PUBLIC INTOXICATION WAS PROPERLY ADMITTED. . . . . . . . . . . 36

**PROPOSITION X**

        DEFENSE COUNSEL WAS NOT INEFFECTIVE WITHIN
        THE MEANING OF *STRICKLAND V. WASHINGTON.* . . . . . . . . . . . . . . . 40

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

*Allen v. United States,*
     164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 41

*Allison v. State,*
     1983 OK CR 169, 675 P.2d 142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Al-Mosawi v. State,*
     1996 OK CR 59, 929 P.2d 270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Arizona v. Gant,*
     556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) . . . . . . . . . . . . . . . . . . . . 29, 38

*Blockburger v. United States,*
     284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Boyd v. State,*
     1992 OK CR 40, 839 P.2d 1363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brewer v. City of Tulsa,,*
     1991 OK CR 59, 811 P.2d 604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Brown v. State,*
     1975 OK CR 191, 541 P.2d 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Buchanan v. State,*
     1974 OK CR 111, 523 P.2d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bush v. State,*
     2012 OK CR 9, 280 P.3d 337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Castro v. State,*
     1987 OK CR 182, 745 P.2d 394 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Clay v. State,*
     1979 OK CR 26, 593 P.2d 509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Cole v. State,*
     2007 OK CR 27, 164 P.3d 1089 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Collins v. State,*
    2009 OK CR 32, 223 P.3d 1014 ............................................. 26

*Cuesta-Rodriguez v. State,*
    2011 OK CR 4, 247 P.3d 1192 ............................................. 26

*Davis v. State,*
    1990 OK CR 20, 792 P.2d 76 .............................................. 27

*DeLaune v. State,*
    1977 OK CR 278, 569 P.2d 463 ........................................... 34

*Dill v. State,*
    2005 OK CR 20, 122 P.3d 866 ......................................... 23, 29

*Edington v. State,*
    1991 OK CR 21, 806 P.2d 81 .............................................. 31

*Findlay v. City of Tulsa,*
    1977 OK CR 113, 561 P.2d 980 ........................................... 38

*Frederick v. State,*
    2001 OK CR 34, 37 P.3d 908 .............................................. 16

*Garrison v. State,*
    2004 OK CR 35, 103 P.3d 590 ......................................... 43, 44

*Gates v. State,,*
    1988 OK CR 77, 754 P.2d 882 ......................................... 33, 35

*Gilson v. State,*
    2000 OK CR 14, 8 P.3d 883 ........................................... 10, 19

*Glass v. State,*
    1985 OK CR 65, 701 P.2d 765 ............................................ 33

*Gomez v. State,*
    2007 OK CR 33, 168 P.3d 1139 ........................................... 36

*Harrington v. Richter,*
    562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) .................... 40

iv

*Head v. State,*
    2006 OK CR 44, 146 P.3d 1141 ............................................... 13

*Hines v. State,*
    1976 OK CR 325, 557 P.2d 917 ............................................ 19, 22

*Hogan v. State,*
    2006 OK CR 19, 139 P.3d 907 ............................................... 31

*Jackson v. Virginia,*
    443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ......................... 10

*Jefferson v. State,*
    1984 OK CR 27, 675 P.2d 443 ............................................... 15

*Jennings v. State,*
    1973 OK CR 74, 506 P.2d 931 ............................................... 14

*Johnson v. State,*
    1982 OK CR 135, 650 P.2d 875 ........................................... 15, 16

*Lamb v. State,*
    1977 OK CR 92, 561 P.2d 123 ............................................... 39

*Ledbetter v. State,*
    1997 OK CR 5, 933 P.2d 880 ......................................... 28, 29, 42

*Logsdon v. State,*
    2010 OK CR 7, 231 P.3d 1156 ............................................... 13

*Lott v. State,*
    2004 OK CR 27, 98 P.3d 318 ............................................... 33

*Malone v. State,*
    2013 OK CR 1, 293 P.3d 198 ............................................... 40

*Manson v. State,*
    1988 OK CR 124, 758 P.2d 324 ............................................. 15

*Matthews v. State,*
    2002 OK CR 16, 45 P.3d 907 ............................................... 11

*McCarty v. State,*
    1995 OK CR 48, 904 P.2d 110 ........................................... 22

*Miranda v. Arizona,*
    384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ..................... 29, 42

*Mitchell v. State,*
    2011 OK CR 26, 270 P.3d 160 ..................................... 22, 33, 35

*Murphy v. State,*
    2012 OK CR 8, 281 P.3d 1283 ................................. 24, 27, 29, 32

*Nix v. Williams,*
    467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 ............................. 39

*Parker v. Martin,*
    589 Fed. Appx. 866 (10th Cir. Oct. 29, 2014) ................................. 11

*Patton v. State,*
    1998 OK CR 66, 973 P.2d 270 ................................. 16, 19, 41, 42

*Peninger v. State,*
    1986 OK CR 113, 721 P.2d 1338 ........................................... 13

*Robedeaux v. State,*
    1993 OK CR 57, 866 P.2d 417 ......................................... 28, 29

*Romano v. State,*
    1995 OK CR 74, 909 P.2d 92 .......................................... 23, 26

*Seabolt v. State,*
    2006 OK CR 50, 152 P.3d 235 ............................................. 36

*Shrum v. State,*
    1999 OK CR 41, 991 P.2d 1032 ...................................... 16, 19, 43

*Simpson v. State,*
    1994 OK CR 40, 876 P.2d 690 ............................................. 24

*Smith v. State,*
    1986 OK CR 158, 727 P.2d 1366 ...................................... 18, 43

*Spuehler v. State*
      1985 OK CR 132, 709 P.2d 202 ...................................... 10, 13, 18

*State v. Goins,*
      2004 OK CR 5, 84 P.3d 767 ................................................ 36

*Stouffer v. State,*
      2006 OK CR 46, 147 P.3d 245 ............................................ 19

*Strickland v. Washington,*
      466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ....................... 40

*Tomlin v. State,*
      1994 OK CR 14, 869 P.2d 334 ............................................ 37

*U.S. v. Felix,*
      503 U.S. 378, 112 S. Ct. 1377, 118 L. Ed. 2d 25 (1992) ..................... 14

*Vowell v. State,*
      1986 OK CR 172, 728 P.2d 854 ....................................... 34, 36

*Warner v. State,*
      2006 OK CR 40, 144 P.3d 838 .................................... 20, 21, 23

*Wiley v. State,*
      1976 OK CR 146, 551 P.2d 1146 .......................................... 18

*Williams v. State,*
      2001 OK CR 9, 22 P.3d 702 ........................................... 35, 39

## STATUTES

12 O.S.2011, § 2403 ...................................................... 30, 31, 42

20 O.S.2001, § 3001.1 ...................................................... 24, 27

21 O.S.2011, § 1289.13 ......................................................... 1

21 O.S.2011, § 142A-8 (A) .......................................... 30, 31, 32, 42

21 O.S.2011, § 701.7 ........................................................... 1

21 O.S.2011, § 801 .................................................... 1

22 O.S.2001, § 438 ................................................... 33

22 O.S.2001, § 439 ................................................... 33

22 O.S.2011, § 894 ......................................... 20, 22, 23

37 O.S.2011, § 8 ...................................................... 1

## RULES

*Rule 3.5(A)(5), Rules of the Court of Criminal Appeals,*
  Title 22, Ch. 18, App. (2014) ........................... 26, 27, 43, 44

*Rule 3.5(C), Rules of the Oklahoma Court of Criminal Appeals,*
  Title 22, Ch. 18, App. (2014) ..................................... 44

*Rule 3.5(C)(3), Rules of the Court of Criminal Appeals,*
  Title 22, Ch. 18, App. (2014) .......................... 15, 34, 39

*Rule 3.5(D), Rules of the Oklahoma Court of Criminal Appeals,*
  Title 22, Ch. 18, App. (2014) ..................................... 44

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

DEANDRE BETHEL,                    )
                                   )
        Appellant,           )
                                   )
v.                                 )     **Case No. F-2014-336**
                                   )
THE STATE OF OKLAHOMA,           . )
                                   )
        Appellee.            )

## BRIEF OF APPELLEE

## STATEMENT OF THE CASE

Deandre Bethel, hereinafter referred to as defendant, was tried by jury on February 4, 5, 6, 7, and 8, 2014, and found guilty of Count 1, First Degree Felony Murder, in violation of 21 O.S.2011, § 701.7; Count 2, Robbery with a Firearm, in violation of 21 O.S.2011, § 801; Count 3, Transporting Loaded Firearm in Motor Vehicle, in violation of 21 O.S.2011, § 1289.13; and Count 4, Public Intoxication, in violation of 37 O.S.2011, § 8, in Tulsa County District Court, Case No. CF-2012-660 (O.R. 312-315).[1] Jury trial was held with the Honorable James M. Caputo, District Judge, presiding. The jury recommended a sentence of Life imprisonment and no fine on Count 1, five (5) years imprisonment and no fine on Count 2, five (5) months imprisonment and a $250.00 fine on Count 3, and thirty (30) days imprisonment and a $100 fine on Count 4 (O.R. 312-315).

At the sentencing proceeding held on March 14, 2014, the trial court sentenced defendant in accordance with the jury's recommendation. It ordered Counts 1 and 2 to run consecutively with

---

[1] References to the Original Record will be cited by page as (O.R. _). References to the trial transcript will be cited by page number as (Tr. _), and references to the sentencing transcript will be cited as (S. Tr. _). State's Exhibits will be designated (S.E. _).

each other, but it ordered Counts 3 and 4 to run concurrently with each other and concurrently with .Counts 1 and 2. From this Judgment and Sentence, defendant has perfected his appeal to this Court.

## STATEMENT OF THE FACTS

In the early morning hours of February 4, 2012, a group of men, which included defendant, pointed guns at a car full of people in a parking lot near 18th and South Boston in Tulsa, Oklahoma, demanding wallets and cell phones. Twenty-four-year-old Byron Ivory was shot and killed during this robbery attempt.

Earnest (Jordan) Roberts, Bradley Jarrett, and Mr. Ivory were close friends who knew each other for years (Tr. 359-360). About 10:30 or 11:00 p.m. on February 3, 2012, the friends met up at Mr. Roberts' apartment, had a few drinks, and later decided to go out (Tr. 361). They first went to a nightclub called the Gray Snail. They went out in Mr. Ivory's car, a gunmetal gray Impala, and Mr. Ivory drove. They stayed at the Gray Snail for about 30 minutes, had some rum, and then left the Gray Snail to go to Club Pink, at 18th and Boston. It was around 1:30 a.m. by that point, and although it was nearly closing time, they just wanted to see the club let out. This involved seeing who came out of the club (Tr. 363, 417). Mr. Ivory drove, Mr. Roberts was in the passenger seat, and Mr. Jarrett was directly behind him in the backseat (Tr. 364). They eventually found a parking lot area next to a rail and a five-foot drop. They sat in the car for two or three minutes talking (Tr. 365). When they were about to get out of the car, a short guy dressed in a black or navy blue hoodie approached the Impala and asked, "[d]o I know you?" The man was an African American male with a "chin strap" where his sideburns connected with his beard, looping around the face without a mustache, and he was thinner and shorter than Mr. Roberts (Tr. 366-367, 378). Mr. Roberts looked

2

at the man and said, "I don't know." The man came up and put a gun to Mr. Roberts' chest (Tr. 367). It "felt like a circle of hard metal." (Tr. 368). Mr. Roberts was scared for his life because they were getting robbed (Tr. 368).

Mr. Roberts got out of the car and raised his hands and asked the robber if he wanted his cell phone and wallet because those were the only valuables he had (Tr. 369). The robber said, "[y]es." (Tr. 370). Mr. Roberts heard some rustling coming from where Mr. Ivory was, and Mr. Ivory said, "[l]et's hurry and get out." (Tr. 370). Based on this rustling noise, Mr. Roberts knew there were at least two people involved (Tr. 378). Mr. Roberts handed over his wallet and cell phone because he felt like he had to give the robber whatever he wanted (Tr. 371, 379) As soon as Mr. Jarrett realized something was wrong, he started running towards Club Pink. This caused one of the robbers to turn and look, as if he did not know that a third person was in the backseat. That gave Mr. Roberts a second to get away (Tr. 371).

Mr. Roberts took one step, jumped over the rail, landed, and started running towards Club Pink as fast as he could. He thought Mr. Ivory was still in the car, and he continued to hear the rustling sound (Tr. 372). The club was about twenty yards away (Tr. 372). As he was running towards the club, he heard "a lot of gunshots." He estimated he heard between five and ten shots, though he admitted he did not stop to count (Tr. 373).

When Mr. Roberts arrived at the club, he met up with Mr. Jarrett and they informed a security guard that they were robbed (Tr. 374). Mr. Jarrett no longer had his shoes on, even though he was wearing shoes earlier in the car (Tr. 375). Mr. Roberts asked a friend for a ride because he was afraid the robbers might come back, and he was afraid of going back where Mr. Ivory was (Tr. 375-

3

376). As they were leaving Club Pink, they saw an ambulance driving over to where they parked their car (Tr. 377). They went back to the apartment complex where they started the evening, and then they headed to Bartlesville, where they felt they would be safe (Tr. 376).

The whole time they were driving to Bartlesville, they attempted to call Mr. Ivory, but they could not reach him by telephone (Tr. 377). After they arrived in Bartlesville about 3:00 a.m., they received a call from Detective Jason White. He informed them that Mr. Ivory had passed away (Tr. 378).

Bradley Jarrett testified that when they arrived at Club Pink that evening, they sat there talking for no more than five minutes when they decided to get out of the car. Mr. Jarrett observed a black male staggering like he was drunk, who came up to the front passenger side of their car (Tr. 419, 422-423). He wore a stocking cap and a baggy, oversized coat, and he was shorter than Mr. Jarrett and skinny (Tr. 422-424). Mr. Roberts rolled down the window, and the man asked, "[d]o you guys know me?" They responded, "[n]o, we don't know you." He asked again and they said no. Ten seconds after that, Mr. Ivory said, "[h]ey, guys, hurry up and get out and go in." They all got out of the car. As Mr. Jarrett got out, he looked to his right and saw a silver-white sedan parked directly behind them (Tr. 420-421). There was a tall, African American male standing next to this car (Tr. 423). It seemed like the people were together (Tr. 423).

As soon as Mr. Jarrett turned back around to focus his attention on the guy on the passenger side, he heard gunshots (Tr. 421, 425). Mr. Ivory got out of the car extraordinarily fast "like somebody was over there[.]" (Tr. 422). It was "like he lunged out." (Tr. 422). Mr. Jarrett ran to Club Pink and lost his Nike Jordan shoes as he was running (Tr. 425-426).

4

Justin White was a firefighter for the City of Tulsa, assigned to Station Five at 18th and Boston, near SpiritBank and Club Pink (Tr. 474-477). It was a two-level station, and they went downstairs to keep an eye on the crowd near the station. A couple of fights had broken out earlier that evening (Tr. 477-478). The captain, Clay Ayers, actually called the police department due to the fights (Tr. 478). As they were standing outside, Mr. White heard nine to twelve shots fired in the parking lot between the fire station and the SpiritBank (Tr. 478). Mr. White ducked behind his truck and kept an eye out to make sure everybody was okay in their area (Tr. 479).

As he was behind the truck, he looked in the direction of the shots and saw a car leaving at a high rate of speed. One of the doors on the side of the car was still open as it was leaving. Mr. White was a "car guy" who grew up around cars, and he believed the car was a white, four-door Chevy Cobalt. Mr. White told Captain Ayers, who relayed this information to dispatch (Tr. 481-482). After that, they waited for the police department to respond to the scene. Then, the firefighters went over to the parking lot (Tr. 482).

A couple of people were standing around and Captain Ayers said, "[o]h, we've got a guy down." The victim was laying face down between two cars (Tr. 483). The victim had gunshot wounds and was gasping. They retrieved their tools and prepared the victim for EMSA to arrive (Tr. 484).

Officer Amley Floyd was working the graveyard shift on the morning of February 4, 2012. That morning, Officer Floyd responded to a call at 2400 East Apache, near Apache and Lewis (Tr. 541-542). Some EMS drivers had observed a man passed out at the steering wheel, with a gun in the passenger seat. Officer Floyd found a white Chevy Cobalt with a paper tag (Tr. 542). The brake

5

lights were on, like the driver was pressing on them. Although there was a green light, the car did not move (Tr. 543). Officer Floyd continued observing the car, but it stayed at the light for a few stoplight cycles, and the car did not move (Tr. 543).

Officer Floyd was concerned that the driver was intoxicated and asleep at the wheel (Tr. 544). Only one person was in the car, the driver (Tr. 544).

Officer Floyd waited for backup to arrive, and then the officer activated the lights and sirens. Then, Officer Floyd gave defendant commands over the loud phone to put his hands up and put the car in park (Tr. 545-546). Eventually, the driver popped his head up and proceeded through the intersection, slowly (Tr. 546). The car went for about 800 to 1,000 feet and then stopped. The officers placed their car in a tactical position. Officer Floyd saw defendant lean over the passenger seat, reaching for the floorboard, and he did this two or three times (Tr. 547). They were concerned defendant was trying to reach the firearm they knew he had (Tr. 548). Officer Floyd commanded defendant to put his hands outside the window (Tr. 548).

Defendant was the driver of the Cobalt (Tr. 548). As he got out of the car, he moved slowly. The officers commanded him to turn around, and he made a few turns. Defendant kept asking questions about when to stop and how to stop. He leaned against his car but kept falling over. Defendant had a strong odor of alcohol coming from his breath and body (Tr. 551). He had slurred speech and bloodshot eyes (Tr. 552). Defendant's nystagmus test confirmed he was intoxicated (Tr. 552). Because defendant kept falling over, no other tests were administered (Tr. 553).

6

Defendant asked what were his charges, and Officer Floyd explained it was currently public intoxication, but that if he blew a certain level, he would have a DUI. He would also be charged with possession of a loaded firearm (Tr. 553-554).

Defendant asked where the firearm was, and the officer explained it was in his car. Defendant told Officer Floyd he had the gun because he was told by an officer a couple of weeks prior to that that he needed a gun because someone was trying to kill him (Tr. 554). Defendant said he had been drinking at a bar downtown until midnight, but he claimed he did not remember anything between the time he left the bar and when he was found at the traffic light (Tr. 554). Defendant ultimately blew a .04 on the Breathalyzer test (Tr. 555). Although this was below the legal limit for alcohol intoxication, Officer Floyd opined he was intoxicated on something (Tr. 556). Defendant seemed to get more intoxicated as they were together. He would ask what the charges were, but then a few minutes later, he would ask the exact same question (Tr. 556).

Officer Jason White was a homicide detective with the Tulsa Police Department (Tr. 785). At approximately 2:24 a.m. on February 4, 2012, he was called to the scene of the murder (Tr. 788). When he arrived, there were not any suspects because nobody was coming forward. However, they obtained the surveillance video from the SpiritBank parking lot (Tr. 789; S.E. 72).

On the video, Officer White saw a white car consistent with a Chevy Cobalt (Tr. 791). A boxy-type sedan pulled up alongside the victim's car (Tr. 796). The other car was a white four-door sedan (Tr. 796). The video showed someone coming up alongside the victim's car, consistently with the surviving victims' accounts. There were muzzle flashes on the video, approximately two to two and a half minutes after the victim initially pulled into his parking spot (Tr. 791-792). After the

7

muzzle flashes, "[o]ne subject, two subjects, possibly a third . . . reentered the vehicle." (Tr. 797). Both of the cars left at a high rate of speed (Tr. 797-798).

At some point, Officer White interviewed Justin White from the fire department and got a make and model for one of the cars (Tr. 800-802).

Officer White also spoke with Mr. Jarrett and Mr. Roberts. He tracked them down because a wallet was left at the crime scene (Tr. 801).

Eventually, Officer White received information on a potential suspect, and he went and retrieved a firearm from the property room (Tr. 803). He typed in defendant's name in the database and learned that defendant was stopped and arrested around 2600 North Lewis and that the .40 caliber firearm which was recovered in the arrest was consistent with the caliber of one of the firearms used in the shooting (Tr. 804). Officer White then obtained a bullet fragment from the medical examiner's office. He checked out the gun and the only casings which could have been fired from the gun and transported them to the OSBI laboratory in Edmond (Tr. 806-807). Eventually, he heard back that the ballistics matched the gun (Tr. 809). He relayed this information to Detective Vic Regalado (Tr. 810).

Based on the information he had, showing that defendant was at Club Pink that night, that defendant's Chevy Cobalt was at the scene, that defendant was arrested with a .40 caliber gun about three hours after the murder, and that the gun was taken along with some of the evidence to Edmond and confirmed to match the casings found adjacent to the victim, he had defendant re-arrested (Tr. 811). Officer White testified it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812).

8

Officer White interviewed defendant. Defendant's story seemed inconsistent to Officer White because defendant claimed not to remember anything from 8:00 p.m. on February 3 until 5:00 the next morning. However, defendant did offer an explanation for how he got the gun that night (Tr. 823-824). Defendant was not able to provide any details that Officer White could follow up on (Tr. 824). He claimed he received a phone call, even though he earlier said his phone was turned off. Defendant claimed he did not have another phone that night. Nevertheless, he claimed he got the gun after he received a phone call from his "cousin" Larry Myers. Defendant did not have an answer when asked how this person knew to call or what phone defendant was using (Tr. 825).

Defendant made multiple calls from the jail. In one call, defendant admitted to his father that he was at the club that night despite telling Officer White he did not remember going to the club (Tr. 850; S.E. 76). Defendant's father asked, "was you there [sic]?" Defendant responded, "yes." (Tr. 854; S.E. 76). Defendant's father reminded defendant he told him to stay away from the club. Defendant responded, "I wasn't planning on going but I don't know what made me end up going in there." (Tr. 854; S.E. 76).

Additional facts will be presented as they relate to the individual propositions of error.

## PROPOSITION I

### SUFFICIENT EVIDENCE SUPPORTS DEFENDANT'S CONVICTIONS FOR FELONY MURDER AND ROBBERY WITH A FIREARM.

### A.    Standard of Review

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is that it will review the evidence in the light most favorable to the State, and will not

9

disturb the verdict if any rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204 (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). *See Gilson v. State*, 2000 OK CR 14, ¶ 177, 8 P.3d 883, 910 (reasoning, "[i]t is the exclusive province of the trier of fact to weigh the evidence and determine the facts.").

**B.    Argument and Authority**

In his first proposition, defendant alleges that the evidence was legally insufficient to prove all the elements of Robbery with a Firearm and hence, the evidence was insufficient to support his conviction for First Degree Murder, too. Defendant's allegations are two-fold: that the elements of Robbery were not present and that the evidence did not show that he was even there. Both of these claims must fail.

Defendant correctly sets forth the elements of Robbery with a Firearm on which the jury was instructed (O.R. 343, 345). However, he claims that the only evidence that the State presented concerning a robbery came from Mr. Roberts. Mr. Roberts testified that the man came up and put a gun to his chest, which "felt like a circle of hard metal." (Tr. 367-368). Mr. Roberts got out of the car and raised his hands and asked the robber if he wanted his cell phone and wallet because those were the only valuables he had (Tr. 369). The robber said, "[y]es." (Tr. 370). Mr. Roberts also testified he was scared for his life because they were getting robbed (Tr. 368). Moreover, there was testimony that when Mr. Roberts arrived at the club, he met up with Mr. Jarrett and they informed a security guard that they were robbed (Tr. 374). While Mr. Roberts may have had more verbal

interaction with the robbers, nothing in Mr. Jarrett's testimony contradicted Mr. Roberts' account of events in any way.

Defendant further claims that there was no evidence placing him at the scene. Naturally, defendant seeks to focus the Court's attention on the short, thin African American male who held the gun on Mr. Roberts, only briefly acknowledging that a tall African American male was also present at the scene (Tr. 423, 448). However, the fact that this taller man was defendant was confirmed by the evidence showing that defendant was found only a few hours later passed out in the white Chevy Cobalt observed at the scene, next to a firearm which was demonstrably used in the robbery (Tr. 804-809). There was testimony that it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812). *See Matthews v. State*, 2002 OK CR 16, ¶ 36, 45 P.3d 907, 920 (sufficient evidence included the fact that the Ruger identified as the murder weapon was found buried in a field next to Matthews' home). *See also Parker v. Martin*, Nos. 14-6111, 14-617, 589 Fed. Appx. 866, 869 (10th Cir. Oct. 29, 2014)[2] (unpub.) (considering the fact that Parker had the same physical characteristics as the murderer and was found hiding the murder weapon in concluding that witness Briggs' trial testimony was not false).

In fact, defendant does not deny possessing the murder weapon; he only disputes when he came to be in possession of it. However, defendant's story as to how he obtained the murder weapon was incredible. He claimed to not remember anything between 8:00 p.m. on February 3, 2012, and the time he was picked up around 5:00 a.m. **except for** an alleged firearms purchase based on the advice of a police officer from a man named "Rio," for which he provided no details which could

---

[2]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

be corroborated (Tr. 823-825). Defendant claimed he received a phone call, even though he earlier said his phone was turned off (Tr. 825). Defendant claimed he did not have another phone that night, even though he presently claims he had his girlfriend's phone. Nevertheless, he claimed he got the gun after he received a phone call from his "cousin" Larry Myers. Defendant did not have an answer when asked how this person even knew to call him (Tr. 825). Defendant's credibility is called into question by the fact that he repeatedly denied being at the club when the officer questioned him, but readily admitted he was at the club when his father asked him (Tr. 850, 854).

Defendant finally makes a last ditch argument: "assuming" he was present at the scene, he argues, "there was no evidence that he directly and actively committed the acts constituting the robbery at issue." This argument ignores the fact that multiple people in at least two cars were confirmed to surround the victims (Tr. 796-798). The jury was correctly instructed on the definition of acting "in concert" and the assistant district attorney correctly argued:

> Now, what does "in concert" mean? We charged [defendant] with in concert with unknown individuals. What that means is he didn't do it alone. He wasn't standing in that parking lot alone. He didn't drive his car in that parking lot alone. Do you remember in that SpiritBank video all of those people that walked out got out [sic] of that car? That's what that means. He wasn't alone. He didn't plan this thing alone. Okay.

(Tr. 1008).

Further supporting the fact that defendant acted in concert with other individuals, there were other guns used besides defendant's .40 caliber Smith and Wesson semi-automatic pistol. The projectiles recovered at the scene indicated that Glock and Hi-Point firearms were also used in the shooting (S.E. 70). The victim was riddled with gunshots (S.E. 73). This evidence shows that

12

multiple individuals in defendant's group participated in the shooting of Mr. Ivory, not one robber acting alone.

Based on the foregoing evidence, any rational trier of fact could find that defendant was present and participated in the robbery and murder of Mr. Ivory. *Spuehler*, 1985 OK CR 132, ¶ 7, 709 P.2d at 203-204. For the foregoing reasons, defendant's first proposition is without merit and must fail.

## PROPOSITION II

**BECAUSE DEFENDANT WAS CONVICTED OF THE ROBBERY OF MR. ROBERTS AND WAS SEPARATELY CONVICTED OF THE MURDER OF MR. IVORY, A SEPARATE VICTIM, THERE WAS NO DOUBLE JEOPARDY AND THE COUNTS DO NOT MERGE.**

### A.    Standard of Review

Where a defendant fails to raise a multiple punishment claim in the district court, the claim is waived and this Court will review only for plain error. *Logsdon v. State*, 2010 OK CR 7, ¶ 28, 231 P.3d 1156, 1167; *Head v. State*, 2006 OK CR 44, ¶ 9, 146 P.3d 1141, 1144. In *Peninger v. State*, 1986 OK CR 113, 721 P.2d 1338, this Court held that it no longer follows the single transaction theory of the law. Rather, it follows the test set out in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932): "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each requires proof of a fact which the other does not . . . ." *Peninger*, 1986 OK CR 113, ¶ 19, 721 P.2d at 1341.

**B.    Argument and Authority**

In his second proposition, defendant alleges that his separate convictions for Felony Murder and Robbery with a Firearm violate the Double Jeopardy Clause. Because separate convictions do not violate the prohibition against Double Jeopardy under the facts and circumstances of this case, this proposition is without merit and must fail.

The evidence in this case showed that, in addition to committing the robbery which resulted in the death of Mr. Ivory, defendant and his cohorts received property from Mr. Roberts in the process of robbing him, as Mr. Roberts gave the robbers his wallet and cell phone (Tr. 369-370). This was a separate and distinct offense from the robbery which led to the death of Mr. Ivory, even if the crimes occurred during the same transaction. *See Jennings v. State*, 1973 OK CR 74, ¶ 15, 506 P.2d 931, 935 ("where crimes against the person are involved, even though various acts are part of the same transaction, they will constitute separate and distinct crimes where they are directed at separate and distinct persons.") and *Clay v. State*, 1979 OK CR 26, ¶ 6, 593 P.2d 509, 510 (reasoning, "it is clear that offenses committed against different individual victims are not the same for double jeopardy or dual punishment purposes, even though they arise from the same episode or transaction."). *See also U.S. v. Felix*, 503 U.S. 378, 386, 112 S. Ct. 1377, 118 L. Ed. 2d 25 (1992) (holding that a mere overlap in proof does not establish a Double Jeopardy violation).

14

In fact, the present case is indistinguishable from the case of *Tony Decarlos Humdy v. State*,

Case No. F-1996-449 (Okla. Crim. App. Jan. 6, 2000)[3] (unpub.) in which this Court upheld separate

convictions for Attempted Robbery with a Firearm and Murder in the First Degree, reasoning:

> In Proposition II, Appellant argues that the double jeopardy provision prohibits conviction of attempted robbery with a firearm and felony murder based upon attempted robbery with a firearm.
>
> In this case, Appellant was convicted of the attempted robbery with a firearm of Paul Wilkes and was separately convicted of the murder of Keith Roach during the attempted robbery with a firearm of Keith Roach.
>
> In *Johnson v. State*, 1982 OK CR 135, 650 P.2d 875, we stated that two separate armed robberies occurred. In *Johnson*, money was taken from several McDonald's cash registers which constituted one offense and a customer's $5 bill which had been placed on the counter was taken constituting a separate robbery of the customer. Convictions for both offenses did not violate the double jeopardy prohibition. Likewise, in this case, there was an attempt to rob the occupants of the car and each victim constituted a separate offense. Because the attempted robberies were separate offenses, merger does not occur and *Manson v. State*, 1988 OK CR 124, 758 P.2d 324; *Castro v. State*, 1987 OK CR 182, 745 P.2d 394; and *Jefferson v. State*, 1984 OK CR 27, 675 P.2d 443, do not apply. There is no double jeopardy violation here.

*Humdy*, slip op., at 3-4. In *Johnson*, the case relied on by the *Humdy* Court, this Court found

separate victims, and thus upheld separate counts, reasoning that "[t]he acts of the appellant and his

accomplice(s) constituted two separate, yet intertwined offenses." *Johnson*, 1982 OK CR 135, ¶ 5,

650 P.2d at 876.

Because Mr. Roberts and Mr. Jarrett suffered a harm separately from Mr. Ivory, there were

separate offenses, and this Court should find that merger did not occur, pursuant to *Jennings, Clay,*

---

[3]Pursuant to Rule 3.5(C)(3), Title 22, Ch. 18, App. (2014), this unpublished summary opinion in *Humdy* is attached hereto as Exhibit A because no published opinion would serve as well the purpose for which it is being cited.

*Johnson* and this Court's on-point unpublished decision in *Humdy*. For the foregoing reasons,

defendant's second proposition is without merit and must fail.

## PROPOSITION III

**LESSER INCLUDED OFFENSE INSTRUCTIONS WERE NOT WARRANTED WHERE DEFENDANT TOOK THE STAND AND "TOTALLY DENOUNCED" ANY INVOLVEMENT IN THE ROBBERY WHICH LED TO MR. IVORY'S DEATH.**

### A.    Standard of Review

"The determination of which instructions shall be given to the jury is a matter within the

sound discretion of the trial court." *Patton v. State*, 1998 OK CR 66, ¶ 49, 973 P.2d 270, 288.

"Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment as

long as the instructions, as a whole, accurately state the relevant law." *Id.* In *Shrum v. State*, 1999

OK CR 41, 991 P.2d 1032, this Court held that it will apply the evidence test to determine whether

a lesser included offense instruction was appropriate. *Shrum*, 1999 OK CR 41, ¶ 10, 991 P.2d at

1036. Under the evidence test, this Court reviews the evidence to determine whether the instruction

was reasonably supported by the evidence. *Shrum*, 1999 OK CR 41, ¶ 12, 991 P.2d at 1037. "The

test is an objective one–we do not ask a jury to consider a lesser offense if no jury could **rationally**

find both that the lesser offense was committed and that the greater offense was not." *Frederick v.*

*State*, 2001 OK CR 34, ¶ 137, 37 P.3d 908, 943-944 (emphasis in original). "We have held that

where there is no evidence to support a lower degree of the crime charged or lesser included offense,

it is not only unnecessary to instruct thereon, the court has no right to ask the jury to consider the

issue." *Id.* at n.11 (citing *Boyd v. State*, 1992 OK CR 40, ¶ 11, 839 P.2d 1363, 1367-68).

16

**B.    Argument and Authority**

In his third proposition, defendant alleges that the trial court committed fundamental error by failing to instruct the jury on the lesser included offenses of Second Degree Depraved Mind Murder, Second Degree Felony Murder, and Accessory After the Fact. Because these lesser included offense instructions were not warranted by the evidence, the trial court did not err in failing to give such instructions *sua sponte* and defendant's third proposition must fail.

The most important thing to keep in mind about defendant's third proposition is that defendant took the stand in his own defense, denied killing Mr. Ivory, and denied any participation in the robbery (Tr. 979). He further testified he believed the car at Club Pink was not his 2009 Chevy Cobalt (Tr. 980-981). Based on defendant's own testimony, his attorney's hands were tied. During the instruction conference, the trial court correctly noted defendant's repeated denials of any involvement in the robbery and murder, albeit in the context of considering a voluntary intoxication instruction:

> Review of the evidence indicates that the defendant has indicated in statements to the police and - let me check - I think also today when he testified that he did not commit these crimes, so if he did not commit these crimes, then there is no defense of voluntary intoxication available to him, because that would available [sic] to someone who perhaps did do the crimes but doesn't recall doing the crimes because of the intoxication level. He was on the record today, and as on several other occasions, totally denounced any participation in any of these crimes.

(Tr. 1000).

Defense counsel properly agreed with the trial court's impeccable analysis:

> It's always a defense attorney's temptation to make a record in situations like this, saying about how they object, but I concur with

the Court's analysis, especially since this is my client's point of view. Even if he could in theory make this defense it would go against the strategy of the case designed to - designed to cause him to have a more favorable result. In other words, it would be a dissipation of argument to try to say on one hand we didn't do it, and on the other hand, if we did it, he was voluntarily intoxicated.

(Tr. 1000).

Obviously, this same rationale is equally applicable to the notion of any lesser included offenses, not just those associated with voluntary intoxication. The evidence showed defendant either was at the scene and was a full participant in the robbery, or he was not present at all. This foreclosed any lesser included offenses. This Court has long held that when a defendant claims to be innocent of any crime, he is not entitled to lesser-included offense instructions. *See Smith v. State*, 1986 OK CR 158, ¶ 17, 727 P.2d 1366, 1371 (reasoning, "when a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one." (quoting *Wiley v. State*, 1976 OK CR 146, 551 P.2d 1146, 1150)); *Spuehler*, 1985 OK CR 132, ¶ 9, 709 P.2d at 204 (applying this rule where the appellant took the stand and testified, admitting he was present at the scene of the homicide but claiming he had nothing to do with the killing of Lori Spuehler).

This same rationale is equally applicable to defendant's claim of entitlement to an instruction on Accessory After the Fact. Defendant's defense was that he purchased the firearm "innocently" because a police officer told him he needed it for his own protection. It must be reiterated, defendant denied any and all participation in the robbery (Tr. 979). There was no evidence adduced at trial that defendant knowingly took possession of a gun which he knew had been used in a robbery committed

18

by someone else, and, as for the car, defendant's claim was mistaken identity. Therefore, this instruction, like the others now requested by defendant, was not reasonably supported by the evidence. *Shrum*, 1999 OK CR 41, ¶ 12, 991 P.2d at 1037. Therefore, the trial court did not abuse its discretion in failing to give this instruction, either. *Patton*, 1998 OK CR 66, ¶ 49, 973 P.2d at 288.

For the foregoing reasons, defendant's third proposition is without merit and must fail.

## PROPOSITION IV

**BECAUSE THE RESPONSES RECEIVED BY THE JURY ACCOMPLISHED THE SAME RESULT AS IF THE COURT HAD BROUGHT THE JURY INTO THE COURTROOM AND RESPONDED VERBALLY, DEFENDANT HAS SHOWN NO ERROR FROM THE WAY JUROR QUESTIONS WERE HANDLED.**

**A.      Standard of Review**

The determination of which jury instructions shall be given is a matter within the discretion of the trial court. *Gilson*, 2000 OK CR 14, ¶ 96, 8 P.3d at 914 (citing *Patton v. State*, 1998 OK CR 66, ¶ 49, 973 P.2d 270, 288). An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *Stouffer v. State*, 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263. Moreover, where a defendant fails to object to the giving of a supplemental instruction without calling the jury into open court at trial, the error is waived. *See Hines v. State*, 1976 OK CR 325, ¶ 6, 557 P.2d 917, 919 ("Inasmuch as the defendants did not object to this action at the time of trial, an objection at this late date is not proper.").

## B.    Argument and Authority

In his fourth proposition, defendant alleges the trial court erred in failing to comply with the law governing contact with jurors during deliberations and by failing to advise deadlocked jurors not to surrender their honest convictions. Defendant alleges there were four separate notes to the trial court, but the record reveals three of those notes only pertained to housekeeping matters. The parties agreed on the court's response to the only substantive note sent out by the jury. Therefore, this proposition is without merit and must fail.

The statute relied on by defendant provides:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

22 O.S.2011, § 894. Of the four notes mentioned by defendant, only the second note expressed a "desire to be informed on a point of law arising in the cause."

Defendant concedes that the trial court did not see the jury's first note, and that the bailiff was able to provide the jury with a DVD player and a television. Considering that there were multiple DVD exhibits in this trial, the jury's need for a DVD player was readily apparent. The jury probably should have been provided this equipment from the beginning. Defendant alleges no prejudice from the bailiff's handling of this matter, nor does he suggest that he would have had a proper objection to the jury receiving this equipment. Contrary to defendant's suggestion, this Court should not "presume" prejudice from the bailiff's resolution of this routine housekeeping matter. In *Warner*

*v. State*, 2006 OK CR 40, ¶ 107, 144 P.3d 838, 875-876, this Court reasoned that "[n]ot every communication between the court and jury outside the presence of counsel is prohibited." Thus, "[c]ommunications with the jury regarding simple housekeeping matters do not give rise to a statutory violation." *Id.*

When the court received the second note, "What should we do if we cannot come to [unanimous] decision," the court considered the fact that the jury had reached unanimous decisions on some counts and concluded, "I don't think it's time for the dynamite instruction yet."[4] (Tr. 1059). But, the court wanted the input of counsel and asked, "[w]hat do you guys feel?" (Tr. 1059). Although defense counsel was concerned that the jury had reached a decision on the easy counts early, he admitted, "I believe you're right." (Tr. 1059). The court noted it would not second guess (Tr. 1059) ("They've been at it now for five hours, there's only four counts, I don't think that's an appropriate amount of time."). The State agreed, "Judge, I think at this point it's probably prudent just to send back a note, just say, continue deliberating. I don't know if it's appropriate for a dynamite instruction either." (Tr. 1059). The court concluded, "I don't think it is. I'm going to write back to them, please to continue to deliberate on those counts that you have not come to unanimous decision on. Fair enough?" (Tr. 1060). Both attorneys agreed with this proposed resolution (Tr. 1060).

Thus, it appears that all parties were in agreement it was too early to give the deadlocked jury charge, that the jury was not at an impasse but was merely in the midst of deliberations. Therefore, because no deadlocked jury charge was required at this point, there was no error in the failure to give

---

[4] The *Allen* instruction which the court alluded to was approved by the U.S. Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

21

a *complete* deadlocked jury charge. Under Oklahoma law, the trial court is required to exercise "great caution to say nothing to coerce an agreement or to indicate his feelings in the case." *McCarty v. State*, 1995 OK CR 48, ¶ 51, 904 P.2d 110, 125. The instruction to "continue to deliberate" clearly did not coerce an agreement.

Defendant alleges that the mandatory dictates of 22 O.S.2011, § 894 were not followed in giving this response. Counsel nowhere objected to the court providing a written response at trial. As noted above, where a defendant fails to object to an alleged violation of this procedure at trial, the error is waived. *Hines*, 1976 OK CR 325, ¶ 6, 557 P.2d at 919 ("Inasmuch as the defendants did not object to this action at the time of trial, an objection at this late date is not proper."). Even in the case of *Mitchell v. State*, 2011 OK CR 26, 270 P.3d 160, relied upon by defendant, the Court found that the appellant "was not prejudiced by the court's failure to strictly adhere to § 894 as the court's written response accomplished the same result as if the court had brought the jury into the courtroom and responded verbally." *Mitchell*, 2011 OK CR 26, ¶ 130, 270 P.3d at 188. Just so, in this case, the defendant has failed to explain how any different result could have been achieved by calling the jury back into the courtroom.

The remaining two notes were again housekeeping matters. In one note, the jurors asked the trial court to contact family members. In the next note, the jurors announced they arrived at a verdict. Neither of these notes constituted "a disagreement between them as to any part of the testimony" or a "desire to be informed on a point of law arising in the cause" within the meaning of 22 O.S.2011, § 894. Defendant further speculates that the trial court's response to the jurors regarding their request to contact family members was coercive to them. On the contrary, this was

22

just another housekeeping matter which did not pertain to the purposes of Section 894, and therefore, no statutory violation occurred. *Warner*, 2006 OK CR 40, ¶ 107, 144 P.3d at 875-876 ("[c]ommunications with the jury regarding simple housekeeping matters do not give rise to a statutory violation."). Of course, the jury's announcement of a verdict was the very opposite of a disagreement. Defendant mentions this fourth note apparently only to increase the tally of "communications" which occurred between the court and jury from three to four.

Because the parties agreed on the only note which fell within the parameters of Section 894, and the remaining notes all involved housekeeping matters, defendant's fourth proposition is without merit and must fail.

## PROPOSITION V

**THE OPINION TESTIMONY OF DETECTIVE WHITE WAS PROPERLY ADMITTED, ESPECIALLY WHERE THE LIMITATIONS OF HIS OPINION TESTIMONY WERE THOROUGHLY EXPLORED ON CROSS-EXAMINATION.**

### A. Standard of Review

The decision to admit evidence is discretionary with the trial court whose decision will not be disturbed on appeal unless clearly erroneous or manifestly unreasonable. *Dill v. State*, 2005 OK CR 20, ¶ 5, 122 P.3d 866, 868. "Opinion evidence on ultimate issues is generally admissible." *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109. "While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible." *Id.*

Furthermore, this Court has held, "[t]o be entitled to relief under the plain error doctrine, [an appellant] must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that

the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding." *Murphy v. State*, 2012 OK CR 8, ¶ 18, 281 P.3d 1283, 1290 (citing *Simpson v. State*, 1994 OK CR 40, ¶¶ 3, 11, 23, 876 P.2d 690, 694, 698; 20 O.S.2001, § 3001.1). The *Murphy* Court went on to reason, "[i]f these elements are met, this Court will correct plain error only if the error 'seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings' or otherwise represents a 'miscarriage of justice.'" *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290 (citing *Simpson*, 1994 OK CR 40, ¶ 30, 876 P.2d at 701).

## B.    Argument and Authority

Defendant's fifth proposition reads as a generalized objection to the testimony of Detective Jason White.    Defendant acknowledges that most of this testimony did not receive a contemporaneous objection but argues that Detective White's testimony denied the jury its fact finding function.  Because defendant has not identified any examples of testimony which were actually improper, and because the detective's opinions were thoroughly tested on cross-examination, this proposition is without merit and must fail.

Even though Detective White was the case agent, defendant objects to the way in which the detective synthesized various pieces of evidence, including testimony regarding the inconsistencies between defendant's interview, in which defendant claimed not to remember anything, and his phone calls, in which defendant admitted being at the club and made other admissions.  Essentially, defendant complains that the detective's recounting of the interview and other evidence, such as the result of the ballistics examination, was cumulative to other evidence admitted at trial, such as the videotape of the interview itself or the testimony of Terrance Higgs.  However, even if this were true,

24

this Court has held, "[t]he admission of evidence which is merely cumulative may not be held

reversible even though the evidence was inadmissible." *Al-Mosawi v. State*, 1996 OK CR 59, ¶ 57,

929 P.2d 270, 284.

The biggest flaw in defendant's fifth proposition is that it fails to take into account a cross-

examination which spanned fifty pages of the trial transcript and which thoroughly tested the limits

of Detective White's opinions. In cross-examining him, defense counsel brought out the fact that

Detective White could not "definitely say with one hundred percent certainty" that he saw defendant

in the videos from Club Pink (Tr. 880). Counsel emphasized defendant's story that he "had been

pretty well out of it all night and was driving his car around all night." (Tr. 882). Counsel brought

out the fact that the photographs and video from Club Pink were not presented to the jury (Tr. 883).

Defense counsel also challenged other assertions made by Detective White (Tr. 885-886)

("Okay. Now, you have referred to this item a number of times as the murder weapon, correct? Or

was that the prosecutor?"). He clarified he did not believe he called it that numerous times but "[i]t

is the gun that was tested by Terrance Higgs." (Tr. 886). Counsel also questioned Detective White

about the placement of the casings at the crime scene, and whether Detective White agreed with the

OSBI expert, Mr. Higgs, that you cannot tell when a casing or a fragment has been put down in a

parking lot (Tr. 888, 890). Counsel took this opportunity to work Mr. Higgs' prior testimony that

one could not tell when the fragments were placed at the scene into the question (Tr. 891). Detective

White conceded, "I see his point, and I see why he's answering that way." (Tr. 891).

Defense counsel further questioned Detective White about the term "burner" used by

defendant and whether a "burner" might just be a nickname for a gun, even one without a criminal

25

history. Detective White admitted it was just a street term (Tr. 910). Counsel even questioned the detective about reports of another robbery incident in the vicinity, and the possibility that the bullets were fired from another location (Tr. 914-916).

Counsel questioned Detective White about the number of jail calls made by defendant, and the fact that the State of Oklahoma only chose to present four of those calls (Tr. 920).

Finally, counsel got Detective White to concede that in searching defendant's residence, he obtained no weapons or cell phones or other evidence linking defendant to the crime (Tr. 926).

Therefore, while the State respectfully submits that there was no improper expert opinion and that defendant's real objection is to the cumulative nature of some of Detective White's opinions, the fact remains, counsel admirably attempted "to expose the imprecision" of White's opinions on cross examination, thus curing any error which may have been present in his opinion testimony. *Romano*, 1995 OK CR 74, ¶ 22, 909 P.2d at 110.

Defendant finally complains, without authority, that after Detective White's testimony, the State was able to argue the same inferences again in closing argument. This separate contention violates Court of Criminal Appeals Rule 3.5(A)(5), which requires that "[e]ach proposition of error shall be set out separately in the brief." The rule also provides that "[m]erely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal." *See* Court of Criminal Appeals Rule 3.5(A)(5), Title 22, Ch. 18, App. (2014); *Collins v. State*, 2009 OK CR 32, ¶ 32, 223 P.3d 1014, 1023 ("Under our recently revised Rule 3.5(A)(5), combining multiple issues in a single proposition is clearly improper and constitutes waiver of the alleged errors."); *Cuesta-Rodriguez v. State*, 2011 OK CR 4, ¶ 12, 247 P.3d 1192, 1197 (holding that

the appellant's assertion of jury instruction error during the sentencing stage of his trial was not properly presented where it was not set out as a separate proposition of error as required by Rule 3.5(A)(5)).

Ultimately, the testimony of Detective White was offered by the State for the proper purpose of proving its case, and defendant has not shown error in the inferences which Detective White made based on the evidence. As demonstrated by the existence of defendant's fourth proposition, the jury deliberated for hours before finally arriving at a verdict, after midnight. Surely, the jury would not have needed to deliberate at such length if it had simply deferred to Detective White's opinions. For the foregoing reasons, defendant's fifth proposition is without merit and must fail.

## PROPOSITION VI

### THE RECORDING OF DEFENDANT'S CONVERSATION WITH HIS MOTHER WAS PROPERLY ADMITTED WHERE DEFENDANT OBVIOUSLY DID NOT INVOKE HIS RIGHT TO SILENCE.

**A.     Standard of Review**

"This Court remains committed to the general rule that a timely objection must be made on the record to preserve any alleged error for appellate review." *Davis v. State*, 1990 OK CR 20, ¶ 6, 792 P.2d 76, 80. Moreover, as set forth in Proposition V above, "[t]o be entitled to relief under the plain error doctrine, [an appellant] must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding." *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290 (citing 20 O.S.2001, § 3001.1).

## B.     Argument and Authority

In his sixth proposition, defendant alleges that the admission of irrelevant and prejudicial evidence in State's Exhibit 28 resulted in a violation of his Due Process Rights. While defendant believes the jury should have heard the portion of the telephone call with his mother where he claimed to have bought the gun that night, defendant believes the jury should not have heard his mother's response to this incredible story, chastising him for failing to call his attorney prior to speaking with the police and telling him to "keep [his] mouth shut and ask for [his] attorney." (Tr. 861). Because defendant did not exercise his right to silence, and this conversation occurred after defendant voluntarily waived his right to silence and spoke with the police, this exhibit was not a commentary on his right to silence, and defendant's sixth proposition must fail.

Defendant's sixth proposition offers scant case law in support of his claimed error. In a footnote, defendant offers the rule of cases such as *Brown v. State*, 1975 OK CR 191, 541 P.2d 242, 244 and *Buchanan v. State*, 1974 OK CR 111, 523 P.2d 1134, 1137, that a prosecutor cannot comment on a defendant's pretrial silence, but he is required to concede that what happened actually was not a comment on the right to counsel. The State respectfully submits that a far more analogous case is *Ledbetter v. State*, 1997 OK CR 5, ¶ 11, 933 P.2d 880, 887, because, as in *Ledbetter*, defendant "obviously did not exercise his right to remain silent[.]" The whole purpose of the rule of cases such as *Brown* and *Buchanan* is to not penalize an appellant for exercising the right to remain silent. *Id.* The *Ledbetter* Court went on to hold that "had the prosecutor intended to introduce evidence of Appellant's sudden refusal to talk," there would be no error. *Ledbetter*, 1997 OK CR 5, ¶ 12, 933 P.2d at 887 (citing *Robedeaux v. State*, 1993 OK CR 57, 866 P.2d 417, 432).

28

This is because one who voluntarily speaks after receiving *Miranda*[5] warnings has not been induced to remain silent. *Id.*

In this case, State's Exhibit 76 revealed nothing more than defendant's remorse at having given the police the story that he just bought the gun (S.E. 76; Tr. 861) ("Should have kept my fucking [sic] mouth shut."). The fact that defendant regretted giving the police this information was relevant, probative evidence, as it reflected on the credibility of defendant's story as to how he came to be in possession of the murder weapon. Why would defendant regret telling the police he "just bought that damn [sic] gun that night" unless he knew the story was false? Like the appellant in *Ledbetter*, defendant "complains the probative value of this evidence was substantially outweighed by its prejudicial effect" but "he has failed to show how this is so, and he has failed to support his contention with relevant case law." *Ledbetter*, 1997 OK CR 5, ¶ 13, 933 P.2d at 887.

Because there was no actual error in the admission of this phone call as an exhibit, there was no plain error. *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290. For the foregoing reasons, defendant's sixth proposition is without merit and must fail.

**PROPOSITION VII**

**THERE WAS NO PLAIN ERROR IN THE ADMISSION OF THE SINGLE, IN-LIFE PHOTOGRAPH OF THE VICTIM OR IN THE COURT'S CONSIDERATION OF THE VICTIM IMPACT STATEMENTS.**

A.    **Standard of Review**

Ordinarily, the decision to admit evidence is discretionary with the trial court whose decision will not be disturbed on appeal unless clearly erroneous or manifestly unreasonable. *Dill*, 2005 OK

_____

[5]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

29

CR 20, ¶ 5, 122 P.3d at 868. "However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive." 12 O.S.2011, § 2403.

Moreover, the statute governing victim impact statements provides:

> Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement, which may include religious invocations or references, or may appear personally at the sentence proceeding and present the statements orally. Provided, however, if a victim or any member of the immediate family or person designated by the victim or by family members of a victim wishes to appear personally, the person shall have the absolute right to do so. Any victim or any member of the immediate family or person designated by the victim or by family members of a victim who appears personally at the formal sentence proceeding shall not be cross-examined by opposing counsel; provided, however, such cross-examination shall not be prohibited in a proceeding before a jury or a judge acting as a finder of fact. A written victim impact statement introduced at a formal sentence proceeding shall not be amended by any person other than the author, nor shall the statement be excluded in whole or in part from the court record. The court shall allow the victim impact statement to be read into the record.

21 O.S.2011, § 142A-8 (A).

**B.    Argument and Authority**

In his seventh proposition, defendant alleges that improper victim impact testimony and evidence was admitted at trial in violation of his Fourteenth Amendment rights. First, he alleges that the admission of the pre-mortem photograph of the victim was error. Second, he alleges error in the admission of statements from the victim's father and sister at the sentencing proceeding.

Defendant admits that counsel failed to renew his pre-trial objection to the admissibility of the in-life photograph of Byron Ivory. However, it is clear that any objection to this photograph would have been properly overruled, pursuant to 12 O.S.2011, § 2403, as it showed the "general appearance and condition of the victim while alive." *See Cole v. State*, 2007 OK CR 27, ¶ 52, 164 P.3d 1089, 1100 (upholding the admissibility of a full color photograph of minor decedent in a staged portrait setting); *Hogan v. State*, 2006 OK CR 19, ¶ 64, 139 P.3d 907, 931 (upholding the admissibility of a graduation photograph of the victim taken in 1986).

Defendant further alleges that Section 2403, as amended in 2002, "erodes the fundamental right to a fair trial by diverting the jury from making a reasoned moral response to the evidence to making an impassioned one." Defendant cites a 1961 case and a 1984 case in support of this argument but offers no authority holding that Section 2403 as amended is unconstitutional. Furthermore, the fact that the jury deliberated for hours before reaching a verdict and recommended only the minimum sentence of Life imprisonment for a shockingly brutal murder, and the minimum sentence of five (5) years for Robbery with a Firearm, negates any suggestion that the jury was carried away by passion (O.R. 353-354). *See Edington v. State*, 1991 OK CR 21, ¶ 7, 806 P.2d 81, 83 ("Appellant must be able to demonstrate prejudice from alleged errors in order to warrant reversal of her conviction.").

Defendant next alleges error in the admission of statements from the victim's father and sister at the sentencing proceeding. Defendant suggests that the first elements of plain error are present in this case. However, defendant fails to demonstrate how any part of the testimony of Byron Ivory, Sr., or Tanisha Livingston ran afoul of 21 O.S.2011, § 142A-8 (A). In fact, to the extent defendant

alleges that certain parts of the family members' statements should have been excluded, that claim is precluded by the statute's requirement that "[a] written victim impact statement introduced at a formal sentence proceeding shall not be amended by any person other than the author, nor shall the statement be excluded in whole or in part from the court record." 21 O.S.2011, § 142A-8 (A). But defendant's claim fails for a much more simple reason: defendant has failed to show that the introduction of these two statements affected his substantial rights. *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290.

Obviously, the court did not heed Ms. Livingston's advice to give defendant "the maximum sentence possible . . . without parole." (S. Tr. 17). The trial court sentenced defendant in accordance with the jury's recommendation, allowing for the possibility of parole, and it also ordered Counts 3 and 4 to run concurrently with each other and concurrently with the consecutive counts, Counts 1 and 2. Thus, even if defendant could somehow show that the victim impact statements started to veer off into improper territory, he has failed to overcome the presumption that the trial court did not consider improper aspects of these statements when it imposed the sentences recommended by the jury. *Bush v. State*, 2012 OK CR 9, ¶ 54, 280 P.3d 337, 348 ("The defendant . . . could not overcome the presumption that the trial court did not consider improper evidence during the trial." (citation omitted)).

For the foregoing reasons, defendant's seventh proposition of error is without merit and must fail.

## PROPOSITION VIII

### THE JOINDER OF COUNTS 3 AND 4 IN THE SAME TRIAL WITH COUNTS 1 AND 2 WAS PROPER AND NOT AN ABUSE OF DISCRETION.

**A.    Standard of Review**

This Court discussed the standard of review for defendant's eighth proposition in *Mitchell*

*v. State*, 2011 OK CR 26, ¶¶ 23-24, 270 P.3d 160, 170-171:

> Joinder of offenses is permitted pursuant to 22 O.S.2001, § 438. This section provides that multiple offenses may be combined for trial "if the offenses could have been joined in a single indictment or information[.]" This Court has allowed joinder of separately punishable offenses allegedly committed by the accused if the separate offenses "rise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." *Lott v. State*, 2004 OK CR 27, ¶ 34, 98 P.3d 318, 333 *quoting Glass v. State*, 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768. When there is a series of criminal acts or transactions, "joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan." *Id.*
>
> Offenses may be severed for trial when either the prosecution or the defense appears to be prejudiced. 22 O.S.2001, § 439. The decision to grant or deny severance is within the discretion of the trial court, and this Court will not disturb its ruling on appeal absent a clear showing of abuse of that discretion. *Brewer v. City of Tulsa*, 1991 OK CR 59, ¶ 13, 811 P.2d 604, 607. To establish an abuse of discretion, the appellant must factually demonstrate that the denial of severance deprived him of a fair trial, not merely that a separate trial might have offered him a better chance of acquittal. *Gates v. State*, 1988 OK CR 77, ¶ 24, 754 P.2d 882, 887–888.

**B.    Argument and Authority**

In his eighth proposition, defendant alleges the trial court committed reversible error by

failing to sever the trial of Counts 3 and 4 from the trial of Counts 1 and 2. Because defendant has

not shown that the joinder of these counts into one trial deprived him of his right to a fair trial, this proposition is without merit and must fail.

"This Court has encouraged the State to join for trial as many offenses as is permissible." *Vowell v. State*, 1986 OK CR 172, ¶ 9, 728 P.2d 854, 857 (citing *Allison v. State*, 1983 OK CR 169, 675 P.2d 142; *DeLaune v. State*, 1977 OK CR 278, 569 P.2d 463). "Judicial economy is thereby promoted. Rather than forcing the State to isolate and prosecute single transactions, joinder of the offenses is extended to those arising from a series of acts or transactions." *Id.* The *Vowell* Court found joinder to be appropriate where "[t]he acts herein were connected by time, proximity, and evidence." *Id.*

Likewise, in the case at bar, the homicide and robbery counts were connected by time, proximity, and evidence, to the public intoxication and transporting a firearm counts. Officer White testified it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812). It is very likely that the only reason the murder weapon was recovered in this case was that defendant was so intoxicated he passed out at the wheel of his car. While defendant alleges that the proof of the offenses did not overlap, defendant is simply wrong. Obviously, there was a close connection in time, and although the crimes may not have occurred in exactly the same place, there was a strong evidentiary connection. Defendant's continuing possession of the firearm allowed him to participate in the robbery which led to the death of Mr. Ivory. *Compare Timothy David Maher v. State*, Case No. F-2012-597, slip op., at 3 (Okla. Crim. App. Jan. 22, 2014)[6] (unpub.)

---

[6]Pursuant to Rule 3.5(C)(3), Title 22, Ch. 18, App. (2014), this unpublished summary opinion in *Maher* is attached hereto as Exhibit B because no published opinion would serve as well the purpose for which it is being cited.

("Appellant's possession of the sawed-off shotgun was an ongoing offense, whose commission coincided with the commission of the decedent's murder. Both offenses involved Appellant's misuse of a firearm and were connected by time, proximity and evidence.").

Moreover, there is no indication that the joinder of these offenses resulted in an unfair trial. The jury received Instruction No. 4, which read as follows:

> You must give separate consideration for each charge in the case. The defendant is entitled to have his case decided on the basis of the evidence and the law which is applicable to each charge. The fact that you return a verdict of guilty or not guilty for one charge should not, in any way, affect your verdict for any other charge.

(O.R. 322).

In *Mitchell*, this Court found that where the jury was instructed it must give separate consideration to each count, "[u]nder these circumstances, Appellant has failed to show that he was prejudiced by the joinder, nor do we discern any actual prejudice from our review of the record." *Mitchell*, 2011 OK CR 26, ¶¶ 27-28, 270 P.3d at 171. *See Williams v. State*, 2001 OK CR 9, ¶ 44, 22 P.3d 702, 716 ("It is well established that juries are presumed to follow their instructions."). In this case, there is not even a hint suggesting the jury failed to follow its instructions to give separate consideration to each count.

To establish error, a defendant "must factually demonstrate that the denial of severance deprived him of a fair trial, not merely that a separate trial might have offered him a better chance of acquittal." *Mitchell*, 2011 OK CR 26, ¶ 24, 270 P.3d at 171 (citing *Gates*, 1988 OK CR 77, ¶ 24, 754 P.2d at 887–888). Defendant has not shown that the joinder deprived him of a fair trial in this case. Moreover, a finding that no error occurred in this case would promote the salutary goal of

joining for trial as many offenses as is permissible, thereby encouraging judicial economy. *Vowell*,

1986 OK CR 172, ¶ 9, 728 P.2d at 857.

For the foregoing reasons, defendant's eighth proposition is without merit and must fail.

## PROPOSITION IX

### THE ADMISSION OF EVIDENCE SEIZED AS A RESULT OF THE TRAFFIC STOP AND ARREST OF DEFENDANT FOR PUBLIC INTOXICATION WAS PROPERLY ADMITTED.

**A.    Standard of Review**

When reviewing a trial court's ruling on a motion to suppress evidence based on a complaint

of an illegal search and seizure, this Court reviews for an abuse of discretion, deferring to the trial

court's findings of fact unless they are not supported by competent evidence and are therefore clearly

erroneous. *Gomez v. State*, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141 (citing *State v. Goins*, 2004

OK CR 5, ¶ 7, 84 P.3d 767, 768 and *Seabolt v. State*, 2006 OK CR 50, ¶ 5, 152 P.3d 235, 237). It

will review the trial court's legal conclusions based on those facts *de novo. Id.*

**B.    Argument and Authority**

In his ninth proposition, defendant alleges that the evidence of the firearm was the fruit of

an illegal search and seizure. Because the arrest of defendant and the seizure of the gun were proper

under the facts and circumstances of this case, where defendant committed an offense in the presence

of the officers, this proposition is without merit and must fail.

Defendant filed a pro se motion to suppress on May 29, 2013, alleging that "[o]fficers may

not make warrantless misdemeanor arrest based solely on information from a third party or on mere

36

suspicion of a misdemeanor," citing *Tomlin v. State*, 1994 OK CR 14, 869 P.2d 334 (O.R. 193-196). This is the only on point authority that defendant offers on appeal.

At the hearing on the motion to suppress, Officer Ian Adair, one of the backing officers, testified that when he looked in defendant's car, he saw a loaded magazine on the floorboard of the driver's side of the car (Tr. 8/27/13, Tr. 43). Later on, the gun was found underneath the driver's seat (Tr. 8/27/13, 44). As the trial court correctly reasoned, the arrest of defendant was based on the observations of the officers who made the arrest:

> As previously stated, the Court has read the transcript of the preliminary hearing and have heard the testimony today of Officer Floyd and Officer Adair. The issue was presented to this Court by the defense that there was no probable cause to arrest the defendant. And I will note that both officers today testified on their training, education and experience in recognition of intoxicated persons. Both officers testified as to what specific symptoms or red flags or triggers that they observed in this individual and notably both officers testified to totally different things.
>
> I find there was probable cause for the defendant to be arrested for at the very least public intoxication, therefore, there was probable cause for the arrest and thereafter because there was no one else to drive the vehicle, the car had to be removed from a public lane of traffic and was, therefore, inventoried prior to the towing of that vehicle when the subsequent firearm and magazine were found.
>
> So the motion to suppress will be denied at this time. If you'll give me just a minute here.

(Tr. 8/27/13, 55-56).

Officer Floyd described how when he came up on defendant's car, defendant "was stopped at a green light" and did not proceed through the intersection (Tr. 8/27/13, 26-27). Officer Floyd observed the car while he waited for backup to arrive, and defendant never proceeded through the intersection (Tr. 8/27/13, 27). When Officer Floyd's backup arrived and he commanded defendant

37

to get out of the car, defendant slowly rolled through the intersection instead (Tr. 8/27/13, 30). Defendant fails to deal with this initial information which the officers observed, which suggested defendant was either asleep at the wheel or being completely inattentive to driving. Moreover, "[a]s soon as he stepped out of the vehicle, he was unsteady on his feet, waving side to side pretty hard." (Tr. 8/27/13, 31).

Under these facts and circumstances, the officers had probable cause to arrest defendant and seize the firearm, based on their own observations. The seizure of the firearm was proper as being incident to a lawful arrest. Recall that defendant came to the attention of the police because some EMS drivers had observed a man passed out at the steering wheel, with a gun in the passenger seat (Tr. 542) ("We were assigned to a call. I believe the EMS had drove up on a vehicle where the driver was passed out at the steering wheel, and they saw a gun in the passenger seat."). Moreover, at the very least, a loaded magazine was in plain view, thus corroborating the report of the EMS workers and giving further probable cause that the offense of Transporting Loaded Firearm in Motor Vehicle had been committed (Tr. 8/27/13, Tr. 43). Furthermore, defendant's arrest for Public Intoxication, standing alone, justified a search of the passenger compartment of the car which officers observed him exit for evidence of that crime. *See Findlay v. City of Tulsa*, 1977 OK CR 113, ¶ 18, 561 P.2d 980, 984 (holding that where the officer observed that defendant was intoxicated in a public place, there was observation of a public offense, and the arrest was not illegal). *See also Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains

38

evidence of the offense of arrest."). *See also Mark Wallace Williams v. State*, Case No. F-2012-172, slip op., at 4 (Okla. Crim. App. July 24, 2013)[7] (unpub.) (applying the foregoing rule from *Gant* and reasoning that although defendant's arrest, standing alone, did not justify a search of the passenger compartment where the defendant was no longer within reaching distance, "[o]n the other hand, Williams' arrest for the offense of burglary/attempted burglary did justify a search of the passenger compartment of his vehicle for evidence of this crime.").

Furthermore, because defendant was under arrest for "at the very least public intoxication," and defendant's car was stopped in a public lane of traffic, his car was subject to being towed away and inventoried. Therefore, the trial court's alternate rationale for admitting this evidence was also correct. In *Lamb v. State*, 1977 OK CR 92, ¶ 9, 561 P.2d 123, 124, this Court upheld the search where Officer Highfield testified it was departmental policy to impound a car when the driver was arrested and there was nobody present in a sober condition to whom the car could be released. This case presented the same situation. *See also Williams*, slip op., at 4 (while the search of Williams' trunk was not justified by his arrest for burglary, "[n]evertheless . . . the search of the car's trunk and its contents-and indeed of the entirety of Williams' car-was justified by an entirely separate and distinct rationale, *i.e.*, that of inevitable discovery through an inventory search." (citing *Nix v. Williams*, 467 U.S. 431, 448, 104 S. Ct. 2501, 81 L. Ed. 2d 377)).

For the foregoing reasons, defendant's ninth proposition is without merit and must fail.

---

[7]Pursuant to Rule 3.5(C)(3), Title 22, Ch. 18, App. (2014), this unpublished summary opinion in *Williams* is attached hereto as Exhibit C because no published opinion would serve as well the purpose for which it is being cited.

## PROPOSITION X

### DEFENSE COUNSEL WAS NOT INEFFECTIVE WITHIN THE MEANING OF *STRICKLAND V. WASHINGTON.*

A.      **Standard of Review**

The test to apply in determining whether counsel was constitutionally ineffective is found in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In *Strickland*, the U.S. Supreme Court held that in order for a defendant to prevail on a claim of ineffective assistance of counsel, the defendant must identify "acts or omissions [which] show that counsel's representation fell below an objective standard of reasonableness." Furthermore, the reviewing court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, 466 U.S. at 689. Even if errors are identified, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. With respect to the prejudice prong of *Strickland*, the Supreme Court has since clarified that, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011) (citation omitted). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697. This Court consistently applies the Supreme Court's *Strickland* test to ineffective assistance of counsel claims. *Malone v. State*, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206.

**B.    Argument and Authority**

In his tenth proposition, defendant alleges that he was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. His allegations fall into three categories: A) "Failure to Adequately Protect the Record with Appropriate Objections"; B) "Failure to Request Instructions on Appropriate Lesser Related Offenses"; and C) "Failure to Present Critical, Available Defense Witnesses." As set forth more fully below, defendant has not shown that any of these alleged omissions creates a reasonable probability of a different outcome at trial. Defendant has waived the claims set forth in his Application for Evidentiary Hearing on Sixth Amendment Claim, and therefore, that request should be denied.

Defendant first alleges that counsel failed to adequately protect the record with appropriate objections. He alleges that counsel was ineffective for failing to object to the trial court's answer to the jury's question about what would happen if they could not reach a unanimous verdict. However, as discussed in Proposition IV above, the parties reasonably agreed that an *Allen* instruction was not warranted at that time, and defendant has shown no prejudice from the written response to continue deliberating.

Defendant next alleges that counsel was ineffective for failing to object to the allegedly improper opinions of Detective White. However, as discussed in Proposition V above, defendant did not have a valid objection to this testimony, and counsel thoroughly explored the limitations of Detective White's testimony in a thorough, fifty-page cross-examination. As this Court reasoned in *Patton v. State*, 1998 OK CR 66, 973 P.2d 270:

> Where objections that might have been raised would have been properly overruled and those that might have been sustained would

41

have amounted to at most harmless error had the ruling been incorrect, Appellant has failed to show that any errors by counsel were so great as to render the results of the trial unreliable.

*Patton*, 1998 OK CR 66, ¶ 129, 973 P.2d at 303.

Defendant next alleges that counsel was ineffective for failing to seek the redaction of State's Exhibit 28 to remove defendant's discussion with his mother about exercising his Sixth Amendment right to counsel. However, as previously discussed, this recording was properly admitted in its entirety where defendant obviously did not invoke his right to silence and the recording showed defendant's remorse at having given the police a story as to how he obtained the murder weapon. *See Ledbetter*, 1997 OK CR 5, ¶¶ 11-12, 933 P.2d at 887 (one who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent).

Finally, defendant alleges that counsel was ineffective for failing to object to the introduction of a pre-mortem photograph and victim impact testimony at the sentencing proceeding. As discussed in Proposition VII, counsel's performance was not deficient in either regard since the single photograph was clearly admissible under 12 O.S.2011, § 2403 and the victim impact testimony was admissible under 21 O.S.2011, § 142A-8 (A), and defendant has shown no prejudice from the admission of this evidence.

Defendant next alleges that counsel was ineffective for failing to request jury instructions on the lesser included offenses of Second Degree Depraved Mind Murder, Second Degree Felony Murder, and Accessory. However, because defendant took the stand and categorically denied any role in the murder of Mr. Ivory, none of these instructions were appropriate under the evidence test, wherein the evidence is reviewed to determine whether the instruction was reasonably supported by

the evidence. *Shrum*, 1999 OK CR 41, ¶ 12, 991 P.2d at 1037; *Smith*, 1986 OK CR 158, ¶ 17, 727 P.2d at 1371.

Finally, defendant alleges the failure to present critical, available defense witnesses, one who could have testified that defendant was with her at the time of the homicide and a second witness who could have testified he was with defendant when he allegedly purchased the handgun. He has filed an Application for Evidentiary Hearing on Sixth Amendment Claims, where he goes into these claims in detail. His claims that counsel was ineffective on these grounds are waived, and this Court's decision in *Garrison v. State*, 2004 OK CR 35, 103 P.3d 590, is dispositive of this issue:

> Appellant's brief raises these four claims generally in his brief-in-chief, on one half page. His application for evidentiary hearing, however, goes into the specifics in great detail—102 pages of detail to be precise, not including the hundreds of pages attached to the application as exhibits—and includes citations to and analysis of the matters within the record. This is a violation of Rule 3.11's provisions relating to applications for evidentiary hearing, the appellate brief content provisions of Rule 3.5, and the 100 page brief limitation of Rule 9.3. Concerning matters of ineffective assistance of trial counsel, an Appellant must set forth his or her assignments of error, supported by citations to the authorities, statutes, *and parts of the record*, within the appellate brief. An application for evidentiary hearing is meant to be an extract of the pertinent factual matters arising outside of the record, while appellate briefs are to contain the application of law to fact and the arguments pertaining to the issue at hand, ineffective assistance (especially those relating to matters in the record). The failure to raise in an appellate brief an issue within the record waives the issue. Rule 3.5(A)(5) and C(6). In the future, failure to fully raise and support by authority in the brief in chief *those issues contained within the record* will constitute waiver of those issues on appeal.

*Id.*, 2004 OK CR 35, ¶ 131 n.36, 103 P.3d at 612 n.36 (emphasis added).

Just like the defendant in *Garrison*, defendant's brief, which is fifty pages long, raises his remaining claim in general terms without even identifying the two alibi witnesses by name. His application for evidentiary hearing, however, goes into ten pages of detail, not including his attached exhibits. His application also contains citation to and analysis of matters *within the record. See* Application, at 2, 3, 4, and 6. As in *Garrison*, defendant's application violates this Court's Rules pertaining to the contents and the fifty-page limitation of an appellate brief. *See* Rules 3.5(A)(5), 3.5(C)(D), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2014). As defendant has failed entirely to "fully raise and support by authority in the brief in chief those issues contained within the record," he has waived his remaining claims of ineffective assistance of counsel. *Garrison*, 2004 OK CR 35, ¶ 131 n.36, 103 P.3d at 612 n.36.

For the foregoing reasons, defendant's tenth proposition is without merit and must fail.

## CONCLUSION

Defendant's contentions have been answered by both argument and citations of authority. The State contends that no error occurred which would require reversal or modification and therefore, respectfully requests that the Judgment and Sentence be affirmed.

Respectfully submitted,

E. SCOTT PRUITT
ATTORNEY GENERAL OF OKLAHOMA

*[signature]*

THEODORE M. PEEPER, OBA #19909
ASSISTANT ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921, Fax 522-4534

**ATTORNEYS FOR APPELLEE**

## CERTIFICATE OF SERVICE

On this 23rd day of March, 2015, a true and correct copy of the foregoing was mailed to:

Jamie D. Pybas
Division Chief
Homicide Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070

*[signature]*
THEODORE M. PEEPER

Exhibit
E

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

DEANDRE BETHEL,                        )
                                       )
        Appellant,                     )        NOT FOR PUBLICATION
                                       )
v.                                     )        Case No. F-2014-336
                                       )
THE STATE OF OKLAHOMA,                 )
                                       )
        Appellee.                      )

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

JUL 1 5 2015

MICHAEL S. RICHIE
CLERK

## SUMMARY OPINION

**JOHNSON, JUDGE:**

A jury convicted Appellant Deandre Bethel in the District Court of Tulsa County, Case No. CF-2012-660, of First Degree Felony Murder (Count 1), in violation of 21 O.S.2011, § 701.7, Robbery with a Firearm (Count 2), in violation of 21 O.S.2011, § 801, Transporting Loaded Firearm in Motor Vehicle (Count 3), in violation of 21 O.S.2011, § 1289.13, and Public Intoxication (Count 4), in violation of 37 O.S.2011, § 8. The jury assessed punishment at life imprisonment with the possibility of parole on Count 1, five years imprisonment on Count 2, five months imprisonment and a $250.00 fine on Count 3, and thirty days imprisonment and a $100.00 fine on Count 4. The Honorable James M. Caputo, who presided at trial, sentenced Bethel accordingly and ordered the sentences on Counts 1 and 2 to be served consecutively with each other, but ordered Counts 3 and 4 to run concurrently

with each other and concurrently with Counts 1 and 2.[1] Bethel appeals, raising

the following issues:

(1)    whether the evidence was sufficient to support his convictions for Counts 1 and 2;

(2)    whether his conviction and sentence for Robbery with a Firearm must be vacated because the same charge served as the underlying felony for his conviction of felony murder;

(3)    whether the district court erred by failing to instruct the jury on the lesser offenses of Second Degree Depraved Mind Murder, Second Degree Felony Murder, and Accessory After the Fact;

(4)    whether the district court failed to comply with the law governing contact with jurors during deliberations and failed to advise deadlocked jurors not to surrender their honest convictions concerning the weight of the evidence in order to reach a verdict;

(5)    whether he was denied a fair trial by the admission of improper law enforcement opinion testimony that invaded the province of the jury;

(6)    whether the admission of an audiotape recording of a jail phone call between Bethel and his mother resulted in a violation of his due process rights;

(7)    whether improper victim impact evidence was admitted at trial;

(8)    whether Counts 3 and 4 were improperly joined for trial with Count 1 and 2;

(9)    whether the district court erred in denying his motion to suppress evidence; and

(10)    whether he was deprived of the effective assistance of counsel.

Bethel also submits his Application for Evidentiary Hearing on Sixth

Amendment claims.

---

[1] Under 21 O.S.2011, § 13.1, Bethel must serve 85% of the sentences imposed on Counts 1 and 2 before he is eligible for parole.

2

Bethel's convictions on Counts 1, 3 and 4 are affirmed, but Count 2 must be reversed with instructions to dismiss for the reasons discussed below.

1.

Any rational trier of fact could find beyond a reasonable doubt that there was a forceful taking and carrying away of personal property in this case and that Bethel participated in the armed robbery during which the victim was killed. We find that the trial evidence was sufficient to sustain Bethel's convictions for First Degree Murder and Robbery with a Firearm based on the evidence presented in this case. *See Logsdon v. State*, 2010 OK CR 7, ¶ 5, 231 P.3d 1156, 1161; *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204.

2.

Bethel's second claim has merit and requires relief. He claims that his conviction for robbery with a firearm must be dismissed because separate convictions for felony murder and the predicate felony in this case violate the Double Jeopardy Clause. *See Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Perry v. State,* 1993 OK CR 5, ¶ 7, 853 P.2d 198, 200-201 (holding conviction for both felony murder and the underlying felony violates double jeopardy).

The State charged Bethel in Count 1 with the felony murder of Byron Ivory, Jr. that occurred during an attempted robbery involving Ivory and two

3

other alleged victims. The State charged Bethel in Count 2 with robbery with a firearm for the taking and asportation of personal property from these three individuals. The State elected to charge one count of robbery with a firearm based on the incident that resulted in Ivory's murder instead of charging separate acts of robbery based on the three victims involved. The Information alleged the same actions against the same victims in Counts 1 and 2 resulting in the same act serving as the basis for two crimes in violation of the Double Jeopardy Clause. Under *Brown, Harris* and *Perry,* Bethel's conviction for robbery with a firearm must be reversed and remanded to the district court with instructions to dismiss. *See Harris,* 97 S. Ct. 2912, 2913 ("When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one.")

3.

Reviewing the lack of lesser offense instructions for plain error only, we find the district court did not err in failing to submit, *sua sponte,* instructions on second degree depraved mind murder, second degree felony murder and accessory. *See Hogan v. State,* 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923 ("[t]he first step in plain error analysis is to determine whether error occurred"). "This Court has long recognized the rule of law that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence." *Harney v. State,* 2011 OK CR 10, ¶ 11, 256

4

P.3d 1002, 1005. Bethel's claim faulting the district court for omitting instructions on lesser offenses is without merit because the omitted instructions were inconsistent with his defense of innocence.

4.

We reject Bethel's claim that the district court's handling of jury questions during deliberations requires relief. The jury sent out four notes during deliberations, with notes 1, 3 and 4 pertaining to housekeeping matters only. The parties agreed on the court's written response to the only substantive note (note 2) submitted by the jury and Bethel did not object to the procedure used in its delivery. Under these circumstances, we review Bethel's claim for plain error only and find none. *Welch v. State*, 1998 OK CR 54, ¶ 42, 968 P.2d 1231, 1245.

Our statutes generally provide that there can be no communication with the jury by the judge or any third person except in open court. 22 O.S.2011, §§ 853, 857, 894. Of course, we have acknowledged that not every communication between the court and jury outside open court is prohibited; in particular, communications with the jury regarding simple housekeeping matters do not violate statutory prohibitions. *Perry v. State*, 1995 OK CR 20, ¶ 26, 893 P.2d 521, 528. Consequently we find no violation of section 894 or error with respect to the district court's handling of notes 1, 3 and 4 dealing with housekeeping matters.

Nor can Bethel establish error and prejudice with respect to the district court's handling of note 2. Title 22, Section 894 states:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

22 O.S.2011, § 894. "The purpose of Section 894 is to prevent communications from being made to the jury without the parties being present to protect their interests." *Mollett v. State*, 1997 OK CR 28, ¶ 42, 939 P.2d 1, 11-12 (internal quotations omitted). "This statute has been construed as mandatory only with regard to bringing the jury back into the courtroom, and the determination of whether the jury's request is granted is within the discretion of the trial court." *Cipriano v. State*, 2001 OK CR 25, ¶ 48, 32 P.3d 869, 879.

"When a communication between judge and jury occurs after a jury has retired for deliberations *on a matter within the scope of § 894* and that communication does not comport with § 894's requirements, a presumption of prejudice arises. The presumption may be overcome if, on appeal, this Court is convinced that on the face of the record no prejudice to the defendant occurred." *Smith v. State*, 2007 OK CR 16, ¶ 52, 157 P.3d 1155, 1172 (internal citations and quotations omitted) (emphasis added).

Note 2 asked what the jury should do if it could not reach a unanimous decision on some counts and how to proceed on the counts on which there was

unanimity. The parties and judge agreed a deadlocked jury instruction was premature because the jury had deliberated only a few hours. The district court instructed the jury to continue to deliberate on the unresolved counts. There was no violation of the underlying purpose of § 894 (preventing communications without parties' interests protected) in the handling of note 2 because the parties were consulted and approved the court's response. Bethel agreed that the court could respond in writing rather than returning the jury to open court. Any presumption of prejudice arising from the court's failure to bring the jury back into the courtroom is refuted by the record showing that the district court provided the jury with the response sanctioned by the parties. There is no showing of plain error; this claim is denied.

## 5.

Bethel was not deprived of a fair trial by the admission of improper "law enforcement" opinion. Contrary to Bethel's claim, the case agent did not vouch for the integrity of the investigation and his testimony was not unnecessarily cumulative, speculative or more prejudicial than probative. *See Postelle v. State,* 2011 OK CR 30, ¶ 31, 267 P.3d 114, 131 (discussing relevancy of evidence); *Harmon v. State,* 2011 OK CR 6, ¶ 48, 248 P.3d 918, 937 (discussing balancing relevancy of evidence against its prejudicial effect). The case agent testified about his part in the investigation and the collection of evidence. He did not comment on the veracity of any witness or tell the jury what result to reach. This claim is denied.

6.

Reviewing for plain error only, we find Bethel has not shown the district court erred in admitting the audiotape of his telephone call to his mother from jail. *See Hogan,* 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. Their conversation was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice. *See Postelle,* 2011 OK CR 30, ¶ 31, 267 P.3d at 131; *Harmon,* 2011 OK CR 6, ¶ 48, 248 P.3d at 937.

7.

The district court did not err in admitting an in life photograph of the murder victim that showed his general appearance and condition while alive. 12 O.S.2011, § 2403. The admissibility of such photographs is settled, and Bethel offers nothing new to warrant a different result in this case. *See Underwood v. State,* 2011 OK CR 12, ¶ 48, 252 P.3d 221, 242-43.

Reviewing for plain error only, we find Bethel has not shown error and prejudice from the presentation of victim impact statements from the victim's father and sister at formal sentencing under 21 O.S.2011, § 142A-8. *See Hogan,* 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

8.

The district court did not err in denying Bethel's motion to sever and allowing Counts 1 and 2 to be joined with Counts 3 and 4 for resolution in a single trial. *See Smith v. State,* 2007 OK CR 16, ¶ 21, 157 P.3d 1155, 1164; *Vowell v. State,* 1986 OK CR 172, ¶¶ 8-9, 728 P.2d 854, 857.

9.

The district court did not err in denying Bethel's motion to suppress evidence because Bethel's arrest for public intoxication was supported by probable cause. *See Coffia v. State,* 2008 OK CR 24, ¶ 5, 191 P.3d 594, 596.

10.

Bethel's ineffective assistance of counsel claim may be disposed of based on lack of prejudice.[2] *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Malone v. State,* 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206, *cert. denied,* ___U.S.___, 134 S.Ct. 172, 187 L.Ed.2d 119 (2013); *Head v. State,* 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. The merits of the substantive claims serving as the basis for this ineffective assistance of counsel claim have been addressed and rejected above. *See* Propositions 3, 4, 5, 6 and 7.

In conjunction with this claim Bethel filed an Application for Evidentiary Hearing on Sixth Amendment claims contemporaneously with his brief, attaching documents to support his claim that trial counsel was ineffective for failing to investigate and present testimony supporting his defense.

This Court will order an evidentiary hearing if "the application and affidavits . . . contain sufficient information to show this Court by clear and

---

[2] Bethel argues defense counsel was ineffective for failing to object to the district court's response to jury note #2, failing to object to improper opinions offered by the case agent, failing to have the prejudicial portions of his telephone call with his mother redacted, failing to object to the in life photo of the victim and the victim impact statements offered at formal sentencing, and failing to request instructions on lesser related offenses.

convincing evidence [that] there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015). Having reviewed Bethel's Request for an Evidentiary Hearing to develop this claim and the materials offered to support that request, we find that Bethel has failed to meet his burden. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015). Therefore, Bethel is not entitled to an evidentiary hearing to further develop his ineffective assistance of counsel allegations, and his motion, as well as this claim, are **DENIED**. *See Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

## DECISION

The Judgment and Sentence of the district court on Counts 1, 3 and 4 is **AFFIRMED**. Count 2 is **REVERSED** and **REMANDED** to the district court with instructions to **DISMISS**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE JAMES M. CAPUTO, DISTRICT JUDGE

**APPEARANCES AT TRIAL**

STEVE VINCENT
ATTORNEY AT LAW
7122 S. SHERIDAN, SUITE 2372
TULSA, OK 74103-3805
ATTORNEY FOR DEFENDANT

KALI STRAIN
JOHN SALMON
ASSISTANT DISTRICT ATTORNEYS
500 S. DENVER, SUITE 900
TULSA, OK 74103
ATTORNEYS FOR STATE

**APPEARANCES ON APPEAL**

JAMIE D. PYBAS
P. O. BOX 926
NORMAN, OK 73070
ATTORNEY FOR APPELLANT

E. SCOTT PRUITT
OKLAHOMA ATTORNEY GENERAL
THEODORE M. PEEPER
ASSISTANT ATTORNEY GENERAL
313 N.E. 21ST STREET
OKLAHOMA CITY, OK 73105
ATTORNEYS FOR APPELLEE

**OPINION BY: JOHNSON, J.**
**SMITH, P.J.: Concur**
**LUMPKIN, V.P.J.: Concur**
**LEWIS, J.: Concur**
**HUDSON, J.: Concur**

RA

# AFFIDAVIT OF DEANDRE BETHEL

| | | |
|---|---|---|
| State of Oklahoma | ) | |
| v. | ) | Case No. CF-2012-660 |
| DeAndre Bethel | ) | |

DeAndre Bethel
#690424
Lawton Correctional Facility
8607 SE Flowermound Rd.
Lawton, OK 73501

     I DeAndre Bethel, of lawful age and sound mind currently being incarcerated at Lawton Correctional Facility swear that the following is true and correct to the best of my knowledge. The case number referred to is CF-2012-660, in the District Court of Tulsa County for the State of Oklahoma.

     I was arrested and convicted in Case #CF-2012-660, for Felony Murder of Bryon Ivory Jr. with the underlying felony of Robbery with a Firearm. I was arrested asleep at a stop light with a weapon used in the commission of the crime in my vehicle the following morning. I absolutely denied any involvement in the crime and testified that I bought the gun earlier that morning from an individual named Rio and that LaHarry Myers was also present during that buy.

     After my conviction, I self-investigated the crime and newly discovered who committed the crime and also discovered several eyewitnesses at the crime scene. I discovered LaHarry Myers was the shooter and the individual that pressed the gun into Mr. Roberts chest, also, the individual I identified at trial whom I bought the gun from as Rio, drove the vehicle and fought with Byron Ivory Jr. There was also three (3) other people who witnessed the crime, of which, two (2) of the eyewitnesses have also submitted affidavits (Elza Riley & DeAndre Williams). These affidavits demonstrate that I am actually innocent of these crimes. The evidence further demonstrates that had my trial counsel investigated, interviewed, and called these eyewitnesses to testify at trial, then I would have been found not guilty.

     Further, I did not tell my trial counsel to concede to the Robbery with a Firearm, neither overtly nor purposely. Mr. Vincent did not consult with me about conceding to the robbery and I never would had conceded because I did not rob or participate in any robbery/murder.

DeAndre Bethel
#690424
Lawton Correctional Facility
8607 SE Flowermound Rd.
Lawton, OK 73501

_____
Signature of Affiant

Subscribed and Sworn to by me this 26 day of September 2016.

_____
Notary Public

NOTARY PUBLIC State of OK
C. TOPPING
Comm. # 13011277
Expires 12-16-2017

My Commission Number is: 13011277

My Commission Expires: 12/16/2017

Exhibit

G

STATE OF OKLAHOMA    )
                         ) ss.

COUNTY OF TULSA      )

## AFFIDAVIT OF DEANDRE ARMON WILLIAMS

I, Deandre Armon Williams, being of sound mind and legal age, do hereby state under oath:

1.      My name is Deandre Armon Williams. I am a friend of Deandre Bethel. We have known each other since 2007.

2.      I was charged jointly with Deandre Bethel in Tulsa County District Court Case No. CF-2012-0660, with First Degree Felony Murder in the Commission of a Robbery with A Firearm, for the death of Byron Ivory, Jr., on February 4, 2012. Our trials were severed. Deandre went to trial first. My trial was scheduled to begin on September 15, 2014. Prior to trial, I entered a plea of guilty to Accessory After the Fact and was sentenced to seven years, with two years in the custody of the Department of Corrections and five years suspended under the supervision of the Division of Probation and Parole.

3.      I saw Deandre Bethel around 4:00 a.m. on the morning of February 4, 2012. I called Deandre on the phone to see where he was. He said he was over in the vicinity of my house near Lucky Sam's convenience store on North Lewis. I told him to meet me at Lucky Sam's. We met there and saw LaHarry Myers, otherwise known as "L.J," getting out of his white Crown Victoria in the parking lot. Deandre asked L.J. if he still had a gun for sale. L.J. said he still had some guns and they would need to go around the corner near the 007 Club to get the guns. Deandre said a cop named "Sticks" told him he needed a gun for protection because the Hoovers were trying to get at him. All three of us drove in separate cars to the location. I was driving my brother's maroon 2000 Chevy Tahoe. It took less than a minute to get to the house. I did know whose house it was. Once at the house, I got out of my car and got into Deandre's white car. L.J. came up and said he was going inside the house to get the guns. A few minutes later, L.J. came out of the house with two guns, a .40 caliber and a 9 millimeter and showed them to us. Deandre asked him if there was anything wrong with the guns and whether they were "hot." L.J. said the guns were fine. Deandre gave L.J. $150.00 in exchange for the .40 caliber gun. I told them I would talk to them later. I got back into my vehicle and left.

4.      I never told this information to the police and I was never asked about it. I invoked my right to counsel when I was interrogated by Detective Jason White and he terminated the interview. Deandre Bethel's trial lawyer never contacted me about this information prior to trial, nor did anyone from his staff. I was willing to testify and would have done so had I been asked to appear on Deandre's behalf.

Dated this 16 day of December, 2014.

Deandre Armon Williams

Signed and subscribed to before me this 16 day of December, 2014.

Kim Alyce Marks, Notary Public
Commission #04006555
Expires July 20, 2016

## <u>AFFIDAVIT OF DEANDRE WILLIAMS</u>

State of Oklahoma )
v. ) Case No. CF-2012-660
DeAndre Bethel )

DeAndre Williams
300 N. Denver
Tulsa, OK 74103

I, DeAndre Williams, of lawful age and sound mind currently being incarcerated at Tulsa Justice Center swear that the following is true and correct to the best of my knowledge. The case number referred to is CF-2012-660, in the District Court of Tulsa County for the State of Oklahoma.

I, DeAndre Williams have known DeAndre Bethel for approximately five (5) years.

On February 4, 2012, I was riding in a white vehicle with my friends Rio and LaHarry Myers a/k/a L.J. Rio was driving his own vehicle. L.J. was in the passenger seat and I sat in the backseat. We pulled into the parking lot of Club Pink at around 1:40 a. m. L.J. had been previously in an altercation with Bryon Ivory. Bryon had robbed L.J. some days earlier. Rio had set up a meeting between Bryon and L.J. so they could fight. We pulled into the parking lot then L.J. and Rio got out and approached Bryon's car. Rio and Bryon begin to tussle. Bryon's gun fell and went off and L.J. and Rio started shooting back at Bryon. Rio picked up Bryon's gun and we left the seen. I did not know that there would be any shooting involved. I thought it would just be a fistfight. I stood back and observed what happened. Rio and L.J. acted alone. DeAndre Bethel was not present or involved in any manner.

Later that mourning L.J. contacted DeAndre Bethel and asked him if he wanted to buy one of the guns. The gun L.J. sold was the gun L.J. used to shoot Bryon. It was a black and silver .40 caliber Smith & Wesson.

I never told this information to the police and I was never asked about it. Mr. Bethel's trial attorney never contacted me about this information before trial, nor did any of his staff. Mr. Bethel's appellate counsel never requested information about the commission of the crime and I never told her. I was willing to testify and would have testified to the aforementioned information on DeAndre's behalf if requested to appear at trial. I am still willing to testify.

DeAndre Williams
300 N. Denver
Tulsa, OK 74103

Signature of Affiant

Subscribed and Sworn to by me this _____ day of _____ 2016.

Notary Public

My Commission Number is: _____

My Commission Expires : _____


Exhibit

H

## AFFIDAVIT OF ELZA RILEY

State of Oklahoma         )
v.                        )     Case No. CF-2012-660
DeAndre Bethel          )


Elza Riley
#531017
Lawton Correctional Facility
8607 SE Flowermound Rd.
Lawton, OK 73501


I Elza Riley, of lawful age and sound mind currently being incarcerated at Lawton Correctional Facility swear that the following is true and correct to the best of my knowledge. The case number referred to is CF-2012-660, in the District Court of Tulsa County for the State of Oklahoma.

I, Elza Riley have known DeAndre Bethel for approximately twelve (12) years.

I, Elza Riley was present at Club Pink on February 4, 2012 at 1:40 a. m. I was parked in the parking lot and I observed the shooting that occurred. I saw another car parked in the parking lot and a white car pull up behind it. Three (3) individuals got out of the white car and I recognized LaHarry Myers a/k/a L.J. and another person pull guns and shoot Bryon Ivory Jr. I also recognized another individual standing by the shooters vehicle (DeAndre Williams). This was retaliation for Bryon Ivory robbing Mr. Myers some days earlier. After the shooting I immediately left the seen in a dark colored vehicle (blue Oldsmobile). No one in our vehicle participated in the incident we just witnessed what happened and left the scene.

I was never approached by police or questioned by Mr. Bethel's attorney as to what I witnessed. Had I been contacted and requested to testify, then I would have testified that DeAndre Bethel was not involved in the shooting or robbery of Mr. Ivory.

_____
Elza Riley

#531017

Lawton Correctional Facility
8607 SE Flowermound Rd.
Lawton, OK 73501

Comanche County            )
                           )        ss.
State of Oklahoma          )


_Elzy Riley_
Signature of Affiant


Subscribed and Sworn to by me. This 22nd day of _June_ 2016.

NOTARY PUBLIC State of OK
MARGO SALDANA
Comm. # 15005196
Expires 06-04-2019

_Margo Saldana_
Notary Public

My Commission Number is: _15005196_

My Commission Expires: _06·04·2019_

Exhibit

工

STATE OF OKLAHOMA     )
                           ) ss.

COUNTY OF TULSA       )

## AFFIDAVIT OF WANDA JANELL SMITH

I, Wanda Janell Smith, being of sound mind and legal age, do hereby state under oath:

1.      My name is Wanda Janell Smith. I am a friend of Deandre Bethel. We have known each other since high school – about 4 ½ years.

2.      I was with Deandre Bethel on the evening of February 3, 2014, and into the early morning hours of February 4, 2014. We were dating at the time. Around 1 p.m., Deandre dropped me off at the home of my best friend, Neka. He came back over at about 9 p.m. We were hanging out, playing dominoes and drinking. I saw him take a couple of Xanax bars. Around 1 a.m., we left for my mother's house. We drove his white Cobalt car. My mother lived at 539 E 49th Place in Tulsa. At that point, Deandre was pretty messed up. My grandmother called me at around 3 a.m. She stayed around the corner. She was ill and needed my help to be moved from her bed to the living room. Deandre and I went over to her house to help her. Then around 3 a.m., Deandre's friend, LJ (LaHarry Myers), called my cell phone. Deandre did not have a phone that worked at the time. LJ asked if "Belly" was with me. "Belly" was Deandre's nickname. I gave Deandre my phone and he was talking to LJ, but I didn't know what they were saying. After he finished talking, Deandre told me he was going to meet LJ to go buy a gun. I told Deandre, "Let me go with you." He told me no and we got into it and argued. Deandre did not want me to go because he thought LJ was going to rob him. We argued some more. I got out of the car and he drove off. Later that morning, I got a phone call that Deandre was in jail.

3.      I was never contacted by the police, the district attorney's office or any defense attorneys who represented Deandre Bethel before his trial in February 2014. I remember talking to Deandre's pastor about the information in this affidavit.. He told me Deandre's lawyer would be calling and interviewing me, and would ask me to testify at Deandre's trial.

4.      Deandre's trial lawyer never contacted me prior to trial. No one from the trial attorney's staff contacted me. I was willing to testify and would have done so had I been asked to appear on Deandre's behalf.

Page 1 of 2

Dated this _16th_ day of December, 2014.

_Wanda Janell Smith_
Wanda Janell Smith

Signed and subscribed before me this ___16th___ day of December, 2014.

_Kim Alyce Marks_

**Kim Alyce Marks, Notary Public**
**Commission #04006555**
**Expires July 20, 2016**

Exhibit

5

**STATE OF OKLAHOMA**      )
                                         )

**COUNTY OF CLEVELAND**     )

### AFFIDAVIT OF JOLENE PERHAM

I, Jolene Perham, being of sound mind and legal age, do hereby state under oath:

1.     My name is Jolene Perham and I am employed as an investigator in the Homicide Direct Appeals Division of the Oklahoma Indigent Defense System (OIDS) in Norman, OK.

2.     In my capacity as an investigator with OIDS, I was assigned to retrieve the trial files from the trial attorney for Mr. Deandre Bethel. Mr. Bethel is appealing his conviction in Tulsa County Case No. CF-2012-660, Oklahoma Court of Criminal Appeals Case No. F-14-366

3.     On June 5, 2014, I received 1 box of trial files from Steven W. Vincent, Mr. Bethel's trial attorney. This file contained 3031 pages of documents, including 24 CD's/DVD's, pertaining to Mr. Bethel's case.

4.     Pursuant to the policy of the Oklahoma Indigent Defense System (OIDS), the trial files are delivered to Ms. Norma Dumas who bates-stamps, in consecutive order, the identifying initials of trial counsel ("SWV" which stands for Steven W. Vincent) and numbers every piece of paper and item(s) from the trial files. This is done to differentiate these documents from any other documents obtained by OIDS.

5.     After searching through the Trail Attorney files the following document was retrieved:

      A.     Letter of correspondence (not dated) to Mr. Vincent from Glenda Gray. The letter consists of one (1) page, and bears the bate-stamp number SWV 1311.

I have read this statement consisting of one (1) page and I state that the foregoing is true and correct.

_____         12/22/2014
**Affiant / Jolene Perham**                      **Date**

Signed and subscribed to before me on the 22nd day of December , 20 14, in

Cleveland _____ County, Oklahoma.

_____
Notary Public
Commission #
Expiration Date:

LEA ANN ISLEY
NOTARY
# 95018393
EXP. 11/10/15
STATE OF OKLAHOMA
PUBLIC

Dear Mr Vincent

I am sending vital information regarding my son Deandre Bethel's case. Tulsa county has in custody Trey Marzett. He's contacted Deandre and wishes to speak with you regarding this case. HeTrey, somehow feels you may already have knowledge of the some of the facts he wishes to discuss with you. This information is important for Deandre's defense.

Here also are the names of the witness for Deandre Bethel:

Wanda Smith    529 E 49th PL N Tulsa, OK 74126    918 282 9931 or 918 902 5075

Ashley Hervey  219 E 52nd PL N tulsa, OK 74127    918 852 1949

Mr Vincent we are also wondering whenyou will and why you have not been to visit Deandre yet. He needs to discuss the defense tactics the plans you have to execute his defense. His trial date is almost upon us and to our knowledge not much has transpired to give Deandre a secure feeling that his best interest is being represented. This is based on the little communication between you two and even the few timesiI have spoken with you.

I have left messages on your cell and left messages at your office with no return calls. Deandre has written letters to your office also and haven't gotten any responses. This is another attempt to contact you as we do not know if you are receiving these messages.

Thanking you in advance for your consideration and your time in responding to this letter.

Glenda Gray

PO BOX 2404 Tulsa , OK

918 851 1205

1

SWV 1311

# IN THE OKLAHOMA COURT OF CRIMINAL APPEALS

DEANDRE BETHEL,       )
                                )
          Petitioner,     )
                                )
v.                            )     Case No.
                                )
STATE OF OKLAHOMA     )
                                )
          Respondent.    )
                                )

## MOTION FOR EVIDENTIARY HEARING

COMES NOW, DeAndre Bethel, Petitioner pro se in the instant action and moves the

Court to conduct an evidentiary hearing on *Sixth Amendment* claims of Ineffective

Assistance of Counsel contained in the Application for Post-Conviction Relief pursuant to Title

22 O.S. § 1080 et. seq. Rules 3.11(B)(3)(b) & 5.4, Rules of the Oklahoma Court of Criminal

Appeals. Title 22, Ch. 18 App.; and *Berget v. State*, 1995 OK CR 66, 907 P.2d 1078.

Mr. Bethel is proceeding pro se, under *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1087 (2007); *Andrews v. Heaton*, 483 F.3d 1070, 1116 (10th Cir. 2007); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 562 (1972) (Taking into account that a pro se pleading is to be held to a less stringent standard than one formally submitted by an attorney); and claims *Hughes v. Rowe*, 449 U.S. 4, 9, 101 S.Ct. 173 (1980) (The Court must review liberally and interpret pro se arguments to raise the strongest arguments that they suggest.). Mr. Bethel prays the Court's forbearance in reviewing the Habeas Petition.

Mr. Bethel demonstrates herein that there are genuine issues of material fact existing in

the instant matter, which may only be resolved through the testimony of witnesses and

introduction of evidence that are presently outside the original record. "When a colorable Sixth

Amendment claim is presented and where material facts are in dispute involving inconsistencies

beyond the record a hearing is necessary." *Id, United States v. Moore,* 950 F.2d 656, 661 (10th

Cir. 1991). Due to evidence not in the Application for Post-Conviction Relief including affidavits

and the incompleteness of the record and issues that require proof not contained in the record

pertaining to ineffective assistance of counsel setting forth clear and convincing evidence

necessary under Rule 3.11(B)(3), that demonstrates ineffective assistance of both trial and

appellate counsels. Whereby, counsels failed to investigate, interview, and call to testify crucial

witnesses pertaining to Mr. Bethel's actual innocence. Wherefore, Mr. Bethel requests an

evidentiary hearing upon his colorable *Sixth Amendment* claims.

## BACKGROUND

February 4, 2012, Bryon Ivory, Ernest Roberts and Bradley Jarrett pulled into the parking lot of

Club Pink at approximately 1:40 a.m. As the men sat in the vehicle, another car pulled into the

parking lot, parking behind the victims with their lights on. One individual approached the vehicle,

while Mr. Roberts was exiting Mr. Ivory's vehicle. The person asked Mr. Roberts did he know him.

Mr. Roberts said, "No." The assailant pulled a gun and stuck it in Mr. Roberts' ribs. Mr. Roberts took

out his wallet and cell phone, offered the wallet and cell phone to the assailant as an escape

mechanism to save his life then turned, and ran. Roberts' jumped over a four-foot wall with a five-

foot drop-off on the other side. Mr. Jarrett also exited the vehicle and ran, but before running saw

two individuals standing beside the car parked behind them. Mr. Jarrett ran so hard that he ran out of

his Nikes. There was shooting and a short time later Mr. Ivory was discovered dead from gun shot

wounds.

Several Tulsa Firefighters witnessed two cars leaving the parking lot in a hurry. They described

one of the vehicles as a white Chevy Cobalt. Several hours later Mr. Bethel was discovered sleep at

an intersection street light in a white Chevy Cobalt and a gun in the passenger seat. He was arrested

for Public Intoxication and Possession of a Firearm and bonded out of jail. Police later tested the

weapon and discovered that it was one of the weapons used in the shooting of Mr. Ivory. During and

after both arrests Mr. Bethel consistently proffered to police officers that he had bought the gun that

morning from someone named Rio. Mr. Bethel was charged and convicted by a jury of Felony

Murder with the underlying felony of First Degree Robbery with a Firearm. Mr. Bethel was sentenced to life with the possibility of parole. From this sentence Mr. Bethel request post-conviction relief.

During his time of incarceration, Mr. Bethel did his own investigations as to what happened at Club Pink that night. He discovered that the incident was not a robbery, but retaliation of an ongoing feud between Bryon Ivory and Laharry Myers. He also discovered that there were eyewitnesses present that could testify that Mr. Bethel was not present and is actually innocent of the crime.

Further, trial counsel conceded to the Robbery with a Firearm charge during trial and failed to challenge the state's case to adversarial testing of that charge. (see Application for Post Conviction Relief)

## I.   EVIDENCE OUTSIDE THE RECORD

Although some of Appellant's ineffectiveness claims are obvious from simply reading the appeal record, several, including trial and appellate counsel's failures to utilize available and potent eyewitness evidence, are supported by matters outside the record.

A.   Mr. Bethel request that the Tulsa County District Court make a finding of fact regarding counsels' ineffective assistance and breach of duty from evidence outside the record by determining:

1.   Trial counsel and appellate counsel failed to investigate, interview, and call to testify Elza Riley and DeAndre Williams to testify that there was no robbery, but retaliation of an ongoing feud between Bryon Ivory Jr. and LaHarry Myers and that Mr. Bethel was not present at the scene of the crime. (see affidavits attached to Application for Post Conviction Relief)

2.   Trial counsel failed to consult with Mr. Bethel before conceding to the First Degree Robbery with a Firearm charge. (see Application for Post Conviction Relief)

3.   Trial counsel failed to call Wanda Janell Smith to testify at trial who would have testified that Mr. Bethel was with her during the time of the crime and that he left to go and purchase the handgun. (see affidavit attached to Application for Post Conviction Relief)

**B.** Mr. Bethel claims that the finding of fact by the court in an evidentiary hearing can be determine by the questioning the following eyewitnesses whom where present at the crime scene, that Mr. Bethel was not present and is actually innocent of the convicted charges, and that Mr. Bethel was not consulted nor consented to the concession of First Degree Robbery with a Firearm.

## WITNESS LIST

Elza Riley,             LCF-Lawton, 8607 SE Flowermound Rd., Lawton OK 73501

DeAndre Williams,       DLM Criminal Justice Center, 300 N. Denver Ave., Tulsa OK 74103

Wanda Janell Smith,     529 E. 49th Pl. N., Tulsa, OK 74126

DeAndre Bethel,         LCF-Lawton, 8607 SE Flowermound Rd., Lawton OK 73501

Steven Vincent,         P.O. Box 701765, Tulsa OK 74170-1765

## CONCLUSION

Mr. Bethel has presented colorable *Sixth Amendment* claims, where material facts are in dispute involving inconsistencies beyond the record. Wherefore, Mr. Bethel requests an evidentiary hearing.

RESPECTFULLY SUBMITTED,

DeAndre Bethel
#690424
LCF-Lawton
8607 SE Flowermound Rd.
Lawton, OK 73501