## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DEANDRE BETHEL,                )
                                )
           Petitioner,        )
                                )
v.                              )       Case No. 17-CV-367-JHP-FHM
                                )
JOE ALLBAUGH, DIRECTOR,    )
                                )
           Respondent.     )

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, Mike Hunter, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein, shows the Court as follows:

1.      Petitioner, DeAndre Bethel, an inmate in the custody of Lawton Correctional Facility in Lawton, Oklahoma, appearing *pro se*, has filed with this Court a Petition seeking federal habeas relief.

2.      Petitioner is currently incarcerated pursuant to a Judgment and Sentence entered in the District Court of Tulsa County for Count 1, First Degree Felony Murder, Count 3, Transporting a Loaded Firearm in a Vehicle, and Count 4, Public Intoxication, in Case No. CF-2012-660. Petitioner is sentenced to Life imprisonment with the possibility of parole on Count 1, five (5) months imprisonment and a $250 fine on Count 3, and thirty (30) days imprisonment and a $100 fine on Count 4, with Counts 3 and 4 running concurrently with Count 1.

3.      Petitioner filed a direct appeal from this Judgment and Sentence in the Oklahoma Court of Criminal Appeals, Case No. F-2014-336. The Oklahoma Court of Criminal Appeals, hereinafter referred to as the OCCA, affirmed the Judgment and Sentence with respect to Counts 1,

3, and 4, and dismissed Count 2, Robbery with a Firearm, in a Summary Opinion on July 15, 2015. Petitioner's direct appeal brief is attached hereto as Exhibit 1. Petitioner's Application for Evidentiary Hearing on Sixth Amendment Claim is attached hereto as Exhibit 2. The State's response brief is attached hereto as Exhibit 3. Petitioner's reply brief is attached hereto as Exhibit 4. The OCCA's Summary Opinion is attached hereto as Exhibit 5.

4.      Thereafter, Petitioner sought post-conviction relief in the District Court of Tulsa County, by filing an Application for Post-Conviction Relief on September 30, 2016. The Application for Post-Conviction Relief and Brief-In-Chief is attached hereto as Exhibit 6 (all page citations are to the Brief-In-Chief). Petitioner's Motion for Evidentiary Hearing is attached hereto as Exhibit 7. The State's Response to Application for Post-Conviction Relief is attached hereto as Exhibit 8. The district court's Order Denying Application for Post-Conviction Relief is attached hereto as Exhibit 9. Petitioner's post-conviction appeal and supporting brief are attached hereto as Exhibit 10.[1] The OCCA's Order Affirming Denial of Application for Post-Conviction Relief in Case No. PC-2017-432, decided on June 9, 2017, is attached hereto as Exhibit 11.

5.      Petitioner has exhausted his state court remedies to the propositions raised in the instant habeas petition.[2]

6.      The instant habeas petition is timely filed.

---

[1]Exhibit 10 of this Response does not contain the exhibits attached to Petitioner's post-conviction brief, as they are duplicative of appellate materials already attached to this habeas response.

[2]As will be discussed further in Proposition I, Petitioner's ineffective assistance proposition contains one claim which is technically unexhausted as it was not presented on direct appeal or in Petitioner's post-conviction proceedings. Respondent does not waive the exhaustion requirement with respect to Petitioner's unexhausted claim but asserts that this is an issue which can be more readily resolved on the merits.

7.     The state court addressed the merits of Petitioner's claims.  Pursuant to *Cullen v. Pinholster*, 563 U.S. 170 (2011), when a claim is considered on the merits, review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claims on the merits.  *Cullen*, 563 U.S. at 181-186.  This holding is compelled by the purpose of Section 2254 which is to leave primary responsibility for review of state court convictions with the state courts.  *Cullen*, 563 U.S. at 182.  Therefore, an evidentiary hearing is unwarranted.  *See Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) ("[T]he Supreme Court decided in *Cullen v. Pinholster* . . . that even if a federal-court evidentiary hearing is not barred by [28 U.S.C.] § 2254(e)(2), the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court.").

8.     Respondent has attached the relevant documents necessary for an adjudication of this matter as exhibits.  The three volume Original Record for Tulsa County Case No. CF-2012-660, the two volume preliminary hearing transcript had on May 21, June 7, and June 15, 2012, transcripts of hearings had on August 27, 2013, September 20, 2013, October 3, 2013, and October 21, 2013, the four volume trial transcript, the sentencing transcript, and the trial exhibits are all available.  Respondent is conventionally filing the Original Record, the trial transcripts, the sentencing transcript, and the exhibits, simultaneously with this Response.  Relevant, cited pages of the transcript are attached hereto as Exhibit 12 and will be cited (Tr. _).  Relevant, cited pages of the Original Record are attached hereto as Exhibit 13 and will be cited (O.R. [vol.] _).  State's Exhibits will be cited as (S.E. _) and, as noted above, are included within the state court record being filed conventionally, simultaneously with this Response.

## STATEMENT OF THE FACTS

In the early morning hours of February 4, 2012, a group of men, which included Petitioner, pointed guns at a car full of people in a parking lot near 18th and South Boston in Tulsa, Oklahoma, demanding wallets and cell phones. Twenty-four-year-old Byron Ivory was shot and killed during this robbery attempt.

Earnest (Jordan) Roberts, Bradley Jarrett, and Mr. Ivory were close friends who knew each other for years (Tr. 359-360). About 10:30 or 11:00 p.m. on February 3, 2012, the friends met up at Mr. Roberts' apartment, had a few drinks, and later decided to go out (Tr. 361). They first went to a nightclub called the Gray Snail. They went out in Mr. Ivory's car, a gunmetal gray Impala, and Mr. Ivory drove. They stayed at the Gray Snail for about thirty minutes, had some rum, and then left the Gray Snail to go to Club Pink, at 18th and Boston. It was around 1:30 a.m. by that point, and although it was nearly closing time, they just wanted to see the club let out. This involved seeing who came out of the club (Tr. 363, 417). Mr. Ivory drove, Mr. Roberts was in the passenger seat, and Mr. Jarrett was directly behind him in the backseat (Tr. 364). They eventually found a parking lot area next to a rail and a five-foot drop. They sat in the car for two or three minutes talking (Tr. 365). When they were about to get out of the car, a short guy dressed in a black or navy blue hoodie approached the Impala and asked, "[d]o I know you?" The man was an African American male with a "chin strap" where his sideburns connected with his beard, looping around the face without a mustache, and he was thinner and shorter than Mr. Roberts (Tr. 366-367, 378). Mr. Roberts looked at the man and said, "I don't know." The man came up and put a gun to Mr. Roberts' chest (Tr. 367). It "felt like a circle of hard metal." (Tr. 368). Mr. Roberts was scared for his life because they were getting robbed (Tr. 368).

Mr. Roberts got out of the car and raised his hands and asked the robber if he wanted his cell phone and wallet because those were the only valuables he had (Tr. 369). The robber said, "[y]es." (Tr. 370). Mr. Roberts heard some rustling coming from where Mr. Ivory was, and Mr. Ivory said, "[l]et's hurry and get out." (Tr. 370). Based on this rustling noise, Mr. Roberts knew there were at least two people involved (Tr. 378). Mr. Roberts handed over his wallet and cell phone because he felt like he had to give the robber whatever he wanted (Tr. 371, 379) As soon as Mr. Jarrett realized something was wrong, he started running towards Club Pink. This caused one of the robbers to turn and look, as if he did not know that a third person was in the backseat. That gave Mr. Roberts a second to get away (Tr. 371).

Mr. Roberts took one step, jumped over the rail, landed, and started running towards Club Pink as fast as he could. He thought Mr. Ivory was still in the car, and he continued to hear the rustling sound (Tr. 372). The club was about twenty yards away (Tr. 372). As he was running towards the club, he heard "a lot of gunshots." He estimated he heard between five and ten shots, though he admitted he did not stop to count (Tr. 373).

When Mr. Roberts arrived at the club, he met up with Mr. Jarrett and they informed a security guard that they were robbed (Tr. 374). Mr. Jarrett no longer had his shoes on, even though he was wearing shoes earlier in the car (Tr. 375). Mr. Roberts asked a friend for a ride because he was afraid the robbers might come back, and he was afraid of going back where Mr. Ivory was (Tr. 375-376). As they were leaving Club Pink, they saw an ambulance driving over to where they parked their car (Tr. 377). They went back to the apartment complex where they started the evening, and then they headed to Bartlesville, where they felt they would be safe (Tr. 376).

The whole time they were driving to Bartlesville, they attempted to call Mr. Ivory, but they could not reach him by telephone (Tr. 377). After they arrived in Bartlesville about 3:00 a.m., they received a call from Detective Jason White. He informed them that Mr. Ivory had passed away (Tr. 378).

Bradley Jarrett testified that when they arrived at Club Pink that evening, they sat there talking for no more than five minutes when they decided to get out of the car. Mr. Jarrett observed an African American male staggering like he was drunk, who came up to the front passenger side of their car (Tr. 419, 422-423). He wore a stocking cap and a baggy, oversized coat, and he was shorter than Mr. Jarrett and skinny (Tr. 422-424). Mr. Roberts rolled down the window, and the man asked, "[d]o you guys know me?" They responded, "[n]o, we don't know you." He asked again and they said no. Ten seconds after that, Mr. Ivory said, "[h]ey, guys, hurry up and get out and go in." They all got out of the car. As Mr. Jarrett got out, he looked to his right and saw a silver-white sedan parked directly behind them (Tr. 420-421). There was a tall, African American male standing next to this car (Tr. 423). It seemed like the people were together (Tr. 423).

As soon as Mr. Jarrett turned back around to focus his attention on the guy on the passenger side, he heard gunshots (Tr. 421, 425). Mr. Ivory got out of the car extraordinarily fast "like somebody was over there[.]" (Tr. 422). It was "like he lunged out." (Tr. 422). Mr. Jarrett ran to Club Pink and lost his Nike Jordan shoes as he was running (Tr. 425-426).

Justin White was a firefighter for the City of Tulsa, assigned to Station Five at 18th and Boston, near SpiritBank and Club Pink (Tr. 474-477). It was a two-level station, and they went downstairs to keep an eye on the crowd near the station. A couple of fights had broken out earlier that evening (Tr. 477-478). The captain, Clay Ayers, actually called the police department due to

the fights (Tr. 478). As they were standing outside, Mr. White heard nine to twelve shots fired in the parking lot between the fire station and the SpiritBank (Tr. 478). Mr. White ducked behind his truck and kept an eye out to make sure everybody was okay in their area (Tr. 479).

As he was behind the truck, he looked in the direction of the shots and saw a car leaving at a high rate of speed. One of the doors on the side of the car was still open as it was leaving. Mr. White was a "car guy" who grew up around cars, and he believed the car was a white, four-door Chevy Cobalt. Mr. White told Captain Ayers, who relayed this information to dispatch (Tr. 481-482). After that, they waited for the police department to respond to the scene. Then, the firefighters went over to the parking lot (Tr. 482).

A couple of people were standing around and Captain Ayers said, "[o]h, we've got a guy down." The victim was laying face down between two cars (Tr. 483). The victim had gunshot wounds and was gasping. They retrieved their tools and prepared the victim for EMSA to arrive (Tr. 484).

Officer Amley Floyd was working the graveyard shift on the morning of February 4, 2012. That morning, Officer Floyd responded to a call at 2400 East Apache, near Apache and Lewis (Tr. 541-542). Some EMS drivers had observed a man passed out at the steering wheel, with a gun in the passenger seat. Officer Floyd found a white Chevy Cobalt with a paper tag (Tr. 542). The brake lights were on, like the driver was pressing on them. Although there was a green light, the car did not move (Tr. 543). Officer Floyd continued observing the car, but it stayed at the light for a few stoplight cycles, and the car did not move (Tr. 543). Officer Floyd was concerned that the driver was intoxicated and asleep at the wheel (Tr. 544). Only one person was in the car, the driver (Tr. 544).

7

Officer Floyd waited for backup to arrive, and then the officer activated the lights and sirens. Officer Floyd gave the driver commands over the loud phone to put his hands up and put the car in park (Tr. 545-546). Eventually, Petitioner popped his head up and proceeded through the intersection, slowly (Tr. 546). The car went for about 800 to 1,000 feet and then stopped. The officers placed their car in a tactical position. Officer Floyd saw Petitioner lean over the passenger seat, reaching for the floorboard, and he did this two or three times (Tr. 547). They were concerned Petitioner was trying to reach the firearm they knew he had (Tr. 548). Officer Floyd commanded Petitioner to put his hands outside the window (Tr. 548).

Petitioner was the driver of the Cobalt (Tr. 548). As he got out of the car, he moved slowly. The officers commanded him to turn around, and he made a few turns. Petitioner kept asking questions about when to stop and how to stop. He leaned against his car but kept falling over. Petitioner had a strong odor of alcohol coming from his breath and body (Tr. 551). He had slurred speech and bloodshot eyes (Tr. 552). Petitioner's nystagmus test confirmed he was intoxicated (Tr. 552). Because Petitioner kept falling over, no other tests were administered (Tr. 553).

Petitioner asked what were his charges, and Officer Floyd explained it was currently public intoxication, but that if he blew a certain level, he would have a DUI. He would also be charged with possession of a loaded firearm (Tr. 553-554). Petitioner asked where the firearm was, and the officer explained it was in his car. Petitioner told Officer Floyd he had the gun because he was told by an officer a couple of weeks prior that he needed a gun because someone was trying to kill him (Tr. 554). Petitioner said he had been drinking at a bar downtown until midnight, but he claimed he did not remember anything between the time he left the bar and when he was found at the traffic light (Tr. 554). Petitioner ultimately blew a .04 on the Breathalyzer test (Tr. 555). Although this was

below the legal limit for alcohol intoxication, Officer Floyd opined he was intoxicated on something (Tr. 556). Petitioner seemed to get more intoxicated as they were together. He would ask what the charges were, but then a few minutes later, he would ask the exact same question (Tr. 556).

Officer Jason White was a homicide detective with the Tulsa Police Department (Tr. 785). At approximately 2:24 a.m. on February 4, 2012, he was called to the scene of the murder (Tr. 788). When he arrived, there were not any suspects because nobody was coming forward. However, they obtained the surveillance video from the SpiritBank parking lot (Tr. 789; S.E. 72).

On the video, Officer White saw a white car consistent with a Chevy Cobalt (Tr. 791). A boxy-type sedan pulled up alongside the victim's car (Tr. 796). The other car was a white four-door sedan (Tr. 796). The video showed someone coming up alongside the victim's car, consistently with the surviving victims' accounts. There were muzzle flashes on the video, approximately two to two and a half minutes after the victim initially pulled into his parking spot (Tr. 791-792). After the muzzle flashes, "[o]ne subject, two subjects, possibly a third . . . reentered the vehicle." (Tr. 797). Both of the cars left at a high rate of speed (Tr. 797-798).

At some point, Officer White interviewed Justin White from the fire department and got a make and model for one of the cars (Tr. 800-802).

Officer White also spoke with Mr. Jarrett and Mr. Roberts. He tracked them down because a wallet was left at the crime scene (Tr. 801).

Eventually, Officer White received information on a potential suspect, and he went and retrieved a firearm from the property room (Tr. 803). He typed in Petitioner's name in the database and learned that Petitioner was stopped and arrested around 2600 North Lewis and that the .40 caliber firearm which was recovered in the arrest was consistent with the caliber of one of the

firearms used in the shooting (Tr. 804). Officer White then obtained a bullet fragment from the medical examiner's office. He checked out the gun and the only casings which could have been fired from the gun and transported them to the OSBI laboratory in Edmond (Tr. 806-807). Eventually, he heard back that the ballistics matched the gun (Tr. 809). He relayed this information to Detective Vic Regalado (Tr. 810).

Based on the information he had, showing that Petitioner was at Club Pink that night, that Petitioner's Chevy Cobalt was at the scene, that Petitioner was arrested with a .40 caliber gun about three hours after the murder, and that the gun was taken along with some of the evidence to Edmond and confirmed to match the casings found adjacent to the victim, he had Petitioner re-arrested (Tr. 811). Officer White testified it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812).

Officer White interviewed Petitioner. Petitioner's story seemed inconsistent to Officer White because Petitioner claimed not to remember anything from 8:00 p.m. on February 3, 2012, until 5:00 the next morning. However, contrary to that assertion, Petitioner did offer an explanation for how he got the gun that night (Tr. 823-824). Petitioner was not able to provide any details that Officer White could follow up on (Tr. 824). He claimed he received a phone call, even though he earlier said his phone was turned off. Petitioner claimed he did not have another phone that night. Nevertheless, he claimed he got the gun after he received a phone call from his "cousin" Larry Myers. Petitioner did not have an answer when asked how this person knew to call or what phone Petitioner was using (Tr. 825).

Petitioner made multiple calls from the jail. In one call, Petitioner admitted to his father that he was at the club that night despite telling Officer White he did not remember going to the club (Tr.

850; S.E. 76).  Petitioner's father asked, "was you there [sic]?"  Petitioner responded, "yes." (Tr.

854; S.E. 76).  Petitioner's father reminded Petitioner he told him to stay away from the club.

Petitioner responded, "I wasn't planning on going but I don't know what made me end up going in

there." (Tr. 854; S.E. 76).

## STANDARD OF REVIEW

Petitioner raises four propositions in the instant habeas corpus petition.[3]  They are as follows:

> 1.  Actual innocence attached to the Sixth Amendment constitutional
> claim of ineffective assistance of trial and appellate counsels.
>
> 2.  The State's evidence was illegally insufficient to prove all the
> elements of robbery with a firearm and therefore also insufficient to
> support [Petitioner's] conviction for First Degree Felony Murder
> based on the underlying felony in violation of the Fourteenth
> Amendment.
>
> 3.  Abuse of discretion by trial court caused [Petitioner's] trial to be
> fundamentally unfair by admission of improper law enforcement
> opinion testimony that invaded the province of the jury in violation
> of the Fourteenth Amendment.
>
> 4.  Counts III and IV were improperly joined at [Petitioner's] trial in
> violation of his right to a fair trial and due process of law under the
> Fourteenth Amendment.

(Petition, at 2).

---

[3]Although Petitioner's Table of Contents sets forth these four propositions, Petitioner goes on to subdivide his first proposition into two propositions.  He raises as Proposition I: "Unreasonable Application of Clearly Established Law Established by the Supreme Court . . . ."  Petition, at 12. Within this "proposition," Petitioner argues that his actual innocence claim was improperly decided but his first proposition also addresses the standard of review to be applied in this case.  Proposition II alleges, "Actual innocence attached to the Sixth Amendment constitutional claim of ineffective assistance of trial and appellate counsels."  To the extent Petitioner's "Proposition I" addresses the standard of review, it is addressed within this Standard of Review section.  To the extent that Petitioner's "Proposition I" is a continuance of the "actual innocence" claim raised in his Proposition II, this claim will be addressed within Proposition I below.  Respondent will address the propositions numerically, as raised in Petitioner's Table of Contents.

As will be discussed more fully herein, Petitioner's trial counsel claims and actual innocence claims, while procedurally barred on post-conviction review, were largely duplicative of the trial counsel claims which Petitioner raised on direct appeal and the OCCA decided on the merits (Exhibit 9, at 6-7; Exhibit 11, at 2). Petitioner's ineffective assistance of appellate counsel claims involving newly discovered evidence not presented on direct appeal were decided on the merits on post-conviction review. Therefore, the Antiterrorism and Effective Death Penalty Act, hereinafter referred to as the AEDPA, provides the governing standard of review for this habeas petition. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (reasoning that the AEDPA's deferential standard of review applies when the OCCA denies a claim on the merits; "a state court reaches a decision 'on the merits' even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion"). Under the AEDPA, a petition for writ of habeas corpus will not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The United States Supreme Court and the Tenth Circuit Court of Appeals have recognized, "Section 2254(d) provides 'preconditions to the grant of habeas relief . . ., not an entitlement to it.'" *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119

(2007)).  The Supreme Court explained how this standard should be applied in *Williams v. Taylor*,

529 U.S. 362 (2000), where Justice O'Connor, writing for the Court, reasoned:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied-the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-413. The *Williams* Court further explained what does and what does not

constitute an unreasonable application of established federal law:

> The term "unreasonable" is no doubt difficult to define.  That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning.  For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect."  Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 410-411 (internal citation omitted) (emphasis in the original).  *See White v.*

*Woodall*, 572 U.S. _, 134 S. Ct. 1697, 1702 (2014) ("[C]learly established federal law for purposes

of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions . . . And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong, even clear error will not suffice." (internal citations and quotation marks omitted)). *See also Davis v. McCollum*, 798 F.3d 1317, 1321 n.6 (10th Cir. 2015) (reasoning that "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." (quoting *White*, 134 S. Ct. at 1706)).

The United States Supreme Court elaborated on this standard of review in *Harrington v. Richter*, 562 U.S. 86 (2011), wherein the Court reasoned, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-103 (citing *Jackson v. Virginia*, 447 U.S. 307, 332 n.5 (1979)). *See also Burt v. Titlow*, 571 U.S. _, 134 S. Ct. 10, 16 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy."); *Frost v. Pryor*, 749 F.3d 1212, 1222-1223 (10th Cir. 2014) ("We may 'issue the writ' only when the petitioner shows 'there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" (citing *Richter*, 562 U.S. at 102) (emphasis and alterations added by the *Frost* Court)).

The *Richter* Court explained, "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. In other

words, "AEDPA prevents defendants-and federal courts-from using federal habeas corpus review to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). The *Richter* Court also reaffirmed that Section 2254 applies even when there has been a summary denial. *Richter*, 562 U.S. at 99. *See also Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (holding that a summary decision is an "adjudication on the merits" for purposes of Section 2254(d) where the decision was reached on substantive grounds).

The United States Supreme Court further clarified the standard of review in its decision in *Cullen*, 563 U.S. at 181-182. In its unpublished decision in *Champ v. Zavares*, No. 10-1308, 431 Fed. Appx. 641 (10th Cir. June 16, 2011)[4] (unpublished), the Tenth Circuit Court of Appeals considered *Cullen* and reasoned:

> [U]nder the Supreme Court's recent decision in *Cullen v. Pinholster*, habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). The *Cullen* Court reasoned that the "backward-looking language" found in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made"; therefore, the record under review must be "limited to the record in existence at that same time-i.e., the record before the state court." *Id.* Although *Cullen* dealt with new evidence that the district court admitted in the context of an evidentiary hearing, this newly articulated rule applies with equal force to any expansion of the record under Habeas Rule 7. That is, *Cullen* stands for the proposition that the district court can only examine "the record in existence at [the] time [the state-court decision was made] - i.e., the record before the state court." *Id.*

*Champ*, 431 Fed. Appx. at 655. *See also Black*, 682 F.3d at 895 ("[T]he Supreme Court decided in *Cullen v. Pinholster* . . . that even if a federal-court evidentiary hearing is not barred by § 2254(e)(2),

---

[4]Unpublished decision by the Tenth Circuit Court of Appeals cited for its persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court.").

Likewise, under 28 U.S.C. § 2254(d)(2), the federal court also must give deference to the state court's factual findings, which are presumed to be correct. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Therefore, a state prisoner seeking federal habeas relief based upon alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption afforded state court factual findings. 28 U.S.C. § 2254(e)(1); *Hamilton v. Mullin*, 436 F.3d 1181, 1186 (10th Cir. 2006).

With this standard of review in mind, Respondent addresses the instant habeas petition below.

## PROPOSITION I

**THE DECISION OF THE OCCA ON DIRECT APPEAL THAT TRIAL COUNSEL WAS NOT INEFFECTIVE, AND THE DECISION OF THE OCCA ON POST-CONVICTION APPEAL THAT APPELLATE COUNSEL WAS NOT INEFFECTIVE, ARE NEITHER CONTRARY TO, NOR UNREASONABLE APPLICATIONS OF, FEDERAL LAW, NOR UNREASONABLE FACTUAL DETERMINATIONS IN LIGHT OF THE STATE COURT RECORD.**

In his first proposition, Petitioner alleges, "Actual innocence attached to the Sixth Amendment constitutional claim of ineffective assistance of trial and appellate counsels." While Petitioner asserts that all of these ineffective assistance of counsel claims were raised for the first time on post-conviction review, many of the claims were essentially raised on direct appeal, such that it is easier to address both types of claims within a single proposition. The decisions of the

OCCA holding that trial and appellate counsel were not ineffective are neither contrary to, nor unreasonable applications of, federal law, nor unreasonable factual determinations in light of the state court record.

**Background**

On direct appeal, Petitioner's allegations of ineffective assistance of trial counsel fell into three general categories: A) "Failure to Adequately Protect the Record with Appropriate Objections"; B) "Failure to Request Instructions on Appropriate Lesser Related Offenses"; C) "Failure to Present Critical, Available Defense Witnesses." (Exhibit 3, at 41). As will be shown, the claims raised under Subsection C were the subject of Petitioner's Rule 3.11 Motion (Exhibit 2). The OCCA rejected Petitioner's claims on direct appeal, reasoning:

> [Petitioner's] ineffective assistance of counsel claim may be disposed of based on lack of prejudice.[5] *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *Malone v. State*, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206, *cert. denied*, _ U.S. _, 134 S. Ct. 172, 187 L. Ed. 2d 119 (2013); *Head v. State*, 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. The merits of the substantive claims serving as the basis for this ineffective assistance of counsel claim have been addressed and rejected above. *See* Propositions 3, 4, 5, 6 and 7.
>
> In conjunction with this claim [Petitioner] filed an Application for Evidentiary Hearing on Sixth Amendment claims contemporaneously with his brief, attaching documents to support his claim that trial counsel was ineffective for failing to investigate and present testimony supporting his defense.
>
> This Court will order an evidentiary hearing if "the application and affidavits . . . contain sufficient information to show this Court by clear and convincing evidence [that] there is a strong

---

[5][Petitioner] argues defense counsel was ineffective for failing to object to the district court's response to jury note #2, failing to object to improper opinions offered by the case agent, failing to have the prejudicial portions of his telephone call with his mother redacted, failing to object to the in life photo of the victim and the victim impact statements offered at formal sentencing, and failing to request instructions on lesser related offenses. [Footnote 2 in the original].

possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015). Having reviewed [Petitioner's] Request for an Evidentiary Hearing to develop this claim and the materials offered to support that request, we find that [Petitioner] has failed to meet his burden. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015). Therefore, [Petitioner] is not entitled to an evidentiary hearing to further develop his ineffective assistance of counsel allegations, and his motion, as well as this claim, are **DENIED.** *See Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

(Exhibit 5, at 9-10).

Thereafter, on post-conviction review, Petitioner raised the following propositions:

I.  Actual innocence.

II.  Newly discovered evidence of ineffective assistance of appellate counsel in violation of the Sixth Amendment to the United States Constitution and Article II, § 20 of Oklahoma's Constitution for failing to discover evidence and failing to file ineffective assistance of trial counsel for failing to interview, investigate and call DeAndre Williams and Elza Riley to testify at trial.

III.  Trial counsel rendered ineffective assistance by failing to present the testimony of critical, available defense witnesses at trial, violating [Petitioner's] rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 30 of the Oklahoma Constitution.

IV.  Appellate counsel was ineffective for failing to file [sic] trial counsel was ineffective for not subjecting the prosecution's case of robbery with a firearm to adversarial testing and conceded the robbery charge by confessing guilt without permission of Petitioner.

V.  Petitioner is entitled to an evidentiary hearing on these issues.

(Exhibit 6, at 2-16; Exhibit 8, at 4).

Affirming the denial of post-conviction relief, the OCCA found:

> Citing *Logan*, Judge Caputo held that any issues raised in Petitioner's direct appeal were barred by *res judicata*, and issues which could have been raised, but were not, were waived. *Logan v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973. Judge Caputo denied Petitioner's claims of actual innocence, ineffective assistance of appellate counsel and newly discovered evidence, in part, due to the fact that portions of these claims were previously raised and argued in Petitioner's direct appeal. *Bethel, supra.* Judge Caputo found Petitioner's remaining claims of actual innocence and newly discovered evidence to be without merit and determined appellate counsel's performance was not objectively unreasonable and that Petitioner failed to demonstrate a reasonable probability that due to the alleged errors the outcome of the appeal would have been different. We agree.
>
> Except as related to his actual innocence, newly discovered evidence and ineffective assistance of appellate counsel claims, consideration of Petitioner's claims for relief are waived because they either were or could have been raised in a direct appeal. *Logan*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973; *Fowler v. State*, 1995 OK CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10, ¶ 6, 826 P.3d 1002, 1004. These claims may be raised for the first time on post-conviction as it could be a petitioner's first opportunity to allege and argue the issues.

(Exhibit 11, at 2).

Finding that Petitioner's actual innocence claims failed to meet the standard of factual innocence, the OCCA further reasoned:

> Petitioner's assertions fail to meet this standard. Petitioner claims he is actually innocent, maintaining testimony based on the affidavits attached to his application prove he is factually innocent. Petitioner ignores that the evidence presented at trial contradicts his version of events. He has failed to show by clear and convincing evidence that after hearing the testimony contained in these affidavits no reasonable jury could have found him guilty of the crimes of which he was convicted. *Id.* This proposition is without merit.
>
> Petitioner makes several claims that newly discovered evidence exists requiring relief. The standard for newly discovered evidence claims "requires that the evidence be material, that it could not have been discovered before trial with due diligence, it cannot be

cumulative, and it must create a reasonable probability of changing the outcome of the trial. *Sheppard v. State*, 1987 OK CR 4, ¶ 4, 731 P.2d at 989, 990. Petitioner's application does not establish that his new witnesses could not have been discovered before trial with due diligence. Further, based on the record in this case Petitioner has failed to establish that there is a reasonable probability that any new evidence exists that would have changed the outcome of his appeal. *Id.* These claims are without merit.

Petitioner's remaining claims are that his appellate counsel was ineffective because appellate counsel either inadequately argued propositions raised in his direct appeal or did not raise the grounds for relief he now raises in his application for post-conviction relief.

(Exhibit 11, at 3-4). After correctly setting forth the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687-689 (1984) and *Richter*, 562 U.S. at 104, discussed more fully below, the OCCA concluded:

In his District Court application for post-conviction relief Petitioner alleges he was denied effective assistance of appellate counsel. These claims of ineffective assistance of appellate counsel are based on Petitioner's claims of actual innocence and newly discovered evidence which we have determined to be without merit. There is nothing in this case that indicates trial counsel was ineffective or had appellate counsel argued, or better argued, these issues on appeal it would have changed the result of his appeal. A review of the record makes it clear these claims are without merit. Petitioner has not established his appellate counsel was deficient.

(Exhibit 11, at 5).

The OCCA affirmed the denial of post-conviction relief and denied Petitioner's request for an evidentiary hearing (Exhibit 11, at 6-7). The decisions of the OCCA on direct appeal and on post-conviction review are neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record. As set forth below, the United States Supreme Court has made clear the deference owed to the State court's rejection of Petitioner's ineffective assistance claims.

**Standard of Review for Ineffective Assistance of Trial and Appellate Counsel Claims**

In *Strickland*, 466 U.S. at 688, 690, the United States Supreme Court held that in order for a defendant to prevail on a claim of ineffective assistance of counsel, the defendant must identify acts or omissions that "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Even if errors are identified, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Furthermore, the reviewing court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing of one." *Id.* at 697. Because *Strickland* is a general standard, the state court had "'even more latitude to reasonably determine that a defendant has not satisfied the standard.'" *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)).

This two-pronged standard also applies to Petitioner's ineffective assistance of appellate counsel claims. In *Smith v. Robbins*, 528 U.S. 259, 285 (2000), the United States Supreme Court held that "the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*." To show that appellate counsel was deficient, a petitioner must show that appellate counsel unreasonably failed to discover a non-frivolous issue and include that issue in the appellate brief. *Id.*, 528 U.S. at 285. To show prejudice, a petitioner "must show a reasonable

probability that, but for his counsel's unreasonable failure to [raise the particular non-frivolous issue] he would have prevailed on his appeal." *Id.*

The *Strickland* standard set forth above was designed to be difficult to meet, even under *de novo* review. *Richter*, 562 U.S. at 102. The *Richter* Court went on to reason:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted).

Thus, this Court must "determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Richter*, 562 U.S. at 102. Even a strong case for relief on *de novo* review does not necessitate a finding that the state court's decision was unreasonable. *Id.* The purpose of Section 2254(d) is to preserve the authority of federal courts to issue a writ of habeas corpus only in cases in which there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. *Id.* Accordingly, in this case, the OCCA's decision must be given "double" deference. *Richter*, 562 U.S. at 105.

In the past, the Supreme Court has held that if a state court denies a *Strickland* claim based solely on one element of the test, and fails to reach the other element, a federal court reviewing the

state court's decision reviews the element that was not reached *de novo*. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). However, *Richter* appears to have implicitly overruled *Rompilla* and *Wiggins* in that respect. The first question presented to the Court in *Richter* was whether Section 2254(d) applies to summary opinions which contain no explanation of the basis for the court's denial of relief. *Richter*, 562 U.S. at 97. The Court held as follows:

> By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2). There is no text in the statute requiring a statement of reasons. The statute refers only to a "decision," which resulted from an "adjudication." As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d). Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. *This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.*

*Richter*, 562 U.S. at 98 (internal citations omitted) (emphasis added).

In *Strickland*, the Supreme Court encouraged appellate courts to deny ineffective assistance of counsel claims on only one element where possible. *Strickland*, 466 U.S. at 697. When the OCCA follows the Supreme Court's advice, it is undoubtedly ruling on the merits of Petitioner's *Strickland* claim. As the Supreme Court recognized, Section 2254(d) requires deference to a state court's adjudication of a *claim* or *decision*, not to components of claims. *Richter*, 562 U.S. at 99. Accordingly, this Court should hold that a habeas petitioner's ineffective assistance claim must fail

unless he can establish that fairminded jurists could not disagree that the arguments or theories that supported or "*could have supported*," the state court's decision are inconsistent with Supreme Court precedents, regardless of whether the state court reached both elements of the *Strickland* test.  *See Richter*, 562 U.S. at 102 (emphasis added).

Finally, not only did the Supreme Court discuss the way in which federal courts are to analyze *Strickland* claims in habeas cases, the decision in *Richter* also informs this Court's analysis of any ineffective assistance claims that this Court may find are not subject to Section 2254(d) because the OCCA did not consider them on their merits.[6]  When *Strickland* was decided, the Supreme Court recognized the danger that "intrusive post-trial inquiry into attorney performance" could "encourage the proliferation of ineffectiveness challenges.  Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense."  *Strickland*, 466 U.S. at 690.

Since that time there have, in fact, been a proliferation of ineffectiveness challenges.  In *Richter*, the Supreme Court has chosen to again emphasize that:

> Surmounting *Strickland*'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest

---

[6]Respondent respectfully submits that double deference is owed to the OCCA's determination that appellate counsel was not ineffective.  The OCCA concluded that appellate counsel was not ineffective in failing to raise these substantive issues on direct appeal, and because the OCCA articulated and applied the correct standard of review pursuant to *Strickland* and its own opinion in *Logan*, the decision of the OCCA is entitled to double deference pursuant to 28 U.S.C. § 2254(d)(1-2) and *Richter*.  Compare *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) ("applying *de novo* review where the OCCA required "something beyond the obvious merit of the omitted claim" as a necessary condition for relief under *Strickland* but noting that whether an OCCA decision should be accorded AEDPA deference will depend on a case-specific determination of whether the OCCA followed established *Strickland* standards).

intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted).

Further, "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111 (internal citations and quotation marks omitted).

With respect to the prejudice prong of *Strickland*, the Court also clarified that:

> In assessing prejudice under *Strickland*, *the question is not* whether a court can be certain counsel's performance had no effect on the outcome or *whether it is possible a reasonable doubt might have been established if counsel acted differently*. Instead, *Strickland* asks whether it is *reasonably likely* the result would have been different. *This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.*

*Richter*, 562 U.S. at 111-112 (internal citations and quotation marks omitted) (emphasis added). *See also Yarborough v. Albarado*, 541 U.S. 652, 664 (2004) ("The range of reasonable judgment can depend in part on the nature of the relevant rule. . . . As a result, evaluating whether a rule

application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

With the foregoing standard of review in mind, Respondent will address Petitioner's various claims of ineffectiveness of counsel below.

**Petitioner's Actual Innocence Claim**

Petitioner couches each one of his ineffective assistance claims in terms of "actual innocence." He alleges:

> A. Actual innocence attached to the Sixth Amendment Constitutional claim of ineffective assistance of trial counsel.
>
> B. Actual innocence attached to appellate counsel was ineffective in violation of the Sixth Amendment for failing to file trial counsel was ineffective for failure to subject the prosecution's case of robbery with a firearm to adversarial testing and conceded the robbery charge by confessing guilt without permission of [Petitioner].
>
> C. Actual innocence attached to ineffective assistance of counsel by failure to object to improper jury instruction.
>
> D. Actual innocence attached to ineffective assistance of counsel by failure to establish the proper context of culpable telephone call.

(Petition, at 17, 24, 31, 39).

It appears that Petitioner is attempting to raise "actual innocence" both as a stand-alone claim and also as a way of overcoming the procedural bar which the OCCA found to claims which "were or could have been raised in a direct appeal." (Exhibit 11, at 2). With respect to the OCCA's procedural bar, Respondent would note that Petitioner's ineffective assistance of trial and appellate counsel claims are completely intertwined, and there was a determination on the merits denying Petitioner's ineffective assistance of appellate counsel claims. Because the underlying claims of trial

counsel ineffectiveness are the basis of Petitioner's ineffective assistance of appellate counsel claims, Respondent believes this is a situation where Petitioner's claims can be disposed of more readily on the merits rather than analysis of the OCCA's procedural bar.  *See Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004) ("When questions of procedural bar are problematic . . . and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits."); *Watson v. Howard*, Case No. 04-6074, 123 Fed. Appx. 910, 914 (10th Cir. Feb. 17, 2005)[7] (unpublished) (if a claim involves Oklahoma's procedural bar rule and it is easily disposed of on the merits, a district court may exercise its discretion to do so (citing *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)).

To the extent this habeas petition could be construed as raising a freestanding claim of actual innocence, that claim also must fail.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) (reasoning, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal relief absent an independent constitutional violation occurring in the underlying state criminal proceeding[.]"); *LaFevers v. Gibson*, 238 F.3d 1263, 1265 n.4 (10th Cir. 2001) (a claim of actual innocence "does not, standing alone, support the granting of the writ of habeas corpus"); *Sellers v. Ward*, 135 F.3d 1333, 1338-1339 (10th Cir. 1998) ("Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence." (quoting *Herrera*, 506 U.S. at 400)).  In *Pettit v. Addison*, No. 04-7044, 150 Fed. Appx. 923, 926 (10th Cir. Oct. 20, 2005)[8] (unpublished) for instance, the Tenth Circuit Court of

---

[7]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[8]Unpublished decision by the Tenth Circuit Court of Appeals cited for its persuasive value (continued...)

Appeals rejected a freestanding claim of actual innocence based on recanted trial testimony where Petitioner failed to show that his actual innocence claim had an "independent constitutional component."

Moreover, Petitioner's proferred affidavits, some of which were attached to his Motion for Evidentiary Hearing on direct appeal or from witnesses identified in that motion (Exhibit 2) fail to meet the standard for factual innocence. The Tenth Circuit Court of Appeals has explained this "very narrow exception":

> The petitioner must supplement his habeas claim with a colorable showing of factual innocence. Such a showing does not in itself entitle the petitioner to relief but instead serves as a "gateway" that then entitles the petitioner to consideration of the merits of his claims. In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

*Demarest v. Price*, 130 F.3d 922, 941-42 (10th Cir. 1997) (internal citations omitted). Likewise, in *Schlup v. Delo*, 513 U.S. 298 (1995), the United States Supreme Court held that "to be credible [a claim of actual innocence requires] new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id. See also House v. Bell*, 547 U.S. 518, 538 (2006) (reasoning, "[t]he *Schlup* standard is demanding and permits review only in the 'extraordinary case'").

The Tenth Circuit Court of Appeals has held that "actual innocence means factual innocence, not mere legal insufficiency." *Prost v. Anderson*, 636 F.3d 578, 600 (10th Cir. 2011) (quoting

[8](...continued)
only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

*Bousley v. United States*, 523 U.S. 614 (1998)). *See also Smith v. Addison*, No. 09-5147, 373 Fed. Appx. 886, 889 (10th Cir. Apr. 20, 2010)[9] (unpublished) (where the defendant presented a legal justification for his conduct in committing a homicide-duress-his argument went to legal innocence as opposed to factual innocence, and therefore, it could not satisfy the fundamental miscarriage of justice exception).

In this case, Petitioner alleges that his trial counsel failed to call three witnesses, one of whom he alleges was an alibi witness. Petitioner alleges his counsel should have called DeAndre Williams, Elza Riley, and Janell Smith as witnesses. These witnesses are considered in turn below.

**Counsel's Investigation of Witnesses**

Petitioner alleges that counsel should have called Elza Riley, who has provided an affidavit indicating:

• That he had known Petitioner for twelve years.

• That he was present at Club Pink on February 4, 2012, and parked in the parking lot.

• That he saw the white car pull behind the victim's car.

• Three individuals got out of the car.

• He recognized LaHarry Myers, a/k/a L.J.

• Myers and "another person" pulled guns and shot "Bryon" [sic] Ivory Jr.

• He also recognized DeAndre Williams as an individual standing by the shooters' vehicle.

• That if he had been contacted and requested to testify, he would have testified Petitioner was not involved in the shooting or robbery of Mr. Ivory.

---

[9]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

(Petition, Ex. 2). This affidavit, dated June 22, 2016, was presented for the first time on post-conviction review (Exhibit 6).

Petitioner further presents the affidavit of Wanda Janell Smith, who provided an affidavit indicating:

• She was dating Petitioner and was with him on the evening of February 3, 2014 into the early morning hours of February 4, 2014.

• Around 1:00 a.m., they left for her mother's house, and they were driving Petitioner's white Cobalt car. Petitioner was "pretty messed up."

• Around 3:00 a.m., her grandmother called, and Ms. Smith and Petitioner went over to her house to help her move from the bed to the living room.

• "Then around 3 a.m. [Petitioner's] friend, LJ (LaHarry Myers) called her cell phone and asked if Belly [Petitioner] was with her. She gave Petitioner her phone and she did not know what they said.

• After they finished talking, Petitioner told Ms. Smith he was going to meet LJ to buy a gun.

• Although Ms. Smith offered to go, Petitioner told her no because he thought LJ was going to rob him.

• Later that morning, she got a phone call that Petitioner was in jail.

(Petition, Ex. 3). This affidavit, dated December 16, 2014, was presented on direct appeal as part of Petitioner's Motion for Evidentiary Hearing (Exhibit 2).

Petitioner next presents two affidavits from DeAndre Armon Williams. The first of these affidavits related the following:

• Mr. Williams saw Petitioner around 4:00 a.m. on February 4, 2012. He called Petitioner to see where he was and told Petitioner to meet him at Lucky Sam's.

• They met there and saw LaHarry Myers, otherwise known as LJ, getting out of his white Crown Victoria in the parking lot.

- Petitioner asked LJ if he still had a gun for sale. LJ said he still had some guns for sale and they would need to go around the corner near the 007 Club to get the guns.

- Petitioner said a cop named "Sticks" told him he needed a gun for his protection because the Hoovers were trying to get at him.

- At the house, Williams got out of his car and got into Petitioner's white car. LJ said he was going inside the house to get the guns, and a few minutes later, he came back outside with two guns, a .40 caliber and a 9 millimeter and showed them to Petitioner.

- Petitioner asked if the guns were hot but LJ said they were fine. Petitioner gave LJ $150 in exchange for the .40 caliber gun.

- Mr. Williams told them he would talk to them later, got back in his car, and left.

(Petition, Ex. 4). This affidavit, dated December 16, 2014, was presented as part of Petitioner's

motion on direct appeal (Exhibit 2).

Petitioner finally presents a second "affidavit" from DeAndre Williams. This affidavit is

neither signed nor notarized, and therefore, it is really no affidavit at all. This statement purports to

add information to Williams' previous affidavit, as follows:

- On February 4, 2012, Williams was riding in a white car with his friends "Rio" and LaHarry Myers (LJ).

- They pulled into Club Pink at around 1:40 a.m.

- LJ had been in a previous altercation with "Bryon" Ivory wherein "Bryon" robbed LJ some days earlier.

- Rio had set up a meeting between "Bryon" and LJ so they could fight. They pulled into the parking lot then LJ and Rio got out and approached the car. "Bryon" and LJ began to tussle. "Bryon's" gun fell and went off and LJ and Rio started shooting back.

- Rio picked up "Bryon's" gun and they left the scene.

- Williams did not know there would be any shooting involved and thought it would just be a fistfight.

- Rio and LJ acted alone and Petitioner was not present or involved.

•      Later that morning LJ contacted Petitioner and asked him if he wanted to buy one of the guns. The gun LJ sold him was the gun which LJ used to shoot "Bryon," a .40 caliber Smith & Wesson.

(Petition, Ex. 4). This second, unsigned, un-notarized "affidavit" from a witness who gave an earlier affidavit in the context of Petitioner's direct appeal was presented for the first time in Petitioner's post-conviction appeal (Exhibit 6). *Compare Parker v. Martin*, No. CIV-13-1365-D, 2014 WL 1873270, *6 (W.D. Okla. May 8, 2014)[10] (unpublished) (noting that while the declaration of an allegedly recanting witness purported to be made under penalty of perjury, it was neither notarized nor otherwise witnessed).

     The OCCA's decisions to deny an evidentiary hearing based on the foregoing affidavits presented on direct appeal, and the affidavits presented for the first time on post-conviction review, are entitled to deference under the AEDPA. In its opinion in *Lott v. Trammell*, 705 F.3d 1167 (10th Cir. 2013), the Tenth Circuit Court of Appeals acknowledged the OCCA's clarification of its standard of review for granting evidentiary hearings based on ineffective assistance claims in *Simpson v. State*, 230 P.3d 888, 905-906 (Okla. Crim. App. 2010), and its holding that Oklahoma's Rule 3.11 does not place on defendants a heavier burden to demonstrate ineffectiveness of counsel than *Strickland*. The *Lott* Court reasoned:

> We agree with the respondent. In *Simpson,* the OCCA made clear that Rule 3.11 obligates it to "thoroughly review and consider [a defendant's Rule 3.11] application and affidavits along with other attached non-record evidence." 230 P.3d at 905. Thus, even in cases, such as *Wilson,* where the OCCA summarily disposes of a defendant's Rule 3.11 application without discussing the non-record evidence, we can be sure that the OCCA in fact considered the non-record evidence

---

[10]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

in reaching its decision. Such a conclusion, we note, is entirely consistent with the Supreme Court's repeated admonitions that AEDPA's deferential standards of review "do[ ] not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter,* ⎯ U.S. ⎯, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011). The OCCA's decision in *Simpson* also clarifies that the interplay of Rule 3.11's "clear and convincing" evidentiary standard and its "strong possibility of ineffectiveness" substantive standard is "intended to be less demanding than the test imposed by *Strickland.*" 230 P.3d at 906. In other words, the OCCA in *Simpson* has now assured us that "when [it] review[s] and den[ies] a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, [it] necessarily make[s] the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in *Strickland.*" *Id.* Consequently, it is plain to us, as a matter of federal law, that any denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11, including the one made by the OCCA in Lott's direct appeal, operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1). Lastly, it is indisputable that we are bound to defer to the OCCA's factual findings (regarding what pretrial investigative steps Lott's trial counsel took) under § 2254(d)(2).

*Lott*, 705 F.3d at 1213.

The affidavits which Petitioner presented on direct appeal and supplemented on post-conviction review were largely cumulative of the defense which Petitioner's jury considered and rejected at trial[11]: that Petitioner "innocently" acquired the murder weapon in the hours following the crime because, unluckily for Petitioner, he just happened to be in the market for a handgun that

---

[11]In closing argument trial counsel remarked, "Well, he's right, he shouldn't have bought that gun. Even if somebody said flat-out, you're going – you need a gun for protection; somebody is trying to kill you. And that seems so farfetched except when you consider the environment that we're talking about." (Tr. 1028). Trial counsel went on to argue, "When family and friends get shot or get involved in horrible things on a regular basis, you might think you might need a gun for protection, especially if somebody in authority tells you you might need a gun. How do you get guns nowadays? You can go to gun shops, and you can buy them informally off the street." (Tr. 1029).

morning, and his friend LJ just happened to be selling a gun that morning after shooting a man with that same gun. Also incredible is the assertion in Wanda Smith's affidavit that Petitioner was willing to rendevous with LJ by himself even though Petitioner thought LJ was going to rob him. It begs the question why Petitioner would be willing to meet up with LJ if he did not yet have a gun for protection but expected to get robbed. Also straining credulity is the claim that a police officer would go by a street name ("Sticks") instead of his given name and advise a gang member to obtain a handgun.

As the State correctly noted in its Response to Application for Post-Conviction Relief, the affidavits from Williams and Smith were presented to the OCCA on direct appeal and therefore, they do not constitute "newly discovered evidence." (Exhibit 8, at 7). *See Herrera*, 506 U.S. at 400. "Petitioner has included the very same affidavits from Deandre Williams and Wanda Smith in his post-conviction application." (Exhibit 8, at 7). The State went on to note that appellate counsel could not be found ineffective for failing to "discover" witnesses Riley and Williams:

> The information contained within Elza Riley's affidavit is not "newly discovered" because it could have, with due diligence, been discovered before trial. *Sheppard*, 1987 OK CR 4, ¶ 4, 731 P.2d at 990. Petitioner concedes within his application that this witness was known and would have testified had he been called. *See* Pet'r's Application, 4. Additionally, Petitioner provides no explanation as to why he did not communicate that Elza Riley was a potential defense witness to his appellate counsel, who clearly investigated the other witnesses he preferred during the pendency of his appeal. Petitioner simply states that appellate counsel was ineffective for failing to "discover" that this witness and Deandre Williams existed. *See* Pet'r's Application, 4. This is contrary to the record, in which appellate counsel proferred such an affidavit from Williams and vigorously litigated the issue of the failure to call available witnesses at trial. Finally, Petitioner fails to explain this evidence in light of his own admission of being present at the scene. Trial Tr. 854; State's Ex. 76. As such, Petitioner has failed to show that this evidence is

34

"newly discovered" and that the information contained within the affidavit would have changed the outcome of the trial. *Sheppard*, 1987 OK CR 4, ¶ 4, 731 P.2d at 990.

(Exhibit 8, at 7-8).

The State's response on post-conviction review was correct. In his post-conviction application, Petitioner alleged, concerning Williams and Riley, "The evidence and the eyewitnesses were available if counsels had properly investigated, interviewed the witnesses . . . ." (Exhibit 6, at 4). As shown above, trial counsel presented Petitioner's theory that he purchased the gun innocently and was not one of the robbers (Tr. 1028-1029). Moreover, as shown above, appellate counsel investigated and presented affidavits from co-defendant Williams as well as Ms. Smith on direct appeal further supporting this same defense theory. If Riley was a long time acquaintance of Petitioner, Petitioner had the opportunity to inform both of his attorneys about the existence of this witness, but apparently he did not. Appellate counsel's vigorous presentation of affidavits in Petitioner's direct appeal shows that counsel fully investigated all witnesses which were brought to counsel's attention (Exhibit 2). *See Littlejohn v. Trammell*, 704 F.3d 817, 872 (10th Cir. 2013) (reasoning, "the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney"); *Parker v. Jones*, No. 10-6219, 423 Fed. Appx. 824, 828-829 (10th Cir. May 20, 2011)[12] (unpublished) (reasoning that under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent

_____

[12]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

that reasonable professional judgments support the limitations on investigation" (citing *Strickland*, 466 U.S. at 690-691)).

Therefore, the decision of the OCCA holding that "Petitioner's application does not establish that his new witnesses could not have been discovered before trial with due diligence" and that "[f]urther, based on the record in this case Petitioner has failed to establish that there is a reasonable probability that any new evidence exists that would have changed the outcome of his appeal" is neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record (Exhibit 11, at 3-4).

**Counsel's Alleged Failure to Subject the Prosecution's Case of Robbery with a Firearm to Adversarial Testing.**

Petitioner next alleges that counsel failed to subject the State's case to adversarial testing by conceding that there was a robbery without Petitioner's permission. Recall that the robbery was the underlying felony supporting the felony murder count. The robbery count, Count 2, was reversed and remanded on direct appeal, as merging into the murder count (Exhibit 5, at 3-4). Trial counsel did not challenge the fact that a robbery occurred but vigorously asserted that Petitioner was not involved in that robbery, while conceding Petitioner's guilt of the lesser crimes of Transporting a Loaded Firearm and Public Intoxication, counts which were perfectly consistent with the defense that Petitioner purchased the weapon several hours after the shooting.

Addressing this claim in response to Petitioner's post-conviction application, the State correctly noted:

> Petitioner's Proposition IV argues that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not subjecting the prosecution's Robbery with a Firearm count to adversarial testing. Petitioner then speculates that the victim was

mistaken as to whether he was being robbed. Petitioner's argument is essentially that there was insufficient evidence that a robbery occurred. This argument is unavailing for several reasons.

Appellate counsel raised a proposition of error regarding the sufficiency of the evidence in Petitioner's direct appeal, arguing that the elements of robbery were not present, and that the evidence did not show Petitioner was there. *Bethel v. State*, F-2014-336 (Okl. Cr. July 15, 2015) (not for publication) [Exhibit 5]. While not couched as an ineffective assistance of trial counsel claim, appellate counsel did raise such a proposition, and therefore Petitioner's claim is barred by the doctrine of *res judicata*. *See Logan*, 2013 OK CR 2, ¶ 3, 293 P.3d at 973. As such, Petitioner cannot show that appellate counsel was ineffective and committed an error that would have changed the outcome of the direct appeal. *Id.* Additionally, there is nothing in the record reflects that trial counsel conceded that Petitioner took part in the robbery. *See generally* Trial Tr. Petitioner complains about the trial attorney's concession of his possession of the firearm linked to the robbery and his intoxication, but the evidence at trial clearly showed that both facts were true. Trial tr. 553-54. Counsel's decision to do so was clearly trial strategy given the weight of the evidence, and should not be second-guessed. *Underwood v. State*, 2011 OK CR 12, ¶ 87, 252 P.3d 221, 253 (citing *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066). Petitioner has failed to show a reasonable probability that, but for appellate counsel's unprofessional error, the result of his appeal would have been different, and as such, Proposition IV should be denied. *See Logan*, 2013 OK CR 2, ¶ 5, 293 P.3d at 973.

(Exhibit 8, at 10).

Petitioner has failed to show that trial counsel's decision to concede that which could not be denied (Petitioner's possession of the weapon, which he has never denied, and the fact that a robbery occurred) was an unreasonable trial strategy. *See Romano v. Gibson*, 278 F.3d 1145, 1154 (10th Cir. 2002) ("'There are countless ways to provide effective assistance in any given case[,]' and '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" (citing *Strickland*, 466 U.S. at 689)). Moreover, the OCCA made a specific finding on direct appeal that Petitioner's convictions for First Degree Murder and Robbery with a Firearm were supported by

sufficient evidence (Exhibit 5, at 3). It reasoned that "[a]ny rational trier of fact could find beyond a reasonable doubt that there was a forceful taking and carrying away of personal property in this case and that [Petitioner] participated in the armed robbery during which the victim was killed." (Exhibit 5, at 3). Therefore, Petitioner cannot show any prejudice from the failure of trial counsel to argue there was no robbery, or the failure of his appellate counsel to argue that trial counsel was ineffective for failing to make that argument (even though appellate counsel did argue, as a substantive issue, that there was no robbery).[13] *See Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) ("When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, we first examine the merits of the omitted issue. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance." (citing *Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir. 1998))). Therefore, the decision of the OCCA was neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.

**Jury Instruction**

Petitioner next alleges, "Actual innocence attached to ineffective assistance of counsel by failure to object to improper jury instruction." Although Petitioner appears to argue that this issue was raised but not decided on direct appeal, nevertheless, the issue was raised and decided against him on direct appeal, both substantively and as an ineffective assistance of trial counsel claim. On direct appeal, Petitioner raised as his fourth proposition:

---

[13]The sufficiency of the evidence is discussed in Proposition II below.

The trial court erred in failing to comply with the law governing contact with jurors during deliberations and by failing to advise deadlocked jurors not to surrender their honest convictions concerning the weight of the evidence in order to reach a verdict, in violation of Okla. Stat. tit. § 894 and [Petitioner's] rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 19 and 20 of the Oklahoma Constitution.

(Exhibit 1, at 26). Then, as part of his tenth proposition, he alleged that trial counsel failed to adequately protect the record with appropriate objections by failing to object to the trial court's allegedly improper answer to the jury's question about what would happen if they could not reach a unanimous verdict (Exhibit 1, at 46 (citing Tr. 1059-1060)).

Rejecting Petitioner's claim on direct appeal, the OCCA reasoned:

We rejected [Petitioner's] claim that the district court's handling of jury questions during deliberations requires relief. The jury sent out four notes during deliberations, with notes 1, 3 and 4 pertaining to housekeeping matters only. The parties agreed on the court's written response to the only substantive note (note 2) submitted by the jury and [Petitioner] did not object to the procedure used in its delivery. Under these circumstances, we review [Petitioner's] claim for plain error only and find none. *Welch v. State*, 1998 OK CR 54, ¶ 42, 968 P.2d 1231, 1245.

Our statutes generally provide that there can be no communication with the jury by the judge or any third person except in open court. 22 O.S.2011, §§ 853, 857, 894. Of course, we have acknowledged that not every communication between the court and jury outside open court is prohibited; in particular, communications with the jury regarding simple housekeeping matters do not violate statutory prohibitions. *Perry v. State*, 1995 OK CR 20, ¶ 26, 893 P.2d 521, 528. Consequently we find no violation of section 894 or error with respect to the district court's handling of notes 1, 3 and 4 dealing with housekeeping matters.

Nor can [Petitioner] establish error and prejudice with respect to the district court's handling of note 2. Title 22, Section 894 states:

After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must

39

require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

22 O.S.2011, § 894. "The purpose of Section 894 is to prevent communications from being made to the jury without the parties being present to protect their interests." *Mollett v. State*, 1997 OK CR 28, ¶ 42, 939 P.2d 1, 11-12 (internal quotations omitted). "This statute has been construed as mandatory only with regard to bringing the jury back into the courtroom, and the determination of whether the jury's request is granted is within the discretion of the trial court." *Cipriano v. State*, 2001 OK CR 25, ¶ 48, 32 P.3d 869, 879.

"When a communication between judge and jury occurs after a jury has retired for deliberations *on a matter within the scope of § 894* and that communication does not comport with § 894's requirements, a presumption of prejudice arises. The presumption may be overcome if, on appeal, this Court is convinced that on the face of the record no prejudice to the defendant occurred." *Smith v. State*, 2007 OK CR 16, ¶ 52, 157 P.3d 1155, 1172 (internal citations and quotations omitted) (emphasis added).

Note 2 asked what the jury should do if it could not reach a unanimous decision on some counts and how to proceed on the counts on which there was unanimity. The parties and the judge agreed a deadlocked jury instruction was premature because the jury had deliberated only a few hours. The district court instructed the jury to continue to deliberate on the unresolved counts. There was no violation of the underlying purpose of § 894 (preventing communications without parties' interests protected) in the handling of note 2 because the parties were consulted and approved the court's response. [Petitioner] agreed that the court could respond in writing rather than returning the jury to open court. Any presumption of prejudice arising from the court's failure to bring the jury back into the courtroom is refuted by the record showing that the district court provided the jury with the response sanctioned by the parties. There is no showing of plain error; this claim is denied.

(Exhibit 5, at 5-7). The OCCA denied Petitioner's associated ineffective assistance of trial counsel claim, noting that "[t]he merits of the substantive claims serving as the basis for this ineffective assistance of counsel claim have been addressed and rejected above. *See* Propositions 3, 4, 5, 6 and

7." (Exhibit 5, at 9).[14]  Petitioner has failed to show that either of these decisions were contrary to, or unreasonable applications of, federal law, or unreasonable determinations of the facts in light of the state court record.

In his habeas petition, Petitioner alleges error in the trial court's handling of the jury's second and third notes.  The record reveals that when the trial court received the second note, "What should we do if we cannot come to [unanimous] decision," the court considered the fact that the jury had reached unanimous decisions on some counts and concluded, "I don't think it's time for the dynamite instruction yet."[15]  However, the court wanted the input of counsel and asked, "[w]hat do you guys feel?" (Tr. 1059).  Although defense counsel was concerned that the jury had only reached a decision on the easy counts early, he admitted, "I believe you're right." (Tr. 1059).  The court noted it would not second guess (Tr. 1059) ("They've been at it now for five hours, there's only four counts, I don't think that's an appropriate amount of time.").  The State agreed, "Judge, I think at this point it's probably prudent just to send back a note, just say, continue deliberating.  I don't know if it's appropriate for a dynamite instruction either." (Tr. 1059).  The court concluded, "I don't think it is.  I'm going to write back to them, please to continue to deliberate on those counts that you have not come to unanimous decision on.  Fair enough?" (Tr. 1060).  Both attorneys agreed with this proposed resolution (Tr. 1060).

Thus, it appears that all parties were in agreement that it was too early to give the deadlocked jury charge, that the jury was not at an impasse but was merely in the midst of deliberations.

---

[14]Petitioner alleges that the OCCA failed to review this claim.  Petition, at 32.  However, this is belied by the foregoing passage from the OCCA's opinion on direct appeal.

[15]By "dynamite instruction" the trial court was referring to an *Allen* instruction, pursuant to *Allen v. United States*, 164 U.S. 492 (1896), which Petitioner claims should have been given.

Therefore, because no deadlocked jury charge was required at this point, there was no error in the failure to give a *complete* deadlocked jury charge, pursuant to *Allen*. Under Oklahoma law, the trial court is required to exercise "great caution to say nothing to coerce an agreement or to indicate his feelings in the case." *McCarty v. State*, 904 P.2d 110, 125 (Okla. Crim. App. 1995). The instruction to "continue to deliberate" was not a deadlocked jury charge and clearly did not coerce an agreement. In fact, it seems likely that if the trial court had given an *Allen* instruction, Petitioner would probably now allege that that decision was in error.

Petitioner alleged on direct appeal that the mandatory dictates of Okla. Stat. tit. 22, § 894 (2011) were not followed in giving this response.[16] Counsel did not object to the court providing a written response at trial, and Petitioner has shown no prejudice from counsel's lack of objection. In the case of *Mitchell v. State*, 270 P.3d 160 (Okla. Crim. App. 2011), which Petitioner relied upon on direct appeal, the OCCA found that the appellant "was not prejudiced by the court's failure to strictly adhere to § 894 as the court's written response accomplished the same result as if the court had brought the jury into the courtroom and responded verbally." *Id.* at 188. Just so, in this case, Petitioner failed to explain how any different result could have been achieved by calling the jury back into the courtroom. *See Hawkins*, 185 F.3d at 1152 (if the issue is meritless, then counsel cannot be ineffective for failing to raise the issue).

---

[16]That section provides as follows: "After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called." Okla. Stat. tit. 22, § 894 (2011).

The remaining two notes were in regards to housekeeping matters. In one note, the jurors asked the trial court to contact family members. In the next note, the jurors announced they had arrived at a verdict. Neither of these notes constituted "a disagreement between them as to any part of the testimony" or a "desire to be informed on a point of law arising in the cause" within the meaning of Section 894. Petitioner has speculated that the trial court's response to the jurors regarding their request to contact family members was coercive to them. On the contrary, this was just another housekeeping matter which did not pertain to the purposes of Section 894, and therefore, no violation of the statute occurred. Of course, the jury's announcement of a verdict was not a disagreement at all. In *Johnson v. Vaughan*, No. 10-CV-301-GKF-PJC, 2013 WL 1788538, *7, (N.D. Okla. Apr. 26, 2013)[17] (unpublished), this Court rejected the petitioner's contention that counsel was ineffective for failing to consult with him when waiving the requirements of Section 894. The *Johnson* Court reasoned that the petitioner had "not shown how he was prejudiced by the attorney's failure to include him in discussions with the trial judge regarding the notes, or the trial court's failure, if any, to bring the jury into the courtroom to address its questions." *Id.* As such, the petitioner failed to satisfy the prejudice requirement of *Strickland*. *Id.*

Likewise, Petitioner has shown no prejudice in this case from the trial court's resolution of the jury's various notes. Therefore, the decision of the OCCA on direct appeal holding that trial counsel was not ineffective in this regard is neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.

---

[17]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

**Petitioner's Claim with Respect to Admissions Made to His Father is Technically Unexhausted But Should Be Denied on the Merits**

In Petitioner's final subproposition, Petitioner alleges that his trial counsel was ineffective for failing to establish the "proper context" of his culpable telephone call to his father and to seek suppression of the admissions which Petitioner made to his father. Petitioner notes that the court on post-conviction review denied his actual innocence claim in part based on Petitioner's admissions to his father over the telephone that he was present at the crime scene (Tr. 854; S.E. 76). Petitioner asks for the admission made during his jailhouse phone call to his "irate father" to be deemed inadmissible due to the fact that Detective White admitted using deceptive tactics during Petitioner's earlier custodial interview (Tr. 819-821).

Petitioner did not raise this issue on direct appeal or in his first post-conviction application (Exhibit 1; Exhibit 5). It is clear that if Petitioner were to present this in a second post-conviction application, the State would find this claim to be procedurally barred. Respondent believes this is a situation where the circumstances warrant a determination on the merits rather than application of Oklahoma's procedural bar or dismissal pending exhaustion. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). *See Cannon*, 383 F.3d at 1159 ("When questions of procedural bar are problematic . . . and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits."); *Miranda v. Cooper*, 967 F.2d 392, 400 (10th Cir. 1992) (reasoning, "it is appropriate for a federal appellate court to address the merits of unexhausted 2254 federal habeas corpus claims if they obviously fail to raise a colorable federal claim, and if the

interests of justice would be better served by addressing the merits of the habeas petition"). *See also Watson*, 123 Fed. Appx. at 914[18] (unpublished) (if a claim involves Oklahoma's procedural bar rule and it is easily disposed of on the merits, a district court may exercise its discretion to do so (citing *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)).[19]

Petitioner's contention can be disposed of readily on the merits because Petitioner's admission to his father was an admission by a party opponent, and thus clearly admissible under Oklahoma law, and also highly probative. Okla. Stat. tit. 12, § 2801(B)(2)(a); *Rawlings v. State*, 740 P.2d 153, 163-164 (Okla. Crim. App. 1987) ("[W]e would be inclined to view the statement of the appellant to his mother of his intention to kill Sally Rawlings as an admission by a party opponent . . . . a statement is not hearsay if it is offered against a party and is his own statement."); *Brooks v. State*, 714 P.2d 217, 219 (Okla. Crim. App. 1986) (testimony of the defendant's brother-in-law and mother-in-law that the defendant told them the rings were stolen was an admission by a party opponent and therefore admissible). *See also United States v. Woods*, 301 F.3d 556, 560-561 (7th Cir. 2002) ("The recordings of Woods' phone conversations were not hearsay and were properly admitted as statements by a party-opponent . . . . Moreover, the statements are material, probative, and reliable . . . ."). Moreover, Petitioner's telephone call to his father was a voluntary act, not compelled by any prior police questioning. Notably, Petitioner's fourth subproposition falls short of alleging that his father somehow acted as an agent of the police when he spoke with Petitioner,

---

[18]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[19]Respondent does not waive the exhaustion requirement with respect to Petitioner's unexhausted claim but asserts that this is a case which can be more readily denied on the merits rather than discussing the procedural bar applicable to claims not raised in a petitioner's first post-conviction application under Oklahoma law.

such as was the case in *Massiah v. United States*, 377 U.S. 201 (1964). In *Massiah*, the United States Supreme Court held that the defendant's Sixth Amendment right to counsel was denied where there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he was indicted, in the absence of counsel. *Massiah*, 377 U.S. at 206. Absent any indication that Petitioner's father spoke to Petitioner at the behest of the police or was otherwise an agent of the prosecution, Petitioner has failed to show that any such constitutional violation occurred in this case. Because Petitioner's admissions to his father were voluntary and admissible, any objection to these statements at trial or on appeal would not have prevailed. *See Hawkins*, 185 F.3d at 1152 (if the issue is meritless, then counsel cannot be ineffective for failing to raise the issue); *Woods*, 301 F.3d at 560-561.

**Conclusion**

For the foregoing reasons, the decision of the OCCA on direct appeal that trial counsel was not ineffective, and the decision of the OCCA on post-conviction review that appellate counsel was not ineffective, are neither contrary to, nor unreasonable applications of, federal law. Moreover, the OCCA's factual determinations in denying these claims are not unreasonable in light of the state court record. Petitioner's challenge to the admissibility of his telephone call to his father is technically unexhausted and subject to an anticipatory bar, but it may be more readily denied on the merits given the fact that Petitioner's voluntary admissions to his father were admissible and any objection to them would have been properly overruled. Petitioner's first proposition must fail.

## PROPOSITION II

**THE DECISION OF THE OCCA HOLDING THAT THE EVIDENCE OF PETITIONER'S GUILT WAS SUFFICIENT IS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR AN UNREASONABLE DETERMINATION OF THE FACTS, IN LIGHT OF THE STATE COURT RECORD.**

In his second proposition, Petitioner alleges, "The State's evidence was illegally insufficient to prove all the elements of robbery with a firearm and therefore also insufficient to support [Petitioner's] conviction for First Degree Felony Murder based on the underlying felony in violation of the Fourteenth Amendment." Petitioner raised this as his first proposition on direct appeal. Because the decision of the OCCA holding there was sufficient evidence to sustain the convictions is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts in light of the state court record, Petitioner's second proposition must fail.

Rejecting Petitioner's sufficiency of the evidence claim on direct appeal, the OCCA reasoned:

> Any rational trier of fact could find beyond a reasonable doubt that there was a forceful taking and carrying away of personal property in this case and that [Petitioner] participated in the armed robbery during which the victim was killed. We find that the trial evidence was sufficient to sustain [Petitioner's] convictions for First Degree Murder and Robbery with a Firearm based on the evidence presented in this case. *See Logsdon v. State*, 2010 OK CR 7, ¶ 5, 231 P.3d 1156, 1161; *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204.

(Exhibit 5, at 3). Petitioner has failed to overcome these findings of fact by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200; *Wood*, 558 U.S. at 301.

On federal habeas review, Petitioner's sufficiency of the evidence claim must be reviewed under *Jackson*, 443 U.S. at 324, in which the Supreme Court held that, "the applicant is entitled to habeas relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* at 319 (emphasis in the original). The standard announced in *Jackson*, "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324. The United States Supreme Court discussed the "deferential review that *Jackson* and § 2254 demand" in its decision in *McDaniel v. Brown*, 558 U.S. 120 (2010). The *McDaniel* Court reasoned:

> A federal habeas court can only set aside a state-court decision as "an unreasonable application of . . . clearly established Federal law," § 2254(d)(1), if the state court's application of that law is "objectively unreasonable," [*Williams*, 529 U.S. at 409]. And *Jackson* requires a reviewing court to review the evidence "in the light most favorable to the prosecution." [443 U.S. at 319]. Expressed more fully, this means a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must also defer to that resolution." *Id.*, at 326; see also *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)) ("The *Jackson* standard . . . looks to whether there is sufficient evidence which, if credited, could support the conviction").

*McDaniel*, 558 U.S. at 132-133.

The Tenth Circuit has consistently applied *Jackson* on federal habeas review of sufficiency of the evidence claims. *See Spears v. Mullin*, 343 F.3d 1215, 1238 (10th Cir. 2003); *Mayes v.*

*Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

It has noted that on federal habeas review of the sufficiency of the evidence, "[s]tate law determines the parameters of the offense and its elements and a federal court may not reinterpret state law." *Tillman v. Cook*, 215 F.3d 1116, 1131-1132 (10th Cir. 2000). A state court's interpretation of the state statute is binding on the federal court in habeas proceedings. *Parker v. Scott*, 394 F.3d 1302, 1309 (10th Cir. 2005). Moreover, the Tenth Circuit has reasoned:

> [W]e are not allowed to "weigh conflicting evidence or consider the credibility of witnesses." *Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir. 2004). Rather, when "faced with a record of historical facts that supports conflicting inferences [the court] must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution." *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). Applying that standard here, we must presume that the jurors simply did not credit Mr. Dyer's testimony at Mr. Matthews's second trial . . . . [T]he evidence creates "a record of historical facts that supports conflicting inferences," a situation in which we must presume "that the trier of fact resolved any such conflicts in favor of the prosecution." *Messer*, 74 F.3d at 1013. . . . The question before the OCCA and us under *Jackson* concerns the sufficiency of the evidence at the trial that resulted in the Petitioner's conviction, not the availability of other evidence that wasn't used as the basis to deprive Mr. Matthews of his liberty. Our review is thus "limited to 'record evidence' . . . [and] does not extend to nonrecord evidence." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993); *accord Romano v. Gibson*, 239 F.3d 1156, 1164 (10th Cir. 2001). Put differently, it makes no sense for us, in reviewing whether a jury's verdict was based on sufficient evidence, to consider facts the jury never heard . . . . Finally, Mr. Matthews claims that the OCCA's application of *Jackson* was unreasonable because the prosecution did not introduce blood, DNA, or fingerprint evidence, or eyewitness testimony. But *Jackson* does not require such evidence to sustain a criminal conviction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."). And, again, the focus of a *Jackson* inquiry is not on what

evidence is missing from the record, but whether the evidence in the record, viewed in the light most favorable to the prosecution, is sufficient for any rational trier of fact to find Petitioner guilty beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. 2781.

*Matthews v. Workman*, 577 F.3d 1175, 1184 (10th Cir. 2009).

Like the Tenth Circuit Court of Appeals, the OCCA also applies the principles of *Jackson* whenever a defendant challenges the sufficiency of the evidence. This case was no different because the OCCA explicitly relied on *Spuehler v. State*, 709 P.2d 202, 203-204 (1985), which in turn relied on *Jackson*.

On direct appeal, Petitioner alleged that the evidence was legally insufficient to prove all the elements of Robbery with a Firearm and hence, the evidence was insufficient to support his conviction for First Degree Murder, too. Petitioner's allegations were two-fold: that the elements of robbery were not present and that the evidence did not show that he was even there. The OCCA correctly rejected both of these allegations (Exhibit 5, at 3).

Petitioner claimed that the only evidence that the State presented concerning a robbery came from Mr. Roberts. Mr. Roberts testified that the man came up and put a gun to his chest, which "felt like a circle of hard metal." (Tr. 367-368). Mr. Roberts got out of the car, raised his hands, and asked the robber if he wanted his cell phone and wallet because those were the only valuables he had (Tr. 369). The robber said, "[y]es." (Tr. 370). Mr. Roberts also testified he was scared for his life because they were getting robbed (Tr. 368). Moreover, there was testimony that when Mr. Roberts arrived at the club, he met up with Mr. Jarrett and they informed a security guard that they were robbed (Tr. 374). While Mr. Roberts may have had more verbal interaction with the robbers, nothing

in Mr. Jarrett's testimony contradicted Mr. Roberts' account of events in any way. The evidence that a robbery occurred was therefore sufficient.[20]

Petitioner further claimed on direct appeal that there was no evidence placing him at the scene of the shooting. Naturally, Petitioner sought to focus attention on the short, thin African American male who held the gun on Mr. Roberts, while only briefly acknowledging that a tall African American male was also present at the scene (Tr. 423, 448). However, the fact that this taller man was Petitioner was confirmed by the evidence showing that Petitioner was found only a few hours later passed out in the white Chevy Cobalt observed at the scene, next to a firearm which was demonstrably used in the robbery (Tr. 804-809). There was testimony that it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812). *See Parker v. Martin*, Nos. 14-6111, 14-617, 589 Fed. Appx. 866, 869 (10th Cir. Oct. 29, 2014)[21] (unpublished) (considering the fact that Parker had the same physical characteristics as the murderer and was found hiding the murder weapon in concluding that witness Briggs' testimony at trial was not false).

In fact, Petitioner does not deny possessing the murder weapon; he only disputes when he came to be in possession of it. However, Petitioner's story as to how he obtained the murder weapon was incredible. He claimed to not remember anything between 8:00 p.m. on February 3, 2012, and the time he was picked up around 5:00 a.m. **except for** an alleged firearms purchase based on the advice of a police officer named "Sticks" from a man named "Rio," for which he provided no details

---

[20]Respondent would further note even if this robbery was part of a revenge plot for an earlier robbery or gang-related altercation, as Petitioner claims elsewhere in his habeas petition, it would still be a robbery. A robbery may be motivated by revenge as well as greed.

[21]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

which could be corroborated (Tr. 823-825). Petitioner claimed he received a phone call, even though he earlier said his phone was turned off (Tr. 825). Petitioner claimed he did not have another phone that night, even though he presently claims he had his girlfriend's phone. Nevertheless, he claimed he got the gun after he received a phone call from his "cousin" Larry Myers. Petitioner did not have an answer when asked how this person even knew to call him (Tr. 825). Petitioner's credibility is called into question by the fact that he repeatedly denied being at the club when the officer questioned him, but readily admitted he was at the club when his father asked him (Tr. 850, 854; S.E. 76).

Petitioner finally made a last ditch argument on direct appeal: "assuming" he was present at the scene, he argued, "there was no evidence that he directly and actively committed the acts constituting the robbery at issue." This argument ignores the fact that multiple people in at least two cars were confirmed to surround the victims (Tr. 796-798). The jury was correctly instructed in Instruction No. 33:

> All persons concerned in the commission of a crime are regarded by the law as principals and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who directly and actively commits the act(s) constituting the offense, or knowingly and with criminal intent aids and abets in the commission of the offense or, whether present or not, advises and encourages the commission of the offense.

(O.R. 351).

Moreover, the assistant district attorney correctly argued:

> Now, what does "in concert" mean? We charged [Petitioner] with in concert with unknown individuals. What that means is he didn't do it alone. He wasn't standing in that parking lot alone. He didn't drive his car in that parking lot alone. Do you remember in that SpiritBank video all of those people that walked out got out [sic] of

52

that car?  That's what that means.  He wasn't alone.  He didn't plan
this thing alone.  Okay.

(Tr. 1008).

Further supporting the fact that Petitioner acted in concert with other individuals, there were

other guns used besides Petitioner's .40 caliber Smith and Wesson semi-automatic pistol.  The

projectiles recovered at the scene indicated that Glock and Hi-Point firearms were also used in the

shooting (S.E. 70).  The victim was riddled with gunshots (S.E. 73).  This evidence shows that

multiple individuals in Petitioner's group participated in the shooting of Mr. Ivory, not one robber

acting alone.  Because there is competent evidence supporting the jury's verdict, this Court "must

presume, even if it does not affirmatively appear in the record, that the trier of fact resolved any such

conflicts in favor of the prosecution, and must defer to that resolution." *Wilson v. Sirmons*, 536 F.3d

1064, 1105 (10th Cir. 2008).

Based on the foregoing evidence, any rational trier of fact could find that Petitioner was

present and participated in the robbery and murder of Mr. Ivory.  *Jackson*, 443 U.S. at 319.  For the

foregoing reasons, the decision of the OCCA holding that the evidence was sufficient to show both

that a robbery occurred, and that Petitioner participated in it, was neither contrary to, nor an

unreasonable application of, federal law, nor an unreasonable determination of the facts in light of

the state court record.  Petitioner's second proposition must fail.

## PROPOSITION III

**PETITIONER'S ALLEGATION THAT HE WAS DENIED A FAIR TRIAL BY THE ADMISSION OF IMPROPER LAW ENFORCEMENT OPINION TESTIMONY RAISES AN ISSUE OF STATE LAW, AND PETITIONER HAS NOT SHOWN THAT THE ADMISSION OF THIS EVIDENCE RENDERED HIS TRIAL FUNDAMENTALLY UNFAIR.**

In his third proposition, Petitioner alleges, "Abuse of discretion by trial court caused [Petitioner's] trial to be fundamentally unfair by admission of improper law enforcement opinion testimony that invaded the province of the jury in violation of the Fourteenth Amendment." Petitioner raised this as his fifth proposition on direct appeal. This proposition alleges a state law evidentiary issue which is not cognizable in this federal habeas corpus action, and Petitioner has failed to show that the admission of this testimony rendered his trial fundamentally unfair. Therefore, this proposition must fail.

When a petitioner alleges an error involving the application of state evidentiary rules, such a claim ordinarily raises an issue of state law only. On habeas review, the federal court considers only whether a conviction violated the Constitution, laws, or treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991). As the United States Court of Appeals for the Tenth Circuit has explained:

> As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence, *see Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), and federal courts may not interfere with state evidentiary rulings unless the rulings in question rendered "the trial so fundamentally unfair as to constitute a denial of federal constitutional rights," *Tucker v. Makowski,* 883 F.2d 877, 881 (10th Cir. 1989).

*Moore v. Marr*, 254 F.3d 1235, 1246 (10th Cir. 2001). While the admissibility of evidence is generally a question of state law, the Tenth Circuit has recognized that "'the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief' when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair. . . .'" *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006) (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). *See also Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (holding that habeas corpus relief cannot be provided on the basis of state law evidentiary rulings "unless they rendered the trial so fundamentally unfair that a denial of constitutional rights results").

With respect to the evidence in question, the OCCA found no error, reasoning:

> [Petitioner] was not deprived of a fair trial by the admission of improper "law enforcement" opinion. Contrary to [Petitioner's] claim, the case agent did not vouch for the integrity of the investigation and his testimony was not unnecessarily cumulative, speculative or more prejudicial than probative. *See Postelle v. State*, 2011 OK CR 30, ¶ 31, 267 P.3d 114, 131 (discussing balancing relevancy of evidence against its prejudicial effect). The case agent testified about his part in the investigation and the collection of evidence. He did not comment on the veracity of any witness or tell the jury what result to reach. This claim is denied.

(Exhibit 5, at 7). Petitioner has failed to overcome these findings of fact by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200; *Wood*, 558 U.S. at 301.

Petitioner's fifth proposition on direct appeal read like a generalized objection to the testimony of Detective Jason White. Petitioner acknowledged that most of this testimony did not receive a contemporaneous objection but argued that Detective White's testimony denied the jury its fact finding function. *But see Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) ("Counsel's failure to object . . . while not dispositive, is . . . relevant to a fundamental fairness assessment.").

Because Petitioner failed to identify any examples of testimony which were actually improper, and because the detective's opinions were thoroughly tested on cross-examination, Petitioner has not shown that the admission of this testimony rendered his trial fundamentally unfair within the meaning of *Moore*.

Even though Detective White was the case agent, Petitioner objected to the way in which the detective synthesized various pieces of evidence, including testimony regarding the inconsistencies between Petitioner's interview, in which Petitioner claimed not to remember anything, and his phone calls, in which Petitioner admitted being at the club and made other admissions (Tr. 850, 854; S.E. 76). Essentially, Petitioner complained that the detective's recounting of the interview and other evidence, such as the result of the ballistics examination, was cumulative to other evidence admitted at trial, such as the videotape of the interview itself or the testimony of Terrance Higgs. However, even if this were true, the introduction of such cumulative evidence did not render Petitioner's trial fundamentally unfair. The OCCA has held, "[t]he admission of evidence which is merely cumulative may not be held reversible even though the evidence was inadmissible." *Al-Mosawi v. State*, 929 P.2d 270, 284 (Okla. Crim. App. 1996).

The biggest flaw in Petitioner's argument was that it failed to take into account a cross-examination which spanned fifty pages of the trial transcript and which thoroughly tested the limits of Detective White's opinions. In cross-examining Detective White, defense counsel brought out the fact that Detective White could not "definitely say with one hundred percent certainty" that he saw Petitioner in the videos from Club Pink (Tr. 880). Counsel emphasized Petitioner's story that he "had been pretty well out of it all night and was driving his car around all night." (Tr. 882).

Counsel brought out the fact that the photographs and video from Club Pink were not presented to the jury (Tr. 883).

Defense counsel also challenged other assertions made by Detective White (Tr. 885-886) ("Okay. Now, you have referred to this item a number of times as the murder weapon, correct? Or was that the prosecutor?"). He clarified he did not believe he called it that numerous times but "[i]t is the gun that was tested by Terrance Higgs." (Tr. 886). Counsel also questioned Detective White about the placement of the casings at the crime scene, and whether Detective White agreed with the OSBI expert, Mr. Higgs, that you cannot tell when a casing or a fragment has been put down in a parking lot (Tr. 888, 890). Counsel took this opportunity to work Mr. Higgs' prior testimony that one could not tell when the fragments were placed at the scene into the question (Tr. 891). Detective White conceded, "I see his point, and I see why he's answering that way." (Tr. 891).

Defense counsel further questioned Detective White about the term "burner" used by Petitioner and whether a "burner" might just be a nickname for a gun, even one without a criminal history. Detective White admitted it was just a street term (Tr. 910). Counsel even questioned the detective about reports of another robbery incident in the vicinity, and the possibility that the bullets were fired from another location (Tr. 914-916).

Counsel questioned Detective White about the number of jail calls made by Petitioner, and the fact that the State of Oklahoma only chose to present four of those calls (Tr. 920).

Finally, counsel got Detective White to concede that in searching Petitioner's residence, he obtained no weapons or cell phones or other evidence linking Petitioner to the crime (Tr. 926).

Therefore, while Detective White's opinion testimony was not improper, the fact remains that defense counsel admirably attempted to "expose the imprecision" of the detective's opinions on

cross-examination, within the meaning of *Romano v. State*, 909 P.2d 92, 110 (Okla. Crim. App. 1995).

Ultimately, the testimony of Detective White was offered by the State for the proper purpose of proving its case, and Petitioner has not shown error in the inferences which Detective White made based on the evidence. Much less has Petitioner shown that the inferences made by Detective White rendered his trial fundamentally unfair. *See Courtney v. Province*, No. 10-CV-172-TCK-TLW, 2013 WL 1192582, *5 (N.D. Okla. Mar. 22, 2013)[22] (unpublished) ("The category of infractions which violate fundamental fairness is very narrow, and Petitioner's claims fall outside that category. . . . Petitioner has failed to demonstrate that his trial was rendered fundamentally unfair by the opinion testimony given by Detective Nance.").

For the foregoing reasons, Petitioner's third proposition alleges only an error in state law, and Petitioner has failed to show that the opinion testimony of Detective White rendered his trial fundamentally unfair, especially in light of the thorough cross-examination of the detective which occurred. The OCCA's factual determinations, including its determination that the detective did not comment on the veracity of any witness or tell the jury what result to reach, are entitled to deference. Petitioner has failed to overcome these findings of fact by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200; *Wood*, 558 U.S. at 301. *See Washington v. Addison*, No. 12-5075, 490 Fed. Appx. 949, 951 (10th Cir. Jul. 27, 2012)[23] (unpublished) (in upholding the

---

[22]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[23]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

denial of the petitioner's vouching claim, the Tenth Circuit Court of Appeals noted that the Supreme Court has never held that improper vouching violates due process).

Petitioner has not shown that the opinion testimony at issue rendered his trial fundamentally unfair. Petitioner has failed to overcome, by clear and convincing evidence, the presumption of correctness afforded to the OCCA's conclusion that the case agent did not comment on the veracity of any witness or tell the jury what result to reach. 28 U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200; *Wood*, 558 U.S. at 301. Therefore, Petitioner's third proposition must fail.

## PROPOSITION IV

**THE DECISION OF THE OCCA HOLDING THAT THE TRIAL COURT DID NOT ERR IN DENYING PETITIONER'S MOTION TO SEVER, THEREBY ALLOWING COUNTS 1 AND 2 TO BE JOINED WITH COUNTS 3 AND 4 IN A SINGLE TRIAL IS AN ISSUE OF STATE LAW, AND PETITIONER HAS FAILED TO SHOW THAT THE JOINDER OF THE COUNTS CAUSED HIS TRIAL TO BE FUNDAMENTALLY UNFAIR.**

In his Table of Contents, Petitioner alleges a fourth proposition, "Counts III and IV were improperly joined at [Petitioner's] trial in violation of his right to a fair trial and due process of law under the Fourteenth Amendment." Petitioner does not address this claim in the body of his habeas petition, but, in an abundance of caution, and because this issue was presented in Petitioner's direct appeal as his eighth proposition, Respondent will treat the issue as if Petitioner has properly raised it. To the extent that Petitioner has argued that the joinder of the counts was improper under state law, such a claim is not a basis for federal habeas relief.

In denying relief on direct appeal, the OCCA reasoned:

> The district court did not err in denying [Petitioner's] motion to sever
> and allowing Counts 1 and 2 to be joined with Counts 3 and 4 for

> resolution in a single trial. *See Smith v. State*, 2007 OK CR 16, ¶ 21,
> 157 P.3d 1155, 1164; *Vowell v. State*, 1986 OK CR 172, ¶¶ 8-9, 728
> P.2d 854, 857.

(Exhibit 5, at 8). Petitioner has failed to overcome this finding by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200; *Wood*, 558 U.S. at 301.

To the extent that Petitioner is arguing that the joinder was improper under state law, such

a claim is not a basis for federal habeas relief. *Webber v. Scott*, 390 F.3d 1169, 1177 n.5 (citing *Fox*

*v. Ward*, 200 F.3d 1286, 1292 (10th Cir. 2000)). "Improper joinder will result in a constitutional

violation 'only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial.'"

*Webber*, 390 F.3d at 1178 (quoting *Lucero v. Kerby*, 133 F.3d 1299, 1314 (10th Cir. 1998)). "Such

prejudice may arise when there is a great disparity in the amount of evidence supporting the charges

or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the

defendant." *Id.* (citing *Lucero*, 133 F.3d at 1314-1315). Likewise, in *United States v. Emmons*, 24

F.3d 1210 (10th Cir. 1994), the Tenth Circuit reasoned:

> In order to obtain a separate trial, the defendant must make a strong
> showing of prejudice. This burden is heavy for the defendant to bear
> as he must show more than a better chance of acquittal or a
> hypothesis of prejudice, he must, in fact, show real prejudice . . . . As
> a severance is a matter of discretion and not right, we review the trial
> court's decision denying a severance under an abuse of discretion
> standard.

*Emmons*, 24 F.3d at 1218 (citing *Zafiro v. United States*, 506 U.S. 534 (1993) and *United States v.*

*Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993)).

In one of the decisions relied upon by the OCCA on direct appeal, the Court reasoned, "This

Court has encouraged the State to join for trial as many offenses as is permissible." *Vowell v. State*,

728 P.2d 854, 857 (Okla. Crim. App. 1986) (citing *Allison v. State*, 675 P.2d 142 (Okla. Crim. App.

60

1983); *DeLaune v. State*, 569 P.2d 463(Okla. Crim. App. 1977)). "Judicial economy is thereby promoted. Rather than forcing the State to isolate and prosecute single transactions, joinder of the offenses is extended to those arising from a series of acts or transactions." *Id.* The *Vowell* Court found joinder to be appropriate where "[t]he acts herein were connected by time, proximity, and evidence." *Id.*

In the case at bar, the homicide and robbery counts were connected by time, proximity, and evidence, to the public intoxication and transporting a firearm counts. Detective White testified it was "very rare" for a firearm to be recovered matching the one used in a homicide (Tr. 812). It is very likely that the only reason the murder weapon was recovered in this case was that Petitioner was so intoxicated he passed out at the wheel of his car. While Petitioner has alleged that the proof of the offenses did not overlap, Petitioner is simply wrong. Obviously, there was a close connection in time, and although the crimes may not have occurred in exactly the same place, there was a strong evidentiary connection. Petitioner's continuing possession of the firearm allowed him to participate in the robbery which led to the death of Mr. Ivory. Put another way, the evidence which directly showed that he was guilty of Count 3, Transporting a Loaded Firearm in a Vehicle, circumstantially showed him to be guilty of Count 1, First Degree Felony Murder.[24]

Moreover, there is no indication that the joinder of these offenses resulted in a fundamentally unfair trial. The jury received Instruction No. 4, which read as follows:

> You must give separate consideration for each charge in the case. The Petitioner is entitled to have his case decided on the basis of the evidence and the law which is applicable to each charge. The fact

---

[24]In fact, even if severance had been granted, Petitioner would not have been able to exclude evidence of his possession of the firearm from his murder trial.

that you return a verdict of guilty or not guilty for one charge should
not, in any way, affect your verdict for any other charge.

(O.R. 322).

In *Mitchell v. State*, 270 P.3d 160 (Okla. Crim. App. 2011), the OCCA found that where the jury was instructed it must give separate consideration to each count, "[u]nder these circumstances, Appellant has failed to show that he was prejudiced by the joinder, nor do we discern any actual prejudice from our review of the record." *Mitchell*, 270 P.3d at 171. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("The Constitution does not require anything more, as a jury is presumed . . . to follow its instructions . . . ."). In this case, there is not even a hint suggesting that the jury failed to follow its instructions to give separate consideration to each count. As noted in Proposition I above, the jury acknowledged at one point during deliberations that it had reached a unanimous decision on some counts but was still deliberating other counts.[25] This is the epitome of giving separate consideration to the separate counts, and it shows that the jury followed its instructions.

Therefore, Petitioner has failed to show under these circumstances that the joinder of Counts 1 and 2 with Counts 3 and 4 "'result[ed] in prejudice so great as to deny [Petitioner] his . . . right to a fair trial.'" *Webber*, 390 F.3d at 1178 (quoting *Lucero*, 133 F.3d at 1314). Joinder of the counts did not result in fundamental unfairness, and Petitioner's fourth proposition must fail.

## CONCLUSION

Petitioner's contentions have been answered by both argument and citations of authority. Respondent has shown that the decisions of the OCCA on direct appeal and post-conviction review

---

[25]The trial court read off a note from the jury during deliberations indicating "What should we do if we cannot come to unanimous decision?" Then, the court acknowledged that the second question was, "If we have unanimous decisions on some counts, how do we proceed?" (Tr. 1059).

are not contrary to, or unreasonable applications of, Supreme Court precedent. Furthermore, as Respondent has supported his arguments with extensive reference to the facts in the state court record, Petitioner fails to show that the OCCA's decisions were unreasonable determinations of the facts in light of Supreme Court precedent or that the state court rested its decisions on factually mistaken views of the record. 28 U.S.C. § 2254(d)(1)-(2). Petitioner has failed to show he was denied a fundamentally fair trial, and therefore, habeas corpus relief must be denied.

Respectfully submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ Theodore M. Peeper**
**THEODORE M. PEEPER, O.B.A. #19909**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (Fax)

Service email: fhc.docket@oag.ok.gov
**ATTORNEYS FOR RESPONDENT**

<u>**CERTIFICATE OF SERVICE**</u>

X        I hereby certify that on August 18, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

X        I hereby certify that on August 18, 2017, I served the attached document by mail on the following, who is not a registered participant of the ECF System:

DeAndre Bethel, # 690424
LCF
8607 SE Flower Mound Rd.
Lawton, OK 73501

s/ Theodore M. Peeper