**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **DEANDRE BETHEL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-CV-0367-GKF-CDL** |
| | ) | |
| **DAVID LOUTHAN,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

**OPINION AND ORDER**

Petitioner DeAndre Bethel ("Bethel") petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the lawfulness of his custody under the criminal judgment entered against him in Tulsa County Case No. CF-2012-660. Bethel contends he is in custody in violation of his Sixth Amendment right to counsel and Fourteenth Amendment right to due process because trial and appellate counsel provided constitutionally deficient representation (claim two); the State of Oklahoma ("the State") did not present sufficient evidence to prove his guilt beyond a reasonable doubt (claim three); and the trial court erroneously admitted unduly prejudicial opinion testimony (claim four). Bethel also asserts a claim of actual innocence to overcome any procedural bars that

---

[1] Bethel presently is incarcerated at the Lexington Correctional Center ("LCC") in Lexington, Oklahoma. *See* OK Offender Lookup, https://www.okoffender.doc.ok.gov (query ODOC # 690424), last visited April 25, 2025. The Court therefore substitutes the LCC's warden, David Louthan, in place of Scott Crow as party respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

might preclude review of his constitutional claims (claim one).[2]  Having considered the Petition

(Dkt. 1), the Response (Dkt. 7), the Reply (Dkts. 10, 11),[3] the record of state court proceedings

(Dkts. 7, 8, 9), and applicable law, the Court finds and concludes that the Petition shall be denied.

## BACKGROUND

On February 4, 2012, Byron Ivory, Jr. ("Ivory") died from multiple gunshot wounds he

sustained during a robbery and shooting that occurred in a parking lot near Club Pink, a club near

18th and Boston in Tulsa.  Dkt. 8-2, Tr. Trial vol. 2, at 72-73 [363-64], 82 [373], 133-35 [424-26],

188-93 [479-84]; Dkt. 8-3, Tr. Trial vol. 3, at 180-94 [751-65].[4]  Following an investigation, the

State charged Bethel and DeAndre Armon Williams ("Williams") with two felonies:  first-degree

felony murder, in violation of Okla. Stat. tit. 21, § 701.7 (count one); and robbery with a firearm,

in violation of Okla. Stat. tit. 21, § 801 (count two).  Dkt. 8-8, Original Record ("O.R.") vol. 1, at

---

[2] "When used to overcome procedural issues, 'a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Fontenot v. Crow*, 4 F.4th 982, 1029-30 (10th Cir. 2021) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  As Respondent states, it is not clear from the Petition whether Bethel is asserting a freestanding actual innocence claim, a gateway actual innocence claim, or both.  Dkt. 7 at 26-27.  A freestanding actual innocence claim would be subject to dismissal because it is not a cognizable habeas claim. *Farrar v. Raemisch*, 924 F.3d 1126, 1130-31 (10th Cir. 2019).  But Bethel contends in his Reply that he "does not make a freestanding claim of actual innocence."  Dkt. 11 at 4.  The Court thus construes claim one as presenting only a gateway actual innocence claim and will consider claim one only to the extent Respondent contends any of Bethel's constitutional claims (claims two, three, and four) should be dismissed or denied as procedurally barred.

[3] Because Bethel filed both replies before the applicable deadline, the Court considers them, collectively, as Bethel's Reply.  And, because Bethel drafted and filed his Petition and Reply before he obtained habeas counsel, the Court liberally construes them.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[4] For consistency, the Court's citations refer to the CM/ECF header pagination.  When citing to transcripts of state court proceedings, the Court first refers to the CM/ECF header pagination then refers, in brackets, to the original transcript pagination.

137.  The State additionally charged Bethel with two misdemeanors:  transporting a loaded firearm in motor vehicle, in violation of Okla. Stat. tit. 21, § 1289.13 (count three); and public intoxication, in violation of Okla. Stat. tit. 37, § 8 (count four).  *Id.* at 138.  The state district court granted Williams's motion for severance, and Bethel's case proceeded to a jury trial in February 2014.  *Id.* at 22; Dkt. 8-1, Tr. Trial vol. 1, at 1.[5]  The following facts were developed at trial.

Just before the shooting, Ivory, Ernest Roberts ("Roberts") and Bradley Jarrett ("Jarrett") were sitting in Ivory's car, which was parked in a parking lot located between 18th and Boston and 18th and Baltimore.  Dkt. 8-2, Tr. Trial vol. 2, at 74-75 [365-66], 123-28 [414-19].  According to Roberts and Jarrett, a "shorter" black man, wearing either a black or navy-blue hoodie or "a real over-sized coat" and stocking cap, walked or "staggered" up to the passenger side of Ivory's car.  *Id.* at 75-76 [366-67], 128-29 [419-20], 132 [423].  The man asked Roberts, "Do I know you?" and Roberts replied, "I don't know."  *Id.* at 75-77 [366-68].  As Roberts stepped out of the car, the man pushed a gun into the right side of Roberts's chest.  *Id.*  Roberts assumed he was being robbed, raised his hands in the air, and asked the man if he wanted Roberts's cell phone and wallet.  *Id.* at 77-80 [368-71], 88 [379].  The man said, "[y]es," Roberts handed both items to the man, and the man took them.  *Id.*  Roberts heard "rustling" from the driver's side of Ivory's car, as if Ivory was outside the car on the driver's side.  *Id.* at 78-79 [369-70], 92 [383].  While Roberts was handing over his cell phone and wallet to the man with the gun, Jarrett got out of the backseat of Ivory's

---

[5] After Bethel's trial, Williams pleaded guilty to an amended count of accessory after the fact, in violation of Okla. Stat. tit. 21, § 175, and the trial court imposed a seven-year sentence, with all but the first two years suspended, and dismissed the robbery charge.  *See* Judgment and Sentence (Sept. 2, 2014), *State v. Bethel*, Case No. CF-2012-660 https://www.oscn.net/dockets/GetCaseInformation.aspx?db=tulsa&number=CF-2012-660&cmid=2498086, last visited April 25, 2025.

car, heard gunshots, and ran toward Club Pink, leaving his shoes behind as he ran. *Id.* at 80 [371], 130-34 [421-25]. As he was getting out of the car, Jarrett saw a "silver-white sedan" parked behind Ivory's car and saw a "tall" black man standing by the open driver's side door of the sedan. *Id.* at 130-32 [421-23], 154-57 [445-48], 181 [472]. It appeared to Jarrett that the short man and the tall man were together. *Id.* at 132 [423]. According to Jarrett, Ivory got out of the car before Jarrett did, and Ivory seemed to get out of the car "real fast, kind of like somebody was over there" on the driver's side of Ivory's car. *Id.* at 130-31 [421-22]. When Jarrett got out of Ivory's car, the short man with the gun briefly turned his attention away from Roberts, so Roberts jumped over a nearby railing, landed on the ground, and ran toward Club Pink. *Id.* at 80-81 [371-72]. Roberts and Jarrett heard multiple gunshots as they ran away from the parking lot. *Id.* at 82 [373], 133-34 [424-25], 137 [428], 160-61 [451-52]. When Roberts got to Club Pink, he told a security guard he had been robbed. *Id.* at 83 [374]. Jarrett separately told the bouncer and a bartender to call the police because there had been a shooting in the parking lot. *Id.* at 135-36 [426-27]. The bartender called 911. *Id.* Jarrett then met up with Roberts at the club entrance and the two talked about the robbery and shooting for a few minutes. *Id.* at 83-84 [374-75], 135-36 [426-27].

Two Tulsa firefighters, Justin White ("White") and Clay Ayers ("Ayers"), were standing outside a fire station, near 18th and Boston, around 1:30 a.m. on February 4, 2012, with a third firefighter, Gillie, when they heard gunshots coming from the parking lot across the street from the fire station. Dkt. 8-2 at 183-91 [474-82], 209-17 [500-08]. White and Ayers saw a white, four-door car, described by White as a Chevy Cobalt, leaving the parking lot "at a high rate of speed." *Id.* at 190 [481], 215-17 [506-08]. White and Ayers also saw a second vehicle, described by Ayers as possibly a dark SUV, leaving the parking lot immediately after the white car. *Id.* at 198-201

4

[489-92], 215-17 [506-08].  Ayers reported the shooting to the Tulsa Fire Department dispatcher, described the suspect vehicles, and told the dispatcher to contact the Tulsa Police Department.  *Id.* White saw someone trying to get into the driver's side rear door of the white car as the car was leaving the parking lot.  *Id.* at 197-99 [488-90].  A few minutes after the shooting stopped, Ayers, White, and Gillie walked across the street to the parking lot and found Ivory lying face down on the ground with gunshot wounds.  *Id.* at 192-93 [483-84], 218-19 [509-10].  Ayers began treating Ivory's wounds, and White ran back to the fire station to get the firetruck and medical equipment. *Id.*

Tulsa Police Officer Mick Halgren responded to the parking lot just before 2:00 a.m., saw firefighters, saw paramedics loading Ivory into an ambulance, and worked with other officers to secure the scene with crime scene tape.  Dkt. 8-2 at 231-37 [522-28].  Roberts and Jarrett left Club Pink with Roberts's friend after they saw an ambulance and police cars arrive, but they did not speak with any police officers.  *Id.* at 84-88 [375-79], 138-41 [429-32].  Ivory was transported by ambulance to a hospital where he died.  Dkt. 8-3 at 180-81 [751-52].

Shortly after 5:00 a.m., less than four hours after Ivory was shot in the parking lot, Tulsa Police Officer Amley Floyd ("Floyd") responded to a call from an ambulance driver regarding a suspected impaired driver.  Dkt. 8-2 at 248-51 [539-42], 267 [558].  The ambulance driver reported that a white Chevy Cobalt was stopped at the traffic light at the intersection of Apache and Lewis, that the driver appeared to be passed out, and that there was a firearm visible on the passenger seat. *Id.* at 251 [542].  When Floyd arrived, he saw a white Chevy Cobalt with a "paper" tag sitting at the traffic light with the brake lights on.  *Id.* at 251-53 [542-44].  Floyd watched the traffic light change to green more than once, but the white car did not move through the intersection.  *Id.*  After

other officers arrived, Floyd turned on his lights and sirens and issued commands over his loud speaker to the driver. *Id.* at 254-56 [545-47]. The driver responded by popping his head up, slowly driving through the intersection, and continuing two or three blocks before stopping. *Id.* at 255-56 [546-47], 271-73 [562-64]; Dkt. 8-3 at 16 [587]. The driver and sole occupant of the car was Bethel. Dkt. 8-2 at 257-58 [548-49]; Dkt. 8-3 at 17 [588]. Bethel appeared to be intoxicated, "had a strong odor of alcohol coming from his breath and body," was slow to comply with officers' commands, and repeatedly asked the same questions, but his breathalyzer test revealed an alcohol level under the legal limit. Dkt. 8-2 at 258-77 [549-68]. Bethel told Floyd he had a firearm because "he was told by an officer a couple of weeks prior to that that he needed to get a gun because someone was trying to kill him," that he had been drinking "at a bar downtown," and that he could not remember anything from the time he left the bar around midnight until how he arrived at the traffic light at Apache and Lewis. *Id.* at 263 [554]. At the time of the traffic stop, Floyd was not looking for a white car, and he had not heard about the shooting at 18th and Boston. *Id.* at 277 [568]. Officer Ian Adair searched Bethel's car and found an unloaded silver and black Smith & Wesson .40 caliber handgun underneath the driver's seat, and a handgun magazine with seven live rounds on the driver's side floorboard. Dkt. 8-3 at 20-26 [591-97]; *see also* Dkt. 8-6, Trial Exhibits part 1, at 15-16 (State's Ex. 7, handgun magazine; State's Ex. 8, handgun). Bethel was arrested on suspicion of public intoxication. Dkt. 8-2 at 262-64 [553-55].

In and near the parking lot where Ivory was shot, crime scene investigators found Roberts's wallet; two size 10 Air Jordans, later identified as Jarrett's shoes; one size 14 shoe that belonged to Ivory; several .40 caliber and .45 caliber cartridge casings; seven .357 caliber unfired

cartridges;[6] and several bullet fragments.  Dkt. 8-3 at 48-69 [619-40]; *see also* Dkt. 8-7, Trial Exhibits part 2, at 24 (State's Ex. 65, diagram of crime scene).

Tulsa Police Detective Jason White ("Detective White") received a call about the shooting around 2:30 a.m.  Dkt. 8-3, at 213-18 [784-89].  At some point, he obtained a surveillance video from a nearby bank.  *Id.*; *see* Dkt. 9 (State's Ex. 72, DVD of surveillance video).  That surveillance video shows Ivory's car arriving and parking in the parking lot.  State Ex. 72 (Cam9), at 21:55.[7] Less than two minutes later, two cars that appeared to be traveling together drove into the parking lot.  *Id.* at 23:07.  One car, a four-door, dark-colored car, parked in the empty space next to Ivory's car; the other car, a four-door, white car, turned around and stopped behind Ivory's car, between and perpendicular to two rows of parked cars.  *Id.* at 23:07-24:30.  At least one person got out of the white car  and approached Ivory's car before the dark-colored car finished pulling into the parking space next to Ivory's car.  *Id.* at 23:16-23:24.  Two more people got out of the white car and approached Ivory's car after the white car turned around and stopped behind Ivory's car.  *Id.* at 23:18-24:18.  The driver of the white car briefly opened and closed the driver's door after the white car stopped behind Ivory's car.  *Id.* at 24:18-24:30.  It is unclear if anyone got out of the dark-colored car.  *Id.*  Two people ran away from the parking lot, across the street, and out of the camera's view.  *Id.* at 24:30-24:39.  Three people got back into the white car and closed the doors as the white car drove toward the parking lot exit.  *Id.* at 24:33-24:45.  The dark-colored car exited the parking lot immediately after the white car.  *Id.* at 24:45-24:55.

---

[6] The .357 caliber cartridges were found in a nearby parking lot in front of the Mercury Lounge, not in the parking lot where Ivory was shot.  Dkt. 8-3 at 56-57 [627-28]; Dkt. 8-7 at 24.

[7] The surveillance video does not have an internal time stamp.  The Court's citations to the surveillance video refer to the time shown on the application used to view the video.

Detective White contacted Roberts and Jarrett several hours after the shooting and informed them of Ivory's death, questioned Roberts and Jarrett about the shooting, interviewed other witnesses, and determined that Bethel was a potential suspect. Dkt. 8-2 at 87 [378], 141 [432]; Dkt. 8-3 at 228-33 [799-804]. Detective White pulled the report from Bethel's February 4 arrest, noted that the car involved in that arrest was a white Chevy Cobalt, and noted that the .40 caliber handgun found in the car was the same caliber as some cartridge casings found in the parking lot after Ivory's shooting. Dkt. 8-3 at 233-34 [804-05]. Detective White retrieved the handgun Officer Adair found in Bethel's car and submitted it, along with a bullet fragment recovered by the medical examiner during Ivory's autopsy and cartridge casings and bullet fragments found in the parking lot, to the Oklahoma State Bureau of Investigation ("OSBI") for testing. *Id.* at 234-38 [805-09].

Terrance Higgs ("Higgs"), an OSBI firearms and toolmark examiner, tested the items he received from Detective White. Dkt. 8-3 at 109-52 [680-723]. Higgs determined that two Winchester brand .40 caliber S&W cartridge casings (State's Exs. 19 and 66) and one heavily damaged .40 caliber S&W projectile (State's Ex. 12) were fired from the Smith & Wesson .40 caliber handgun that was found in Bethel's car. *Id.* at 119-25 [689-96]; *see also* Dkt. 8-7 at 30 (State's Ex. 71, OSBI report). Higgs determined that other .40 and .45 caliber cartridge casings found in the parking lot likely were fired from a Glock .40 caliber handgun and a Hi-Point .45 caliber handgun, indicating to Higgs that at least three firearms were fired during the shooting. Dkt. 8-3 at 125-36 [696-707], 144-45 [714-15].

On February 8, 2012, four days after Ivory's death, Bethel was arrested a second time, and Detective White and Detective Felton interviewed Bethel that same day. Dkt. 8-3 at 241-43 [812-

14]; Dkt. 8-4, Tr. Trial vol. 4, at 22 [850].  During the interview, Bethel repeatedly denied involvement in Ivory's shooting and the related robbery and told the detectives that he could not remember any events after 8:00 p.m., on February 3, when he began drinking vodka and took one Xanax bar. Dkt. 9 (State's Ex. 74, two DVDs of Bethel's videotaped interview).  Bethel did not remember being at or near Club Pink on February 3 or February 4.  *Id.*  He told the detectives that he bought the handgun that was found in his car on the early morning of February 4, just before he fell asleep at the traffic light.  *Id.*  Bethel explained that he had been trying to buy a gun for protection because a police officer named "Sticks" or "Larson" told him he was in danger; that his friend LaHarry "L.J." Myers ("Myers") called him on February 4 and said he knew about a gun for sale;[8] that he stopped at a Shell station to sober up, parked his car on a slope, and activated his emergency brake; that he met Myers at Lucky Sam's convenience store off North Lewis; that he followed Myers—who was driving a green Grand Am—to a house just around the corner near the 007 Club on North Lewis; that he saw a white van in the driveway of the house; and that he paid a black man with dreadlocks $175 for the handgun.  *Id.*  Bethel did not remember the gun seller's name but thought he might have been named Rio.  *Id.*  Bethel did not remember what happened between the time he bought the handgun and the time he woke up at the traffic light surrounded by police officers.  *Id.*  Bethel's videotaped interview was published to the jury.  Dkt. 8-3 at 255-56 [826-27]; Dkt. 8-4 at 5 [833].  After Bethel's second arrest, Tulsa Police Detective Bob Hickey searched Bethel's car and found a .45 caliber cartridge, which Hickey described as a "live round" or "unfired bullet," under the driver's seat, and a black hooded coat in the trunk of the car.  Dkt.

---

[8] Myers was shot and killed between the time of Bethel's first arrest and second arrest, and a portion of Bethel's February 8 interview includes questions from a detective who was investigating Myers's murder.  *See* State's Ex. 74 (Bethel's interview, DVD 2 of 2).

8-3 at 99-104 [670-75].

Bethel made calls from jail after each of his arrests, and recordings of some calls were published to the jury. Dkt. 8-4 at 11-12 [839-40], 17-21 [845-49], 23-40 [851-68]; Dkt. 9 (State's Ex. 76, jail calls). During one call on February 8, Bethel told his father that he had been charged with murder and three counts of robbery relating to a shooting at a club. Dkt. 8-4 at 25 [852]. His father asked, "Was you even there at the club?" and Bethel stated, "They said I'm on camera getting kicked out." *Id.* at 26 [854]. His father then said, "I'm asking you, was you there?" and Bethel replied, "Yes." *Id.* Bethel later said "I wasn't planning on going but I don't know what made me end up going in there. I don't know what made me go in there." *Id.* Bethel denied involvement in the shooting. *Id.* at 26-28 [854-56]. Bethel also told his father that that "somebody must [have] used" the handgun that police found in Bethel's car, and that he could not remember who he bought the gun from, but he thought the man was named Rio. *Id.* at 23-25 [851-53]. When he later spoke to his mother on February 8, Bethel stated that he had been charged with murder, denied involvement in the shooting, stated that the detectives "tried to tell [Bethel he] was at this club and [he] told them [he] wasn't there," and stated that he told them he "just bought that damn gun that night." *Id.* at 32-35 [860-63]. Bethel also spoke to his mother about contacting an attorney. *Id.* During a third call on February 8, to an unidentified individual, Bethel said that he told "them" that Myers knew the person Bethel bought the handgun from, that Bethel could not remember the seller's name, and that Bethel "bought that gun that night and [he] was drunk at the bar and [he] bought that gun that night right before he got pulled over." *Id.* at 36-40 [864-68]. Bethel also told the individual that he was on "a videotape" that placed him at the scene "getting escorted out of the Club Pink," denied that he had been at Club Pink, and told the individual that

10

he needed help getting money for a lawyer. *Id.*

Bethel testified as the sole defense witness and denied involvement in the robbery and shooting. Dkt. 8-4 at 151-52 [979-80]. He admitted that, on February 4, he transported a loaded firearm in a motor vehicle, and he was intoxicated in public. *Id.* Bethel testified that he did not remember being in Club Pink on February 3 or 4, and that he believed his car was not in the vicinity of Club Pink. *Id.* at 152-53 [980-81]. Bethel testified he bought the handgun that was found in his car just before he passed out at the traffic light, he never checked to see if it had ammunition, he had no knowledge that the handgun had been used in a crime, and he removed the magazine for safety reasons when he understood he was being pulled over by police officers. *Id.* at 155-56 [983-84], 164-65 [992-93]. On cross-examination, Bethel testified that he did not tell his father on the jail call that he had been at the club and testified that he instead was telling his father only that the detectives told him they had evidence showing he was at the club. *Id.* at 159 [987], 162 [990].

Ultimately, the jury found Bethel guilty as charged. *Id.* at 235-36 [1063-64]. The jury recommended, and the trial court imposed, prison sentences of life with the possibility of parole (count one), five years (count two), five months (count three), and thirty days (count four). *Id.*; Dkt. 7-5 at 1. The trial court ordered the sentences for counts one and two to be served consecutively to each other and ordered the sentences for counts three and four to be served concurrently with each other and with the sentences imposed for counts one and two. *Id.* at 1-2.

On direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA"), found Bethel's convictions for felony murder and the underlying felony of attempted robbery violated his right to be free from double jeopardy and ordered the state district court to vacate the robbery conviction, but otherwise affirmed Bethel's convictions and sentences. *Id.* at 4-5. Following his direct appeal,

11

Bethel unsuccessfully sought postconviction relief.  Dkts. 7-6, 7-9, 7-11, 27-5, 27-6, 27-9.[9]

Bethel now seeks federal habeas relief reasserting claims he presented to the OCCA, through his direct and postconviction appeals, alleging trial and appellate counsel provided constitutionally deficient representation (claim two); challenging the sufficiency of the evidence to prove his guilt beyond a reasonable doubt (claim three); and alleging the trial court erroneously admitted unduly prejudicial opinion testimony (claim four).  Dkt. 1 at 12, 16, 40, 48; Dkt. 10 at 3-4.[10]  Respondent urges the Court to deny the Petition, primarily arguing that 28 U.S.C. § 2254(d) bars relief.  Dkt. 7.

## DISCUSSION

A federal court may grant federal habeas relief to a state prisoner only if the prisoner shows that he or she "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  But the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and federal habeas jurisprudence limit a federal court's discretion in several ways.[11]  Relevant here, when a state court has adjudicated a federal claim in the merits, a federal court "shall not"

---

[9] In August 2020, on Bethel's motion, the Court stayed this habeas proceeding and administratively closed the case while Bethel pursued state postconviction relief based on *McGirt v. Oklahoma*, 591 U.S. 894 (2020).  *Id.* at 2-3.  The Court reopened the case in April 2022 but denied Bethel's request to amend the Petition to add a *McGirt* claim because the Court determined amendment would be futile.  *Id.* at 4-10.

[10] As Respondent points out, the claims Bethel identifies in the Petition's table of contents do not match the claims he identifies in the body of the Petition.  Dkt. 1, at 2, 12-54; Dkt. 7, at 11 n.3.  But Bethel clarifies in his Reply that his table of contents is incorrect and that he seeks relief on the claims he identifies and briefs in the body of the Petition.  Dkt. 10, at 3-4.

[11] The AEDPA imposes a one-year statute of limitations and requires a state prisoner to exhaust available state remedies before seeking federal habeas relief.  28 U.S.C. §§ 2244(d)(1), 2254(b)(1)(A).  Respondent concedes that Bethel timely filed his claims, and that Bethel exhausted available state remedies as to all but one portion of claim two.  Dkt. 7 at 2 & n.2.

grant habeas relief unless the prisoner first shows that the state court's adjudication of that claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[12] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  The prisoner "carries the burden of proof" in satisfying these standards.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  This burden is demanding; it requires the prisoner to "show[] there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see also Meek v. Martin*, 74 F.4th 1223, 1248 (10th Cir. 2023) (noting that to satisfy § 2254(d)'s demanding standards, "[t]he prisoner must show that a state court's decision is 'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the prisoner's case" (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (*per curiam*))).

Moreover, even if a prisoner satisfies § 2254(d)'s preconditions to relief, a federal court need not grant habeas relief.  *See Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction."); *Horn v. Banks*, 536 U.S. 266, 272 (2002) ("While it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review set forth in 28 U.S.C. § 2254(d) . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should

---

[12] The phrase "clearly established Federal law," as used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Bonney v. Wilson*, 754 F.3d 872, 880 (10th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted).

automatically issue if a prisoner satisfies the AEDPA standard."). Rather, the prisoner "must still . . . persuade a federal habeas court that 'law and justice require' relief." *Davenport*, 596 U.S. at 134 (quoting 28 U.S.C. § 2243).

With these standards in mind, the Court turns to Bethel's claims.

## I.     Claim two:  ineffective assistance of counsel

Bethel contends that trial counsel and appellate counsel provided constitutionally deficient representation, violating his Sixth and Fourteenth Amendment rights to the effective assistance of counsel. Dkt. 1 at 16-40; Dkt. 11 at 4-9. More specifically, Bethel contends trial counsel: (1) failed to interview and call as defense witnesses, Williams (Bethel's co-defendant), Elza Riley ("Riley"), and Wanda Janell Smith ("Smith"), Dkt. 1 at 18-24; (2) failed to "test" the robbery charge and effectively conceded Bethel's guilt as to that charge, *id.* at 24-31; (3) failed to object when the trial court violated state law and failed to give an appropriate *Allen*[13] instruction in response to jury questions during deliberations, *id.* 31-38; and (4) failed "to establish proper context" for Bethel's "false admission" during the jail call he made to his father, *id.* at 39-40. Bethel further contends that appellate counsel failed to argue, or failed to adequately argue, that trial counsel was ineffective for these reasons. *Id.* at 18-40.

### A.     Clearly established federal law

Claims of ineffective assistance of trial counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate a constitutional violation, a defendant must show deficient performance and resulting prejudice. 466 U.S. at 687-88. To establish deficient performance, the defendant must show "that counsel's representation fell below an objective

---

[13] *Allen v. United States*, 164 U.S. 492 (1896).

standard of reasonableness." *Id.* "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential" and the reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This is so because "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Ultimately, in adjudicating a claim of actual ineffectiveness of counsel, the "focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. Lastly, while *Strickland* establishes a two-part inquiry, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

*Strickland*'s legal principles also apply to claims alleging ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000). In this context, the inquiry as to counsel's performance focuses on whether the appellant has shown "that a particular nonfrivolous issue" appellate counsel omitted from the appeal "was clearly stronger than issues that counsel did present." *Id.* at 288. An "appellate counsel who files a merits brief need not (and should not) raise

15

every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). And, even if an appellant establishes that appellate counsel performed deficiently, the appellant must show resulting prejudice, i.e., "a reasonable probability that," but for appellate counsel's deficient performance, the appellant "would have prevailed on his appeal." *Id.* at 285-86. "When . . . the basis for the ineffective assistance claim is the failure to raise an issue, [the reviewing court] must look to the merits of the omitted issue." *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006). "If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance." *Id.*

When a petitioner seeks habeas relief on a claim of ineffective assistance of counsel that is subject to review under § 2254(d) because it has already been adjudicated in state court, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, "even a strong case for relief does not mean the state court's contrary conclusion [on a *Strickland* claim] was unreasonable." *Id.* at 102.

### B.    Analysis and conclusion

With one exception, the OCCA considered each of Bethel's allegations concerning the constitutional adequacy of the legal representation he received from trial and appellate counsel.

### 1.    Failure to present available defense witnesses

Bethel contends, as he did on direct and postconviction appeal, that trial counsel provided

constitutionally deficient representation by failing to call Williams, Smith, and Riley as defense witnesses and that appellate counsel provided constitutionally deficient representation by failing to adequately argue trial counsel's ineffectiveness in this regard.  Dkt. 1 at 18-24; Dkt. 11 at 4-6.

### a.      Claim presented on direct appeal

On direct appeal, appellate counsel raised an ineffective assistance of trial counsel claim as Bethel's tenth proposition of error.  Dkt. 7-1 at 57-61.  Appellate counsel argued, in part, that trial counsel was ineffective for failing to present two available defense witnesses, Williams and Smith.  Dkt. 7-1 at 60-62; Dkt. 7-2.  Appellate counsel requested an evidentiary hearing and submitted affidavits from Williams, Smith, and Jolene Parham ("Parham") to support that request. Dkt. 7-2.  Parham, an investigator with the appeals division of Oklahoma Indigent Defense Services, stated that she found an undated letter from Bethel's mother, in trial counsel's case file, identifying Smith as potential defense witnesses.  *Id.* at 18-19.  The OCCA closely considered these affidavits and, applying its standard for granting an evidentiary hearing, concluded that Bethel did not "meet his burden" to show "a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."  Dkt. 7-5 at 10-11.  In denying Bethel's request for an evidentiary hearing, the OCCA effectively determined that Bethel failed to show either deficient performance or resulting prejudice under *Strickland*.  *See Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013) (stating, "the OCCA . . . has now assured us that 'when [it] review[s] and den[ies] a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, [it] necessarily make[s] the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in *Strickland*'" and further stating, "as a matter of federal law, that any denial of a request for an

17

evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 . . . operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)").

Bethel strenuously disagrees with the OCCA's decision, asserting that he was necessarily prejudiced by trial counsel's failure to present testimony from Williams and Smith because both would have testified that he was not involved in the shooting. Dkt. 1 at 22-23; Dkt. 11 at 4-6. But the facts presented in state court support the objective reasonableness of the OCCA's decision that trial counsel was not ineffective for presenting these witnesses.

In his signed 2014 affidavit,[14] Williams states:

> I saw Deandre Bethel around 4:00 a.m. on the morning of February 4, 2012. I called [Bethel] on the phone to see where he was. He said he was over in the vicinity of my house near Lucky Sam's convenience store on North Lewis. I told him to meet me at Lucky Sam's. We met there and saw LaHarry Myers, otherwise known as "L.J.," getting out of his white Crown Victoria in the parking lot. [Bethel] asked L.J. if he still had a gun for sale. L.J. said he still had some guns and they would need to go around the corner near the 007 Club to get the guns. [Bethel] said a cop named "Sticks" told him he needed a gun for protection because the Hoovers were trying to get at him. All three of us drove in separate cars to the location. I was driving my brother's maroon 2000 Chevy Tahoe. It took less than a minute to get to the house. I did know whose house it was. Once at the house, I got out of my car and got into [Bethel's] white car. L.J. came up and said he was going inside the house to get the guns. A few minutes later, L.J. came out of the house with two guns, a .40 caliber and a 9 millimeter and showed them to us. [Bethel] asked him

---

[14] In this proceeding, Bethel presents three affidavits from Williams, one signed and notarized in December 2014, one possibly written in 2016 that is not signed or notarized, and one signed and notarized in July 2018. Dkt. 4 at 7-10; Dkt. 14-1. Bethel presented the unsigned 2016 affidavit in state postconviction proceedings, but it has no evidentiary value because Williams did not sign it. Bethel did not present the signed 2018 affidavit in any state court proceedings, and this court previously determined that the 2018 affidavit is not part of the state court record for purposes of applying § 2254(d). *See* Dkt. 17; *Pinholster*, 563 U.S. at 181 (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and noting that § 2254(d)(2)'s plain language also limits habeas review to "the evidence presented in the State court proceeding"). The Court therefore considers only the 2014 affidavit signed by Williams that was presented to the OCCA.

> if there was anything wrong with the guns and whether they were "hot." L.J. said
> the guns were fine. [Bethel] gave L.J. $150.00 in exchange for the .40 caliber gun.
> I told them I would talk to them later. I got back into my vehicle and left.

Dkt. 4 at 7 (alterations added; all other spelling, grammar, and syntax in original). Williams's

statements conflict with Bethel's statements that were presented at trial. During his videotaped

interview—which was published to the jury—Bethel told detectives that he bought the gun for

$175 early on the morning of February 4, after he received a call from Myers, met up with Myers

at Lucky Sam's convenience store, followed Myers—who was driving a green Grand Am—the

house of someone he did not know who had dreadlocks possibly was named Rio. Bethel said

nothing about talking to Williams or about Williams being present when Bethel bought the gun.

Given the apparent discrepancies between Williams's version and Bethel's version of Bethel's

handgun purchase, it was objectively reasonable for the OCCA to conclude that Bethel failed to

establish that trial counsel performed deficiently and prejudicially by failing to call Williams.

Likewise, it was objectively reasonable for the OCCA to reach the same conclusion as to

trial counsel's failure to call Smith to testify as a defense witness. Smith states in her affidavit that

she and Bethel had known each other since high school or, as of 2014, for about four and a half

years, and that she

> was with Deandre Bethel on the evening of February 3, 201[2], and into the early
> morning hours of February 4, 201[2]. We were dating at the time. Around 1 p.m.,
> [Bethel] dropped me off at the home of my best friend, Neka. He came back over
> at about 9 p.m. We were hanging out, playing dominoes and drinking. I saw him
> take a couple of Xanax bars. Around 1 a.m., we left for my mother's house. We
> drove his white Cobalt car. My mother lived at 539 E. 49th Place in Tulsa. At that
> point, [Bethel] was pretty messed up. My grandmother called me at around 3 a.m.
> She stayed around the corner. She was ill and needed my help to be moved from
> her bed to the living room. [Bethel] and I went over to her house to help her. Then
> around 3 a.m., [Bethel's] friend, LJ (LaHarry Myers), called my cell phone.
> [Bethel] did not have a phone that worked at that time. LJ asked if "Belly" was
> with me. "Belly" was [Bethel's] nickname. I gave [Bethel] my phone and he was
> talking to LJ, but I didn't know what they were saying. After he finished talking,

> [Bethel] told me he was going to meet LJ to go buy a gun.  I told [Bethel], "Let me go with you."  He told me no and we got into it and argued.  [Bethel] did not want me to go because he thought LJ was going to rob him.  We argued some more.  I got out of the car and he drove off.  Later that morning I got a phone call that [Bethel] was in jail.

Dkt. 4 at 11 (alterations added; all other spelling, grammar, and syntax in original).[15]  Here too, trial counsel reasonably could have determined not to present testimony from Smith that differed from statements Bethel made to Officer Floyd, Detectives White and Felton, his father, and an unidentified individual Bethel spoke to from jail.  Bethel told Officer Floyd that he had been drinking at a bar until midnight and that he remembered nothing between leaving the bar and arriving at Apache and Lewis where he fell asleep at the traffic light.  Bethel told Detectives White and Felton that he had taken only one Xanax bar around 8:00 p.m., when he began drinking vodka and driving around alone in his car, and he could not remember any events between that time and his arrest at Apache and Lewis—with the exception of his highly detailed account of the call he received from Myers and the events immediately surrounding his purchase of the handgun found in his car.  In addition, Bethel told the detectives his cell phone was off after February 3, suggested that he might have had Smith's phone when Myers called him on February 4 about buying a handgun, and identified Smith as Janell.  But Bethel could not tell the detectives Smith's phone number, her last name, or where she lived, and further described Smith as a "hook-up" who he usually meets up with when she is walking down the street.  Bethel told his father he had been to the club, and he did not know why he went there, but that he was not involved in the shooting, and that he had just bought the handgun before his arrest, possibly from a man named Rio.   Bethel

---

[15] The dates identified in the Smith affidavit are in the original but, in context, likely should be February 3 and 4, 2012.

told the unidentified individual he called from jail that he had been drunk at the bar and had just bought the handgun before his arrest. Other than Bethel's suggestion that he might have had Smith's phone when Myers called him about a handgun for sale, none of Bethel's statements to anyone suggests he spent any portion of the night of February 3 into the morning of February 4 with Smith.[16] On this record, it was objectively reasonable for the OCCA to conclude that even if trial counsel performed deficiently by failing to call Smith as a witness, Bethel could not show resulting prejudice.

### b.     Claim presented on postconviction appeal

On postconviction appeal, Bethel argued that trial counsel was ineffective for failing to call Williams and Riley as defense witnesses and that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to call these two witnesses. Dkt. 7-6 at 6-15. With his application, Bethel submitted the unsigned 2016 affidavit from Williams, a 2016 affidavit from Riley, the 2014 affidavits from Williams and Smith that he previously presented to the OCCA

---

[16] Moreover, it would have been reasonable for trial counsel to question how the jury might respond to Bethel's expressed inability to provide detectives with Smith's last name and phone number when, according to Bethel and Smith, Myers contacted Bethel about the handgun purchase by calling Smith's phone.

on direct appeal; and his own 2016 affidavit.[17]  Dkt. 7-6 at 22-31.  Applying *Strickland* and *Smith*,

the OCCA "found no merit in the claim that [Bethel] was denied effective assistance of appellate

counsel as alleged in his post-conviction application."  *Id.* at 4-5.  The OCCA noted that

"[a]ppellate review of an ineffective assistance of counsel claim begins with a presumption of

competence" and that relief is available only if the defendant "show[s] a reasonable probability

that appellate counsel would have prevailed on direct appeal had they argued trial counsel was

---

[17] Bethel relied on these same affidavits to support state postconviction claims based on actual innocence and newly discovered evidence.  Dkt. 7-6 at 3, 6-7.  The OCCA acknowledged that defendants can assert "actual innocence, newly discovered evidence and ineffective assistance of appellate counsel claims" for the first time in an application for postconviction relief.  Dkt. 7-11 at 2-4; *see* Okla. Stat. tit. 22, § 1080(4) (permitting postconviction relief where "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice").  The OCCA explained that, under *Braun v. State*, 937 P.2d 505 (Okla. Crim. App. 1997), "[t]he "actual innocence" exception is applicable only to factual innocence, where a petitioner can make a colorable showing he is actually innocent of the crime for which he is convicted," and that *Braun* requires a defendant asserting actual innocence to "show by clear and convincing evidence that, but for the alleged error, no reasonable juror would have found the [defendant] guilty of the crime of which he was convicted."  Dkt. 7-11 at 3 (quoting *Braun*, 937 P.2d at 513 n.15 (internal quotation marks omitted)).  The OCCA concluded that Bethel "failed to show by clear and convincing evidence that after hearing the testimony in these affidavits no reasonable jury could have found him guilty of the crimes of which he was convicted."  *Id.*  As previously noted, *see supra* n.2, Bethel presents a gateway actual innocence claim in claim one of the Petition.  In claim one, Bethel argues, in part, that the OCCA failed to apply clearly established federal law when it rejected his actual innocence claim because the standard for actual innocence set out in *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013), only requires a showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner]."  Dkt. 1 at 12-16.  But Bethel's argument misunderstands the difference between the federal standard for a gateway actual innocence claim and the state standard for a freestanding actual innocence claim.  As previously discussed, the Supreme Court has not recognized a freestanding actual innocence claim as a cognizable habeas claim.  *Farrar*, 924 F.3d at 1130-31.  *Perkins* describes the federal standard for a gateway actual innocence claim and that claim does not permit federal habeas relief based on factual innocence.  Instead, a gateway actual innocence claim, if proven, only permits a petitioner to overcome procedural barriers that would otherwise bar habeas review of the petitioner's constitutional claims.  *Fontenot*, 4 F.4th at 1029-30.  Because no clearly established federal law recognizes a freestanding actual innocence claim, individual states that permit freestanding actual innocence claims to be raised in postconviction proceedings are free to establish their own standards, as the OCCA has done in *Braun*.

deficient and these errors resulted in prejudice." *Id.* at 6. The OCCA found that Bethel "failed to provide evidence supporting his claims," and concluded that Bethel "failed to establish appellate counsel's performance was deficient or objectively unreasonable and . . . failed to establish any resulting prejudice." *Id.*

Bethel has not shown how the OCCA's decision regarding appellate counsel's representation is objectively unreasonable. Riley states in his affidavit that he had known Bethel for about twelve years, and that he would have testified:

> I, Elza Riley was present at Club Pink on February 4, 2012 at 1:40 a.m. I was parked in the parking lot and I observed the shooting that occurred. I saw another car parked in the parking lot and a white car pull up behind it. Three (3) individuals got out of the white car and I recognized LaHarry Myers a/k/a L.J. and another person pull guns and shoot Bryon Ivory Jr. I also recognized another individual standing by the shooters vehicle (DeAndre Williams). This was retaliation for Bryon Ivory robbing Mr. Myers some days earlier. After the shooting I immediately left the seen in a dark colored vehicle (blue Oldsmobile). No one in our vehicle participated in the incident we just witnessed what happened and left the scene.

Dkt. 4 at 3 (spelling, grammar, and syntax in original). Riley also would have testified that Bethel "was not involved in the shooting or robbery of Mr. Ivory." *Id.* It is not clear from the record that Bethel provided Riley's name to trial counsel as a potential defense witness. Regardless, Bethel's suggestion that Riley would have been a "critical" witness not only ignores evidence presented at trial but also ignores the potential damage that could have been caused had trial counsel presented Riley's testimony identifying Williams and Myers as two of the three shooters. The jury saw a surveillance video showing a white car, described by one eyewitness as a white Chevy Cobalt, follow a dark-colored car into the parking lot immediately before the shooting; showing three people get out of the white car and approach Ivory's car while the driver of the white car remained in the car; showing three people getting into the white car after the shooting and attempting to

close the doors as the driver of the white car drove out of the parking lot; and showing the dark-colored car leaving the same parking lot immediately after the shooting. Dkt. 9 (State's Ex. 72 (Cam9) surveillance video). The identities of the shooters and the driver of the white car could not be determined from the surveillance video and no trial witnesses identified any shooters or the driver of the white car. Bethel denied involvement in the shooting and denied that his white Chevy Cobalt was the car seen in the video. Other evidence, however, established that the Smith & Wesson .40 caliber handgun found in Bethel's car was used in the shooting, that one shooter used a .45 caliber handgun, and that one .45 caliber cartridge (unfired bullet) was found in Bethel's car. Bethel's defense rested, in part, on his statements attempting to distance himself from the vicinity of Club Pink, but even his own statements indicated he communicated with Myers, by phone and in person, on the morning of the shooting when he purchased the handgun found in his car. In contrast to this evidence, which Bethel rightly describes as circumstantial evidence of his involvement in the shooting, Riley's statements, if credited by the jury, would have provided eyewitness testimony identifying Williams (Bethel's co-defendant), Myers, and "another person" as the three shooters who entered and exited the parking lot in the white Chevy Cobalt, arguably providing stronger evidence that Bethel likely was the driver of the white Chevy Cobalt. On this record, it was objectively reasonable for the OCCA to conclude that appellate counsel did not provide constitutionally deficient representation by failing to argue trial counsel was ineffective for not presenting Riley's testimony at trial.

### 2.    Failure to "test" robbery charge and concession of guilt

In his application for postconviction relief, Bethel argued that appellate counsel was ineffective for failing to argue that trial counsel was ineffective "for not subjecting the

prosecution's case of robbery with a firearm to adversarial testing" and for "conced[ing] the robbery charge by confessing guilt without permission of [Bethel]." Dkt. 7-6 at 15-19. The state district court rejected that claim, stating:

> In Proposition IV, [Bethel] argues that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not subjecting the prosecution's Robbery with a Firearm count to adversarial testing. [Bethel] speculates that the victim was mistaken as to whether he was being robbed. This [c]ourt finds that [Bethel's] argument is essentially a challenge to the sufficiency of the evidence of the Robbery count.

> Appellate counsel raised a proposition of error regarding the sufficiency of the evidence in [Bethel's] direct appeal, arguing that the elements of robbery were not present, and that the evidence did not show [Bethel] was there. *Bethel v. State*, F-2014-336 (Okl.Cr. July 15, 2015) (not for publication). While not couched as an ineffective assistance of trial counsel claim, appellate counsel did raise such a proposition, and this [c]ourt finds [Bethel's] claim is barred by the doctrine of *res judicata*. *See Logan*, 2013 OK CR 2, ¶ 3, 293 P.3d at 973. [Bethel] cannot show that appellate counsel was ineffective and committed an error that would have changed the outcome of the direct appeal. *Id.* Additionally, there is nothing in the record reflect[ing] that trial counsel conceded that [Bethel] took part in the robbery. *See generally* Trial Tr. [Bethel] complains about the trial attorney's concession of his possession of the firearm linked to the robbery and his intoxication, but the evidence at trial clearly showed that both facts were true. Trial Tr. 553-54. Counsel's decision to do so was clearly trial strategy given the weight of the evidence, and should not be second-guessed. *Underwood v. State*, 2011 OK Cr 12, ¶ 87, 252 P.3d 221, 253 (citing *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066). This [c]ourt finds that [Bethel] has failed to show a reasonable probability that, but for appellate counsel's unprofessional error, the result of his appeal would have been different.

Dkt. 7-9 at 12-13. The OCCA agreed with the state district court's assessment of appellate counsel's representation on this point. Dkt. 7-11 at 5-7.

In this proceeding, Bethel reasserts his views (1) that Roberts was mistaken about whether he was being robbed, suggesting that Roberts "volunteered his property without provocation" "when he felt a gun on his torso," and (2) that trial counsel conceded his guilt as to the robbery charge, primarily through statements trial counsel made during closing argument. Dkt. 1 at 26-29;

Dkt. 11 at 6-7. On the record presented, Bethel has not shown "clear and convincing" evidence to overcome the presumption of correctness that attaches to the state court's finding that trial counsel did not concede Bethel's guilt as to the robbery charge. *See* 28 U.S.C. § 2254(e)(1); *Fontenot*, 4 F.4th at 1061. Likewise, the record does not support Bethel's assertion that the OCCA unreasonably applied *Strickland* when it determined that appellate counsel was not ineffective for failing to argue that trial counsel did not "test" the robbery charge.

### 3.     Failure to object to trial court's response to jury questions

On direct appeal, the OCCA considered the merits of several trial errors Bethel identified—including his claim that the trial court failed to comply with state law and failed to give an appropriate *Allen* instruction in response to jury questions during deliberations—and determined that none of the alleged trial errors required appellate relief. Dkt. 7-5 at 5-10. Applying *Strickland*, the OCCA then determined that Bethel could not establish prejudice arising from trial counsel's failure to object to the alleged trial errors, including trial counsel's failure to object to the trial court's response to the jury questions. *Id.* at 10.

Bethel appears to argue that the OCCA did not apply *Strickland* to consider his allegation that trial counsel was ineffective for failing to challenge the trial court's response to the jury questions. Dkt. 1 at 32, 38; Dkt. 11 at 7. The Court disagrees. After the OCCA determined that the trial court's allegedly erroneous response to the jury questions did not require relief, it was objectively reasonable for the OCCA to further conclude that trial counsel's failure to object to the trial court's response to the jury questions, even if deficient, did not create a reasonable probability that the outcome of Bethel's trial would have been different had trial counsel objected to the trial

court's responses to the jury questions.

### 4.    Failure to provide context for Bethel's "false admission" to his father

Bethel did not present, in any state court proceedings, his allegation that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to provide adequate context for the jury to consider Bethel's statement to his father, during a recorded phone call from jail, admitting that he was "at the club" before Ivory's shooting. Dkt. 1 at 39-40; Dkt. 11 at 7-8.

As Respondent contends, this portion of claim two is unexhausted. Dkt. 7 at 44-46; *see* 28 U.S.C. § 2254(b)(1)(A) (requiring habeas petitioner to exhaust available state remedies). "Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies." *Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006). But because the OCCA undoubtedly would apply a procedural bar if Bethel returned to state court to exhaust this claim, this portion of claim two is procedurally defaulted for purposes of federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (noting that "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," "there is a procedural default for purposes of federal habeas" review); *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992) (same). As previously noted, Bethel asserts a gateway actual innocence claim in claim one to overcome any potential procedural bars. *See supra* n.2. But the Court agrees with Respondent that, in this case, it is easier to overlook the procedural bar and deny relief on the merits. Dkt. 7 at 44-45; *see Smith v. Duckworth*, 824 F.3d 1233, 1242 (10th Cir. 2016) (electing to bypass procedural issues where claim was "readily resolved on the merits").

As previously discussed, Bethel called his father from jail on February 8 and told his father that he had been charged with murder and three counts of robbery relating to a shooting at a club. Dkt. 8-4 at 25 [852]. His father asked, "Was you even there at the club?" and Bethel stated, "They said I'm on camera getting kicked out." *Id.* at 26 [854]. His father then said, "I'm asking you, was you there?" and Bethel replied, "Yes." *Id.* Bethel later said "I wasn't planning on going but I don't know what made me end up going in there. I don't know what made me go in there." *Id.* Bethel contends that trial counsel failed to make clear to the jury that Bethel's "false admission" to his father that he was "at a club" (but not necessarily Club Pink, according to Bethel), was "[t]he admission of a child to an irate father of what was told by a deceptive detective [and] not a reliable confession of being at the scene." Dkt. 1 at 39-40; Dkt. 11 at 7-8. Disregarding the fact that Bethel was an adult when he participated in the robbery and shooting and when he spoke to his father from jail, the trial record belies Bethel's argument that trial counsel performed deficiently by failing to ensure the jury had sufficient "context" to consider Bethel's statement to his father. Before the jury viewed Bethel's videotaped interview or heard Bethel's phone conversation with his father, the jury heard Detective White testify on direct examination that he sometimes tells an interviewee, "I've got you on video, when in fact we may not actually have them on video," to prompt the interviewee to provide more information during the interview. Dkt. 8-3 at 250-51 [821-22]. Detective White also testified on direct examination that he obtained the Club Pink video but that he could not definitively say that Bethel was on the video. Dkt. 8-4 at 6 [834]. Trial counsel emphasized this point on cross-examination, eliciting testimony that Detective White examined the Club Pink video and "hundreds and hundreds of pictures of people that were at Club Pink" and could not "definitively say with one hundred percent certainty" that he saw Bethel in

28

the video or photographs. Dkt. 8-4 at 52-53. Lastly, Bethel testified that he did not remember being at Club Pink before Ivory's shooting, that he did not believe his white Chevy Cobalt was in or near the Club Pink parking lot, and that his statement to his father was his attempt to tell his father that detectives told Bethel he was seen on video being escorted out of Club Pink. *Id.* at 152-53 [980-81], 159-63 [987-91]. Given this testimony, the audiotaped jail call to his father, and Bethel's videotaped interview, the jury had sufficient context to evaluate Bethel's statements to his father. Thus, even considering this unexhausted portion of claim two de novo, the Court finds that Bethel has not shown either deficient performance or resulting prejudice based on trial counsel's alleged failure to provide context for Bethel's "false admission" to his father.

### D.    Conclusion as to claim two

Having carefully considered the parties' arguments, the record of state court proceedings, and the OCCA's decisions, the Court finds, for the foregoing reasons, that § 2254(d) bars relief as to those portions of claim two that Bethel presented to the OCCA and that the portion of claim two that Bethel did not present to the OCCA should be denied on the merits notwithstanding Bethel's failure to exhaust that portion of the claim. The Court thus denies the Petition as to claim two.

## II.    Claim three: insufficient evidence

Bethel contends he was deprived of his Fourteenth Amendment right to due process because the State did not present sufficient evidence at trial to prove, beyond a reasonable doubt, all the elements of robbery with a firearm, and thus failed to prove, beyond a reasonable doubt, his guilt as to first-degree felony murder based on the underlying felony of robbery with a firearm. Dkt. 1 at 40-48; Dkt. 11 at 9-12.

A.      **Clearly established federal law**

The Fourteenth Amendment's due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing the sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When applying the *Jackson* standard, a federal court first looks to State law to determine the essential elements of the crime. *Hawes v. Pacheco*, 7 F.4th 1252, 1264 (10th Cir. 2021). The federal court then "examine[s] whether the evidence suffices to establish each element." *Anderson-Bey v. Zavaras*, 641 F.3d 445, 448 (10th Cir. 2011). In doing so, the federal court, like the jury, may rely on circumstantial evidence. *See United States v. Hill*, 786 F.3d 1254, 1261 (10th Cir. 2015) (explaining that the government may rely on circumstantial evidence to meet its burden to prove guilt beyond a reasonable doubt and stating that "[c]ircumstantial evidence alone may permissibly support a jury's guilty verdict").

Notably, "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." [. . .] And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

*Id.* at 651 (internal citation omitted) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*)).

In assessing the objective reasonableness of a state court's decision under § 2254(d)(1), a federal court "ask[s] whether the [state court] correctly identified the governing legal principle from *Jackson* and reasonably applied it to the facts of [the petitioner's] case." *Hooks v. Workman*, 689 F.3d 1148, 1167 (10th Cir. 2012). Under § 2254(d)(2), "a factual finding may be unreasonable . . . only if the state court 'plainly misapprehended or misstated the record' and the 'misapprehension goes to a material factual issue that is central to the petitioner's claim.'" *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) (quoting *Menzies v. Powell*, 52 F.4th 1178, 1195 (10th Cir. 2022)), *cert. denied*, 144 S. Ct. 2634 (2024). A federal court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the federal court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (alteration added) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Further, and regardless of whether the federal court reviews a federal claim under § 2254(d)'s deferential standards or reviews that claim de novo, facts found by a state court are presumed correct absent clear and convincing evidence otherwise. 28 U.S.C. § 2254(e)(1); *Fontenot*, 4 F.4th at 1061.

### B.    Analysis and conclusion

Bethel challenged the sufficiency of the evidence on direct appeal, and the OCCA denied relief, stating:

> Any rational trier of fact could find beyond a reasonable doubt that there was a forceful taking and carrying away of personal property in this case and that [Petitioner] participated in the armed robbery during which the victim was killed. We find that the trial evidence was sufficient to sustain [Petitioner's] convictions for First Degree Murder and Robbery with a Firearm based on the evidence presented in this case. *See Logsdon v. State*, 2010 OK CR 7, ¶ 5, 231 P.3d 1156, 1161; *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204.

Dkt. 7-5 at 3.

Bethel contends the OCCA's decision is contrary to clearly established federal law, based

on an unreasonable application of *Jackson*, and based on an unreasonable determination of the facts presented in state court. Dkt. 1 at 41-48; Dkt. 11 at 9-12. Respondent contends that § 2254(d) bars relief because the OCCA reasonably applied *Jackson* to the facts of this case and reasonably determined the facts based on the evidence presented at trial. Dkt. 7 at 47-53. For two reasons, the Court finds Respondent's position more persuasive. First, because the OCCA identified *Jackson* as the clearly established federal law governing Bethel's claim, Bethel has not shown that the OCCA's decision is contrary to clearly established federal law under § 2254(d)(1). *See Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009) ("Because the OCCA applied the *Jackson* standard in deciding [the petitioner's] sufficiency claim on direct review, our task is limited by AEDPA to inquiring whether the OCCA's application of *Jackson* was unreasonable." (footnote omitted)); *see also Spuehler*, 709 P.2d at 203-04 (acknowledging that sufficiency of the evidence claims should be evaluated under *Jackson*).

Second, Bethel has not shown that the OCCA applied *Jackson* to the facts of the case in an objectively unreasonable manner, or that the OCCA based its decision on an unreasonable determination of the facts presented in state court. *Jackson* requires a reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. To obtain a conviction for felony murder, the State had to prove: (1) the death of a human, (2) the death occurred as result of an act or event which happened in the defendant's commission of a robbery with a firearm, and (3) the elements of robbery with a firearm which are (a) a wrongful (b) taking and (c) carrying away, (4) of personal property, (5) of another, (6) from the person of another, (7) by force or fear, (8) through the use of a firearm. Dkt. 8-9, O.R.

vol. 2, at 147.  Applying the *Jackson* standard, the OCCA determined that a rational jury could have found, beyond a reasonable doubt, that a robbery was committed, that Ivory was killed during the commission of the robbery, and that Bethel participated in the robbery.  The evidence presented at trial supports the objective reasonableness of the OCCA's conclusion.

As previously discussed, the jury heard and saw evidence establishing that two cars seemingly traveling together drove into the parking lot less than two minutes after Ivory parked his car; that at least three people exited a white Chevy Cobalt while the driver of the Cobalt remained in the car; that one person took Roberts's cell phone and wallet at gunpoint; that Ivory was shot multiple times; that cartridge casings found at the scene indicated the shooters used at least three guns, two different brands of .40 caliber pistols and one .45 caliber pistol; that the Smith & Wesson .40 caliber handgun found in Bethel's white Chevy Cobalt only hours after the robbery and shooting was one of the guns used in the shooting; and that a .45 caliber cartridge (unfired round) also was found in Bethel's car.  The jury was also instructed that "[a]ll persons concerned in the commission of a crime are regarded by the law as principals are equally guilty thereof," that "[a] person concerned in the commission of a crime as a principal is one who directly and actively commits the act(s) constituting the offense, or knowingly and with criminal intent aids and acts in the commission of the offense, or, whether present or not, advises and encourages the commission of the offense," that "[m]ere presence at the scene of a crime, without participation, does not make a person a principal to a crime," and that "[t]o aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense."  *Id.* at 155-56.

Viewing the evidence in the light most favorable to the State, the Court finds that a rational

33

juror, properly instructed on the law of aiding and abetting and the elements of felony murder based on the underlying felony of robbery with a firearm, could have found Bethel guilty, beyond a reasonable doubt, of first-degree felony murder based on the underlying felony of robbery with a firearm.  The Court thus finds that the OCCA's rejection of Bethel's *Jackson* claim is objectively reasonable, as a matter of law and a matter of fact, and denies the Petition as to claim three.

## III.    Claim four:  admission of unduly prejudicial opinion testimony

Bethel contends the State violated his Fourteenth Amendment right to due process because the trial court admitted unduly prejudicial law enforcement opinion testimony, through Detective White, that invaded the province of the jury.  Dkt. 1 at 48-54; Dkt. 11 at 13-15.

### A.    Clearly established federal law

Ordinarily, the admission of evidence at a state trial is governed by state law.  And whether evidence was improperly admitted under state rules of evidence "is no part of a federal court's habeas review of a state conviction."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lisenba v. California*, 314 U.S. 219, 228 (1941) (noting that federal habeas courts "do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence").  Habeas review of state evidentiary rulings is therefore limited to determining whether the admission of the challenged evidence "so infused the trial with unfairness as to deny due process of law."  *Lisenba*, 314 U.S. at 228.  And, when the state court has already passed on that due process question, a habeas petitioner must show that the state court had no reasonable basis to reject the due process claim.  *Richter*, 562 U.S. at 98.

### B.    Analysis and conclusion

Bethel raised a broader claim on direct appeal, asserting that Detective White's testimony

"clearly overstepped permissible bounds on numerous occasions." Dkt. 7-1 at 43. The OCCA

rejected this claim, stating:

> Bethel was not deprived of a fair trial by the admission of improper "law enforcement" opinion. Contrary to Bethel's claim, the case agent did not vouch for the integrity of the investigation and his testimony was not unnecessarily cumulative, speculative or more prejudicial than probative. *See Postelle v. State*, 2011 OK CR 30, ¶ 31, 267 P.3d 114, 131 (discussing balancing relevancy of evidence against its prejudicial effect). The case agent testified about his part in the investigation and the collection of evidence. He did not comment on the veracity of any witness or tell the jury what result to reach. This claim is denied.

Dkt. 7-5 at 7.

In this proceeding, Bethel appears to focus on Detective White's testimony regarding what

he perceived as "red flags" or inconsistencies in statements Bethel made during the videotaped

interview and audiotaped jail calls that were published to the jury. Dkt. 1 at 48-53; Dkt. 11 at 13-

15. Bethel contends the OCCA's decision that Detective White's opinion testimony did not invade

the jury's province to determine Bethel's credibility and did not deprive him of a fundamentally

fair trial is contrary to, and based on an unreasonable application of, clearly established federal

law. *Id.* Respondent contends that, to the extent Bethel asserts a federal constitutional claim, he

has not overcome the presumption of correctness that applies to the OCCA's factual determination

that Detective White "did not comment on the veracity of any witness or tell the jury what result

to reach." Dkt. 7 at 54-59.

The record does not necessarily support the reasonableness of the OCCA's factual

determination that White did not comment on the veracity of any witness. As Bethel contends,

Detective White testified about his view that Bethel made inconsistent statements and otherwise

commented on Bethel's credibility. *See*, *e.g.*, Dkt. 8-3 at 251-54 [822-25] (testifying that Bethel

inconsistently stated he could not remember anything from 8 p.m. on February 3 to the time of his

first arrest on February 4 but then stated he could remember specific moments in that time period; and testifying that Bethel's statements about not having a working phone and receiving a phone call from Myers were "raising flags" or "red flags" about Bethel's statements); Dkt. 8-4 at 22-23 [850-51] (testifying that Bethel's phone call to his father raised a "red flag[]" because Bethel told his father he was at the club after Bethel told detectives he was not); *id.* at 31 [859] (responding to the prosecutor's question about "red flags" regarding Bethel's call to his mother and testifying that Bethel "denied being at the club" when he spoke to his mother, was "telling one parent one thing and one the other and just . . . not telling the truth"). Contrary to Respondent's apparent position, § 2254(e)(1) does not preclude relief on claim four.

Nonetheless, this Court cannot say that the OCCA's ultimate decision—that the admission of Detective White's testimony did not deprive Bethel of a fair trial—is based on an unreasonable application of the federal due process standard. Because the federal due process standard provides a general rule of application, state courts have more leeway in applying that rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Considering the admission of Detective White's challenged testimony in light of the entire trial record, this Court finds that the admission of his testimony about inconsistencies and red flags in Bethel's statements did not "so infuse[] the trial with unfairness as to deny due process of law." *Lisenba*, 314 U.S. at 228. Though circumstantial, the weight of the evidence against Bethel was strong; trial counsel vigorously cross-examined the State's witnesses, including Detective White; and the jury was properly instructed on relevant law, including the legal principles that the "responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness" is left the jury, and that jurors "may consider the testimony of [expert] witnesses, and give it such weight and value as [they] think it

should have but need not "surrender [their] own judgment to that of any person testifying, based on that person's education, training or experience." Dkt. 8-9 at 131, 144. Defense counsel's thorough cross-examination of Detective White and these jury instructions mitigated any prejudicial effect of Detective White's testimony about "red flags" and inconsistencies in Bethel's statements.

Based on the foregoing, the OCCA's ultimate decision rejecting Bethel's due process claim is objectively reasonable. The Court thus finds that § 2254(d) bars relief and denies the Petition as to claim four.

## *CONCLUSION*

The Court concludes that 28 U.S.C. § 2254(d) bars relief as to the constitutional claims Bethel asserts in claims two, three, and four.[18] The Court therefore denies the Petition. The Court further concludes that reasonable jurists would not debate the Court's assessment of Bethel's constitutional claims. The Court therefore declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of David Louthan in place of Scott Crow as party respondent.

2. The Petition (Dkt. 1) is **denied**.

3. Bethel's request for an evidentiary hearing, as asserted in his Reply (Dkt. 11) is **denied**.

4. A certificate of appealability is **denied**.

---

[18] Because Bethel has not satisfied § 2254(d)'s preconditions to relief as to any of his constitutional claims, the Court denies his request for an evidentiary hearing. Dkt 11 at 15-16; *see Pinholster*, 563 U.S. at 181.

5.  A separate judgment shall be entered herewith.

**DATED** this 30th day of April 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE